IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RON BLOCKER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CASE NO.:  2:07cv.722 MHT-WC |
| | ) | |
| EQUITY GROUP EUFAULA | ) | |
| DIVISION, LLC, | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S NARRATIVE STATEMENT OF FACTS AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Equity Group Eufaula Division, LLC ("Equity Group"), and submits the following as Defendant's Narrative Statement of Facts and Memorandum of Law in Support of Its Motion for Summary Judgment.

### I.    STATEMENT OF THE CASE

#### A.  The Present Action

##### 1.  *Plaintiff's Initial Complaint Was Filed Against Wrong Employer*

Plaintiff (referred to herein as "Plaintiff" and "Blocker"), a former Equity Group employee, commenced this action on May 15, 2007 in the Circuit Court of Barbour County, Alabama against Charoen Pokphand (USA), Inc. ("CP").  (See stamped copy of Plaintiff's Complaint,  p. 1)    In his initial Complaint, Plaintiff alleged that CP (1) violated 29 U.S.C. § 201, et seq., commonly known as the Fair Labor Standards Act of 1938 ("FLSA"), by firing him in retaliation for his having complained about working overtime; and (2) fraudulently induced him into accepting a promotion from an hourly position to a salaried position.  (Complaint, p. 2 ¶10).  On June 11, 2007, CP filed a Motion to Dismiss on the grounds that Plaintiff's claims were barred by the applicable statutes of limitation.  (See Motion

to Dismiss p. 1 ¶ 2).  CP asserted that it had previously employed Plaintiff, but on March 12, 2004 it sold the facility in which it had employed Plaintiff to Equity Group, thereby effectively terminating his employment with CP on that date.  (Id).  Equity Group was not named as a defendant in the original Complaint, and Plaintiff did not include any fictitious parties as defendants.  (See Complaint p. 1).  CP argued in its Motion to Dismiss that based on the March 12, 2004 termination, all of Plaintiff's claims against CP were barred by the applicable statutes of limitation.  (Motion to Dismiss, p. 2 ¶ 3).  On July 9, 2007, Plaintiff filed a Motion for Leave to Amend Complaint to add Equity Group as a defendant.  On July 11, 2007 the trial court granted both Plaintiff's Motion for Leave to Amend Complaint and CP's Motion to dismiss, and dismissed Plaintiff's claims against CP with prejudice.  (See Circuit Court of Barbour County, Alabama's Order dated July 11, 2007).

### 2.    *Plaintiff's Amended Complaint Against Equity*

On July 12, 2007, Plaintiff filed his Amended Complaint, adding Equity Group as a defendant.  (See Amended Complaint p. 1 ¶ 2).  In Count One of his Amended Complaint, Plaintiff alleges Equity Group terminated his employment in retaliation for his having complained about working overtime, and avers that the termination violated the FLSA.  (Amended Complaint, p. 2 ¶ 9).  In Count Two of his Amended Complaint, Plaintiff alleges Equity Group fraudulently misrepresented to him that it was implementing a new "no-overtime" policy, that he would make more money as a salaried supervisor than as an hourly employee and that he would work no more than 45 hours per week.  (Amended Complaint, p. 3 ¶ 13).  Pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216 (b), Equity Group timely removed this action on August 10, 2007.

### 3.    *Plaintiff's Second Amended Complaint Against Equity*

On August 16, 2007, Equity filed a Motion for More Definite Statement since both Plaintiff's Complaint and Amended Complaint were ambiguous in that they allege an obviously incorrect date of

termination (May 17, 2007, instead of the correct date of May 15, 2005) and also lacked the requisite specificity. (Motion for More Definite Statement, p.1, ¶ 1).

On September 5, 2007, Plaintiff filed a Motion for Leave to Amend the Complaint to allege "a more definite statement." (Plaintiff's Motion for Leave to Amend Complaint, ¶ 2). On September 12, 2007, the Court granted Plaintiff's Motion for Leave to Amend the Complaint. Plaintiff's Second Amended Complaint alleges in Count One that Defendant terminated his employment on May 17, 2005 in retaliation for having complained about working overtime, thus violating the FLSA. (Second Amended Complaint, p. 2 , ¶ 9). In Count Two, Plaintiff alleges Reb Bludsworth and Greg Mills, who are Equity Group employees, fraudulently misrepresented to him that Equity Group was implementing a new "no-overtime" policy, that he would make more money as a salaried supervisor than as an hourly employee and that he would work no more than 45 hours per week. (Second Amended Complaint, p. 3, ¶ 13).

