**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **RON BLOCKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.: 2:07cv.722 MHT-WC** |
| | ) |
| | ) |
| **EQUITY GROUP EUFAULA DIVISION, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

## <u>DEFENDANT'S EVIDENTIARY SUBMISSIONS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Defendant submits the following evidentiary submissions in support of its Motion for Summary Judgment filed contemporaneously herewith:

1. Excerpts from the Deposition of Ron Blocker with exhibits

2. Excerpts from the Deposition of Kathy Gilmore with exhibits

3. Excerpts from the Deposition of James Gregory Mills

4. Excerpts from the Deposition of Reb Bludsworth

5. Affidavit of Ken Pelham

6. Affidavit of Glenda Merritt

7. Affidavit of Alan Carpenter

　/s/ *Joel P. Smith, Jr.*　　　　　　　
Joel P. Smith, Jr.  ASB-0328-M46J
Attorneys for Defendant Equity Group Eufaula
Division, LLC

OF COUNSEL:

WILLIAMS, POTTHOFF, WILLIAMS
& SMITH, L.L.C.
Post Office Box 880
Eufaula, Alabama    36072-0880
Telephone:     (334) 687-5834
Facsimile:     (334) 687-5722

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that a copy of the foregoing has been served upon the following counsel

of record via electronic service on this 28th day of July, 2008:

  Jerry Roberson, Esq.
  ROBERSON & ROBERSON
  Post Office Box 380487
  Birmingham, Alabama  35238-0487


        */s/ Joel P. Smith, Jr.*
        Of Counsel



MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:07cv.722MHT-WC


RON BLOCKER,

        Plaintiff,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter



        DEPOSITION TESTIMONY OF

        RON BLOCKER


        * * * * * * * * * * * * * * * * * * * * * * * * *

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 36

1    A.    Uh-huh.

2    Q.    Okay.  So then you applied at the chicken

3    plant?

4    A.    Yes.

5    Q.    When was that?

6    A.    '88 or '89.  No.  I mean, '98 or '99.

7    Q.    All right.  We can check on that and see.

8    But it was Charoen Pokphand at the time?

9    A.    Right.

10    Q.    What kind of job did you get there?

11    A.    Maintenance supervisor over second shift.

12    Q.    And who did you report to?

13    A.    Philip Mauldin and Reb Bludsworth.

14    Q.    And what plant were you working in?

15    A.    The cook plant.

16    Q.    Okay.  Was Philip Mauldin the cook plant

17    manager?

18    A.    He was the maintenance superintendent of the

19    cook plant.

20    Q.    Okay.  And were you on hourly wage at that

21    time?

22    A.    Yes.

23    Q.    Okay.  What was your hourly wage to start

Page 37

1    with?

2    A.    I'm thinking I started around 12.50.  I'm

3    not sure of the exact number, but somewhere in

4    that area.  Then I moved up to about 14.75.

5    Q.    And this was with CP?

6    A.    Yes.

7    Q.    And how many hours a week were you working?

8    A.    Probably averaging 80 hours a week.

9    Somewhere -- it varied different times.  Sometimes

10   60 or 70.

11   Q.    Wasn't there a period of time when that

12   plant wasn't even running?

13   A.    When that plant shut down, the cook plant, I

14   was the last supervisor over there running it.

15   And then I moved into refrigeration at first

16   processing, on day shift.

17   Q.    All right.  Let's break it down to the cook

18   plant.

19        When you were working at the cook plant,

20   tell me what period of time that was.

21   A.    I probably worked three years at the cook

22   plant before it shut down, or maybe a little

23   longer.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 40

1    maintenance supervisor over second shift.

2    A.    I worked second, third -- during the time I

3    was there, I worked all three shifts at different

4    times.

5    Q.    Okay.  But the third shift's job was to do

6    maintenance on things that might have occurred

7    during the second shift; is that right?

8    A.    Yes.  During the first and second, if a belt

9    was worn or a gear was worn or a motor was giving

10   them any problems, third shift would change that

11   out.

12   Q.    Okay.  So did you leave the cook plant when

13   CP shut it down?

14   A.    Yes.

15   Q.    What happened with that?

16   A.    I was asked if I would take a job in

17   refrigeration.

18   Q.    Okay.  By whom?

19   A.    By Reb Bludsworth.

20   Q.    Okay.  And was that over in the processing

21   plant?

22   A.    Yes.

23   Q.    And did you take that job?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 41

1    A.    Yes.

2    Q.    What did that involve?

3    A.    Inspections and testing of equipment, and

4    sometimes I'd work on special projects during the

5    construction.

6    Q.    All right.  And what was your hourly rate?

7    Did it remain the same as it was when you came?

8    A.    Yes, sir.  14.75 or 14.72, something like

9    that.

10   Q.    Did you work overtime during that period of

11   time?

12   A.    Yes.

13   Q.    Did you ever complain about the overtime?

14   A.    Only when I got over 100 hours a week one

15   time.

16   Q.    Who did you complain to?

17   A.    Joe McCraney.

18   Q.    They paid you time and a half for all that

19   time?

20   A.    Yes.

21   Q.    How long did you work in refrigeration?

22   A.    Approximately a year.

23   Q.    All right.  And tell me what prompted you to

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 42

1    move out of refrigeration into your next job.

2    A.    I was told that the cook plant was starting

3    back up, they wanted me to be a supervisor, and

4    that Equity Group was going to cut out all

5    overtime.

6    Q.    Who owned the plant?  Well, let's get the

7    dates before we get into that.  When you left

8    refrigeration, tell me what --

9    A.    Equity Group owned it at that time.

10    Q.    So that would have been after March of '04?

11    A.    Yes.

12    Q.    Do you recall that they bought it in March

13    of 2004?

14    A.    I really don't recall the dates.

15    Q.    Well, do you disagree with that date?

16    A.    No.

17    Q.    Okay.  So March 2004, the Equity Group buys

18    the plant, correct?

19    A.    Uh-huh.

20            MR. ROBERSON:  Is that yes?

21    A.    Yes.

22    Q.    And they kept you on in your current job, in

23    the job you had at the time, right?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 43

1    A.    Yes.

2    Q.    And at the same wage?

3    A.    Yes.

4    Q.    Okay.  And how long, under Equity Group's

5    ownership, did you work in refrigeration?

6    A.    I don't remember exactly.

7    Q.    Did you work overtime during that period?

8    A.    Yes.

9    Q.    Okay.  So then you moved -- that wasn't a

10   maintenance job, or was it?

11   A.    It was maintenance.

12   Q.    It was maintenance?  It was maintenance in

13   the -- because you were under Reb?  Reb's a

14   maintenance supervisor, correct?

15   A.    Yeah.  But he was also over the

16   refrigeration and all.

17   Q.    Okay.  Were you a supervisor?

18   A.    No.

19   Q.    You just worked as a maintenance man?

20   A.    Yes.

21   Q.    And you made time and a half on your

22   overtime?

23   A.    Yes.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 46

1    plant.

2    Q.    And do you remember what time that was?  Was

3    that October of 2004 when you moved?  At some

4    point you went from hourly to salary?

5    A.    That would be October, yes.

6    Q.    And I think October 2004 is when that was,

7    correct?

8              MR. ROBERSON:  Your document shows it

9    to be November 1st.

10             MR. SMITH:  Okay.  I'm sorry.  So

11   November 1, 2004.

12             MR. ROBERSON:  I mean, your personnel

13   record.

14             MR. SMITH:  Right.  Okay.  I knew it

15   was in the fall of '04.

16   Q.    So November of '04, you think that's when

17   you went from hourly maintenance in refrigeration,

18   back over to the cook plant?

19   A.    Yes.

20   Q.    And tell me all the conversations you can

21   recall that led up to you changing positions.

22   A.    Greg Mills and Reb Bludsworth brought me

23   into Greg's office and told me they wanted me for

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 47

1    a supervisory position.

