**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RON BLOCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No.: 2:07cv722MHT-WC** |
| | ) | |
| **EQUITY GROUP EUFAULA** | ) | |
| **DIVISION, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

The Plaintiff's discharge by the Defendant Equity Group Eufaula Division violated the Fair Labor Standards Act (FLSA) and was fraudulent in nature. The plaintiff's discharge was in retaliation for his complaints under the FLSA.

**II.    PLAINTIFF'S STATEMENT OF FACTS**

1.    Equity Group is a poultry processor that owns and operates a poultry processing facility in Barbour County, Alabama. (Plaintiffs Second Amended Complaint, ¶¶2,4). Equity Group operates a fresh processing plant and a further processing plant, which is also called a cook plant. (Answer, ¶2).

2.    Prior to his employment with Equity Group, Plaintiff worked in the cook plant as a second shift maintenance supervisor for its prior owner, CP. (Plaintiff Dep., p. 36:7-15). While employed by CP in its cook plant, he averaged 80 hours per week. (Plaintiff Dep.,

p.37:7-9). CP closed the cook plant, and Plaintiff moved to the refrigeration department in the first processing plant. (Plaintiff Dep., pp. 37:11-16, 40:12-23, 41:1).

3.     Equity Group purchased the facility from CP in March, 2004. (Plaintiff Dep. p. 42:9-19). When the sale of the plant occurred, Plaintiff became an Equity Group employee and continued to work in the refrigeration department as an hourly maintenance employee, earning time and half for overtime work. (Plaintiff Dep. p. 42:22-23, 43:1, 9-23).

4.     Equity Group re-opened the cook plant, and Greg Mills, the plant manager at the time, and Reb Bludsworth, the maintenance manager, offered Plaintiff the salaried position of third shift maintenance supervisor, but he initially told them he was not interested and he wanted to stay in his refrigeration job. (Mills Dep., p. 8:16-24; Bludsworth Dep. p., 17:12-16; Plaintiff Dep., p. 46:20-23, 47:1-4). Plaintiff alleges Mills and Bludsworth represented to him, apparently in an effort to convince him to take the job, that (1) Equity Group had adopted a new policy pursuant to which it planned to eliminate overtime, (2) employees would only be working 40-45 hours per week, (3) he would be taking a cut in pay if he stayed in an hourly position, (4) they were offering him a salaried position, and (5) the only way he could make "anywhere near "the money he had made before was to take the salaried supervisor's position. (Plaintiff Dep., p. 47:6-12, 20-23). Regarding his hours, Bludsworth and Mills told him he would only need to work 40 hours per week, and if the plant was running well he could leave early. (Plaintiff Dep., p. 54:16-18).

5.     Plaintiff decided to accept the offer, and in November, 2004 moved from his

hourly position in the first processing plant to the salaried position of third shift maintenance supervisor in the cook plant. (Plaintiff Dep., pp. 46:2-19, 54:5-6, 56:22-23, 57:1). Plaintiff claims the only reason he took the salaried position was to avoid a cut in pay. (Plaintiff Dep., pp. 52:22-23, 53:1-9).

6.      In his new position, Plaintiff supervised several hourly maintenance employees, including Ken Pelham, Alan Carpenter, Josh Bradford, Rex Faircloth and Darrell McCartha. (Plaintiff Dep., pp. 55:4-13, 19-20). Equity Group had not run production in the cook plant since it purchased the facility, and was therefore in the process of re-opening the cook plant after it had been down for a period of time. (Plaintiff Dep., pp. 59:14-23, 60:1-5).

7.      During Plaintiff's first week in the new position, he worked 90 hours. (Plaintiff Dep., p. 60:9-11). He estimates that during the first two-week pay period in the new position, beginning in November, 2004, he worked a total of 170 hours. (Plaintiff Dep., pp. 60:19-23, 61:1-2). In the next two week pay period, occurring during the second half of November, 2004, he worked at least 80 hours per week. (Plaintiff Dep., p.63:13-16).