### 4. *Defendant's Answer to Plaintiff's Second Amended Complaint*

Equity Group timely filed an Answer to Plaintiff's Second Amended Complaint in which it denied the material allegations and asserted various affirmative defenses. In its Answer, Equity Group asserted Plaintiff's claims are barred by the applicable state of limitations and that it did not willfully violate the FLSA. (Answer to Second Amended Complaint, p. 4, Second Defense and Seventh Defense). In addition, Equity Group asserted that the Plaintiff was terminated for a legitimate, non-retaliatory reason. (Answer to Second Amended Complaint, p. 4, Sixth Defense). Finally, Equity Group denied that Plaintiff is entitled to any of the relief requested in his Second Amended Complaint. (Answer to Second Amended Complaint, p. 6, Fifteenth Defense).

Equity Group timely filed its motion for summary judgment with this Court on July 28, 2008 and submits this brief in support of its motion.

**B.    Applicable Summary Judgment Principles.**

Pursuant to Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). The moving party "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met, does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *See also Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 157, 90 S. Ct. 1598 (1970). Additionally, the movant can meet its burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence of some element of his case on which it bears the ultimate burden of proof. *Celotex* , 477 U.S. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' showing  that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The non-moving party may not merely rest on its pleadings. *Id*. A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 106 S. Ct. 2505 (1986). While reasonable doubts must be resolved in favor of the nonmoving party, "an inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982). The

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The Court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be a sufficient evidence on which the jury could reasonably find for the Plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communications, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).

## II.    NARRATIVE STATEMENT OF FACTS[1]

1.    Equity Group is a poultry processor that owns and operates a poultry processing facility in Barbour County, Alabama. (Plaintiff's Second Amended Complaint, ¶ ¶ 2,4; Answer to Second Amended Complaint, ¶ 2). Equity Group operates a fresh processing plant and a further processing plant, which is also called a cook plant. (Answer, ¶ 2).

2.    Prior to his employment with Equity Group, Plaintiff worked in the cook plant as a second shift maintenance supervisor for its prior owner, CP. (Plaintiff Dep. p. 36:7-15). While employed by CP in its cook plant, he averaged 80 hours per week. (Plaintiff Dep. p.37:7-9). CP closed the cook plant, and Plaintiff moved to the refrigeration department in the first processing plant. (Plaintiff Dep., pp. 37:11-16, 40:12-23, 41:1).

3.    Equity Group purchased the facility from CP in March, 2004. (Plaintiff Dep. p. 42:9-19). When the sale of the plant occurred, Plaintiff became an Equity Group employee and continued to work in the refrigeration department as an hourly maintenance employee, earning time and half for overtime work. (Plaintiff Dep. p. 42:22-23, 43:1, 9-23).

---

[1] For purposes of its motion for summary judgment, Equity Group will treat Plaintiff's allegations as undisputed fact, despite the fact that it vehemently denies Plaintiff's allegations. Assuming, arguendo, that the facts as Plaintiff portrays them are true, which they are not, Equity Group is still entitled to summary judgment as a matter of law on all claims asserted by the Plaintiff.

4.      Equity Group re-opened the cook plant, and Greg Mills, the plant manager at the time, and Reb Bludsworth, the maintenance manager, offered Plaintiff the salaried position of third shift maintenance supervisor, but he initially told them he was not interested and he wanted to stay in his refrigeration job (Mills Dep. p. 8:16-24; Bludsworth Dep. p. 17: 12-16;  Plaintiff Dep. p. 46:20-23, 47:1-4).  Plaintiff alleges Mills and Bludsworth represented to him, apparently in an effort to convince him to take the job, that (1) Equity Group had adopted a new policy pursuant to which it planned to eliminate overtime, (2) employees would only be working 40-45 hours per week, (3) he would be taking a cut in pay if he stayed in an hourly position,  (4) they were offering him a salaried position, and (5) the only way he could make "anywhere near" the money he had made before was to take the salaried supervisor's position. (Plaintiff Dep. p. 47:6-12, 20-23).   Regarding his hours, Bludsworth and Mills told him he would only need to work 40 hours per week, and if the plant was running well he could leave early.  (Plaintiff Dep. p. 54:16-18).

5.      Plaintiff decided to accept the offer, and in November, 2004 moved from his hourly position in the first processing plant to the salaried position of third shift maintenance supervisor in the cook plant. (Plaintiff Dep. p. 46:2-19, 54:5-6, 56:22-23, 57:1).  Plaintiff claims the only reason he took the salaried position was to avoid a cut in pay. (Plaintiff Dep. p. 52:22-23, 53:1-9).