2    Q.    Okay.

3    A.    I told them I really wasn't interested, that

4    I would like to stay where I was.

5    Q.    Okay.

6    A.    They explained to me that Equity Group's new

7    policy was going to cut out all overtime, that

8    people were only going to get 40 to 45 hours a

9    week, and that I would be taking a great big cut

10   in pay because of the overtime I was going to

11   lose; and they were going to offer me a salary

12   position.

13   Q.    Who said they were cutting out the overtime?

14   A.    Greg Mills and Reb Bludsworth.

15   Q.    They both said that?

16   A.    Yes.

17   Q.    Did they say Equity Group for certain is

18   going to adopt this policy or that they were

19   trying to?  Tell me exactly what they said.

20   A.    The exact words Greg told me was that Equity

21   Group was going to cut out all overtime; the only

22   way I could make anywhere near the money I made

23   before was to take the supervisor's position.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 52

1    Q.    -- $47 a week for your health insurance?

2    A.    Yes.

3    Q.    And tell me what they told you, what they

4    offered you at that time, as far as going to the

5    cook plant.

6    A.    $48,000 a year.

7    Q.    Okay.

8    A.    They would pay my medical and dental.

9    Q.    Okay.

10   A.    And a 401(k) plan.

11   Q.    Okay.  How did the 48,000 -- just put the

12   benefits aside.  How did the 48,000 compare on to

13   what you made on an hourly basis?

14   A.    It was a cut in pay.

15   Q.    It was?

16   A.    Yes.

17   Q.    How much of a cut in pay was it?

18   A.    About 6- or $7,000 a year, approximately.

19   Q.    Okay.  Were you aware of that at the time?

20   I mean, when you were having that conversation,

21   you did that math in your head?

22   A.    Well, I had the conversation with them --

23   because I wouldn't have took the position.  I

Page 53

1    didn't want the position, except they were cutting

2    out overtime.  So my money would have dropped from

3    the 53-, or 54-, I made the year before, they

4    said, down to what I would make on 40 hours.

5         That's the only reason I took the salary

6    position, because I would have lost -- if they

7    went with the 40 hours week they told me, I

8    wouldn't make any overtime.  Half my money was

9    made on overtime.

10   Q.    Okay.  What else did they tell you about the

11   job, as far as what your benefits would be?  You

12   said they would pay medical, dental; and then how

13   much would they contribute to your 401(k)?

14   A.    I don't remember the percentage at this

15   time.

16   Q.    Were you participating in that 401(k) when

17   you were hourly?

18   A.    No.

19   Q.    Okay.  So you weren't putting any money in

20   your retirement with the company?

21   A.    No, sir.

22   Q.    And then once you -- tell me what else they

23   said in regards to that offer to go to the cook

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 54

1    plant.

2    A.    They just told me it would be a great job

3    for me, that they needed me, and that I had

4    managed that same place before.

5    Q.    Right.  And what was the exact position now?

6    A.    Third shift supervisor.

7    Q.    Would that be over maintenance?

8    A.    Yes.  Third shift maintenance supervisor.

9    Q.    Okay.  Did they tell you it was a job where

10   you wouldn't have to clock in?

11   A.    Yes.

12   Q.    Okay.  And is it a job where you could leave

13   if your work was done?  I mean, you didn't have to

14   meet 40 hours a week necessarily, as long as you

15   got your work done; is that right?

16   A.    They told me I needed to work basically 40

17   hours a week; that if everything was running good

18   and I wanted to leave early, I could.

19   Q.    And what were the hours approximately?  I

20   mean, when would you need to be there for work?

21   A.    Ten until six.

22   Q.    Ten to six?

23   A.    10 at night until 6 a.m.

Page 55

1    Q.    Okay.  And you started out, it looks like,

2    November 1 or so, of '04?

3    A.    Yes.

4    Q.    And who was under your supervision?

5    A.    Josh Bradford --

6    Q.    You may have told me that.

7    A.    No, that was a different list.

8    Q.    Okay.

9    A.    Alan Carpenter, Ken Pelham.  Did I mention

10   Josh Bradford already?

11   Q.    Yeah.

12   A.    Okay.  Darrell -- I done forgot Darrell's

13   last name.  McCartha.  Darrell McCartha.

14   Q.    These were all guys you recall being under

15   your supervision on maintenance?

16   A.    Yes.

17   Q.    And they were making hourly wages there;

18   they weren't on salary; is that correct?

19   A.    Yes, they were hourly wages.  And there was

20   Rex Faircloth.

21   Q.    Okay.  You've got some other people on here.

22   On your interrogatory answers, you mention a David

23   Griffin?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 56

1    A.    That was a supervisor.

2    Q.    He was a supervisor?  And what did he

3    supervise?

4    A.    I don't know his exact job title, but he

5    came in on new construction.

6    Q.    What does that mean?

7    A.    He came in when they were building the plant

8    and installing new fryers and stuff, to make sure

9    they worked okay.  I believe he's an engineer over

10   the new equipment that comes in.

11   Q.    Okay.  And then you mention a Randy

12   Ogletree?

13   A.    He was in maintenance at the first

14   processing.

15   Q.    Okay.  So when you got your first paycheck

16   -- well, let's talk about your first week on the

17   job, when you agreed to take it.

18        They offered it to you.  They didn't tell

19   you they were eliminating your old position,

20   correct, your job in refrigeration maintenance?

21   That was a bad way to ask that.

22        You had the option to either take or decline

23   the job in the cook plant, correct?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 57

1    A.    Yes.

2    Q.    Okay.  And so you agreed to take it.  Have

3    you told me everything that was said in that

4    conversation by Reb and Greg, where they offered

5    you the job in the cook plant?

6    A.    Yes.

7    Q.    And so you agreed to take it?

8    A.    Yes.  But I also came back within eight

9    hours, after talking to my wife, and she told me I

10   would be crazy to take it, because I would go back

11   to third shift, which she hated me working, when I

12   had a first shift job.

13         I went back to Greg Mills and declined it;

14   and he said, "I'm sorry; it's too late.  This is

15   your job now."

16   Q.    When was that?

17   A.    The same day it was offered to me and I

18   agreed to take it.

19   Q.    Well, how would it be the same day?  I mean,

20   if they offered it to you, and then --

21   A.    I called my wife, during my break at lunch,

22   and told her what I was offered.

23   Q.    All right.  So your wife got upset with you

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 59

1    Tell me about the first week of work over there.

2    Do you remember what day you started on?

3    A.    I don't remember the exact day.

4    Q.    All right.  Well, let's go through the first

5    week that you can recall working there.  Tell me

6    what you did and how long you worked.

7    A.    Came in a little bit early, probably 9:30.

8    Q.    Okay.

9    A.    We ran the lines until approximately 11:30,

10   when we quit running chicken.

11   Q.    What were y'all doing?

12   A.    Making chicken tenders/strips for

13   McDonald's.

14   Q.    And was this when the plant had just started

15   back up?

16   A.    Yes.

17   Q.    So they hadn't been running any production

18   in there since the Equity Group had bought it; is

19   that right?

20   A.    They had run some tests on days and stuff,

21   but not actual production on both shifts.

22   Q.    So they brought you back over there, and

23   they were in the process of cranking that plant

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 60

1    back up; is that right?

2    A.    Right.

3    Q.    And it had been down for some period of

4    time; is that right?

5    A.    Yes.

6    Q.    And they were cooking chicken nuggets?  No.

7    What were they cooking?  What did you tell me?

8    A.    At that time, we were cooking the nuggets.

9    Q.    All right.  So how many hours did you have

10   to work the first week?

11   A.    Shoot, probably 90 hours.

12   Q.    All right.  When you're on salary, do you

13   get paid once a week or --

14   A.    Every two weeks.

15   Q.    Okay.  So when you got your first paycheck,

16   it would be two weeks after that, I guess; is that

17   right?

18   A.    Yes.

19   Q.    And how many hours had you worked during

20   that two weeks, that you can recall?

21   A.    Probably 170 hours.

22   Q.    In a two-week period?

23   A.    Yes.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 61

1    Q.    And was that in November of 2004?

2    A.    Yes.

3    Q.    All right.  And you got your paycheck.  And

4    how much was your paycheck?