8.      This trend continued throughout the remainder of Plaintiffs employment, as he was required to be at the job seven days per week, and worked no less than 75-80 hours per week from November, 2004 until May, 2005. (Plaintiff Dep., p. 65:8-13).

9.      During his first month in the new position, Plaintiff complained to Bludsworth about his long hours, and Bludsworth told him to "hang in there for me, I need you" and that things would get better later as they trained additional personnel and got the machinery

running well. (Plaintiff Dep., pp. 66:5-18, 67:1-4). Beginning in December, 2004, Plaintiff began to believe he was being "done wrong" and began complaining about his hours. (Plaintiff Dep., pp. 84:4-14). Plaintiff complained to Bludsworth "probably eight or ten times." (Plaintiff Dep., pp. 70:22-23; 71:1-2). He also complained to Mills, whose response was similar to Bludsworth's. (Plaintiff Dep., p. 81:8-18).

10.    Kathy Gilmore is Equity Group's Assistant Human Resources Manager (Gilmore Dep., p. 12:18-24). He also complained to her about the number of hours he was working. (Plaintiff Dep., pp. 65:14-23, 66:1-7).

11.    On May 2, 2005, Blocker and two other supervisors were suspended for three days due to a lockout/tagout safety violation. (Plaintiff Dep., pp. 72:9-14, 75:15-23, 76:6-8, Pl's Ex. 5). As a result of this, Blocker complained to Gilmore that even though he was only suspended for three days, his pay had been cut pro rata based on a five-day work week, which he believed was an underpayment. (Plaintiff Dep., pp. 76:9-22, 77:1-15). In addition, at some point just after this complaint, he complained to her about the number of hours he was being required to work, and she told him that Bludsworth was in charge of his scheduling and if he tells him he has to work, then he has to be there. (Plaintiff Dep., p. 88:8-22).

12.    Kathy Gilmore is the Human Relations Assistant Manager. (Gilmore Dep., p. 12:18-24). Gilmore made the recommendation to terminate Ron Blocker. (Gilmore Dep., p. 14:24-15:15). This occurred on May 17, 2005, when Blocker had been the salaried supervisor for approximately six months. (Gilmore Dep., p. 15:10-12).

13.     Blocker was promoted to a salaried supervisor in the cook plant on November

1, 2004.  (Bludsworth Dep., p.14:3-18).   The Cook Plant was in a start-up mode.

(Bludsworth Dep., p. 17:12-18:22).  The Cook Plant actually cooks the chicken as two shifts

cook and the third shift performs maintenance on the machines.  (Bludsworth Dep., pp.

17:21-19:2).

14.     Bludsworth never had any complaint about Blocker until Gilmore came to him

in the middle of May 2005, shortly before Blocker was fired.  (Bludsworth Dep., p. 23:11-

15).

15.     Blocker had worked for years as an hourly employee and Bludsworth never

had any complaint on him. (Bludsworth Dep., pp. 24:14-25:1).  Bludsworth knows of nothing

to disqualify Blocker from working as an hourly employee, noting that he was a good

maintenance man.  (Bludsworth Dep., pp. 57:20-58:13).

16.     Blocker had previously worked as the Cook Plant Supervisor for CP, where

Blocker was a supervisor but was paid by the hour.  (Bludsworth Dep., p. 63:4-19).  When

Equity Group took over and restarted the Cook Plant, they wanted all of their supervisors to

be salaried.  (Bludsworth Dep., pp. 64:16-65:11).

17.     Bludsworth felt that Blocker was the most qualified maintenance employee to

become the supervisor. (Bludsworth Dep., pp. 16:16-17:11).

18.     Equity Group has a new overtime policy for supervisors.  (Gilmore Dep., p.

19:2-12).  This policy is contained in Exhibit 6.  The policy is alleged to be effective on May

9, 2005.  (Gilmore Dep., pp. 19:25-20:2; Pl's Ex. 6).  Blocker was discharged on May 17, 2005.  (Gilmore Dep., p. 21:3-6).  This new policy pays salaried supervisors if they work on Saturdays, additional pay over their normal salary.  (Gilmore Dep., p. 19:2-7; Pl's Ex. 6).