6.      In his new position, Plaintiff supervised several hourly maintenance employees, including Ken Pelham, Alan Carpenter, Josh Bradford, Rex Faircloth and Darrell McCartha.  (Plaintiff Dep. p. 55:4-13, 19-20).  Equity Group had not run production in the cook plant since it purchased the facility, and was therefore in the process of re-opening the cook plant after it had been down for a period of time. (Plaintiff Dep.. p. 59:14-23, 60:1-5).

7.       During Plaintiff's first week in the new position, he worked 90 hours. (Plaintiff Dep. p. 60:9-11).  He estimates that during the first two-week pay period in the new position, beginning in

November, 2004, he worked a total of 170 hours. (Plaintiff Dep. p. 60:19-23, 61:1-2). In the next two week pay period, occurring during the second half of November, 2004, he worked at least 80 hours per week. (Plaintiff Dep. p. 63:13-16).

8.      This trend continued throughout the remainder of Plaintiff's employment, as he was required to be at the job seven days per week, and worked no less than 75-80 hours per week from November, 2004 until May, 2005. (Plaintiff Dep. p. 65:8-13).

9.      During his first month in the new position, Plaintiff complained to Bludsworth about his long hours, and Bludsworth told him to "hang in there for me, I need you" and that things would get better later as they trained additional personnel and got the machinery running well. (Plaintiff Dep. p. 66:5-18, 67:1-4). Beginning in December, 2004, Plaintiff began to believe he was being "done wrong" and began complaining about his hours. (Plaintiff Dep. p. 84:4-14). Plaintiff complained to Bludsworth "probably eight or ten times." (Plaintiff Dep. p. 70:22-23; 71:1-2). He also complained to Mills, whose response was similar to Bludsworth's. (Plaintiff Dep. p. 81:8-18).

10.     Kathy Gilmore is Equity Group's Assistant Human Resources Manager (Gilmore Dep., Page 12:18-24).    He also complained to her about the number of hours he was working. (Plaintiff Dep. p. 65:14-23, 66:1-7).

11.     On May 2, 2005, Blocker and two other supervisors were suspended for three days due to a lockout/tagout safety violation. (Plaintiff Dep. p. 72:9-14, 75:15-23, 76:6-8, Ex. 1).    As a result of this, Blocker complained to Gilmore that even though he was only suspended for three days, his pay had been cut pro rata based on a five-day work week, which he believed was an underpayment. (Plaintiff Dep. p. 76:9-22, 77:1-15).    In addition, at some point just after this complaint, he complained to her about the number of hours he was being required to work, and she

told him that Bludsworth was in charge of his scheduling and if he tells him he has to work, then he has to be there. (Plaintiff Dep. p. 88:8-22).

12.     At some point prior to May 16, 2005, Gilmore had been made aware of an email circulated to Equity Group regarding Jim Allen, a former maintenance employee, which detailed physical and mental abuse directed at Allen while he worked on third shift maintenance under Blocker. (Gilmore Dep. p. 29:25, 30:1-10, 31:6-17). In addition, Allen personally complained to Gilmore about he was being treated at work while under Blocker's supervision. (Gilmore Dep. p. 33:1-2, 32:24-25).

13.     On May 16, 2005, Ms. Gilmore received a phone call from Ken Pelham, a former maintenance employee under Ron Blocker's supervision, during which conversation Pelham told her that he also had suffered mental and physical abuse while working on the third shift maintenance crew, and that he wanted to make her aware of it.     (Gilmore Dep., pp. 28: 10-18,  29:22-24; Ken Pelham Aff., ¶¶ 2-3).   Pelham agreed to meet with Ms. Gilmore the next day to discuss what was happening on the third shift in maintenance.   (Pelham Aff., ¶ 3).

14.     Because of the prior complaints from Allen and the complaint from Pelham regarding the work environment on the third shift maintenance crew, Gilmore decided to investigate its supervisor, Blocker. (Gilmore Dep. pp. 28:10-15, 29:11-14, 22-25, 30:1-10).

15.     On May 17, 2005, Pelham and Gilmore met and Pelham told her the following about his first-hand work experience and personal observations at Equity Group:

- He had been terminated for attendance violations after almost 90 days on the job as the tool man for the third shift maintenance crew. The reason he missed so much work was because the way he was treated at work caused him to have high blood pressure.

- The job was stressful because many of the maintenance employees on the shift were young and hit him on the back at least three times and in the kidneys, which was very painful.

- He observed employees hitting each other on their hardhats with tools.

- The employees, specifically Alan Carpenter, John Bradford, Rex Faircloth and Kelvin Heath locked him in the tool cage, and threw bolts over the cage, hitting him in the head.

- Alan Carpenter hit him in the head with a box and it almost knocked him out.

- On one occasion, someone threw something that busted his lip.