5    A.    I don't remember exactly.  Somewhere around

6    -- I don't remember exactly.  I think it was

7    $1500, something like that.  I don't remember

8    exactly.

9    Q.    And do you contend it would have been more

10   if you would have been hourly?

11   A.    Definitely.  My employees were taking home

12   more than me.

13   Q.    The people under your supervision were

14   taking home more?

15   A.    Yes.

16   Q.    Okay.  What about your health insurance and

17   dental and all that?  Was that free at that time?

18   I mean, was that provided as part of your

19   compensation?

20   A.    They were paying that.

21   Q.    So they did do that?

22   A.    Yes.

23   Q.    Do you know how much they were paying for

Page 63

1    they matched it.  I don't remember exactly.

2    Q.    Did you participate in that?

3    A.    Yes.

4    Q.    Do you remember how much?

5    A.    I put in very little.  I don't remember

6    exactly.

7    Q.    But whatever you put in, did they match?

8    A.    I don't remember exactly.

9    Q.    I mean, do you remember having a problem

10   with them not matching your 401(k)?

11   A.    I don't remember much about the 401(k), I

12   was so busy working.

13   Q.    Okay.  Let's go to the second half of

14   November 2004.  Tell me how many hours you think

15   you worked.

16   A.    At least 80 hours a week.

17   Q.    And you were not clocking in?

18   A.    The first couple of weeks I did, because it

19   was a force of habit to walk in and clock.

20   Q.    And that would have been in October?

21   A.    The first week or so of taking the

22   supervisor position, David Griffin jokingly asked

23   me if I was clocking in so they would keep up with

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 65

1    marital -- he was going through bankruptcy and a

2    divorce.  He was the first shift supervisor.  So

3    I, a lot of times, had to stay over and things.

4    Q.    Okay.  At any time during your tenure as the

5    third shift maintenance supervisor, did you work

6    less than 45 hours a week?

7    A.    Never worked less than 45.

8    Q.    What's the least amount of hours you worked

9    in a week during that time, from November of 2004

10   to May of 2005?

11   A.    Approximately 75 to 80 hours.

12   Q.    You never worked less than that?

13   A.    No.  I had to be there seven days a week.

14   Q.    Okay.  And tell me about any complaints you

15   made about the number of hours you were working.

16   Tell me who you complained to and when it was and

17   what was said.

18   A.    I complained to Reb Bludsworth, Greg Mills,

19   and Kathy Gilmore.

20   Q.    Okay.  And tell me when that -- if you

21   could, just tell me when you made those

22   complaints.

23   A.    It was probably after being the supervisor

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

1    for over three months.  I can't remember the exact

2    dates.

3    Q.    So you think you had been in there two or

4    three months before you started complaining?

5    A.    I complained a little bit to start with, but

6    not officially, you know.  I just said, "Hey, man,

7    this ain't what y'all promised."

8    Q.    Who did you tell that to?

9    A.    Reb Bludsworth.

10   Q.    How did he respond?

11   A.    He said, "Oh, man, come on, hang in there

12   for me.  I need you."

13   Q.    All right.  Anything else he said, that you

14   can remember?

15   A.    Just that things would get better later.

16   Q.    All right.  And so do you remember when

17   those first complaints to Reb were?

18   A.    The first month I was supervising.

19   Q.    And you call those unofficial complaints?

20   A.    Well, what I mean was I didn't go over his

21   head or anything complaining about it.  I believed

22   -- I tried to believe what the man told me, that

23   things would get better.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 67

1    What he would tell me was, "Give it another

2   couple weeks.  We'll get this machinery running

3   better, get people more trained, and things will

4   work out."  But it just never happened.

5   Q.    Well, I mean, you had started plants before,

6   hadn't you, in your career?

7   A.    Yes.

8   Q.    And you would agree that it takes time to

9   get things running right, doesn't it?

10  A.    Yes, sometimes.

11  Q.    And so is that the process they were going

12  through during that period of time?

13  A.    It wasn't just the plant being running.  The

14  plant could be running fine, and they would tell

15  me to stay over because the first shift supervisor

16  didn't show up; so I ended up pulling both shifts.

17        Then there was a ten-day period the man was

18  out.  The first supervisor was out because of a

19  knee operation, and I ended up pulling both

20  shifts.  I complained that it should have been

21  split between the two supervisors, to be fair.

22  Q.    Who did you complain to about that?

23  A.    Reb Bludsworth.

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 70

1    said, "Hey, all the complaining you did finally

2    worked for us; sorry it couldn't work for you.

3    They've now put in a policy where, if we work

4    over, we get a bonus."

5    Q.    And who told you that?

6    A.    Terrance Skinner.

7    Q.    And he was working in Camilla?

8    A.    No.  He was working in Eufaula.

9    Q.    Oh, okay.  I misunderstood.

10   A.    A supervisor in Eufaula called and told me

11   that, "Since you complained and all, they've

12   started giving us a bonus if we have to work on

13   the weekends."

14   Q.    When was that?

15   A.    Approximately a month after I was

16   terminated.

17         MR. ROBERSON:  We're going to call that

18   the Blocker Bonus.

19   Q.    All right.  And so tell me the next

20   complaint you made either to -- you made an

21   initial complaint to Reb.

22         How many times would you say you complained

23   to Reb during your employment there, as a salaried

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 71

1     supervisor?

2     A.     Probably eight or ten times.

3     Q.     Okay.  And what would his response be?

4     Would he have the same response for you every time

5     or did it change?

6     A.     He kept telling me that he needed me in

7     there because I knew more about the equipment;

8     they've already sent me to school on the

9     equipment; and if it was down or tore up, he

10     needed me there; that he had to keep his job, and

11     the only way he was going to keep his job was to

12     keep that plant running and keep down time down.

13     Q.     Okay.  When did they send you to school?

14     A.     Probably two months before I was terminated.

15     They sent me to school in Camilla and Albany.

16     Q.     All right.  How long were you -- were you at

17     the plant over there?

18     A.     We took a week's class over at that plant,

19     approximately a week.  We went to training over

20     there, and then we came and worked on the

21     equipment there at Baker Hill, with the teacher.

22     Q.     All right.  And so that was in, what, March

23     of 2005?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 72

1  A.    Approximately.  I couldn't tell you exact

2  dates.

3  Q.    Okay.  And so the complaint about your

4  overtime to Reb, where he talked about your

5  training, that would have to be at least after

6  March, right?

7  A.    I complained before then, yes.

8  Q.    How many times did you complain before then?

9  A.    I don't remember exactly.  Eight or ten

10  times to Reb.  But then I was suspended, with all

11  three supervisors on my shift:  the sanitation,

12  the QA, and myself.

13  Q.    What were you suspended for?

14  A.    They said improper lock out and tag out.

15  Q.    Did they train you on lock out and tag out?

16  A.    Yes.  But when I complained to Reb that I

17  wasn't actually at fault on this, he said that he

18  had to cover his job; and they suspended all three

19  supervisors.

20  Q.    Well, tell me what happened.  Go through

21  that for me.

22  A.    A person crawled into a machine that

23  shouldn't have, and there was chemicals and all in

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 75

1    Q.    Okay.

2    A.    It was a new piece of equipment, and we

3    weren't trained on the equipment to know how

4    everything worked.

5    Q.    So when was that one, in relation to the guy

6    crawling in the machine?  Was it before or after?

7    A.    It was during the same day, I believe.

8    Q.    What approximate month was that?

9    A.    You've got a document on that.

10   Q.    Yeah, I think I do.  Let's look at that.

11              (Defendant's Exhibit No. 1 was

12              marked for identification and a

13              copy of the same is attached

14              hereto.)

15   Q.    I've marked as Exhibit 1 a Corrective Action

16   Form dated May 2, 2005.

17        See if you remember seeing that and signing

18   that.