19.    Gilmore claims that she never had any complaints by any salaried employee concerning the number of hours they were required to work. (Gilmore Dep., p. 24:16-20).

20.    Gilmore began her investigation on May 16, 2005. (Gilmore Dep., pp. 28:24-29:4).  Gilmore admits that she received a call on that day from Ken Pelham, a former employee who Blocker had fired.   (Gilmore Dep., pp. 29:22-30:12).   She also claims she got an e-mail from Jim Allen, another former employee.  (Gilmore Dep., pp. 29:25-30:12).  Gilmore does not presently have this e-mail.  (Gilmore Dep., pp. 31:6-10).

21.    Gilmore also claims that Allen complained while he was employed, and claims that she told Blocker about Allen's complaint, (Gilmore Dep., p. 33:3-18), but she has no document reflecting this.   (Gilmore Dep., pp. 31:22-33:18).   Blocker denies ever receiving any notice of a complaint by Allen.  (Pl's Ex. 11, Declaration of Blocker).

22.    Gilmore claims that she made an investigation and talked to Blocker's crew and other witnesses regarding Blocker. (Gilmore Dep., p. 40:1-22).  Although she prepared a report, (Pl's Ex. 8),   Gilmore obtained no witness statements in the Blocker investigation. (Gilmore Dep., p. 40:1-22).  Gilmore claims "she didn't feel it was necessary".   (Gilmore Dep., p. 40:23-41:10).

23.    Interestingly, no other employee was disciplined other than Ron Blocker who

was fired. (Gilmore Dep., p. 42:9-24). Gilmore's alleged investigation revealed inappropriate conduct by many people, but only Blocker was disciplined. (Gilmore Dep., p. 42:25-43:25).

24.    Gilmore acknowledges that Blocker took a pay cut of over $12,000.00 to be a supervisor, but she knows of no reason why he would do so. (Gilmore Dep., p. 45:11-46:9). Gilmore, as an HR Representative, knows that hourly employees must be paid time and a half for overtime. (Gilmore Dep., p. 48:8-14). Gilmore claims Blocker never had any conversation with her regarding his pay or overtime. (Gilmore Dep., p. 48:21-24).

25.    Gilmore was the representative for Blocker's deposition and she disputes Blocker testimony that he had numerous conversations with her regarding overtime pay. (Gilmore Dep., pp. 49:7-50:9).

26.    Gilmore admits that Blocker filed for unemployment after his termination and that Equity Group had fired Blocker for misconduct, but that Equity Group did not oppose his application to unemployment benefits. (Gilmore Dep., pp. 52:20-54:15).

27.    Equity Group has approximately 1600 employees. Gilmore claims that Blocker had no reason to believe that he was fired for making complaints that he was not receiving overtime pay when he was working 80 or more hours per week. (Gilmore Dep., pp. 56:11-57:13). During the six to seven months Blocker worked as the Cook House Supervisor, there were no complaints other than by Pelham and Allen, two fired employees. (Gilmore Dep., pp. 57:24-58:5).

28.    Blocker began working for CP, the predecessor to Equity Group, in 1999. (Plaintiff Dep., p. 36:2-6). His employment began as a maintenance supervisor in what was then the Cook Plant. (Plaintiff Dep., p. 36:11-22). Although Blocker worked as a supervisor, he was paid by an hourly rate. (Plaintiff Dep., p. 36:11-22). Blocker worked in this capacity approximately 60-80 hours per week. (Plaintiff Dep., p. 37:7-10). He continued working for approximately three (3) years before the Cook Plant was shut down by CP. (Plaintiff Dep., pp. 37:11-38:5). After the Cook Plant shutdown, he began working as an hourly maintenance man working in refrigeration. (Plaintiff Dep., p. 40:15-43:11).