- Blocker intimidated people and humiliated him by calling him "tool boy" and telling him to get in his cage.

- He saw one worker hit Jim Allen in the head with a wrench, knocking him to the ground.

- He saw Blocker and Rex Faircloth sleeping on the job.

- He saw Alan Carpenter slam the snack machine against the wall, and also saw Blocker trying to get chips out of the machine for free.

(Pelham Aff., ¶ 4; Gilmore Dep., Ex. 4, first page).

16.    As part of her investigation, Ms. Gilmore interviewed Glenda Merritt, who worked as the first shift quality assurance supervisor in the cook plant from September 7, 2004 until July 29, 2005.  (Merritt Aff., ¶ 2).   Merritt's hours were from 4:00 AM until 4:00 – 5:00 PM, and she typically arrived at work at 3:45 AM. (Id.)  When she would arrive at work in the morning, Blocker would still be on duty, and she regularly personally observed him in the workplace. (Id.).

17.    Gilmore advised Merritt that she was investigating employee complaints about Blocker and asked whether she had observed him in the workplace.  (Merritt Aff., ¶ 3).  During this interview, Merritt told Gilmore she had personally observed the following conduct by Blocker in the workplace at Equity Group:

- Sleeping at his desk and in the refrigeration office while he was supposed to have been working.  (On one morning she had to call to him three times to wake him up.)

- Humiliating employees by talking down to them in a demeaning manner in front of others, and displaying an arrogant attitude towards his co-workers.

- Intimidating his employees.

- Calling Ken Pelham "tool boy" and telling him to "stay in his cage."

(Id.; Gilmore Dep., Ex. 4, second page).

18.    In addition,  Merritt told  Gilmore about the following conduct she had observed on the part of the hourly maintenance workers under Blocker's supervision on the third shift maintenance crew:

- Horseplay and practical joking while on duty, such as taping Clay Corbins' tools together with duct tape and punching holes in his drink can so that when he drank it would drip on him.

- Hitting each other on their hard hats with wrenches.

- Pulling on each other and aggravating each other in general.

- Routine sleeping on the job on the part of Rex Faircloth.

(Merritt Aff., ¶ 4; Gilmore Dep., Ex. 4, second page).

19.    Merritt also told Gilmore during this meeting that Blocker was aware that Rex Faircloth, who worked under him as an hourly maintenance employee, routinely slept on the job, because Blocker and Merritt had both stood together and witnessed him sleeping.  (Merritt Aff., ¶ 5; Gilmore Dep., Ex. 4, second page).

20.    In addition, she told her that Blocker had complained about being disciplined because a worker failed to lock out and tag out a machine while it was being serviced earlier in that month, and further that she had told him that she had been suspended for the same incident and that they had deserved it. (Id.).

21.    Finally, Merritt told Gilmore that in her opinion Clay Corbin had quit his job there because of the way he was treated by Blocker, and that he had been a good worker but had just taken all he could.  (Id.).  This belief was based on numerous conversations with Clay Corbin wherein he complained about how Blocker and his hourly maintenance crew treated him in the workplace. (Id.).

22.    Gilmore also interviewed Alan Carpenter, who works for Equity Group an hourly employee on the third shift maintenance crew in the cook plant, and who was previously supervised by Blocker before Blocker's termination.  (Alan Carpenter Aff., ¶2; Gilmore Dep., Ex. 4, third page). In this interview, Gilmore specifically asked Carpenter about Blocker' supervision of employees. (Carpenter Aff., ¶3; Gilmore Dep., Ex. 4, third page). Carpenter told her he had personally observed the following conduct by hourly employees on the third shift maintenance crew in the cook plant, under Blocker's supervision:

- Tossing nuts and bolts into the tool cage.

- Locking Ken Pelham in the tool cage.

- Rex Faircloth sleeping on the job.

(Carpenter Aff., ¶¶ 3, 4; Gilmore Dep., Ex. 4, third page). In addition, he told her he had observed Blocker asleep at his desk while on the job. (Carpenter Aff., ¶¶ 3,4; Gilmore Dep., Ex. 4, third page).