19   A.    Yes, I do.

20   Q.    Okay.  And this is what you testified about

21   earlier, when you were suspended along with the

22   sanitation supervisor and the QA supervisor?

23   A.    Right.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 76

1    Q.    So it wasn't just you?

2    A.    Right.

3    Q.    They got all the supervisory people on duty

4    at that time; is that what happened?

5    A.    Yes.

6    Q.    Y'all all got suspended?

7    A.    Yes.  But at this time, the QA supervisor --

8    all of us were suspended for three days.

9          And I went to Kathy Gilmore and said, "This

10   can't be correct.  I'm suspended for three days.

11   And you've cut my pay based on a five-day work

12   week.  But yet you want me to work the next four

13   days this week."

14   Q.    All right.  I'm not following that.

15   A.    Okay.  They told me my pay is based on 40

16   hours, Kathy Gilmore did.

17   Q.    When did she tell you that?

18   A.    When my check came out, after this

19   suspension.

20   Q.    So you were arguing they suspended you and

21   then sent you a reduced paycheck; and you went to

22   her to complain about that part of it?

23   A.    Yeah.  And my boss, Reb.  Because they're

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1   telling me they base my pay on 40 hours.  And they

2   suspend me for three days, so they take three

3   days' pay, 60 percent of my pay out; and then tell

4   me straight out that that's what they're doing,

5   but want me to work the next four days of that

6   week.  I said, "This isn't right.  How do you

7   expect me to work for two days' pay and work four

8   days?"

9   Q.   So you had a beef with them about how much

10  they were reducing your pay as a result of this

11  suspension?

12  A.   Yes, sir.  I told them that I had no problem

13  with working two days that week.  But you're

14  telling me to work four, and I'm not getting paid

15  for it.

16  Q.   Were the other people treated the same way,

17  or do you know?

18  A.   The sanitation director was also treated the

19  same way; but the QA was only working five days,

20  so it wasn't no big deal.  She got suspended for

21  three days, worked two days, and got two days'

22  pay.

23  Q.   Okay.  Who brought -- who counseled you on

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 81

1    I mean, tell me what the complaint you made to him

2    was.

3    A.    That I was tired.  I worked 80, 90 hours

4    week, and yet my pay is based on 40.  And if you

5    suspend me, you base my pay on 40.  You guaranteed

6    me when I took the job that I would only have to

7    work 40 to 45 hours a week.  And I'm exhausted.

8    Q.    Did you ever, prior to that time, May 2nd,

9    did you ever complain to Greg Mills about how many

10   hours you were working?

11   A.    Yes.

12   Q.    All right.  Tell me about those.

13   A.    He had came by and asked me how things were

14   going, and I told him I was working too many hours

15   for what was promised.

16   Q.    And what did he say to that?

17   A.    Oh, it will get better one day, don't you

18   worry; just stick it on in there; we need you.

19   Q.    All right.  Anything else he said?

20   A.    That was it.

21   Q.    All right.  And back to this May 2nd.  After

22   this May 2nd counseling, he just essentially sent

23   you back to Reb?

Page 84

1     I mean, it sounds like you went October to May;

2     that's seven months.  And they wanted you -- are

3     you talking about in May of --

4     A.    The first month I didn't complain because I

5     said, you know, we're trying to build this thing

6     up.

7     Q.    Right.

8     A.    But after that, I felt that I was being done

9     wrong.  That's when I started complaining.

10    Q.    In November or December?

11    A.    Yes.  Because they said, "Oh, it's normal

12    for start-up."  I said, "Man, start-up's been

13    over.  We've got people quitting because of the

14    overtime."

15    Q.    Tell me who quit because of the overtime.

16    A.    Michael Johnson quit because of the

17    overtime.

18    Q.    Was he under you?

19    A.    No.  That was before.

20    Q.    All right.  Who else?

21    A.    I really don't remember all the people that

22    quit.  I couldn't tell you the names right now.

23    Q.    Okay.  I know we're jumping around a little

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 88

1    to see Kathy Gilmore about this.  And I take it

2    you went to see her because you thought they had

3    taken too much out of your paycheck for the

4    suspension?

5    A.    It wasn't just that.  I thought that I

6    shouldn't have to stay over and work that many

7    hours.

8    Q.    All right.  Tell me what she said when you

9    went to see her.

10   A.    She told me Reb was in charge of scheduling,

11   and she would get a meeting with us.  Then we had

12   a meeting, and she said, "Well, Reb's in charge of

13   scheduling.  If he tells you to work, you've got

14   to be there."

15   Q.    Okay.  Anything else?

16   A.    That's all she said.

17   Q.    Who else was at that meeting?

18   A.    Just the three of us.

19   Q.    So she essentially told you, Reb's the boss;

20   if he says you've got to work, you've got to work?

21   I mean, is that kind of how that went?

22   A.    Yes.

23   Q.    What did you do after that, in the way of

# CORRECTIVE ACTION FORM

DATE 5 - 2 - 05

Ron F. Blockt.    maint.    Supervisor
EMPLOYEE NAME    DEPARTMENT    JOB TITLE

REASON FOR INTERVIEW:    ☐ Job Performance

☑ Other

Lock out and tag out Violation

**DEFENDANT'S EXHIBIT**

1- Blocker

EMPLOYEE STATEMENT

_Ron F. Block_
EMPLOYEE SIGNATURE

INTERVIEWER STATEMENT AND ACTION TAKEN

Employees is suspended for three days for failing to follow lock out and tag out Violation. If this occurs again, further disciplinary action will be taken including and up to termination.

_(signature)_    _(signature)_ 5/2/05
SUPERVISOR SIGNATURE    PERSONNEL MANAGER SIGNATURE

☐ Verbal Warning    ☑ Written Warning    ☐ 1 Day Suspension
☑ 3 Day Suspension    ☐ Termination    ☐ Counseling

BLUE: PERSONNEL    WHITE: SUPERVISOR    CANARY: EMPLOYEE

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


RON BLOCKER,

     Plaintiff,

vs.            CASE NO. 2:07cv722MHT-WC

EQUITY GROUP, EUFAULA DIVISION,

L.L.C.,

     Defendants.


     *     *     *     *     *     *     *     *


     The deposition of **KATHY GILMORE** was
taken before Cornelia J. Baker, Certified
Court Reporter, ACCR 290, as Commissioner,
on Friday, May 30, 2008, commencing at
approximately 9:09 a.m., in the law offices
of Williams, Potthoff, Williams & Smith,
L.L.C., 125 South Orange Avenue, Eufaula,
Alabama, pursuant to the stipulations set
forth herein.

12

```
 1                    A.   Yes, sir, in Eufaula.
 2                    Q.   Okay.  And any other marriages?
 3                    A.   That's it.
 4                    Q.   Okay.  Now, how long have you
 5      worked for -- I'm going to call where you're
 6      working now the chicken plant.
 7                    A.   Okay.  Seven years.
 8                    Q.   Seven years?
 9                    A.   Uh-huh (affirmative response).
10                    Q.   And when you first went to work
11      there, it was CP?
12                    A.   Yes, sir.
13                    Q.   And now it's Equity Group?
14                    A.   Uh-huh (affirmative response).
15                    Q.   When did you begin working,
16      2001?
17                    A.   March of 2001, yes, sir.
18                    Q.   Were you hired in at your
19      present position?
20                    A.   Yes, sir.
21                    Q.   And that's HR?
22                    A.   Uh-huh (affirmative response).
23                    Q.   Do you have a title?
24                    A.   Assistant HR Manager.
25                    Q.   Who's the HR Manager?
```

28

```
 1    as Exhibit 4 to your deposition.  Now, can
 2    you tell me what Exhibit 4 is?
 3                    (Whereupon Plaintiff's Exhibit
 4                     No. 4 was marked for
 5                     identification and attached
 6                     hereto.)
 7                    (Witness reviewed document.)
 8              A.   These are the notes that I took
 9    when I interviewed these employees.
10              Q.   I see.  Now, who asked you to
11    interview employees?
12              A.   I had received a couple of
13    complaints about treatment on the third-shift
14    maintenance, and I decided to do an
15    investigation.
16              Q.   Okay.  Who did you receive
17    complaints from?
18              A.   Ken Pelham.
19              Q.   After he was fired, he made a
20    complaint?
21              MR. SMITH:  Object to the form.
22              A.   I'm not sure whether it was
23    after he was fired or during his employment.
24              Q.   When did you begin your
25    investigation?
```