29.    Beginning in November 2004, Blocker was promoted to supervisor in the Cook Plant. (Plaintiff Dep., p. 46:2-19). The first time he was offered the supervisory position, he turned it down. (Plaintiff Dep., pp. 46:20- 47:4). Greg Mills and Reb Bludsworth, Blocker's supervisors, said that he should accept the salaried position as Equity Group was going to cut out all overtime, and he would only get to work 40-45 hours per week. (Plaintiff Dep., p. 47:3-48:19). Blocker then accepted a $48,000.00 annual salary plus he received additional health insurance benefits and a 401(k). (Plaintiff Dep., pp. 51:20-54:4). Blocker was told that if everything was running good on his shift, he would be able to leave early in his salaried position. (Plaintiff Dep., p. 54:12-18). Two hours after Blocker accepted the position, he spoke to his wife, and then tried to decline the supervisory position. (Plaintiff Dep., pp. 57:7-58:22). Blocker was told that he could no longer turn it down as he had previously accepted it. (Plaintiff Dep., pp. 57:7-58:22).

30.     For the first few months, the Cook Plant was in the process of start up, and there were numerous problems. (Plaintiff Dep., p. 59:14-65:3). Additionally, other supervisors had attendance problems and Blocker was required to fill in for them. (Plaintiff Dep., p. 64:8-67:21).

31.     Blocker complained about the overtime and the representations that had been made to get him to take the job to Bludsworth and Mills. (Plaintiff Dep., pp. 65:14-67:4). Blocker was assured that things would get better after the start up problems settled down and the shift became better trained. (Plaintiff Dep., pp. 66:10-68:15).

32.     Blocker also complained when he and all supervisors on the third shift were suspended three days because of a lockout problem. (Plaintiff Dep., pp. 72:8-76:19). Blocker claimed that it was unfair for him to be suspended for three days, take a 60% pay cut for that week, but that he be required to work four (4) days and only receive two days pay. (Plaintiff Dep., pp. 72:8- 76:15).

33.     Finally, Blocker made a complaint to Greg Mills and Kathy Gilmore on May 2, 2005. (Plaintiff Dep., pp. 79:20-81:18). Blocker told them that he was going to have to look for work elsewhere, because he could not keep working as many hours as they were requiring. (Plaintiff Dep., pp. 89:22-90:6). Blocker also advised them that he wanted to go back to his hourly job in refrigeration. (Plaintiff Dep., pp. 90:19-91:16). Gilmore later told him that he was being suspended pending her investigation. (Plaintiff Dep., pp. 121:1-123:16). Blocker was terminated a week later and Gilmore told him that they did not have

tell him why. (Plaintiff Dep., p. 125:11-22).

34.    Blocker sought unemployment benefits, which he received.  (Plaintiff Dep., p. 126:4-23).

35.    Blocker denies that he ever tried to get free chips from any machine.  (Plaintiff Dep., pp. 158:11-159:1).

36.    Blocker also denies that there was any more horseplay on his shift than on any of the other shifts. (Plaintiff Dep., p. 156:8-19).  Blocker admits that he called Pelham a "tool boy", but claims that Pelham referred to himself as a tool boy. (Plaintiff Dep., pp. 156:20-158:10).  Pelham is a white male. (Plaintiff Dep., pp. 157:14-158:10).  Blocker states that Pelham's accusations are all false.  (Plaintiff Dep., p. 156:12-19).

37.    For the year 2004, Blocker earned $59,000.00.  (Plaintiff Dep., pp. 165:8-167:10).  In the year 2005, Blocker was scheduled to make $48,000.00 annually.  (Plaintiff Dep., p. 167:2-4).

38.    Greg Mills was the operations manager with Equity Group.  (Mills Dep., p. 9:11-16).  No one ever complained to Mills about Blocker's performance before he made supervisor. (Mills Dep., p. 7:16-19).  Mills claims that he is likewise unaware of any no overtime policy. (Mills Dep., p. 12:2-18).  Mills denies having any discussion with Blocker about Equity Group forbidding overtime. (Mills Dep., p. 12:2-18).