23.    As part of her investigation Gilmore also personally interviewed Darrell McCartha, James Bragg, Josh Bradford, and Rex Faircloth, in addition to Carpenter, Merritt, and Pelham, and made notes from her interviews with all of the employees. (Gilmore Dep. pp. 28:1-9, 40:20-22, Ex. 4). During the interviews McCartha confirmed to Gilmore that Pelham was mistreated by the other employees on the shift, and that he was hit while working, and that Blocker belittled him in front of other employees, and Blocker slept on the job. (Gilmore Dep., Ex. 4, second page, lines 10-12,17,18,). McCartha also told Gilmore that he had seen the hourly employees hit Jim Allen on the head with a wrench and a hard hat. (Id., second page, lines 20-23). He also told her that Blocker reeked of alcohol on occasion, that there was a "big game" on the shift, and the shift was so bad he would have quit if he had not moved from third shift to first shift. (Id., second page, lines 5-8, 38). Bragg, Bradford, and Faircloth all confirmed that they hit each other on the hardhats, and Bradford told her that the shift is "rough" because of Blocker's lack of supervision over the employees, and that he constantly humiliated people. (Id., third page, line 38; fourth page, lines 9, 33-34; and fifth page, line 3).

24.    Thus, in her investigation Gilmore recorded numerous allegations of misconduct involving Blocker and people under his supervision. (Gilmore Dep. pp. 42:25, 43:1-14, Ex. 4). From her investigation Gilmore concluded that Blocker should have managed his employees so the misconduct her investigation revealed would not have occurred, and as a result she made a recommendation that Blocker be fired. (Gilmore Dep. pp. 44:1-21, 52:9-24). The facts revealed by her investigation, summarized in her notes attached as Exhibit 4 to her deposition, were the sole reason she made a recommendation that Blocker be terminated. (Gilmore Dep. p. 52:9-16, Ex. 4). As

a result of her investigation and recommendation, Blocker was suspended on May 17, 2005 for conduct unbecoming of a member of management and ultimately terminated effective May 17, 2005. (Gilmore Dep. pp. 52:9-16, 56:11-17, Ex. 5; Second Amended Complaint, ¶ 9).

## III.    ARGUMENT

### A.  Plaintiff's Only Surviving Claim Under the FLSA is for a Willful Violation of the FLSA; All Others Are Barred by the Statute of Limitations

Generally, claims alleging violations of the FLSA must be brought within two years of accrual, except that a cause of action alleging a willful violation may be commenced within three years of its accrual. 29 U.S.C. § 255(a). Blocker was terminated on May 17, 2005. He did not amend his complaint to add Equity as a defendant until July 12, 2007, more than two years after his termination, so claims under the FLSA for anything other than a willful violation are forever barred.

### B.  Equity Group's Termination of Blocker Did Not Violate the Anti-Retaliation Provisions of the FLSA and Does Not Constitute a Willful Violation of the FLSA

Pursuant to the FLSA, it is "unlawful for any person . . . to discharge . . . [an] employee because such employee has filed any complaint, or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).

#### 1.  *Applicability of McDonnell Douglas Analysis*

The Eleventh Circuit has held that in FLSA retaliation cases where the plaintiff presents no direct evidence of retaliation, circumstantial evidence may be evaluated under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Raspanti v. Four Amigos Travel, Inc*., 2008 WL 227590 (11th Cir. 2008). Under the *McDonnell Douglas* framework, a plaintiff must first demonstrate a prima facie case of retaliation. *Id*., see also *Wolf v. Coca-Cola*, 200 F.3d 1337, 1342-43 (11th Cir.2000). Once plaintiff has established a prima facie case, the employer may then articulate a legitimate,

13

nonretaliatory reason for the adverse action.  *Wolf*, 200 F.3d at 1343.   "This intermediate burden is 'exceedingly light.'"  *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (quoting *Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir.1994)*).   If the employer meets this burden of production, plaintiff may then establish that the proferred reason is pretextual.  *Wolf*, 200 F.3d at1343. In demonstrating causation, the plaintiff must prove that the adverse employment action would not have been taken "but for" the assertion of FLSA rights.  *Id*; see also *Reich v. Davis*, 50 F.3d 962, 965-66 (11th Cir.1995).  As will be shown, Blocker cannot meet his burden under the McDonnel-Douglas framework, and likewise can offer no evidence that he would not have been fired but for his complaints about his work hours.

### 2.  *Plaintiff's Prima Facie Case*

A claimant establishes a prima facie case under Section 215(a)(3) of the FLSA by proving the following three elements: "(1) she engaged in activity protected under the act; (2) she subsequently suffered adverse employment action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action."  *Wolf*, 200 F.3d at 1342-43.

Given the temporal proximity of Blocker's complaints to Ms. Gilmore on and after May 2, 2005 regarding his suspension pay and the number of hours he was working to his termination on May 17, 2005, and assuming, arguendo, that said complaint constitutes expression protected under the FLSA, then Blocker can make out prima facie case.   However, "[t]he establishment of a prima facie case does not in itself entitle a plaintiff to survive a motion for summary judgment."  *Grigsby v. Reynolds Metals Co.,* 821 F. 2d 590, 595 (11th Cir. 1987).   The burden merely shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions.