29

```
 1              A.   May 16th.

 2              Q.   2005?

 3              A.   Uh-huh (affirmative response).

 4    It's what it says here, yes, sir.

 5              Q.   Do you know when Mr. Pelham's

 6    last day was?

 7              A.   I don't.

 8              Q.   You probably could obtain that

 9    information, though, couldn't you?

10              A.   Yes, sir.

11              Q.   So it was your decision to

12    begin an investigation on Ron Blocker,

13    correct?

14              A.   Correct.

15              Q.   Did you have any discussions

16    with Mr. Bice before you began your

17    investigation?

18              A.   Probably.

19              Q.   You don't recall any?

20              A.   I don't.  But I usually do run

21    things by Jim before I do proceed.

22              Q.   Okay.  Well, in fact, did you

23    get a call from Ken Pelham on May 16th?

24              A.   Yes.

25              Q.   And is that what prompted you
```

1    to begin your investigation?

2              A.    Well, there were several issues

3    that had come up about this.  It was also an

4    e-mail circulated to the company from a Jim

5    Allen saying how he had been abused on third

6    shift.

7              Q.    Who is Jim Allen?

8              A.    He was a former employee.

9              Q.    In the maintenance department?

10             A.    Yes, sir.

11             Q.    And when did he work there?

12             A.    I don't recall right now.

13             Q.    Was there a maintenance

14   supervisor on the third shift before Ron

15   Blocker?

16             A.    I don't remember.  I don't

17   recall who it would be.

18             Q.    Well, was this a new position

19   that was being created, a maintenance

20   supervisor on the third shift, or did he

21   replace somebody?

22             A.    I don't recall.

23             Q.    Well, do you think there's

24   anybody out at Equity Group who might recall

25   or if there's some document you might look at

31

```
 1    to refresh your recollection?
 2              A.   Reb may know.  He's been the
 3    maintenance manager for quite a few years.
 4              Q.   Okay.  Well, we'll get to him
 5    in just a few minutes.
 6              So Jim Allen made a complaint.
 7    Was his complaint in writing?
 8              A.   From an e-mail, yes.
 9              Q.   Where's the e-mail?
10              A.   I don't have it.
11              Q.   What was his complaint?
12              A.   That he had been abused and
13    mistreated on the third shift, and . . .
14              Q.   Did he tell you what form this
15    abuse had taken place in, how he was abused?
16              A.   Well, he talked about being
17    struck.
18              Q.   Who struck him?
19              A.   I don't recall.
20              Q.   Anything else?
21              A.   No, sir.
22              Q.   Jim Allen, Ken Pelham, all
23    former employees.  Now, did Jim Allen ever
24    make a complaint while he was working out
25    there?
```

32

```
 1                A.   He did come to see me one time,

 2     yes.

 3                Q.   Okay.  When did he come?

 4                A.   Sometime that 2005.

 5                Q.   Well, you're an HR person,

 6     correct?

 7                A.   Correct.

 8                Q.   When somebody comes to see you,

 9     it's important, correct; they're coming to

10     HR?

11                A.   Yes, sir.

12                Q.   You're going to address their

13     needs, right?

14                A.   Yes, sir.

15                Q.   You're going to make a record

16     of their visit, right?

17                A.   Not necessarily.

18                Q.   Oh.  Well, did you make a

19     record of his visit with you in 2005?

20                A.   Not to my knowledge.

21                Q.   Okay.  How long did he stay in

22     your office?

23                A.   I don't recall.

24                Q.   What was the nature of his

25     complaint?
```

33

```
 1              A.   He just didn't think he was
 2     being treated right on third shift.
 3              Q.   Okay.  Well, how did you
 4     address that complaint?
 5              A.   I would have told Ron Blocker.
 6              Q.   You would have told him?  You
 7     would have come to see Ron?
 8              A.   I would call Ron to come see
 9     me.
10              Q.   Okay.  And did he?
11              A.   To my knowledge, yes.
12              Q.   You don't recall that
13     conversation, though, correct?
14              A.   Correct.
15              Q.   There's no writing that
16     reflects a conversation ever took place,
17     correct?
18              A.   Correct.
19              Q.   There's nothing in his
20     personnel file to indicate that James
21     Allen -- Jim Allen, ever complained and that
22     he was ever counseled about such a complaint,
23     is there?
24              A.   No, sir.
25              Q.   Okay.  Any other complaints,
```

40

1          Q.   Well, do y'all have forms out

2    there for witnesses to sign statements?

3          A.   No, sir.

4          Q.   Have you ever had an

5    investigation where you obtained signed

6    statements from witnesses?

7          A.   Yes, sir.

8          Q.   Under what circumstances do you

9    do that, ma'am?

10         A.   Depends on the situation.  If

11   something happens in the plant, a lot of the

12   supervisors will take statements and then

13   bring it to me.  And I'll complete the

14   investigation.

15         Q.   Okay.  Well, you didn't obtain

16   any witness statements before Mr. Blocker was

17   discharged, correct?

18              MR. SMITH:  Object to the form.

19         A.   No.

20         Q.   Why not?

21         A.   I interviewed everybody

22   personally.

23         Q.   Great.  Why didn't you obtain a

24   witness statement and get them to sign it and

25   acknowledge that that's what they were

42

```
 1                A.   I don't know.

 2                Q.   Never discussed it with you?

 3                A.   No, sir.

 4                Q.   You don't know the outcome of

 5     that investigation?

 6                A.   Not from Jim Bice, no.

 7                Q.   From any source?

 8                A.   No, sir.

 9                Q.   Was anybody disciplined as a

10     result of vandalism to a vending machine?

11                A.   Not that I can recall.

12                Q.   Was anybody disciplined besides

13     Ron Blocker?

14                MR. SMITH:   Object to the form.

15                A.   Disciplined when?

16                Q.   Well, you recall that Ron

17     Blocker was suspended and then fired,

18     correct?

19                A.   Yes, sir.

20                Q.   I call that discipline.  Was

21     anybody else disciplined besides Ron Blocker

22     as a result of the investigation into the

23     third shift?

24                A.   No, sir.

25                Q.   Well, you were made aware of
```

1    inappropriate behavior on the part of

2    numerous people under Blocker's supervision,

3    correct?

4         A.   Say that again.

5         Q.   There were allegations of

6    inappropriate conduct on the part of numerous

7    people, correct?

8         A.   Allegations of misconduct

9    from -- I'm sorry.  I'm kind of distracted.

10   Say again.

11        Q.   You recorded numerous

12   allegations of misconduct involving several

13   people, correct?

14        A.   Yes, sir.

15        Q.   Was anybody else disciplined

16   other than Ron Blocker?

17        A.   Not to my knowledge.

18        Q.   Why not?

19        A.   Because Ron was the manager

20   over that shift, and he was ultimately

21   responsible for his employees.

22        Q.   Well, if you had proof of

23   misconduct, why didn't you take some action,

24   ma'am?

25        A.   I did.

44

1    Q.    You fired Ron Blocker, but what

2    did you do to his crew?

3    A.    They weren't responsible for

4    their -- I mean, he was responsible for the

5    management of that shift.    He was held

6    accountable for his employees.    And we held

7    him accountable.

8    Q.    I see.    Ken Pelham named Alan

9    Carpenter, John Bradford, Rex Faircloth, and

10   Kelvin Heath.    He said they lock him in his

11   cage.    They throw bolts over the cage and hit

12   him in the head.    Alan hit him in the head,

13   and it almost knocked him out.    He said one

14   time someone threw something and busted his

15   lip.    Did you take any action in response to

16   those complaints?