39.    Mills does agree that it does not make sense for Blocker to take a $12,000.00 pay cut to in order to accept a management position. (Mills Dep., pp. 13:2-14:1).  Mills has

never seen any witness statement from anyone on Blocker's crew. (Mills Dep., p. 14:16-24).

Mills claims that Gilmore made the decision to fire Blocker. (Mills Dep., pp. 14:25-15:18).

Mills knows that the Equity Group handbook forbids retaliation. (Mills Dep., pp. 17:14-19:21). Mills knew at the time Blocker was fired that if a person complains about his hours, you cannot punish him for that. (Mills Dep., pp. 17:14-19:21). Mills cannot explain why Equity's policy of paying supervisors who work on Saturday did not come into effect until 14 months after the Equity Group purchase. (Mills Dep., pp. 20:13-22:15). Mills claims that Blocker is a competent maintenance man, and he does not know any reason why he could not work as an hourly maintenance man. (Mills Dep., pp. 26:9-27:22).

## III.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c):

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed, 2d 265, 106 S. Ct. 2548 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Id. At 323.

> If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the nonmovant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. See *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e). A dispute of material fact "is genuine... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S.

Ct. 2505 (1986).

In deciding a motion for summary judgment, the evidence presented by the non-movant, here the Plaintiff, must be believed and all justifiable inferences must be drawn in their favor. *Anderson*, 477 U.S. at 255. Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. *Scott v. Harris*, 127 S. Ct 1769, 1776 (2007). "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . . " *Graham v. State Farm Mutual Ins. Co.,* 193 F. 3d 1274, at 1282 (11th Cir. 1999). "If the record presents factual issues the court must not decide them; it must deny the motion and proceed to trial". *Herzog v,. Castle Rock Entertainment,* 193 F. 3d 1241, at 1246 (11th Cir. 1999).

## IV.    ARGUMENT

### A.    Blocker's Claims Are Timely

Generally, claims alleging violations of the FLSA must be brought within two years of accrual, except that a cause of action alleging a willful violation may be commenced within three years of its accrual. 29 U.S.C. § 255(a). Blocker was terminated on May 17, 2005. He initially sued CP, the predecessor to his current employer, within the two year statutory period, but did not amend his complaint to add Equity Group as a defendant until July 12, 2007, more than two years after his termination. All his supervisors remained the same with both CP and Equity Group. Thus, Equity Group was put on notice of his claims

within the two year statutory period.

The Fair Labor Standards Act is a remedial statute. In analogous situations courts have not applied a rigid test to determine what is timely but look to several factors including (1) the similarity of interest between the named party and the unnamed party; (2) whether the unnamed parties received adequate notice of the claims; (3) whether the unnamed party was prejudiced by its exclusion. (to determine whether claims are timely, see e.g. *Glus v. GC Murphy Co.*, 562 F. 2d 880, (888) (3rd Cir. 1977). Here the supervisors of the Equity Group were put on notice of Blocker's claims within the statutory period, and Equity Group is not prejudiced by his amendment after the statutory period. All the remedial goals of the FLSA are met and upheld by such ruling. Additionally, Blocker has made claims of a wilful violation which has a three year statute.

### B.    Blocker Has a Claim for Retaliation

Pursuant to the FLSA, it is "unlawful for any person . . . to discharge . . . [an] employee because such employee has filed any complaint, or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).

The Courts construing §215 (a)(3) have overwhelmingly held that the plain language of the FLSA retaliation provision does encompass informal complaints made to employers. See *EEOC v. White & Sons Enterprises*, 881 F.2d 1006 (11th Cir. 1989). This overwhelming majority view is based on the broad remedial purposes of the FLSA. Plainly, effective enforcement of the FLSA can only be expected if employees are free to approach officials

to air their grievances.  This is the end that the prohibition of § 215(a)(3) against discharges and other discriminatory practices was designed to serve.  There is no argument that the fear of economic retaliation might often operate to induce as the aggrieved employees accept substandard conditions, without such a holding.