### 3. *Equity Group's Reason for Terminating Blocker is Legitimate, Non-retaliatory, and Not Pretextual and Therefore Did Not Violate the FLSA*

Equity Group terminated Blocker for conduct unbecoming a member of management after conducting a thorough investigation into employee complaints about the work conditions on the shift Blocker supervised.    This constitutes a legitimate, non-retaliatory reason for his discharge.  Blocker can offer no evidence to suggest that Equity's reason for his discharge, conduct unbecoming of a member of management, is pretextual.  To establish pretext, a plaintiff is required to prove that the employer's "proferred reason was not the true reason for the employment decision . . . either . . . by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation [was] unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (internal quotation marks omitted).   "Provided the proferred reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  *Chapman v. AI Transp.*, 229 F.3d 1012,1030 (11th Cir. 2000) (en banc). A plaintiff may establish pretext by undermining the credibility of the defendant's proferred explanations.  *Smith v. Alabama,* 252 F. Supp. 2d 1317; see also *Combs v. Plantation Patterns,* 106 F. 3d 1519, 1528 (11th Cir. 1997).  The plaintiff must prove his pretext argument by "a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]."  *Smith*; see also *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).  "Instead of relying on conclusory allegations of retaliation, the plaintiff must come forward with evidence demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could find them

unworthy of credence.'" *Smith* at 1335 quoting *Combs v. Plantation Patterns,* 106 F. 3d 1519, 1528 (11th Cir. 1997).

Equity Group terminated Ms. Gilmore conducted a thorough investigation prompted by complaints about work conditions on the shift he supervised. (Narrative Statement of Facts, ¶24). During her investigation, Ms. Gilmore interviewed and confirmed the allegations of mental and physical abuse of employees under Blocker's supervision by both Blocker and co-employees, sleeping on the job by Blocker and hourly employees under his supervision, and other managerial shortcomings which she meticulously recorded in notes made during the investigative interviews. (Gilmore Dep., p. 29:8-9, Ex. 4).

Although Blocker may dispute the allegations and the statements of the witnesses, it is undisputed that Ms. Gilmore received the complaint, interviewed witnesses who gave first-hand accounts that corroborated the complaints she had received about Blocker, apparently was satisfied that the information she learned from the witnesses was credible, and consequently effected his termination for conduct unbecoming of a member of management. It has long been held that federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Smith* at 1330 quoting *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F. 3d 1354, 1361 (11th Cir. 1999). Likewise, it is well established that the federal courts should not serve as "super-personnel department[s] that reexamine an entity's business decisions." *Id.* at 1330 quoting *Chapman v. AI Transport*, 229 F. 3d at 1030 (11th Cir. 2000) quoting *Elrod v. Sears, Roebuck & Co.,* 939 F. 2d 1466, 1470 (11th Cir. 1991).

Not only is Blocker unable to offer any evidence that calls into question Equity Group's stated reason for discharging him, he has adduced no evidence that Equity received similar complaints

regarding similarly situated supervisory employees who engaged in and permitted such misconduct within their departments or by employees under their supervision, and treated such supervisory employees differently. Blocker simply cannot establish pretext, and cannot carry his burden of proving that Equity Group violated the anti-retaliation provisions of the FLSA in terminating him.

### 4. *Equity Group Did Not Willfully Violate the FLSA in Terminating Blocker*

In this case, because he filed his civil action against Equity Group after the two-year statute of limitations for non-willful FLSA violations had run, Blocker must also prove that Equity Group willfully violated the FLSA in order to avail himself of its three-year statute of limitations and avoid dismissal of his claims. However, he has adduced not a shred of evidence in support of this claim that Equity Group willfully violated the FLSA in terminating Blocker.

In *McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988),* the Supreme Court defined willful violations of the FLSA as those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Reich v. Dep't of Conservation and Natural Res., State of Ala.*, 28 F.3d 1076 (11th Cir. 1994) (quoting *McLaughlin*, 486 U.S. at 133, 108 S.Ct. at 1681, 100 L.Ed.2d at 123.)

In the present case, it cannot be credibly argued that Equity Group either knew or showed a reckless disregard for the matter of whether the FLSA prohibited its termination of Blocker. To the contrary, the investigation that led to Blocker's termination was prompted by a complaint that an employee under his supervision had suffered mental and physical abuse. The investigation revealed that the employees over which Blocker had supervisory authority routinely engaged in misconduct, and that Blocker himself had numerous shortcomings as a supervisor. Ms. Gilmore, the decision maker, concluded that Blocker was due to be terminated for conduct unbecoming of a member of management, and he was in fact terminated for that reason. Blocker's termination simply had nothing

to do with the FLSA, and in fact, there is no evidence that Equity Group even negligently or inadvertently violated the FLSA, much less willfully. It simply cannot be said that Equity violated the FLSA, willfully or otherwise, in terminating Blocker, because Blocker's termination was for a legitimate, non-retaliatory reason.