17   A.    I did indeed.    I went to the

18   management and disciplined them, who were

19   ultimately in charge of that shift.    Ron

20   Blocker should have managed his employees on

21   that shift so that would not have happened.

22   Q.    Do you know how much money Ron

23   Blocker made in 2004?

24   A.    No, sir.

25   Q.    He made $60,000; were you aware

52

1          A.    The general manager.  At this

2     time, it's Tim Eslinger [phonetic].

3          Q.    When did he take over?

4          A.    He's only been there four or

5     five months, maybe, two or three.

6          Q.    What happened to Mr. Jernigan?

7          A.    He went to Huntsville.  He is

8     the corporate HR manager now in Huntsville.

9          Q.    Is it fair to say that you made

10    your recommendation to terminate Mr. Blocker

11    on this Exhibit 4 based on your

12    investigation?

13         A.    Yes, sir.

14         Q.    Is that the only reason you

15    made that recommendation to terminate him?

16         A.    Yes, sir.

17         Q.    In other words, it wasn't

18    anything else that we haven't discussed?

19         A.    No, sir.

20         Q.    Okay.  Now, do you agree with

21    me that if Mr. Blocker engaged in the conduct

22    that's recorded here, that he would be guilty

23    of misconduct; do you agree with that?

24         A.    Yes, sir.

25         Q.    Okay.  Do you play any role

56

1    there are at Equity Group, approximately?

2         A.   Approximately, 1,600.

3         Q.   And Equity Group's right here

4    in Barbour County; their plant's in Barbour

5    County, right?

6         A.   Yes, sir.  That does include

7    the feed mill and hatchery.

8         Q.   And Mr. Blocker was fired on

9    May 17th, correct?

10        A.   Correct.

11        Q.   And did y'all tell him anything

12   about why he was fired?  I'm talking about

13   did you have any discussions with Mr. Blocker

14   about the reason for his termination?

15        A.   As far as I can recall, it was

16   misconduct unbecoming of a member of

17   management.

18        Q.   Okay.  You have never told him

19   he was fired for his complaints of not being

20   paid overtime or being tricked into taking a

21   salaried position, correct?

22        A.   No, sir.

23        Q.   And it's your position that he

24   should have no reason to believe that,

25   correct?



On Monday, May 16, 2005, Kenneth Pelham called and said that he needed to tell me what was happening on 3rd shift in maintenance. He said that he was hired as the 3rd shift tool man and that he had "a lot of problems". He said that he got fired and "took a lot of abuse, mentally and physically". He started telling me about how the boys hit him in his back and on his head. I made an appointment with him for the following day Tuesday, May 17, 2005, at 9:00 a.m.


INTERVIEW WITH KEN PELHAM

Ken said that had been working almost 90 days and he got fired because he missed days because of his attendance. Ken said it was because of his blood pressure dealing with the situation at work. He said that there were a lot of things going on that shift. He said that the guys that work on that shift are young and they have hit him on the back three times in his kidneys. He said that it hurts so bad sometimes that he has trouble moving. He said that they hit people in the head with tools when they have their hard hats on. He named Alan Carpenter, John Bradford, Rex Faircloth and Kelvin Heath. He said that they lock him up in the cage. They throw bolts over into the cage and hit in the head. Alan hit him with a box in the head and it almost knocked him out. He said that someone threw something one time and busted his lip.

Ken said that Ron humiliates him by calling in "tool boy" and tells him to "go get in your cage". He says stuff like this in front of people and it is embarrassing. He says that Ron intimidates people. He saw one of the guys hit Jim Allen in the head with the wrench and he went down on the ground. He mentioned Darrell McCartha and Glenda Merritt knowing this activity is going on. He says that Ron sleeps in his office. He has also seen Rex Faircloth asleep.

In regards to the money machine being vandalized, he said that all of them (the maintenance folks) were on break and he saw Alan Carpenter put $5.00 in the machine. When the machine did not give him change back, Alan shook the machine and slammed it up against the wall. He said that Ron and the whole maintenance crew was in the break room when this happened. He has seen Ron try to get free chips out of the vending machine. When the sign went up offering $500.00 for information to who did the damage, Ken jokingly stated that he could use $500.00. Ron told him that "$500.00 would probably benefit your family but it won't you". Ken is a little scared of Ron because he knows what he is "capable of".

Ken said that Alan Carpenter was the one who terminated him. He said that he kept trying to call Ron to find out about his being out and Alan got and the phone and told him he didn't work here anymore. He said that he was on medication for his blood pressure but since all this stuff was going on 3rd shift; his blood pressure has been extremely high.

He said that when he came to the Company he had planned on making this place his "retirement place" but he says he cannot work under the conditions that are on that 3rd shift maintenance.

## INTERVIEW WITH DARRELL MCCARTHA

Darrell is now on 1st shift maintenance because of personal problems but he also said that because the 3rd shift maintenance was so bad he would've quit if he had to stay on that shift.

He said that it is a "big game" on that shift. There is a lot of playing. He says that everyone hits everyone on the hard hats with their tools. He says that when he first came to Ron's shift he thought the world of Ron. Now, however, he says that he had no respect for him at all. Darrell says that Ron will "stab you in the back" if you don't watch yourself. Darrell also said that he doesn't believe half of what Ron says. He has seen Ron asleep in his office. He has never seen Alan asleep.

Darrell has watched all the guys pick on Ken Pelham. He says that Ken used to ride to work with him and there were days that he had marks on him from things striking him while he worked in the cage. Ken got hit in the back a couple of times one night and he could tell that Ken was having trouble getting out of the vehicle. Darrell has heard Ron make comments belittling Ken in front of the guys. He tells him to "get back in your cage" and calls him the "tool boy". He said that the behavior with Ken got "out of hand."

Darrell says that he saw the guys hit Jim Allen on the head a couple of times— one with a wrench and another time with another hard hat. He said that Jim Allen quit because of his treatment. He says that Alan Carpenter does it and he has seen Rex Faircloth also hit people on the head. Darrell says that Ron doesn't control his guys and just "lets go on what lets go on".

Darrell said that a week ago when the man got burned, Ron was very upset that he got suspended. He questioned Darrell about why he didn't get suspended. In a group of people, he would make snide comments about "some people got special treatment" because of the incident.

Darrell said that he never saw Alan tear the machine down, but he did hear the guys tells Ron that "you got it" when Ron was shaking the machine to get out some chips. He says that he has seen Ron shake the machines and make the statement that he could "tear the machines apart." He said that when the sign was put up about the reward about the vending machine it was a big joke with all the guys. He said that Ken was playing around and told them that he could sure use $500.00. Ron made that "well the $500.00 won't do you any good but it would your family".

Ron had a couple of meetings with the guys and told them that if they felt that the horseplay was "too much" then he will stop it! Darrell also stated that Ron reeked of alcohol sometimes.

INTERVIEW WITH GLENDA MERRITT

Glenda has observed Ron asleep as his desk. She states that one morning she had to call him three times before he woke up. She says that there is a lot of horse playing on that shift. She has seen the guys pulling on and aggravating each other. She says that she has seen them duck tape Clay Corbin's tools together and she watch them punch holes in his drink cans so that when he drank it would go all over him.

Glenda says that they all walk around and hit each other in the hard hats with their wrenches. Ron humiliates his employees by talking down to them in a demeaning manner in front of others. He has an "arrogant attitude" towards everyone. Just a couple of weeks ago, Darrell McCartha wanted to transfer to another department and she had an opening in QA. Ron wasn't there so she went to Reb to ask him if it was O.K. Reb told her that it was O.K. She said that when Ron came back to work, he was not happy at all about Darrell wanting to transfer. She said that he would make snide, degrading comments to her in front of people.

She says that Ron feels like he should not have been suspended because of the safety violation a few weeks ago. She says he fusses about it and she tells him that she was suspended too and that they should have been suspended!