### C.    Blocker's Claim is Based on Circumstantial Evidence

The Eleventh Circuit has held that in FLSA retaliation cases where the plaintiff presents no direct evidence of retaliation, circumstantial evidence may be evaluated under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).  *Raspand v. Four Amigos Travel, Inc.,* 2008 WL 227590 (11ʰ Cir. 2008). Under the *McDonnell Douglas* framework, a plaintiff must first demonstrate a prima facie case of retaliation. Id., see also Wolf *v. Coca-Cola,* 200 F.3d 1337, 1342-43 (11' Cir.2000). Once plaintiff has established a prima facie case, the employer may then articulate a legitimate, nonretaliatory reason for the adverse action. Wolf, 200 F.3d at 1343.  "This intermediate burden is 'exceedingly light'." *Holifield v. Reno,* 115 F.3d 1555, 1564 (11" Cir. 1997) (quoting *Turnes v. AmSouth Bank N.A.,* 36 F.3d 1057, 1061 (11th Cir.1994)). If the employer meets this burden of production, plaintiff may then establish that the proffered reason is pretextual. Wolf, 200 F.3d at1343. In demonstrating causation, the plaintiff must prove that the adverse employment action would not have been taken "but for" the assertion of FLSA rights. Id; see also *Reich v. Davis,* 50 F.3d 962, 96566 (1 I" Cir.1995). As will be shown, Blocker can meet his burden under the *McDonnel-Douglas*

framework.

**D.    Plaintiff's Prima Facie Case**

A claimant establishes a prima facie case under Section 215(a)(3) of the FLSA by proving the following three elements: "(1) he engaged in activity protected under the act; (2) he subsequently suffered adverse employment action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." Wolf, 200 F.3d at 1342-43.

Blocker has engaged in a protected activity.  Blocker has testified he complained to Gilmore on May 2, 2005.  (Plaintiff Dep., pp. 79:20-81:18).  When one compares the temporal proximity of Blocker's complaints to Gilmore on  May 2, 2005 regarding the number of hours he was working to his termination date of May 17, 2005, Blocker has demonstrated a close causal link of retaliation.  Blocker has demonstrated a strong prima facie case.

**E.    Blocker Has Demonstrated Overwhelming Evidence of Pretext**

Besides the close causal link given the timing of Blocker's complaint to his discharge, Blocker has also presented other overwhelming evidence of pretext.

Blocker was discharged allegedly because of misconduct.  Only Blocker complained about the hours he was working.  Blocker's crew worked the same amount of hours but made no complaints, as they were receiving overtime compensation.  In fact, Blocker's crew was guilty of far more serious misconduct than Blocker, if one believes Gilmore's allegations.

However, only Blocker was disciplined. (Gilmore Dep., p. 42:9-24).  Blocker was discharged and no one else was even reprimanded.  This is in spite of serious allegations of horseplay, sleeping on the job, and vandalizing vending machines of other crew members.  (Gilmore Dep., pp. 42:25-43:25; Pl's Ex. 8).  It makes no sense that Blocker would be the fall guy for his entire crew, unless one factors in to the equation that Blocker was the only one making a complaint.  That explains the difference in discipline.  The employer claims that he was fired because he was the supervisor, but Blocker asserts that he was fired because of his complaints.  This conflict presents a factual question that a jury must determine.

Additionally, if Blocker is guilty of what Gilmore claims, he would be guilty of misconduct for unemployment purposes.  This would disqualify him for receiving unemployment compensation.   However, Blocker filed for and indeed received unemployment compensation, and Equity Group did not challenge his ability to do so. (Gilmore Dep., pp. 52:20-54:15).  This failure on the part of Equity Group must be construed to be a negative inference as it is an admission against interest.

Blocker worked for numerous years as an hourly worker.  He only worked for approximately six to seven months as a supervisor.  Although there were some infrequent complaints by coworkers about Blocker prior to Blocker's May 2, 2005 complaint to Gilmore, no employee's complaint regarding Blocker was ever investigated until after Blocker's complaint of May 2, 2005 was made.  Thus a jury would be free to infer that Equity Group did not care about complaints against Blocker until he asserted his rights under

the FLSA. This view is supported by the failure of Equity Group to produce the e-mail in which it claims that James Allen complained about Blocker. (Gilmore Dep., p. 31:6-10). The timing makes this all to curious.