**C.  Plaintiff's Common Law Fraud Claims are Barred by the Statute of Limitations**.

Fraud actions in Alabama are subject to a two-year limitations period. *Lott v. Tarver,* 741 So. 2d 394, 397 (Ala. 1999) ("An action alleging fraudulent misrepresentation is subject to a two-year statue of limitations. § 6-2-38(l), Ala.Code 1975."); *Boyce v. Cassese,* 941 So. 2d 932, 943 (Ala. 2006) (Plaintiffs' "claims of fraudulent misrepresentation and fraudulent suppression are subject to a two-year statute of limitations."); *Parsons Steel, Inc. v. Beasley,* 522 So. 2d 253 (Ala. 1998) ("The general statute of limitations for an action based on fraud or deceit, *Ala.Code* 1975, § 6-2-38, provides that any such action must be commenced within two years from the date of the fraud."). *Ala. Code* § 6-2-38(*l* ) (1993). However, that period does not begin to run for fraud actions under the so-called discovery rule until "discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." *Ala. Code* § 6-2-3 (1993); *See also Cordell v. Greene Finance of Georgetown, Georgia*, 953 F. Supp. 1391 (M.D. Ala. 1996).

The question of when the party discovered, or should have discovered, the fraud is a question for the jury in most circumstances. *Kelly v. Connecticut Mutual Life Ins. Co*., 628 So. 2d 454 (Ala. 1993). However, the question of when a plaintiff should have discovered a fraud may be decided as a matter of law in cases in which the plaintiff actually knew of facts that would have put a person on reasonable notice of the fraud. *Id.;* see also *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d 645 (Ala. 2001).  "'The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that

would put a reasonable person on notice of fraud.' *Hicks, supra*, 584 So. 2d at 463. Thus, it is the knowledge of such facts that would have alerted a reasonable person to the existence of a potential fraud, and not actual knowledge of the fraud itself, that determines whether the question of the tolling of the limitations period in a fraud case can be decided as a matter of law." *Lott*, 741 So. 2d at 397 (citations omitted).

In *Whaley v. Sony Magnetic Products, Inc. of America*, 894 F.Supp. 1517 (M.D. Ala. 1995), Judge Ira DeMent applied the so-called "discovery rule" to an allegation of fraud in the employee promotion context. In *Whaley*, the plaintiff sued his employer for age discrimination, fraud and other state law causes of action, some four years after he was denied a promotion. *Id*. at 1521. Plaintiff asserted that his supervisor's assurances that he would be promoted to the next supervisory opening in his department and the employer's subsequent failure to promote him to such a position when there was an opening constituted fraud. *Id*. at 1526. Relying on *Hicks*, *supra*, as well as *Tribble v. Provident Life and Acc. Ins. Co*., 534 So.2d 1096 (Ala. 1998) and *Gonzalez v. U-J Chevrolet*, 451 So.2d 244 (Ala. 1984), the Court held that plaintiff's claim for fraud was barred by the statute of limitations, because it was undisputed that plaintiff knew he had been rejected for the promotion some four years prior to filing his lawsuit. *Id*. at 1527.

In the present case, as in *Whaley*, the question of discovery of the alleged fraud may clearly be decided as a matter of law, because Blocker actually knew of facts that would have put a reasonable person on notice of the fraud. The basis of Blocker's fraud claim is his claim that Mills and Bludsworth, in offering him the salaried position, represented to him that Equity Group was implementing a new no-overtime policy, that he would make more money as a salaried supervisor than as an hourly worker, and that he would work no more than 45 hours per week. (Plaintiff's Second Amended Complaint, Par. 13. In support of this claim, Blocker testified that Bludsworth and

Mills told him he would take a big cut in pay if he stayed in his hourly position because of the overtime he would lose. (Plaintiff Dep. p. 46:20-23, p. 47:1-16). In addition, he says they told him he would be working "basically 40 hours per week if the plant was running well, and that his hours would be 10:00 PM to 6:00 AM. (Plaintiff Dep. p. 54:12-23). Blocker agreed to take the salaried supervisor position, because he made half of his money in overtime, and he believed would have suffered a substantial pay reduction had he remained in his hourly position. (Plaintiff Dep. p. 53:5-9).