Glenda says that she has seen Rex sleeping—he sleeps all the time. Glenda says that Ron is aware that Rex sleeps. She believes that Clay quit because of Ron. Glenda says that Clay was a very good worker and he had just taken all he could. She says that he was real rough with Ken Pelham. Ron would tell him to "stay in his cage" and would call him "tool boy". Glenda says that he is very intimidating to people.

INTERVIEW WITH JAMES BRAGG

The biggest problem with Ron that James has is that when James comes in to work, they are late starting up because none of the equipment is ready to start up. He doesn't understand what they do at night so that when the plant is ready to start up, they aren't ready. When James leaves every evening, the Maintenance office is cleaned up with no chairs. When he gets in the office every morning, there are cigarettes and cigarette butts all over the floor and all the chairs are moved back into the office.

James feels that Rex is the most mistreated by Ron because Ron is always complaining about him. He has heard Ron threaten to fire Rex. He has also heard that Rex has taken pictures of Ron asleep on his digital camera. He has seen all of Ron's guys hitting on the hard hats with tools. He has also witnessed the guys hitting others in the groin with their hard hats. He has had to warn Josh Bradford and Alan Carpenter about not playing on his shift. He has told them that "we don't play like ya'll do". He said that when he told them this they kind of hung their heads and told him O.K. James has also seen Alan and Josh slap people on the back. James did see the guys hit Ken Pelham on the head with their wrenches.

When Jim Allen was here, he has seen Ron's guys pick on him. James said that Jim was actually scared to talk to anyone about the situation. Ken Pelham did call James the other day crying talking to him about how the guys are punching and beating on him. He has heard Ron make racial comments. James said that Marcus Young, a black male, worked here awhile back. James said Marcus was a sharp individual that presents himself to be very professional. Marcus was put on Ron's shift and quit work after being employed about three week. He called James and told him that he could not work with Ron because he was a racist and he didn't feel that he could work for him.

James has heard Ron constantly humiliate and intimidate his people. He says that Ron "doesn't have a clue as to how to talk to people".

INTERVIEW WITH ALAN CARPENTER

Alan says that everyone on that 3rd shift maintenance does play around. He says that they do hit each other on the hard hats with wrenches. Alan says that he did hit Ken Pelham on the back but he did "tap" him on the butt a few times. He says that they have locked people in the cage, but it was "just a joke". He says that they have tossed a few small nuts and bolts into the cage but to his knowledge has never hit anyone. Alan said that everyone on that shift, including Ken, played around.

Alan did say that he has seen Ron "dozing" in his office. He has also witnessed Rex being asleep.

About the vandalism of the change machine, Alan says that he did not tear up the machine. He says that when he went into the break room the machine was already on the floor and him and Josh Bradford picked it up. He said that it was beat up but he heard change in it so he got $5.00 worth of change out of the machine—he said that it still worked.

INTERVIEW WITH JOSH BRADFORD (a.k.a. Pork chop)

About the vandalism: Josh said that they walked into the break room and that the machine was on the floor and he helped Alan set it up. He said that he didn't see anyone put any money to get change into it. He said that it was so beat up that he didn't understand why anyone would want to try to get change out of it. He didn't see Alan try to get any money out of the machine because "he went to the bathroom" right after they set the machine back up.

Josh has never witnessed anyone sleeping. He says that 3rd shift is "rough" because nobody there to supervise. All of them do "tap" each other on the hard hats. He says that only times that they meet in the offices was when they had safety meetings.

Josh said that he knew that Ron had been suspended because it was his understanding that Ron had called Alan at home and told him

INTERVIEW WITH REX FAIRCLOTH

Rex admitted that he did sleep during the shift. He also stated that he has witnessed Ron asleep. He said that they "pick" on each other at night to make the night go quicker. He said that they do hit each other on their hard hats but not hard. He said that they really don't have any supervision because they all know what they need to do. He says that Ron doesn't intimidate him but he is a "pretty big fellow".

Rex said that he didn't see anyone tear up the machine in the break room. He said that he was the last one to leave the Shop when they were going to break so he was lagging behind the others. All he saw was Alan and Josh setting up the machine.

*Kathy Gilmore*

5-24-2005



KEYSTONE FOODS LLC
*Equity Group Eufaula Division*

Equity Group Eufaula Div. • 57 Melvin Clark Road
Eufaula, AL 36027 • (334) 687-7790 • Fax (334) 687-7779



PLAINTIFF'S
EXHIBIT
5
Gilmore

To:    Ron Blocker                    Date:  May 17, 2005

Re:    Conduct Unbecoming            From:  Reb Bludsworth
       Of Management

      You are being suspended for five (5) days for conduct unbecoming of a member of management of this company.  It has been reported that there has been numerous reports of physical and mental abuse and vandalism in areas that you are managing. There will be an investigation into these allegations.

      Your are to contact Human Resources on Tuesday, May 24, 2005, for the results of this investigation.

_____        5-17-05
Ron Blocker                                _____
                                           Date

_____
Reb Bludsworth

Equity Group
15

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    RON BLOCKER,

6         Plaintiff,

7    vs.              CASE NO. 2:07cv722MHT-WC

8    EQUITY GROUP, EUFAULA DIVISION,

9    L.L.C.,

10        Defendants.

11

12      *      *      *      *      *      *      *      *

13

14        The deposition of **JAMES GREGORY MILLS**

15    was taken before Cornelia J. Baker,

16    Certified Court Reporter, ACCR 290, as

17    Commissioner, on Friday, May 30, 2008,

18    commencing at approximately 12:21 p.m., in

19    the law offices of Williams, Potthoff,

20    Williams & Smith, L.L.C., 125 South Orange

21    Avenue, Eufaula, Alabama, pursuant to the

22    stipulations set forth herein.

23

24

25

BAKER & BAKER REPORTING AND VIDEO SERVICES, INC.
Certified Court Reporters and Certified Legal Video Specialists
334.262.3332 - 1.888.253.DEPS (3377)
www.baker-baker.com

8

```
1              Q.  And he recruited you from Wayne

2    Farms?

3              A.  Yes.

4              Q.  Was he a general manager at

5    Wayne Farms?

6              A.  Yes.

7              Q.  And you recruited Reb?

8              A.  Yes.

9              Q.  So when did Al get here?

10             A.  It was in 1999.  I don't know

11   what month, so . . .

12             Q.  All right.  And then shortly

13   after, you followed, and then shortly after,

14   Reb followed?

15             A.  Yes.

16             Q.  What position did you take here

17   at CP?

18             A.  Maintenance manager.

19             Q.  What's your position now?

20             A.  Operations manager.

21             Q.  When did you receive that

22   promotion, approximately?

23             A.  '04.  Latter part of '04, I

24   believe.

25             Q.  So after Equity Group took
```

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     RON BLOCKER,

6          Plaintiff,

7     vs.                CASE NO. 2:07cv722MHT-WC

8     EQUITY GROUP, EUFAULA DIVISION,

9     L.L.C.,

10         Defendants.

11

12       *      *      *      *      *      *      *      *

13

14         The deposition of **REB BLUDSWORTH** was

15    taken before Cornelia J. Baker, Certified

16    Court Reporter, ACCR 290, as Commissioner,

17    on Friday, May 30, 2008, commencing at

18    approximately 11:01 a.m., in the law offices

19    of Williams, Potthoff, Williams & Smith,

20    L.L.C., 125 South Orange Avenue, Eufaula,

21    Alabama, pursuant to the stipulations set

22    forth herein.