Additionally, Equity Group purchased this plant in March 2004. Supposedly, all Equity Group policies became effective on that date. However, Equity Group's policy of paying supervisors for working on Saturday was not effective in Eufaula until May 9, 2005 according to the document. (Pl's Ex. 6). In truth, Equity Group did not begin paying supervisors for Saturday work until after Blocker was discharged. It does seem odd that this new policy would only begin after Blocker's complaint and before his discharge. Blocker did not find out about the new policy until months after his discharge, when he spoke with a co-worker. Surely a jury is free to draw a negative inference from the totality of these circumstances. Clearly Blocker has come forward with evidence demonstrating `such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence."' *Combs v. Plantation Patterns,* 106 F. 3d 1519, 1528 (11" Cir. 1997). Under these facts, this Court should allow a jury to determine whether unlawful discriminatory animus motivates a challenged employment decision." *Smith* at 1330 quoting *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F. 3d 1354, 1361 (11[h] Cir. 1999).

Blocker asserts that his case is more in the nature of a mixed-motive case than a pretext case. As such, the fact-finder should be required to determine if his complaints were

a motivating factor in his termination, or if the Defendant would have made the same decision anyway.

### F.    Equity Group's Violation was Wilful

In *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128,108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Supreme Court defined willful violations of the FLSA as those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Reich v. Dep't of Conservation and Natural Res., State of Ala.,* 28 F.3d 1076 (11" Cir. 1994) (quoting *McLaughlin,* 486 U. S. at 133, 108 S.Ct. at 1681, 100 L.Ed.2d at 123.)

Equity Group had a written policy which forbid retaliation. The decision makers in Equity Group have acknowledged that they were aware, at the time of the Blocker's discharge that retaliation based on complaints of workers was illegal. (Mills Dep.,, pp. 17:14-19:21). If a jury believes that Blocker's complaints were a motivating factor in his discharge, under these circumstances Equity Group's discharge would be a wilful violation. As such, Blocker could recover this violation within a three statutory period. Additionally, every employee at Equity Group has testified that Blocker was a good maintenance man. (Mills Dep., pp. 26:9-27:22). All have testified that they never had any complaint regarding his performance as an hourly maintenance man. Blocker neither sought nor wanted to work as a salaried supervisor. Blocker, on May 2, 2005 asked to be returned to work as an hourly employee. (Plaintiff Dep., pp. 90:19-91:16). In spite of these facts, and in spite of the

allegations that Blocker was a poor supervisor but good maintenance man, Equity Group discharged Blocker rather than return him to an hourly employee. This is evidence that Equity Group set out to punish Blocker for his complaints, which is a wilful violation.

### G.    Plaintiff's Common Law Fraud Claims are not Barred by the Statute of Limitations

Fraud actions normally have a two year statute of limitations in Alabama. However, that period does not begin to run for fraud actions under the so-called discovery rule until "discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." *Ala. Code § 6-2-3 (1993); See also Cordell v. Greene Finance of Georgetown, Georgia,* 953 F. Supp. 1391 (ID. Ala. 1996). The question of when the party discovered, or should have discovered, the fraud is a question for the jury in most circumstances. *Kelly v. Connecticut Mutual Life Ins. Co.,* 628 So. 2d 454 (Ala. 1993). When a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute of limitation purposes is a question of fact to be submitted to and decided by a jury. *Jones v. Alfa*, 2008 -Al- R0617.002 (Ala. June 13, 2008) quoting *Leblang Motors, Ltd. v. Subura of America,* 7th Circuit 148 F.3d 680 (7th Cir. 1998).