However, after beginning work in the new position, Blocker learned immediately that his work hours would be far more than Bludsworth and Mills had represented. Blocker estimates that during his first week in the new position, which occurred in November, 2004, he worked "probably 90 hours." (Plaintiff Depo. p. 60:9-11; 61:1-2). Blocker was paid every two weeks, and during the first two week pay period in his new position, he worked "probably 170 hours." (Plaintiff Dep. p. 60: 12-23).

Within a month of taking the position, Blocker complained to Bludsworth about his hours, and Bludsworth told him to "hang in there, things would get better." (Plaintiff Dep. p. 66:3-23). However, according to Blocker's testimony the trend continued throughout the remainder of his employment with Equity, as he worked least 75-80 hours per week each week from November, 2004 until his termination on May 17, 2005. (Plaintiff Dep. p. 65:8-13).

In addition to discovering immediately after taking the new position that he would be working far more than he had been told, his testimony clearly shows that in December, 2004, he believed he had been wronged:

> "A.:     The first month I didn't complain because I said, you know, we're trying to build this thing up.
>      . . .
> "A:      But after that, I felt that I was being done wrong. That's when I started complaining.

> "Q.     In November or December?
>
> "A.     Yes.  Because they said, 'Oh, its normal for start-up.'  I said, 'Man, start-up's been over.  We've got people quitting because of the overtime.'"

(Plaintiff Dep. p. 84:4-14).

Clearly, as early as December, 2004, Blocker believed he had been misled, which is sufficient to put him on notice that he had been defrauded.  In addition, Blocker claims he suffered a cut in pay of approximately $6,000 to $7,000 per year.  (Plaintiff Dep. p. 52, l. 11-18).  Blocker, and any reasonable person, unquestionably would have realized that he would not be working a mere 40-45 hours per week in December, 2004 as evidenced by his own testimony in this case.  Thus, the statute of limitations began to run in December, 2004.  The statute of limitations therefore had run as of December, 2004, and consequently his fraud claims are barred because he did not bring this action against Equity Group until July 12, 2007.

In an apparent effort to circumvent the "discovery rule", Plaintiff alleges in Paragraph 16 of his Second Amended Complaint that he "did not learn until he spoke with counsel for Plaintiff in the fall of 2006, that the Defendant's conduct may have violated his federal rights and been fraudulent." (Second Amended Complaint, ¶ 16).  However, any argument based on this allegation falls short, because the inquiry is whether the plaintiff was on notice of facts that would have alerted a reasonable person to the existence of a potential fraud, and not actual knowledge of the fraud itself.  *Lott*, 741 So. 2d at 397.  As has been shown, Plaintiff admits to knowing facts that would have put a reasonable person on notice of fraud, which is all that is required to commence the running of the statute.  The fact that a party's lawyer later tells him that he may have an actionable fraud claim does not, and should not, operate to extend the date on which the statute of limitations begins to run pursuant to the case law.

In addition to Plaintiff's testimony regarding his discovery of the alleged fraud, Plaintiff failed to plead his claim in a manner sufficient to invoke the tolling provision of *Ala. Code* §6-2-3. In order for a plaintiff to avail himself of the "saving" or tolling provision set forth in *Ala. Code* § 6-2-3, his complaint must show the time and circumstances of the discovery of the alleged fraud. *Smith v. National Security Insurance Company*, 860 So.2d 343 (Ala. 2003); *Angell v. Shannon*, 455 So.2d 823 (Ala. 1984). Although Paragraph 16 of the Second Amended Complaint indicates he learned from his lawyer in the Fall of 2006 that Equity Group's conduct might have been fraudulent, it does not identify with the requisite specificity the facts that he learned from his lawyer that would enable himself to avail himself of the tolling provisions of *Ala. Code* §6-2-3.

## IV.    CONCLUSION

For the foregoing reasons, Equity Group's motion for summary judgment is due to be granted, and all of Plaintiff's claims against Equity Group are due to be dismissed with prejudice.

Respectfully submitted,

    /s/ *Joel P. Smith, Jr.*
Joel P. Smith, Jr.  ASB-0328-M46J
Attorney for Equity Group Eufaula Division, LLC

OF COUNSEL:

WILLIAMS, POTTHOFF, WILLIAMS
& SMITH, L.L.C.
Post Office Box 880
Eufaula, Alabama   36072-0880
Telephone:     (334) 687-5834
Facsimile:     (334) 687-5722

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel of record via electronic service on this 28th day of July, 2008:

Jerry Roberson, Esq.
ROBERSON & ROBERSON
Post Office Box 380487
Birmingham, Alabama  35238-0487

_/s/ Joel P. Smith, Jr._
OF COUNSEL