23

24

25

1          Q.   What made him the best
2     candidate?
3               A.   He had been filling in or
4     acting in that capacity as an hourly
5     employee.
6               Q.   Do you know who he filled in
7     for as the supervisor?
8               A.   I don't remember.   There
9     wasn't -- I don't think there was a salaried
10    supervisor in that slot prior to making Ron
11    salaried in that position.
12              Q.   Okay.   When Ron took over the
13    position, had y'all recently restarted the
14    cook plant; that is, was this a startup?
15              A.   Yes, sir, it was a startup.   I
16    believe that is correct.
17              Q.   And do you know how long y'all
18    hadn't been operating the cook plant?
19              A.   No.   I can't remember that
20    right off.
21              Q.   For those of us who aren't in
22    the chicken business, what is the cook plant?
23    Tell me what they do.
24              A.   That's where they take the raw
25    product, bread it, batter it, par fry it,

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **RON BLOCKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.: 2:07cv.722 MHT-WC** |
| | ) |
| | ) |
| **EQUITY GROUP EUFAULA DIVISION, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

### AFFIDAVIT OF KEN PELHAM

I, Ken Pelham, hereby depose, declare and affirm under penalties of perjury, and attest as follows:

1.     My name is Ken Pelham.  I am over the age of 19 years.  I am aware that this affidavit is being given in conjunction with the lawsuit styled *Ron Blocker v. Equity Group Eufaula Division, LLC,* Civil Action No. 2:07 CV -722 MHT pending in the United States District Court for the Middle District of Alabama.  I have personal knowledge of the facts contained herein and this affidavit is based on my personal knowledge.

2.     I previously worked for Equity Group Eufaula Division, LLC ("Equity Group") at its further processing/cook plant in Baker Hill, Alabama as an hourly employee in charge of the tools on the third shift maintenance crew.  I worked there from February 17, 2005 until May 13, 2005. Ron Blocker was my supervisor.

3.     After my employment with Equity Group ended, I telephoned Kathy Gilmore on May 16, 2005 and told her that I had experienced a lot of problems while working there, including

mental and physical abuse.  I told her that I wanted to tell her about what was happening on third shift in maintenance.  We agreed to meet the next day.

    4.      On May 17, 2005, I met with Ms. Gilmore, who was in Human Resources at Equity Group.   I told her the following about my first-hand work experience and personal observations at Equity Group during this meeting:

- I was terminated for attendance violations after almost 90 days on the job as the tool man for the third shift maintenance crew. The reason I missed so much work was because the way I was treated at work caused me to have high blood pressure.

- The job was stressful because many of the maintenance employees on the shift are young and hit me on the back at least three times and in the kidneys, which was very painful.

- I observed employees hitting each other on their hardhats with tools.

- The employees, specifically Alan Carpenter, John Bradford, Rex Faircloth and Kelvin Heath locked me in the tool cage, and threw bolts over the cage, hitting me in the head.

- Alan Carpenter hit me in the head with a box and it almost knocked me out.

- On one occasion, something threw something that busted my lip.

- Ron Blocker intimidates people and humiliated me by calling me "tool boy" and telling me to "get in my cage."

- I saw one worker hit Jim Allen in the head with a wrench, knocking him to the ground.

- I saw Ron Blocker and Rex Faircloth sleeping on the job.

- I saw Alan Carpenter slam the snack machine against the wall, and also saw Ron

  Blocker trying to get chips out of the machine for free.

Ken Pelham

SWORN to and subscribed before me this ___18th___ day of July, 2008.

NOTARY PUBLIC

My Commission Expires: 9-12-2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RON BLOCKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 2:07cv.722 MHT-WC |
| | ) |
| | ) |
| EQUITY GROUP EUFAULA DIVISION, LLC, | ) |
| | ) |
| Defendant. | ) |

**AFFIDAVIT OF GLENDA MERRITT**

I, Glenda Merritt, hereby depose, declare and affirm under penalties of perjury, and attest as follows:

1.    My name is Glenda Merritt.  I am over the age of 19 years.  I am aware that this affidavit is being given in conjunction with the lawsuit styled *Ron Blocker v. Equity Group Eufaula Division, LLC,* Civil Action No. 2:07 CV -722 MHT pending in the United States District Court for the Middle District of Alabama.  I have personal knowledge of the facts contained herein and this affidavit is based on my personal knowledge.

2.    I previously worked for Equity Group Eufaula Division, LLC ("Equity Group") at its further processing/cook plant in Baker Hill, Alabama. I am no longer employed there. I was the first shift quality assurance supervisor and was employed there in that position from September 7, 2004 until July 29, 2005, when I left to take another job.  My hours were from 4:00 AM until 4:00 – 5:00 PM.  I typically arrived at work at 3:45 AM.  When I would arrive at work in the morning,

Ron Blocker, who was the third shift maintenance supervisor in the same plant at that time, was still on duty and I regularly personally observed him in the workplace.

3.     As part of an investigation in May, 2005 Kathy Gilmore asked me whether I had observed Ron Blocker in the workplace. She explained to me that she was investigating employee complaints about Ron Blocker.   Prior to this conversation I had personally observed the following conduct by Ron Blocker while working at Equity Group as the third shift maintenance supervisor in the cook plant:

- Sleeping at his desk and in the refrigeration office while he was supposed to have been working.  On one morning I had to call to him three times to wake him up.

- Humiliating employees by talking down to them in a demeaning manner in front of others, and displaying an arrogant attitude towards his co-workers.

- Intimidating his employees.

- Calling Ken Pelham "tool boy" and telling him to "stay in his cage."

4.     In addition to the above described conduct I observed the following conduct on the part of the hourly maintenance workers under Ron Blocker's supervision on the third shift maintenance crew:

- Horseplay and practical joking while on duty, such as taping Clay Corbins' tools together with duct tape and punching holes in his drink can so that when he drank it would drip on him.

- Hitting each other on their hard hats with wrenches.

- Pulling on each other and aggravating each other in general.

- Routine sleeping on the part of Rex Faircloth.

5.      During my conversation in May, 2005 with Ms. Gilmore regarding Ron Blocker, I told her about all of the above incidents. I told her that Ron Blocker was aware that Rex Faircloth, who worked under Ron as an hourly maintenance employee, routinely slept on the job, because he and I had both stood there together and witnessed him sleeping. In addition, I told her that Ron had complained about being disciplined because a worker failed to lock out and tag out a machine while it was being serviced earlier in that month, and further that I told him that I had been suspended for the same incident and that we deserved it. Finally, I told her that in my opinion Clay Corbin had quit because of the way he was treated by Ron Blocker, and that he had been a good worker but had just taken all he could. This belief was based on numerous conversations with Clay Corbin wherein he complained about how Ron Blocker and his hourly maintenance crew treated him in the workplace.

_____
Glenda Merritt


SWORN to and subscribed before me this _____20th_____ day of June, 2008.


_____
NOTARY PUBLIC

My Commission Expires: __6/24/0__

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **RON BLOCKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.: 2:07cv.722 MHT-WC** |
| | ) |
| | ) |
| **EQUITY GROUP EUFAULA DIVISION, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

## AFFIDAVIT OF ALAN CARPENTER

I, Alan Carpenter, hereby depose, declare and affirm under penalties of perjury, and attest as follows:

1.      My name is Alan Carpenter.  I am over the age of 19 years.  I am aware that this affidavit is being given in conjunction with the lawsuit styled *Ron Blocker v. Equity Group Eufaula Division, LLC,* Civil Action No. 2:07 CV -722 MHT pending in the United States District Court for the Middle District of Alabama.  I have personal knowledge of the facts contained herein and this affidavit is based on my personal knowledge.

2.      I work for Equity Group Eufaula Division, LLC ("Equity Group") at its further processing/cook plant in Baker Hill, Alabama as an hourly employee on the third shift maintenance crew.   Ron Blocker was my supervisor when he was employed by Equity Group.

3.      As part of an investigation in May, 2005 Kathy Gilmore asked me about Ron Blocker' supervision of his employees.   Prior to this conversation I had personally observed the

following conduct by hourly employees under his supervision on the third shift maintenance crew in the Equity Group cook plant:

- Tossing nuts and bolts into the tool cage.

- Locking Ken Pelham in the tool cage.

- Rex Faircloth sleeping on the job.

In addition, I observed Ron Blocker asleep at his desk while on the job.

4.      During my conversation in May, 2005 with Ms. Gilmore regarding Ron Blocker, I told her about all of the above incidents and personal observations.

Alan Carpenter

SWORN to and subscribed before me this ___7th___ day of July, 2008.

NOTARY PUBLIC

My Commission Expires: 9-12-2011