The basis of Blocker's fraud claim is his claim that Mills and Bludsworth, in offering him the salaried position, represented to him that Equity Group was implementing a new no-overtime policy, that he would make more money as a salaried supervisor than as an hourly worker, and that he would work no more than 45 hours per week. (Plaintiffs Second Amended Complaint, Par. 13. In support of this claim, Blocker testified that Bludsworth and

Mills told him he that his income would be greatly reduced because of the no overtime policy. (Plaintiff Dep. p. 46:20-23, p. 47:1-16). In addition, he says they told him he would be working "basically 40 hours per week if the plant was running well, and that his hours would be 10:00 PM to 6:00 AM. (Plaintiff Dep. p. 54:12-23). Blocker agreed to take the salaried supervisor position, because he made half of his money in overtime, and he believed he would have suffered a substantial pay reduction had he remained in his hourly position. (Plaintiff Dep. p. 53:5-9). Within a month of taking the position, Blocker complained to Bludsworth about his hours, and Bludsworth told him to "hang in there, things would get better." (Plaintiff Dep. p. 66:3-23).

While it is true that Blocker worked more than 45 hours per week beginning in November, it is also true that the Cook Plant was in the start-up phase. One would expect to work more overtime while the Cook Plant was in the start-up phase. Additionally, there were other supervisors who had marital problems, injuries to their knees and attendance problems which required that Blocker work overtime to fill in for their absences. On each occasion of Blocker's complaints, he was reassured that things would get better in the future after the immediate problem was corrected. It is a for a jury to determine at what time Blocker's belief was no longer reasonable, if in fact it was not.

It seems odd that Equity Group can deny that they ever made any fraudulent statements, can deny that Blocker had any basis to claim that facts were misrepresented to him, (Gilmore Dep., pp. 56:11-57:13), and yet also in the same breath claim that a

reasonable person would have known that he was being defrauded before he filed his lawsuit. That seems highly inconsistent to say that there was no fraud and to claim that a reasonable person would have known that they had been defrauded.

Furthermore, Equity Group has suppressed the information needed by Blocker to determine that he had a claim. Blocker was never told why he was being discharged. No one ever explained what allegations of abuse were being leveled by him, nor what charges of vandalism were being made against him. Combine that fact with the fact that his crew members are alleged to have committed far more serious offenses than he did, yet none of them were disciplined, and you have an employer's articulated explanation for Blocker's discharge that is ripe with pretext but certainly does not give rise to knowledge of any events that would put Blocker on notice that he had a fraud claim surrounding his discharge.

## V.    CONCLUSION

There are clearly genuine issues of material facts that compel this result. Blocker has proved a prima facie case of fraud and violations of the Fair Labor Standards Act, and has supplied compelling evidence of pretext. The Defendant has asked this Court to weigh the evidence, and to make credibility decisions which are reserved for the jury. For all those reasons, defendant's summary judgment should be denied.

Plaintiff respectfully requests oral argument in this matter and asks this Court to set

a hearing date.

WHEREFORE, PREMISES CONSIDERED, Blocker respectfully requests that the

Defendant's Motion for Summary Judgment be denied and that he receive a jury trial on all

issues.

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238-0487
Phone Number:      205.981.3906
Fax Number: 205.981.3908
E-mail: jdratty@charter.net
            tlbaker@charter.net

OF COUNSEL:

Albert H. Adams, Jr., Esquire (ADA-058)
Law Office of Albert H. Adams, Jr., P.C.
520 South Eufaula Avenue, Suite E
Post Office Box 670
Eufaula, Alabama 36072
Telephone: 334-687-1326
Fax: 866-910-9989

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2008, I served a copy of the foregoing document upon counsel of record either through the CM/ECF system, via facsimile or by placing a copy of the same in the United States Mail, first class postage prepaid and addressed as follows:

Joel P. Smith, Jr.
WILLIAMS, POTTHOFF, WILLIAMS
& SMITH, L.L.C.
125 South Orange Avenue
Post Office Box 880
Eufaula, Alabama 36072
Telephone:    334-687-5834
Fax:          334-687-5722


s/Jerry Roberson
Jerry Roberson (ROB010)