**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RON BLOCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No.: 2:07cv722MHT-WC** |
| | ) | |
| **EQUITY GROUP EUFAULA** | ) | |
| **DIVISION, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S EVIDENTIARY MATERIALS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Ron Blocker and submits the following evidentiary

materials in Opposition to the Defendant's Motion for Summary Judgment:

Exhibit 1.    Deposition transcript of Ron Blocker

Exhibit 2.    Deposition transcript of Kathy Gilmore

Exhibit 3.    Deposition transcript of James Gregory Mills

Exhibit 4.    Deposition transcript of Reb Bludsworth

Exhibit 5.    Blocker - Corrective Action Form

Exhibit 6.    The Equity Group Saturday Pay Policy

Exhibit 7.    Equity Group Managers/Supervisors 6th and 7th Day Approval

Exhibit 8.    Gilmore Interview Notes dated 5/24/05

Exhibit 9.    Ron Blocker Conduct Unbecoming of Management dated 5/17/05

Exhibit 10.    Ron Blocker 2004 W-2 & Earnings Summary

Exhibit 11.    Declaration of Ron Blocker

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Telephone:    (205) 981-3906
Fax:             (205) 981-3908
E-mail: **jdratty@charter.net**
            **tlbaker@charter.net**

OF COUNSEL:

Albert H. Adams, Jr., Esquire (ADA-058)
Law Office of Albert H. Adams, Jr., P.C.
520 South Eufaula Avenue, Suite E
Post Office Box 670
Eufaula, Alabama 36072
Telephone: 334-687-1326
Fax: 866-910-9989

## CERTIFICATE OF SERVICE

I hereby certify that on the _15th  day of August, 2008, I served a copy of the foregoing document upon counsel of record either through the CM/ECF system, via facsimile or by placing a copy of the same in the United States Mail, first class postage prepaid and addressed as follows:

Joel P. Smith, Jr.
WILLIAMS, POTTHOFF, WILLIAMS
& SMITH, L.L.C.
125 South Orange Avenue
Post Office Box 880
Eufaula, Alabama 36072
Telephone:   334-687-5834
Fax:          334-687-5722

s/Jerry Roberson
Jerry Roberson (ROB010)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2             MIDDLE DISTRICT OF ALABAMA
3                  NORTHERN DIVISION
4
5    CASE NUMBER:  2:07cv.722MHT-WC
6
7    RON BLOCKER,
8         Plaintiff,
9    vs.
10   EQUITY GROUP EUFAULA
11   DIVISION, LLC,
12        Defendant.
13
14
15   BEFORE:
16   Cynthia M. Noakes, Commissioner
17   and Certified Court Reporter
18
19
20        DEPOSITION TESTIMONY OF
21            RON BLOCKER
22
23   ****************************
```

## Page 2

```
1         S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of RON BLOCKER may
6    be taken before Cynthia M. Noakes, Certified
7    Court Reporter, at the Law Offices of WILLIAMS,
8    POTTHOFF, WILLIAMS & SMITH, Eufaula, Alabama
9    36027, on the 9th day of May, 2008.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the signature to and the reading of the
12   deposition by the witness is waived, the
13   deposition to have the same force and effect as
14   if full compliance had been had with all laws and
15   rules of Court relating to the taking of
16   depositions.
17       IT IS FURTHER STIPULATED AND AGREED
18   that it shall not be necessary for any objections
19   to be made by counsel to any questions except as
20   to the form or leading questions, and that
21   counsel for the parties may make objections and
22   assign grounds at the time of the trial, or at
23   the time said deposition is offered in evidence,
```

## Page 3

```
1    or prior thereto.
2        IT IS FURTHER STIPULATED AND AGREED
3    that the notice of filing of the deposition by
4    the Court Reporter is waived.
5
6
7
8
9
10
11
12
13
14
15
16   ****************************************
17
18
19
20
21
22
23
```

## Page 4

```
1                    INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    MR. SMITH              6-165, 167-168
4    MR. ROBERSON                 165-167
5
6
7    EXHIBITS:
8    Defendant's Exhibit No. 1        75
9    Defendant's Exhibit No. 2        121
10   Defendant's Exhibit No. 3        131
11   Defendant's Exhibit No. 4        144
12   Defendant's Exhibit No. 5        155
13   Defendant's Exhibit No. 6        159
14   Defendant's Exhibit No. 7        160
15   Defendant's Exhibit No. 8        161
16   Defendant's Exhibit No. 9        162
17   Reporter's Certificate          169
18
19
20
21
22
23   *******************************************
```

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

Page 5

```
 1           APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       MR. JERRY D. ROBERSON
 5       ROBERSON & ROBERSON
 6       ATTORNEYS AT LAW
 7       3765 Kinross Drive
 8       Birmingham, Alabama  35238-0487
 9       (205) 981-3906
10
11   ON BEHALF OF THE DEFENDANT:
12       MR. JOEL P. SMITH, JR.
13       WILLIAMS, POTTHOFF,
14       WILLIAMS & SMITH, LLC
15       ATTORNEYS AT LAW
16       125 South Orange Avenue
17       Eufaula, Alabama 36027
18       (334) 687-5834
19
20   ALSO PRESENT:
21       Kathy Gilmore Davis, Equity Group
22       Human Resources Representative
23   *****************************************
```

Page 6

```
 1       I, CYNTHIA M. NOAKES, a Certified Court
 2   Reporter of Eufaula, Alabama, acting as
 3   Commissioner, certify that on this date, as
 4   provided by the Alabama Rules of Civil Procedure
 5   and the foregoing stipulation of counsel, there
 6   came before me at the Law Offices of WILLIAMS,
 7   POTTHOFF, WILLIAMS & SMITH, Eufaula, Alabama
 8   36027, beginning at 9 a.m., RON BLOCKER, witness
 9   in the above cause, for oral examination,
10   whereupon the following proceedings were had:
11
12       RON BLOCKER,
13   being first duly sworn, was examined and
14       testified as follows:
15
16       THE COURT REPORTER:  Usual
17   stipulations?
18   MR. ROBERSON:  (No response.)
19   MR. SMITH:  Uh-huh.
20
21       EXAMINATION
22   BY MR. SMITH:
23   Q.   Would you state your name, please.
```

Page 7

```
 1   A.   Ron Frank Blocker.
 2   Q.   All right.  And your address?
 3   A.   2578 Highway 431 North.
 4   Q.   How long have you been there?  That's
 5   Eufaula?
 6   A.   Yes, sir.  Probably eight, nine years.
 7   Q.   Okay.  Are you married?
 8   A.   Yes.
 9   Q.   What's your wife's name?
10   A.   Cindy Blocker.
11   Q.   Where does she work?
12   A.   Garden Gallery.
13   Q.   Before I go much further, we met a minute
14   ago.  I'm Joel Smith, and I'm the lawyer for
15   Equity Group, who you've sued in this case.
16       I'm going to be asking you questions, and
17   they're going to be, hopefully, straightforward.
18   If they're not straightforward and you don't
19   understand, just ask me to repeat them.  Okay?
20   A.   Okay.
21   Q.   Have you ever given one of these before?
22   A.   No.
23   Q.   Okay.  And the other thing is, if you need a
```

Page 8

```
 1   break, just let me know and we'll take a break.  I
 2   hope I'm not going to go too long, but you never
 3   know.  So anytime you need a break, just tell me.
 4       Where do you work now?
 5   A.   I'm unemployed at the present time.
 6   Q.   Okay.  Let's go back through your education
 7   and employment history.  Just go back, if you
 8   would, to high school, year of graduation and
 9   where you graduated.
10   A.   I went to the 11th grade at Dougherty High,
11   Albany, Georgia.
12   Q.   Okay.
13   A.   Then I went over here to Wallace Community
14   College and got my GED.
15   Q.   Okay.  What's your date of birth?
16   A.   5/17/60.
17   Q.   Okay.  So when did you get your GED? late
18   '70s?
19   A.   In the '80s.
20   Q.   All right.  Well, let's start with your
21   employment history, the first job you can
22   remember, and just give me -- you don't have to
23   give me exact dates, but just tell me the best you
```

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

| Page 9 | Page 11 |
|---|---|
| 1 can. | 1 Q. Do you remember what years you worked for |
| 2 A. I spent three or four years traveling around | 2 them? Sounds like you went three to four years |
| 3 doing electrical work. | 3 doing the electrical, and then six years of that; |
| 4 Q. Okay. Did you learn about that at Wallace? | 4 is that -- |
| 5 A. No, sir. I learned on job training. | 5 A. Right. |
| 6 Q. Okay. Who did you work for? | 6 Q. Does that help you remember what time frame |
| 7 A. Davis Electric. | 7 we're talking about here? |
| 8 Q. Where were they out of? | 8 A. I left there somewhere around '84, and came |
| 9 A. Greenville, South Carolina. | 9 to Eufaula. |
| 10 Q. Were you living up there? | 10 Q. You left Houma? |
| 11 A. No. They placed me in different jobs all | 11 A. I left Houma, I believe, in '84. |
| 12 over the country. I was wanting to travel. | 12 Q. Okay. Did you leave that job? |
| 13 Q. Okay. And were you doing apprentice-type | 13 A. Yes. |
| 14 work for them? | 14 Q. Why did you leave the job? |
| 15 A. Yes. | 15 A. It was a boomtown when I first got there, |
| 16 Q. And why did you leave that job? | 16 and it kind of up, the work; and they had lost a |
| 17 A. I went into the oil field. | 17 few fields. |
| 18 Q. Did you work on an oil rig? | 18 Q. So did they lay you off or terminate you, or |
| 19 A. I worked six years for Dimensional Oil Field | 19 did you leave voluntarily? |
| 20 Services, on oil rigs. | 20 A. I took a voluntary layoff. I requested it, |
| 21 Q. Where was that out of? | 21 while they were laying off. |
| 22 A. Houma, Louisiana. | 22 Q. Where is that company headquartered? Are |
| 23 Q. All right. Tell me what you did there. | 23 they still in business? |

| Page 10 | Page 12 |
|---|---|
| 1 A. I was a wire line operator. | 1 A. They're still in business, in Houma, |
| 2 Q. What does that mean? | 2 Louisiana. |
| 3 A. You run the wire. It's diesel equipment | 3 Q. Okay. Do they still go by the same name? |
| 4 with a big spool of wire, and you run the tools up | 4 A. I assume they do. |
| 5 and down the oil wells that put subsurface safety | 5 Q. Okay. After Dimensional Oil Field, who did |
| 6 valves in. And also you run a tool in that sets | 6 you work for? |
| 7 certain valves that inject air/gas, that pushes | 7 A. I went to work for Fish World for Tom Mann. |
| 8 the oil up. | 8 Q. Okay. Let me back up real quick. You got |
| 9 Q. How did you learn how to do all that? | 9 your GED at Wallace. Did you take any junior |
| 10 A. On-the-job training. | 10 college classes? |
| 11 Q. Did you work offshore? | 11 A. No, sir. |
| 12 A. Yes, sir. | 12 Q. Or any vocational? |
| 13 Q. And did you live in Louisiana or did you | 13 A. No, sir. |
| 14 live up here? | 14 Q. All right. So Tom Mann hired you at Fish |
| 15 A. I lived in Louisiana part time; part time I | 15 World? |
| 16 lived in Eufaula. | 16 A. Uh-huh. |
| 17 Q. Okay. Just traveled back and forth? | 17 Q. What did you do for him? |
| 18 A. After my apprenticeship was over and I | 18 A. I was a plant manager. |
| 19 became an operator, I got a 7/7, where I worked | 19 Q. Was that when they were making Kangaroo |
| 20 seven days on and seven days off. | 20 worms and all that stuff? |
| 21 Q. Okay. What kind of money were you making at | 21 A. Yes, sir. |
| 22 your highest level of wage on that job? | 22 Q. How many people did you supervise? |
| 23 A. Probably 35-, $40,000 a year. | 23 A. About 20 people. Maybe six in the plant, |

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 13

1   and the others were home workers.
2   Q.   Do you remember what kind of money you made
3   there?
4   A.   $450 a week.
5   Q.   Okay. Was that a salary?
6   A.   Yes.
7   Q.   Let me back up to the oil field job. When
8   you were working there, you said you went seven
9   days on and seven off?
10  A.   Uh-huh.
11       MR. ROBERSON:  Yes. You've got to
12  answer out.
13  A.   Yes, sir.
14  Q.   How many hours did you work in that seven
15  days? How would they compensate you? Were you
16  getting paid by the hour?
17  A.   I got paid by the hour.
18  Q.   So how did that work?
19  A.   I worked 12 hours a day, seven days a week.
20  Everything over 40 was time and a half.
21  Q.   All right. So seven times 12 is 96, right?
22  A.   Right. But also, if I worked on a rig off
23  my seven days --

## Page 14

1       MR. ROBERSON:  That's 84.
2       MR. SMITH:  I'm sorry. You're right.
3   Eight times 12 is 96. My third grader knows that
4   from those multiplication tables, and I can't get
5   it right.
6       MR. ROBERSON:  I wasn't criticizing
7   you.
8       MR. SMITH:  No, that's all right.
9   Q.   So you were basically doing, in a month, you
10  were doing 116 hours?
11  A.   It was usually a little more than that,
12  because they paid you travel time and things like
13  that.
14  Q.   All right. My math's really bad. That's
15  not right either. 168 hours.
16      So you would get paid for your travel out to
17  the rig?
18  A.   From the Houma office to wherever you were
19  catching your flight or your boat, you got paid.
20  Q.   Okay. So you routinely got overtime in that
21  job?
22  A.   Yes.
23  Q.   What about when you came back and worked for

## Page 15

1   Fish World? How did that work? Were you on
2   salary or were you on a --
3   A.   That was just a five-day-a-week deal. We
4   only worked 40 hours a week.
5   Q.   Were you on salary or hourly?
6   A.   Salary.
7   Q.   All right. How long did you work at Fish
8   World?
9   A.   Approximately a year and a half.
10  Q.   And who was your boss there?
11  A.   Tom Mann.
12  Q.   Okay. Why did you leave that job?
13  A.   I bought out his production, his equipment,
14  and started my own business.
15  Q.   What was that called?
16  A.   Designer Lures.
17  Q.   And how long were you involved with Designer
18  Lures?
19  A.   Approximately seven years.
20  Q.   Did you run the plant out there on 431?
21  A.   Yes.
22  Q.   Did you own that building?
23  A.   I leased the building from Tom Mann, but I

## Page 16

1   owned the manufacturing equipment inside.
2   Q.   Okay. How many employees did you have?
3   A.   Probably 20.
4   Q.   Did you work as the plant manager? I mean,
5   who did that?
6   A.   I was the plant manager, the maintenance,
7   the secretary, everything.
8   Q.   So how many hours a week do you think you
9   worked back then?
10  A.   We worked four days a week, ten hours a day.
11  Q.   So you were in charge of maintenance?
12  A.   I built the facility.
13  Q.   You built the whole thing; so when something
14  would break down, you'd fix it?
15  A.   Yes, sir.
16  Q.   What did y'all have? Did y'all have
17  injection molding out there?
18  A.   We had injection molding.
19  Q.   What else did y'all do?
20  A.   We did the painting of the hard fishing
21  lures, assembly of spinner baits, lead heads; we
22  made wooden lures.
23  Q.   I mean, tell me what types of equipment you

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 17

1  had.
2  A.   I had injection molding equipment.
3  Q.   And then what did you have for other --
4  that's the soft plastic stuff that you pour in a
5  lead mold, basically; is that right?
6  A.   It's injected into an aluminum mold to make
7  worms, lizards, and frogs.
8  Q.   Right.
9  A.   Then I built a chain-drive spray system to
10  spray paint the fishing lures.  Instead of doing
11  like Mann's Bait Company, hold each one up and
12  spray it, I had mine going on, basically, a
13  bicycle chain around the room, with heat lights.
14  I designed and built all that.
15  Q.   Okay.  And how did you -- you would run four
16  days, like a Monday through Thursday?  Is that how
17  it worked?
18  A.   Right.
19  Q.   And what would y'all do on Fridays?
20  A.   The plant was closed on Fridays.
21  Q.   When did you work on the equipment if it
22  broke down?  How did that work?
23  A.   I came in an hour or so every morning and

Page 18

1  got it heated up, and checked everything out.
2  Q.   Okay.  When did you do maintenance work on
3  it?
4  A.   That hour or so I came in there every
5  morning, I would take care of everything ahead of
6  the employees.
7  Q.   So you would do it when the employees
8  weren't working on the line?
9  A.   Right.  That way I wouldn't have any down
10  time.
11  Q.   Right.  Did you ever have to work on it on
12  Fridays?
13  A.   I usually fished on Fridays.  But there was
14  a few occasions.
15  Q.   You could fish right there out your back
16  door, couldn't you?
17  A.   Yes.
18       MR. ROBERSON:  You tested your
19  equipment.
20  A.   On Fridays I tried to travel out of town.
21       MR. ROBERSON:  That's research.
22       THE WITNESS:  Right.  Free fishing
23  trip.  Run it through the company.

Page 19

1  Q.   I understand that.  But you would agree that
2  you can't do maintenance on the equipment,
3  generally speaking, when the production workers
4  are making product on it, correct?
5  A.   Correct.
6       MR. ROBERSON:  You can, but you don't
7  want to.
8       THE WITNESS:  Right.
9  Q.   All right.  So you had Designer Lures for
10  seven years.  Did you have any partners in that?
11  A.   Tom Mann was my partner also.
12  Q.   Okay.  What years did that involve, if you
13  can remember?
14  A.   I can't remember exactly, right off the top
15  of my head.
16  Q.   You left Houma in '84, and then you came
17  back here and you did Fish World for a year and a
18  half; so that's about '85, '86.
19       So would you say you had Designer Lures
20  until '92, '93?  Does that sound right?
21  A.   Approximately, yes.
22  Q.   All right.  Tell me why you stopped working
23  for Designer Lures.

Page 20

1  A.   I sold the company.
2  Q.   Okay.  Who did you sell it to?
3  A.   Salco.  I sold it to Tom Mann, but he turned
4  around and sold it to Salco.
5  Q.   Is that the Aflac people from Columbus?
6  A.   Right.  Well, Salco's from Columbus; I'm not
7  sure about Aflac.
8  Q.   Did you work for Salco after you sold it, or
9  did you -- I mean, after you sold the company, did
10  you stay on and run it for them?
11  A.   I stayed for approximately eight months.  I
12  agreed to stay for six, to train somebody after I
13  sold it.
14  Q.   All right.  And you wound up staying for
15  eight?
16  A.   Approximately eight.
17  Q.   Okay.  Then what did you do?
18  A.   I went and built a fishing lure
19  manufacturing company in Guatemala City.
20  Q.   Who did you do that for?
21  A.   Tom Freeman, Freeman International.
22  Q.   Where is he out of?
23  A.   At that time, he was out of Columbia,

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 21

1  Alabama.
2  Q.   Is that place still in business?
3  A.   The plant in Guatemala is.  The home office
4  in the United States has been shut down.
5  Q.   What was the name of that company?
6  A.   It changed names from Columbia International
7  to American Sports.  It went by those two names
8  when I worked with them.
9  Q.   Were you an employee there or did you have
10 your own business?
11 A.   I was an employee.
12 Q.   So it was Columbia International.  And then
13 what was the other one?
14 A.   American Sports International.
15 Q.   And what was your job title there?
16 A.   I was a plant manager, plus designing of new
17 equipment.
18 Q.   Did you live in Guatemala City?
19 A.   Yes.
20 Q.   How long were you down there?
21 A.   I stayed approximately two years.
22 Q.   Okay.  And how many employees did you have
23 down there?

## Page 22

1  A.   208.
2  Q.   So you supervised 208 employees?
3  A.   Yes, sir.
4  Q.   And how many shifts was that?  Tell me how
5  y'all operated.
6  A.   We had two shifts.
7  Q.   I mean, how would they go?  Would they go
8  more than 40 a week?
9  A.   No.  We only worked, basically, 40 hours a
10 week.
11 Q.   First shift, right?
12 A.   Uh-huh.
13      MR. ROBERSON:  Is that yes.
14 A.   Yes, sir.
15 Q.   And tell me what type of operation that was.
16 A.   We manufactured lead jigs, soft plastic
17 worms, lizards, and grubs, also tube jigs; and we
18 spray painted hard lures made out of plastic and
19 wood.
20 Q.   So it was a similar operation to what you
21 had at Designer Lures?
22 A.   Yes, sir.
23 Q.   Sounds like it was a lot bigger though; is

## Page 23

1  that right?
2  A.   Yes, sir.
3  Q.   Did you have a maintenance department there?
4  A.   No, sir.
5  Q.   Who was in charge of maintenance?
6  A.   I took care of the maintenance myself.
7  Q.   And the same thing:  Did you do maintenance
8  when y'all were not running the equipment?  Is
9  that basically how that worked?
10 A.   There wasn't much maintenance to be done.
11 You had to do that maintenance while the plant
12 ran.  A mold change or something was basically all
13 the maintenance you had to do, unless something
14 tore up; so you actually did it while it was
15 running.
16 Q.   So if it was running and it tore up, then
17 they would have to stop using it; but you would
18 come in there and fix it?  Is that how it worked?
19 A.   Correct.
20 Q.   And you'd get it back running so they could
21 keep production going?
22 A.   Right.
23 Q.   How many hours a week did you work down

## Page 24

1  there?
2  A.   Basically, 40; sometimes 45.
3  Q.   And how did you get paid in that job?
4  A.   I was on salary.
5  Q.   Do you remember what your salary was?
6  A.   $500 a week.  They gave me a bonus if I had
7  to work over.  Like, if something tore up and I
8  had to work the weekend or something, I got a
9  little bonus.
10 Q.   All right.  How much of a bonus would you
11 get?  What would it be based on?  Would it be
12 based on how much time?
13 A.   Right.
14 Q.   Did they have that figured out to the hour
15 how much they would pay you?
16 A.   It was just a repay deal.
17 Q.   Okay.  Give me an example.  Like, the
18 injection mold machine is broken, and we're going
19 to pay you 50 extra dollars?  I mean, how did that
20 work?
21 A.   Sometimes it would be $100, or sometimes it
22 would be a $200 fishing trip.  The company would
23 pay it.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 25

1    Let's say I worked Saturday ten hours to fix
2  the equipment. Sunday he might cover a $200
3  fishing trip for me and my son; pay it out of the
4  company.
5    Q.   Okay. And when you say "he," who is that?
6    A.   Tom Freeman.
7    Q.   Was he living down there too?
8    A.   Yes.
9    Q.   Is he still down there?
10    A.   Yes.
11    Q.   In Guatemala City? That's in Guatemala, I
12  take it?
13    A.   Yes.
14    Q.   But he's originally from Columbia, Alabama?
15    A.   Yes, sir.
16    Q.   And so he's still in the lure business down
17  there?
18    A.   Yes, sir.
19    Q.   Who do they manufacture for?
20    A.   I can't tell you who they manufacture for at
21  the present time; but when I was down there, we
22  manufactured for Sportsman's Supply, H & H.
23    Q.   Anybody locally?

Page 26

1    A.   Terry Spence at Southern Plastics.
2    Q.   Y'all do work for Terry?
3    A.   Yes.
4    Q.   And then what about Dennis Montgomery? Was
5  he in business then?
6    A.   He was in business then; but at that time we
7  were trying to get his business. When I was
8  there, we weren't manufacturing for him then.
9    Q.   Okay. But he was a potential customer?
10    A.   Yes.
11    Q.   So you were down there for two years?
12    A.   Yes.
13    Q.   And why did you leave that job?
14    A.   My father was fixin' to have surgery on his
15  heart, and I had resigned. I told him I'd give
16  him a date of six months ahead, so I could be at
17  home.
18    Q.   Okay. So you gave them a six-month notice?
19    A.   I told them my father was going to have
20  open-heart surgery and I wanted to be there with
21  him and be with my family; and I told him I would
22  be leaving and be home for Christmas that year.
23  And so I started training someone else to take

Page 27

1  over my position. And then right before
2  Christmas, I left.
3    Q.   Did you leave voluntarily or did they
4  terminate your employment?
5    A.   I left voluntarily. I told them I was
6  leaving six months ahead.
7    Q.   Well, it sounded like you were telling them
8  you wanted a leave of absence; is that right?
9  Maybe I misunderstood you.
10    A.   Well, I left my furniture and my car down
11  there in case I came back.
12    Q.   You didn't know if you were coming back or
13  not, it sounds like.
14    A.   I did not know. It was a big stress to be
15  away from my family that period of time.
16    Q.   Sure. So, I mean, did you resign ultimately
17  and tell them you just weren't coming back, or did
18  they separate you or terminate you?
19    A.   I resigned myself. I was offered to come
20  back.
21    Q.   Do you remember what year that was? mid
22  1990s?
23    A.   It was right before I went to work at

Page 28

1  Columbus Mills. That would be -- let's see. I
2  don't believe I wrote that down. I should have
3  brought my dates. That would have been
4  approximately ten years ago.
5    Q.   All right. So 1998 or so?
6    A.   Yes, sir.
7    Q.   All right. And did your father live here in
8  Eufaula?
9    A.   No, sir.
10    Q.   Where was he?
11    A.   Albany, Georgia.
12    Q.   Okay. So you came back up here and decided
13  not to go back to Guatemala. Tell me the next
14  place you worked.
15    A.   I went to work at Columbus Mills.
16    Q.   Who hired you there?
17    A.   Kathy Gilmore.
18    Q.   What did you do there?
19    A.   I was a second shift supervisor.
20    Q.   What did that involve?
21    A.   It's basically a carpet company. Blending
22  the yarn, spinning.
23    Q.   Okay. How many employees did you have?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 29

1   A.   Probably 30 or 40.
2   Q.   And who did you report to?
3   A.   Bob Newsome.
4   Q.   Was he the plant manager or a shift manager?
5   A.   I'm thinking he was the general manager.
6   I'm not sure exact title.
7   Q.   But he was a plant manager-type person; does
8   that sound right?
9   A.   Yes, sir.
10  Q.   Who else was up there in management at the
11  time?
12  A.   The plant manager, I think, was George
13  Harper at the time.
14  Q.   Okay.  And how many years were you at
15  Columbus Mills?
16  A.   Approximately a year and a half, two years.
17  Q.   And were you on salary or were you hourly?
18  A.   Salary.
19  Q.   What was your salary, if you can recall?
20  A.   I think it was somewhere around 37,000.
21  Q.   And how many hours a week did you work?
22  A.   It was basically 40 hours a week.
23  Q.   Were you on salary the whole time you were

Page 30

1   there?
2   A.   Yes.
3   Q.   Did you have to clock in?
4   A.   No.
5   Q.   What about your job in Guatemala City?  Did
6   you clock in there too?
7   A.   They didn't even have clocks.
8   Q.   They ain't worried about the FLSA in
9   Guatemala, are they?
10       MR. ROBERSON:  They have the UFLSA,
11  Unfair Labor Standards.
12       MR. SMITH:  That's right.
13  A.   Now, when I worked at Columbus Mills, I also
14  worked at Whitfield Timber at the same time.
15  Q.   Okay.  Who owns that?
16  A.   Jeff Whitfield.
17  Q.   What did you do for them?
18  A.   Skidder operator.  That was a part-time job.
19  Q.   What was your shift at Columbus Mills?  Were
20  you on second shift?  What hours was that?  Was
21  that like four to midnight or something?
22  A.   Six at night until six in the morning.
23  Q.   Okay.

Page 31

1   A.   You worked two days on, three days off; then
2   three days on, two days off.
3   Q.   So on your off days, you worked for
4   Whitfield?
5   A.   Yes.
6   Q.   Where were they located?
7   A.   At that time, Baker Hill.
8   Q.   Okay.
9   A.   It's listed as a Clayton address though.
10  Q.   Okay.  Did you ever have to work more than
11  40 hours a week at Columbus Mills?
12  A.   You might have to come in for a meeting or
13  something.
14  Q.   Okay.  Did you have any supervisory
15  authority over maintenance men out there at
16  Columbus Mills?
17  A.   Just the maintenance guys on my shift.
18  Q.   All right.  And do you remember their names?
19  A.   James Pugh.  And there was two others, but I
20  can't recall their names right off the top of my
21  head.
22  Q.   Do you know whether they ever had to work
23  overtime?

Page 32

1   A.   They would volunteer to work every now and
2   then, on Tuesdays, but not very many times.
3   Q.   Why would it be a Tuesday?
4   A.   Tuesdays they used to shut down one piece of
5   equipment and, like, let certain people -- like,
6   if the Volkmann line would be down, the guy on the
7   second shift would come in off his shift, on
8   Tuesdays, and help work on that piece of
9   equipment.
10  Q.   Okay.
11  A.   They would shut a piece of equipment down
12  once a month or so and spend maybe four to six
13  hours going through it and checking all the
14  bearings.
15  Q.   Okay.  And would that count as overtime for
16  those guys when they did that?
17  A.   Yes.
18  Q.   And that was a regular thing?
19  A.   Yes.
20  Q.   Okay.  What department did you supervise
21  there at Columbus Mills?  Was there a certain --
22  A.   BS -- blending, spinning -- BSTW.  That's
23  what they called it:  BSTW.  Blending, spinning,

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 33

1  twisting, and winding.
2  Q.   Okay.
3  A.   That was the name they called it BSTW.
4  Q.   Okay.
5  A.   Over the blending department, spinning
6  department, twisting department, and winding.
7  Q.   And that was making yarn for carpet?  Is
8  that what y'all were doing?
9  A.   Yes.
10  Q.   Why did you leave that job?
11  A.   Kathy and George told me things weren't
12  working too well, and they offered me eight weeks
13  -- I can't remember if it was four or six weeks'
14  severance pay if I resigned.  Told me something
15  could happen if I didn't.
16  Q.   All right.  Did they give you a reason?
17  A.   They just said that they were -- at that
18  time, they were hiring, basically, people with
19  college degrees.  And they already had two of them
20  in there being trained.
21  Q.   Who were those people?
22  A.   I don't remember their names.
23  Q.   So you're saying the reason they told you

## Page 34

1  they were terminating you, or asking you to take a
2  severance package, was because they wanted to
3  bring in college --
4  A.   I don't know exactly why.
5  Q.   Well, tell me what all they told you.
6  A.   Just that things weren't working that well,
7  and that some of the production numbers wasn't
8  what they wanted, and they were trying to increase
9  production.
10  Q.   So it was a job performance issue?
11  A.   I never knew exactly why.
12  Q.   Well, but what they told you was essentially
13  job performance?
14  A.   Right.  The production level on my shift was
15  lower than some.
16  Q.   Okay.  And did you take the severance pay?
17  A.   Oh, yes.
18  Q.   What did you do after that?
19  A.   I went to work full time for Whitfield
20  Timber.
21  Q.   Did you ever complain about your hours at
22  Columbus Mills?
23  A.   No.

## Page 35

1  Q.   Okay.  So you went full time at Whitfield
2  Timber.  Tell me about your compensation there.
3  A.   I don't understand what you mean.
4  Q.   I'm sorry.  When you went to Whitfield, were
5  you working on salary or by the hour?
6  A.   By the hour.
7  Q.   And what were you making, if you can recall?
8  A.   Wait a minute.  I got paid $125 a day, I
9  think it was.
10       I only worked there for a little while,
11  until I went to work at -- I left -- I worked
12  there for just a short amount of time.  And that's
13  when I started at CP.
14  Q.   Okay.  So you were at Whitfield driving a
15  skidder; is that right?
16  A.   Yes.
17  Q.   And that was 125 a day.  And was that -- did
18  you get paid overtime?
19  A.   We didn't work overtime.
20  Q.   So it was just $125 a day for an eight-hour
21  day?
22  A.   Straight $125 a day.
23  Q.   Five days a week?

## Page 36

1  A.   Uh-huh.
2  Q.   Okay.  So then you applied at the chicken
3  plant?
4  A.   Yes.
5  Q.   When was that?
6  A.   '88 or '89.  No.  I mean, '98 or '99.
7  Q.   All right.  We can check on that and see.
8  But it was Charoen Pokphand at the time?
9  A.   Right.
10  Q.   What kind of job did you get there?
11  A.   Maintenance supervisor over second shift.
12  Q.   And who did you report to?
13  A.   Philip Mauldin and Reb Bludsworth.
14  Q.   And what plant were you working in?
15  A.   The cook plant.
16  Q.   Okay.  Was Philip Mauldin the cook plant
17  manager?
18  A.   He was the maintenance superintendent of the
19  cook plant.
20  Q.   Okay.  And were you on hourly wage at that
21  time?
22  A.   Yes.
23  Q.   Okay.  What was your hourly wage to start

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

| Page 37 | Page 39 |
|---|---|
| 1  with? | 1  used, sometimes when it wasn't. |
| 2  A.  I'm thinking I started around 12.50. I'm | 2  Q.  Okay.  When it wasn't, what types of work |
| 3  not sure of the exact number, but somewhere in | 3  were you performing on it, when it wasn't being |
| 4  that area.  Then I moved up to about 14.75. | 4  used by production? |
| 5  Q.  And this was with CP? | 5  A.  When I was on third shift, we would do |
| 6  A.  Yes. | 6  maintenance on the down -- on third shift, when |
| 7  Q.  And how many hours a week were you working? | 7  they're washing the equipment down, that's when |
| 8  A.  Probably averaging 80 hours a week. | 8  you do your maintenance. |
| 9  Somewhere -- it varied different times.  Sometimes | 9  Q.  Okay.  So is it correct to say that you |
| 10  60 or 70. | 10  would have to be -- maintenance would have to be |
| 11  Q.  Wasn't there a period of time when that | 11  on duty while the equipment was running, in case |
| 12  plant wasn't even running? | 12  it broke down, right? |
| 13  A.  When that plant shut down, the cook plant, I | 13  A.  Right. |
| 14  was the last supervisor over there running it. | 14  Q.  And then there would be occasions when you |
| 15  And then I moved into refrigeration at first | 15  would have to work on it when the production |
| 16  processing, on day shift. | 16  people weren't using it, correct? |
| 17  Q.  All right.  Let's break it down to the cook | 17  A.  Every night, when sanitation came in to |
| 18  plant. | 18  clean the equipment, the third shift maintenance |
| 19    When you were working at the cook plant, | 19  responsibility was to check the equipment out, so |
| 20  tell me what period of time that was. | 20  it wouldn't have to be worked on other times.  It |
| 21  A.  I probably worked three years at the cook | 21  should be in tiptop shape when it starts up the |
| 22  plant before it shut down, or maybe a little | 22  next morning. |
| 23  longer. | 23  Q.  Okay.  So I thought you told me you were |

| Page 38 | Page 40 |
|---|---|
| 1  Q.  So '99 to 2001? | 1  maintenance supervisor over second shift. |
| 2  A.  Approximately. | 2  A.  I worked second, third -- during the time I |
| 3  Q.  And you're saying you averaged 80 hours a | 3  was there, I worked all three shifts at different |
| 4  week during that time? | 4  times. |
| 5  A.  Yes. | 5  Q.  Okay.  But the third shift's job was to do |
| 6  Q.  Tell me who worked under your supervision | 6  maintenance on things that might have occurred |
| 7  back then. | 7  during the second shift; is that right? |
| 8  A.  Kurt Riley, Warren Gilmore, Brandon Baker. | 8  A.  Yes.  During the first and second, if a belt |
| 9  I'm trying to remember Papa Smurf's real name.  We | 9  was worn or a gear was worn or a motor was giving |
| 10  had nicknames for a lot of people.  I can't | 10  them any problems, third shift would change that |
| 11  remember all the names. | 11  out. |
| 12  Q.  Okay.  And what were their hours like?  Did | 12  Q.  Okay.  So did you leave the cook plant when |
| 13  they work the same hours you did, or more, or | 13  CP shut it down? |
| 14  less? | 14  A.  Yes. |
| 15  A.  Less. | 15  Q.  What happened with that? |
| 16  Q.  Less hours?  Okay.  Why was that? | 16  A.  I was asked if I would take a job in |
| 17  A.  I was asked to come in early to start up the | 17  refrigeration. |
| 18  equipment to make sure it was running okay, and | 18  Q.  Okay.  By whom? |
| 19  stay late, a lot of times. | 19  A.  By Reb Bludsworth. |
| 20  Q.  Okay.  And, again, in maintenance, would you | 20  Q.  Okay.  And was that over in the processing |
| 21  work on the equipment when it was not in use by | 21  plant? |
| 22  the production employees? | 22  A.  Yes. |
| 23  A.  We worked on it sometimes when it was being | 23  Q.  And did you take that job? |

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 41

1   A.   Yes.
2   Q.   What did that involve?
3   A.   Inspections and testing of equipment, and
4   sometimes I'd work on special projects during the
5   construction.
6   Q.   All right.  And what was your hourly rate?
7   Did it remain the same as it was when you came?
8   A.   Yes, sir.  14.75 or 14.72, something like
9   that.
10  Q.   Did you work overtime during that period of
11  time?
12  A.   Yes.
13  Q.   Did you ever complain about the overtime?
14  A.   Only when I got over 100 hours a week one
15  time.
16  Q.   Who did you complain to?
17  A.   Joe McCraney.
18  Q.   They paid you time and a half for all that
19  time?
20  A.   Yes.
21  Q.   How long did you work in refrigeration?
22  A.   Approximately a year.
23  Q.   All right.  And tell me what prompted you to

Page 42

1   move out of refrigeration into your next job.
2   A.   I was told that the cook plant was starting
3   back up, they wanted me to be a supervisor, and
4   that Equity Group was going to cut out all
5   overtime.
6   Q.   Who owned the plant?  Well, let's get the
7   dates before we get into that.  When you left
8   refrigeration, tell me what --
9   A.   Equity Group owned it at that time.
10  Q.   So that would have been after March of '04?
11  A.   Yes.
12  Q.   Do you recall that they bought it in March
13  of 2004?
14  A.   I really don't recall the dates.
15  Q.   Well, do you disagree with that date?
16  A.   No.
17  Q.   Okay.  So March 2004, the Equity Group buys
18  the plant, correct?
19  A.   Uh-huh.
20       MR. ROBERSON:  Is that yes?
21  A.   Yes.
22  Q.   And they kept you on in your current job, in
23  the job you had at the time, right?

Page 43

1   A.   Yes.
2   Q.   And at the same wage?
3   A.   Yes.
4   Q.   Okay.  And how long, under Equity Group's
5   ownership, did you work in refrigeration?
6   A.   I don't remember exactly.
7   Q.   Did you work overtime during that period?
8   A.   Yes.
9   Q.   Okay.  So then you moved -- that wasn't a
10  maintenance job, or was it?
11  A.   It was maintenance.
12  Q.   It was maintenance?  It was maintenance in
13  the -- because you were under Reb?  Reb's a
14  maintenance supervisor, correct?
15  A.   Yeah.  But he was also over the
16  refrigeration and all.
17  Q.   Okay.  Were you a supervisor?
18  A.   No.
19  Q.   You just worked as a maintenance man?
20  A.   Yes.
21  Q.   And you made time and a half on your
22  overtime?
23  A.   Yes.

Page 44

1   Q.   Who all else was on that crew with you?  You
2   may have already told me that.
3   A.   No.
4   Q.   You told me the cook plant people you worked
5   with.  Tell me the people you worked with in
6   refrigeration.
7   A.   Refrigeration, there was Terrance Skinner,
8   Tony Green.  The boy's last name is White; I'm
9   trying to remember his first name.
10  Q.   Butch?
11  A.   No.
12  Q.   He was a manager out there, wasn't he?
13  A.   This was a young guy; his last name was
14  White.  No kin to Butch though.
15  Q.   Okay.  Anybody else?
16  A.   There was Chris Spurlock.
17  Q.   Okay.
18  A.   Larry Doswell.  A young boy we called D.C.
19  I forgot his real name.
20  Q.   Okay.
21  A.   There was also -- I can't remember the rest
22  of the guys' names right off the top of my head.
23  Q.   Okay.  And was Reb your supervisor?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 45

1    A.    Terrance Skinner was my supervisor, but Reb
2    was over Terrance.  But Reb also told me what to
3    do.
4    Q.    Okay.  Do you know if Terrance was on
5    salary, or was he hourly?
6    A.    He was hourly.  Same wage I was at that
7    time.
8    Q.    Were the other people on that crew, were
9    they at a lower wage than you?
10    A.    I really don't know what kind of pay they
11    made.
12    Q.    Okay.  They didn't cut your pay?  It sounds
13    like they moved you from supervisory in the cook
14    plant over to --
15    A.    Refrigeration.
16    Q.    -- refrigeration, as a maintenance man.
17    A.    That was the top pay of a maintenance person
18    was 14.75.  Maintenance in refrigeration topped
19    out at that scale.  I was making the top money
20    that you could make in maintenance.
21    Q.    Okay.  How long did you stay in the
22    maintenance in refrigeration?
23    A.    Until the job of supervision at the cook

## Page 46

1    plant.
2    Q.    And do you remember what time that was?  Was
3    that October of 2004 when you moved?  At some
4    point you went from hourly to salary?
5    A.    That would be October, yes.
6    Q.    And I think October 2004 is when that was,
7    correct?
8         MR. ROBERSON:  Your document shows it
9    to be November 1st.
10        MR. SMITH:  Okay.  I'm sorry.  So
11    November 1, 2004.
12        MR. ROBERSON:  I mean, your personnel
13    record.
14        MR. SMITH:  Right.  Okay.  I knew it
15    was in the fall of '04.
16    Q.    So November of '04, you think that's when
17    you went from hourly maintenance in refrigeration,
18    back over to the cook plant?
19    A.    Yes.
20    Q.    And tell me all the conversations you can
21    recall that led up to you changing positions.
22    A.    Greg Mills and Reb Bludsworth brought me
23    into Greg's office and told me they wanted me for

## Page 47

1    a supervisory position.
2    Q.    Okay.
3    A.    I told them I really wasn't interested, that
4    I would like to stay where I was.
5    Q.    Okay.
6    A.    They explained to me that Equity Group's new
7    policy was going to cut out all overtime, that
8    people were only going to get 40 to 45 hours a
9    week, and that I would be taking a great big cut
10    in pay because of the overtime I was going to
11    lose; and they were going to offer me a salary
12    position.
13    Q.    Who said they were cutting out the overtime?
14    A.    Greg Mills and Reb Bludsworth.
15    Q.    They both said that?
16    A.    Yes.
17    Q.    Did they say Equity Group for certain is
18    going to adopt this policy or that they were
19    trying to?  Tell me exactly what they said.
20    A.    The exact words Greg told me was that Equity
21    Group was going to cut out all overtime; the only
22    way I could make anywhere near the money I made
23    before was to take the supervisor's position.

## Page 48

1    That all I would have to do is come in and work my
2    shift, and maybe five hours extra a week.  That
3    Equity Group was going to cut out the overtime to
4    save money.
5    Q.    Did they tell you how they planned to cut
6    out overtime on maintenance?
7    A.    They would hire enough people that when a
8    man's shift was over, he would go home.
9    Q.    They said they were going to hire more
10    people?
11    A.    They told me that we would have enough
12    people on staff that when your shift was over, it
13    was the next shift's problem, if there was a
14    problem.
15    Q.    All right.  What else did they tell you?
16    A.    That I would get full medical insurance,
17    they paid all; I'd get a bonus, a quarterly bonus
18    or a -- there was a chance for a quarterly bonus,
19    all due to production.
20    Q.    And did you get -- I mean, tell me what your
21    benefits were when you were hourly, that you can
22    recall.  I mean, did you get some health insurance
23    there?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
**Court Reporting * Legal Videography * Trial Services**

Page 49

1    A.    They paid most of your health insurance.
2    Q.    Individually?
3    A.    Right.
4    Q.    How many kids did you -- did you have any
5    kids that were minors or lived with you?
6    A.    At that time, there was me, my wife, and I
7    had two grandchildren I was raising.
8    Q.    And were they on your insurance?
9    A.    Yes.
10    Q.    How was that being paid for when you were
11    hourly?
12    A.    I had so much a week; it come out of my
13    check.
14    Q.    Do you remember how much a week that was?
15    A.    I'd have to look at my pay stubs.  I don't
16    have that with me.
17          MR. ROBERSON:  Yeah, you do.
18    A.    Oh, excuse me.  That will show it right
19    there.
20    Q.    Okay.
21    A.    $43.75 a week came out.
22    Q.    And this was when you were on hourly?
23    A.    Yes, sir.

Page 50

1    Q.    Can I see that real quick?
2    A.    Yes, sir.
3    Q.    All right.  That's with CP now.  Was it the
4    same with Equity Group?
5    A.    They basically had the same policy.
6    Q.    All of these look like CP.
7    A.    Equity Group picked up basically the same
8    policy though.
9    Q.    So you don't remember any change between CP
10    and Equity Group on what your benefits were
11    costing you?
12    A.    No.
13    Q.    And I don't know.  I'm just saying your
14    recollection is it stayed the same?
15    A.    If it went up at all, it couldn't have went
16    up much or I would have remembered.
17    Q.    Okay.
18          MR. ROBERSON:  Now you understand why
19    his idiot lawyer may have sued the wrong defendant
20    originally.
21          MR. SMITH:  Well, that's all you had,
22    right?  I'd like to copy these.  Can I get
23    somebody to copy these real quick, and then I'm

Page 51

1    going to mark them.
2          MR. ROBERSON:  I'm going to provide
3    them to you; but yes, you can, sure.
4          MR. SMITH:  Yeah.  If you don't mind,
5    I'll go ahead and do that.
6          MR. ROBERSON:  I don't mind.  And,
7    Joel, you may want to get this too.
8          MR. SMITH:  Yeah, I'll go ahead and get
9    that copied too.
10          (A brief recess was taken.)
11    (BY MR. SMITH)
12    Q.    So before we broke just then, you gave me
13    some pay stubs that looked like CP pay stubs?
14    A.    Yes.
15    Q.    And you recall, when you were hourly, when
16    the plant ownership changed from CP to Equity
17    Group, your cost of your health insurance stayed
18    the same, more or less?
19    A.    Yes.
20    Q.    And so during this time that you had the
21    conversation with Greg Mills and Reb Bludsworth
22    that you just described, they were taking out --
23    A.    $47 a week.

Page 52

1    Q.    -- $47 a week for your health insurance?
2    A.    Yes.
3    Q.    And tell me what they told you, what they
4    offered you at that time, as far as going to the
5    cook plant.
6    A.    $48,000 a year.
7    Q.    Okay.
8    A.    They would pay my medical and dental.
9    Q.    Okay.
10    A.    And a 401(k) plan.
11    Q.    Okay.  How did the 48,000 -- just put the
12    benefits aside.  How did the 48,000 compare on to
13    what you made on an hourly basis?
14    A.    It was a cut in pay.
15    Q.    It was?
16    A.    Yes.
17    Q.    How much of a cut in pay was it?
18    A.    About 6- or $7,000 a year, approximately.
19    Q.    Okay.  Were you aware of that at the time?
20    I mean, when you were having that conversation,
21    you did that math in your head?
22    A.    Well, I had the conversation with them --
23    because I wouldn't have took the position.  I

13 (Pages 49 to 52)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 53

1  didn't want the position, except they were cutting
2  out overtime. So my money would have dropped from
3  the 53-, or 54-, I made the year before, they
4  said, down to what I would make on 40 hours.
5      That's the only reason I took the salary
6  position, because I would have lost -- if they
7  went with the 40 hours week they told me, I
8  wouldn't make any overtime. Half my money was
9  made on overtime.
10  Q.  Okay. What else did they tell you about the
11  job, as far as what your benefits would be? You
12  said they would pay medical, dental; and then how
13  much would they contribute to your 401(k)?
14  A.  I don't remember the percentage at this
15  time.
16  Q.  Were you participating in that 401(k) when
17  you were hourly?
18  A.  No.
19  Q.  Okay. So you weren't putting any money in
20  your retirement with the company?
21  A.  No, sir.
22  Q.  And then once you -- tell me what else they
23  said in regards to that offer to go to the cook

## Page 54

1  plant.
2  A.  They just told me it would be a great job
3  for me, that they needed me, and that I had
4  managed that same place before.
5  Q.  Right. And what was the exact position now?
6  A.  Third shift supervisor.
7  Q.  Would that be over maintenance?
8  A.  Yes. Third shift maintenance supervisor.
9  Q.  Okay. Did they tell you it was a job where
10  you wouldn't have to clock in?
11  A.  Yes.
12  Q.  Okay. And is it a job where you could leave
13  if your work was done? I mean, you didn't have to
14  meet 40 hours a week necessarily, as long as you
15  got your work done; is that right?
16  A.  They told me I needed to work basically 40
17  hours a week; that if everything was running good
18  and I wanted to leave early, I could.
19  Q.  And what were the hours approximately? I
20  mean, when would you need to be there for work?
21  A.  Ten until six.
22  Q.  Ten to six?
23  A.  10 at night until 6 a.m.

## Page 55

1  Q.  Okay. And you started out, it looks like,
2  November 1 or so, of '04?
3  A.  Yes.
4  Q.  And who was under your supervision?
5  A.  Josh Bradford --
6  Q.  You may have told me that.
7  A.  No, that was a different list.
8  Q.  Okay.
9  A.  Alan Carpenter, Ken Pelham. Did I mention
10  Josh Bradford already?
11  Q.  Yeah.
12  A.  Okay. Darrell -- I done forgot Darrell's
13  last name. McCartha. Darrell McCartha.
14  Q.  These were all guys you recall being under
15  your supervision on maintenance?
16  A.  Yes.
17  Q.  And they were making hourly wages there;
18  they weren't on salary; is that correct?
19  A.  Yes, they were hourly wages. And there was
20  Rex Faircloth.
21  Q.  Okay. You've got some other people on here.
22  On your interrogatory answers, you mention a David
23  Griffin?

## Page 56

1  A.  That was a supervisor.
2  Q.  He was a supervisor? And what did he
3  supervise?
4  A.  I don't know his exact job title, but he
5  came in on new construction.
6  Q.  What does that mean?
7  A.  He came in when they were building the plant
8  and installing new fryers and stuff, to make sure
9  they worked okay. I believe he's an engineer over
10  the new equipment that comes in.
11  Q.  Okay. And then you mention a Randy
12  Ogletree?
13  A.  He was in maintenance at the first
14  processing.
15  Q.  Okay. So when you got your first paycheck
16  -- well, let's talk about your first week on the
17  job, when you agreed to take it.
18      They offered it to you. They didn't tell
19  you they were eliminating your old position,
20  correct, your job in refrigeration maintenance?
21  That was a bad way to ask that.
22      You had the option to either take or decline
23  the job in the cook plant, correct?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

| Page 57 | Page 59 |
|---|---|
| 1  A.  Yes. | 1  Tell me about the first week of work over there. |
| 2  Q.  Okay.  And so you agreed to take it.  Have | 2  Do you remember what day you started on? |
| 3  you told me everything that was said in that | 3  A.  I don't remember the exact day. |
| 4  conversation by Reb and Greg, where they offered | 4  Q.  All right.  Well, let's go through the first |
| 5  you the job in the cook plant? | 5  week that you can recall working there.  Tell me |
| 6  A.  Yes. | 6  what you did and how long you worked. |
| 7  Q.  And so you agreed to take it? | 7  A.  Came in a little bit early, probably 9:30. |
| 8  A.  Yes.  But I also came back within eight | 8  Q.  Okay. |
| 9  hours, after talking to my wife, and she told me I | 9  A.  We ran the lines until approximately 11:30, |
| 10  would be crazy to take it, because I would go back | 10  when we quit running chicken. |
| 11  to third shift, which she hated me working, when I | 11  Q.  What were y'all doing? |
| 12  had a first shift job. | 12  A.  Making chicken tenders/strips for |
| 13    I went back to Greg Mills and declined it; | 13  McDonald's. |
| 14  and he said, "I'm sorry; it's too late.  This is | 14  Q.  And was this when the plant had just started |
| 15  your job now." | 15  back up? |
| 16  Q.  When was that? | 16  A.  Yes. |
| 17  A.  The same day it was offered to me and I | 17  Q.  So they hadn't been running any production |
| 18  agreed to take it. | 18  in there since the Equity Group had bought it; is |
| 19  Q.  Well, how would it be the same day?  I mean, | 19  that right? |
| 20  if they offered it to you, and then -- | 20  A.  They had run some tests on days and stuff, |
| 21  I called my wife, during my break at lunch, | 21  but not actual production on both shifts. |
| 22  and told her what I was offered. | 22  Q.  So they brought you back over there, and |
| 23  Q.  All right.  So your wife got upset with you | 23  they were in the process of cranking that plant |

| Page 58 | Page 60 |
|---|---|
| 1  for taking a third shift? | 1  back up; is that right? |
| 2  A.  Right.  Because I never could sleep good in | 2  A.  Right. |
| 3  the daytime.  It's hard to sleep in the daytime | 3  Q.  And it had been down for some period of |
| 4  with children at home. | 4  time; is that right? |
| 5  Q.  Okay.  And so tell me what you did after | 5  A.  Yes. |
| 6  that phone call. | 6  Q.  And they were cooking chicken nuggets?  No. |
| 7  A.  I went back to Greg's office, explained to | 7  What were they cooking?  What did you tell me? |
| 8  him that I had talked it over with my wife, and | 8  A.  At that time, we were cooking the nuggets. |
| 9  that I'd rather stay where I was.  And he said it | 9  Q.  All right.  So how many hours did you have |
| 10  was too late.  You're here; you're going to be the | 10  to work the first week? |
| 11  supervisor, and that's it. | 11  A.  Shoot, probably 90 hours. |
| 12  Q.  Had you started working over there yet? | 12  Q.  All right.  When you're on salary, do you |
| 13  A.  No. | 13  get paid once a week or -- |
| 14  Q.  All right.  So he essentially, you're | 14  A.  Every two weeks. |
| 15  saying, makes you stay in this job once you had | 15  Q.  Okay.  So when you got your first paycheck, |
| 16  accepted it, correct? | 16  it would be two weeks after that, I guess; is that |
| 17  A.  Yes.  He said, "You accepted it two hours | 17  right? |
| 18  ago.  You're going to keep the job.  You've got | 18  A.  Yes. |
| 19  it.  It's either that or you're out the gate."  He | 19  Q.  And how many hours had you worked during |
| 20  said, "You're going to be it, because you're the | 20  that two weeks, that you can recall? |
| 21  best we've got.  You've run this cook plant | 21  A.  Probably 170 hours. |
| 22  before, and we need you." | 22  Q.  In a two-week period? |
| 23  Q.  All right.  And so you start over there. | 23  A.  Yes. |

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 61

1   Q.   And was that in November of 2004?
2   A.   Yes.
3   Q.   All right.  And you got your paycheck.  And
4   how much was your paycheck?
5   A.   I don't remember exactly.  Somewhere around
6   -- I don't remember exactly.  I think it was
7   $1500, something like that.  I don't remember
8   exactly.
9   Q.   And do you contend it would have been more
10   if you would have been hourly?
11   A.   Definitely.  My employees were taking home
12   more than me.
13   Q.   The people under your supervision were
14   taking home more?
15   A.   Yes.
16   Q.   Okay.  What about your health insurance and
17   dental and all that?  Was that free at that time?
18   I mean, was that provided as part of your
19   compensation?
20   A.   They were paying that.
21   Q.   So they did do that?
22   A.   Yes.
23   Q.   Do you know how much they were paying for

Page 62

1   that?
2   A.   The difference in what I used to pay was $47
3   a week.
4   Q.   Were you getting different coverage or was
5   it the same?
6   A.   I'm thinking it was basically the same.
7   Q.   Do you know that for sure though?
8   A.   Only thing I know is I used to pay 47.50, I
9   think it was, and then I didn't have to pay it no
10   more.
11   Q.   Right.  But I guess my question is:  Did you
12   get better family coverage as a salaried employee?
13   A.   I don't remember.  I believe it was the same
14   thing.  I'd have to look back at the records to
15   see.  But as far as I know, it was the same thing.
16   I never used it.
17   Q.   But it was Blue Cross?
18   A.   Yes.
19   Q.   And then you had dental coverage?
20   A.   Yes.
21   Q.   And then did they contribute some to your
22   401(k)?
23   A.   If you put in a certain percentage, I think

Page 63

1   they matched it.  I don't remember exactly.
2   Q.   Did you participate in that?
3   A.   Yes.
4   Q.   Do you remember how much?
5   A.   I put in very little.  I don't remember
6   exactly.
7   Q.   But whatever you put in, did they match?
8   A.   I don't remember exactly.
9   Q.   I mean, do you remember having a problem
10   with them not matching your 401(k)?
11   A.   I don't remember much about the 401(k), I
12   was so busy working.
13   Q.   Okay.  Let's go to the second half of
14   November 2004.  Tell me how many hours you think
15   you worked.
16   A.   At least 80 hours a week.
17   Q.   And you were not clocking in?
18   A.   The first couple of weeks I did, because it
19   was a force of habit to walk in and clock.
20   Q.   And that would have been in October?
21   A.   The first week or so of taking the
22   supervisor position, David Griffin jokingly asked
23   me if I was clocking in so they would keep up with

Page 64

1   my time, because I was putting in so many hours.
2   And I said it was just a force of habit, clocking
3   in and clocking out every day.
4   Q.   Okay.  So it looks like all through November
5   of '04, you were working 80 to 90 hours a week,
6   correct?
7   A.   Yes.
8   Q.   What about December of '04? same thing?
9   A.   Somewhere along that time, James Bragg was
10   having some marital problems; and he would come in
11   late, so they would make me stay over.
12   Q.   Who would make you?
13   A.   Reb Bludsworth would tell me not to leave
14   until the second shift supervisor came in.
15   Q.   Okay.
16   A.   The second shift supervisor wouldn't have to
17   come in, I don't think, until approximately one
18   o'clock.
19   Q.   So you're saying, in December, your hours
20   went up?
21   A.   It was somewhere along the eight month
22   period -- I'm not sure if it was December --
23   somewhere around there, James was having some

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 65

1  marital -- he was going through bankruptcy and a
2  divorce. He was the first shift supervisor. So
3  I, a lot of times, had to stay over and things.
4  Q.   Okay. At any time during your tenure as the
5  third shift maintenance supervisor, did you work
6  less than 45 hours a week?
7  A.   Never worked less than 45.
8  Q.   What's the least amount of hours you worked
9  in a week during that time, from November of 2004
10  to May of 2005?
11  A.   Approximately 75 to 80 hours.
12  Q.   You never worked less than that?
13  A.   No. I had to be there seven days a week.
14  Q.   Okay. And tell me about any complaints you
15  made about the number of hours you were working.
16  Tell me who you complained to and when it was and
17  what was said.
18  A.   I complained to Reb Bludsworth, Greg Mills,
19  and Kathy Gilmore.
20  Q.   Okay. And tell me when that -- if you
21  could, just tell me when you made those
22  complaints.
23  A.   It was probably after being the supervisor

---

Page 66

1  for over three months. I can't remember the exact
2  dates.
3  Q.   So you think you had been in there two or
4  three months before you started complaining?
5  A.   I complained a little bit to start with, but
6  not officially, you know. I just said, "Hey, man,
7  this ain't what y'all promised."
8  Q.   Who did you tell that to?
9  A.   Reb Bludsworth.
10  Q.   How did he respond?
11  A.   He said, "Oh, man, come on, hang in there
12  for me. I need you."
13  Q.   All right. Anything else he said, that you
14  can remember?
15  A.   Just that things would get better later.
16  Q.   All right. And so do you remember when
17  those first complaints to Reb were?
18  A.   The first month I was supervising.
19  Q.   And you call those unofficial complaints?
20  A.   Well, what I mean was I didn't go over his
21  head or anything complaining about it. I believed
22  -- I tried to believe what the man told me, that
23  things would get better.

---

Page 67

1       What he would tell me was, "Give it another
2  couple weeks. We'll get this machinery running
3  better, get people more trained, and things will
4  work out." But it just never happened.
5  Q.   Well, I mean, you had started plants before,
6  hadn't you, in your career?
7  A.   Yes.
8  Q.   And you would agree that it takes time to
9  get things running right, doesn't it?
10  A.   Yes, sometimes.
11  Q.   And so is that the process they were going
12  through during that period of time?
13  A.   It wasn't just the plant being running. The
14  plant could be running fine, and they would tell
15  me to stay over because the first shift supervisor
16  didn't show up; so I ended up pulling both shifts.
17       Then there was a ten-day period the man was
18  out. The first supervisor was out because of a
19  knee operation, and I ended up pulling both
20  shifts. I complained that it should have been
21  split between the two supervisors, to be fair.
22  Q.   Who did you complain to about that?
23  A.   Reb Bludsworth.

---

Page 68

1  Q.   And what did he say?
2  A.   He said, "I've asked Charlie to come in
3  early, but you can't leave until he shows up or I
4  give you permission."
5  Q.   Well, did Charlie ever start coming in
6  early?
7  A.   Sometimes he'd show up around 12:30,
8  lunchtime. Maybe 30 minutes early than the
9  regular shift.
10  Q.   Well, is he still working out there?
11  A.   I really don't know who's working out there
12  and who isn't at this time.
13  Q.   Well, when you left, was he working out
14  there?
15  A.   Yes, he was.
16  Q.   Okay. And your guys on your crew, were they
17  working the same hours you were?
18  A.   No, sir. They would get to go, once things
19  got up running okay. Then I would have to stay.
20  Q.   So you're saying you worked longer than the
21  people on your crew?
22  A.   Yes, sir.
23  Q.   All right. Do you know of any kind of

---

17 (Pages 65 to 68)

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 69

1  record we could look at that showed how long you
2  worked on a weekly basis, while you were on
3  salary?
4  A.  There wouldn't be a record, because they
5  told me not to clock in and out.
6  Q.  Right.  Well, you were on salary if you
7  weren't getting paid by the hour, correct?
8  A.  Right.
9  Q.  But do you have any personal record that you
10  kept?  Any kind of notes or anything?
11  A.  I'd have to look back at the house.  At one
12  time I was jotting down some of the hours I
13  worked.  Because I'd jot down three weeks' worth
14  and show it to Reb and say, "Hey, this is what I
15  worked, man; this ain't right."
16  Q.  And how would he --
17  A.  And I also knew that the company in Eufaula,
18  the same company owns the one in Camilla.  And a
19  supervisor over there, if he has to work
20  Saturdays, got approximately $100 bonus.
21  Q.  Okay.  Did you not get any bonuses?
22  A.  No.  I was told later, approximately a month
23  after I was terminated, a supervisor called me and

Page 70

1  said, "Hey, all the complaining you did finally
2  worked for us; sorry it couldn't work for you.
3  They've now put in a policy where, if we work
4  over, we get a bonus."
5  Q.  And who told you that?
6  A.  Terrance Skinner.
7  Q.  And he was working in Camilla?
8  A.  No.  He was working in Eufaula.
9  Q.  Oh, okay.  I misunderstood.
10  A.  A supervisor in Eufaula called and told me
11  that, "Since you complained and all, they've
12  started giving us a bonus if we have to work on
13  the weekends."
14  Q.  When was that?
15  A.  Approximately a month after I was
16  terminated.
17  MR. ROBERSON:  We're going to call that
18  the Blocker Bonus.
19  Q.  All right.  And so tell me the next
20  complaint you made either to -- you made an
21  initial complaint to Reb.
22  How many times would you say you complained
23  to Reb during your employment there, as a salaried

Page 71

1  supervisor?
2  A.  Probably eight or ten times.
3  Q.  Okay.  And what would his response be?
4  Would he have the same response for you every time
5  or did it change?
6  A.  He kept telling me that he needed me in
7  there because I knew more about the equipment;
8  they've already sent me to school on the
9  equipment; and if it was down or tore up, he
10  needed me there; that he had to keep his job, and
11  the only way he was going to keep his job was to
12  keep that plant running and keep down time down.
13  Q.  Okay.  When did they send you to school?
14  A.  Probably two months before I was terminated.
15  They sent me to school in Camilla and Albany.
16  Q.  All right.  How long were you -- were you at
17  the plant over there?
18  A.  We took a week's class over at that plant,
19  approximately a week.  We went to training over
20  there, and then we came and worked on the
21  equipment there at Baker Hill, with the teacher.
22  Q.  All right.  And so that was in, what, March
23  of 2005?

Page 72

1  A.  Approximately.  I couldn't tell you exact
2  dates.
3  Q.  Okay.  And so the complaint about your
4  overtime to Reb, where he talked about your
5  training, that would have to be at least after
6  March, right?
7  A.  I complained before then, yes.
8  Q.  How many times did you complain before then?
9  A.  I don't remember exactly.  Eight or ten
10  times to Reb.  But then I was suspended, with all
11  three supervisors on my shift:  the sanitation,
12  the QA, and myself.
13  Q.  What were you suspended for?
14  A.  They said improper lock out and tag out.
15  Q.  Did they train you on lock out and tag out?
16  A.  Yes.  But when I complained to Reb that I
17  wasn't actually at fault on this, he said that he
18  had to cover his job; and they suspended all three
19  supervisors.
20  Q.  Well, tell me what happened.  Go through
21  that for me.
22  A.  A person crawled into a machine that
23  shouldn't have, and there was chemicals and all in

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 73

1  the machine. And I had called the safety
2  director, Harry Wilson, at home, and reported that
3  they weren't following by procedure.
4  Q.  What do you mean, "by procedure"?
5  A.  They put a man inside a tank, basically --
6  Q.  Who is "they"?
7  A.  The sanitation director.
8  Q.  Okay.
9  A.  -- to clean it. And that's a confined
10  space. I've been to school on it, and you have to
11  have a confined space permit. And maintenance had
12  to pull the man out when he quit breathing.
13  Q.  All right. What was that guy's name?
14  A.  I don't know his name.
15  Q.  Was that during your shift?
16  A.  Yes.
17  Q.  Was it a maintenance man in there cleaning
18  up?
19  A.  No. It was a sanitation worker, Hispanic.
20  Q.  Whose responsibility is it to do the lock
21  out and tag out?
22  A.  The maintenance locks out, but also the
23  workers cleaning on the equipment. Whoever is

## Page 74

1  working on the equipment is supposed to lock it
2  out also.
3  Q.  So everybody had a tag?
4  A.  Everybody's issued a lock and a tag.
5  Q.  And they trained you on lock out and tag
6  out, correct?
7  A.  We went to a little class on it.
8  Q.  Okay. Wouldn't that be training?
9  A.  Yes.
10  Q.  So they teach you about locking out and
11  tagging out before you work on a machine or clean
12  a machine, correct?
13  A.  Yes.
14  Q.  So do I understand that some hourly worker
15  that was cleaning didn't lock out and tag out, and
16  got inside a machine?
17  A.  That's one incident, yes.
18  Q.  Were there others?
19  A.  They had locked out the electrical, but
20  there was an airline; and they didn't lock all
21  three sources out one time.
22  Q.  Who is "they"?
23  A.  The QA person and the sanitation person.

## Page 75

1  Q.  Okay.
2  A.  It was a new piece of equipment, and we
3  weren't trained on the equipment to know how
4  everything worked.
5  Q.  So when was that one, in relation to the guy
6  crawling in the machine? Was it before or after?
7  A.  It was during the same day, I believe.
8  Q.  What approximate month was that?
9  A.  You've got a document on that.
10  Q.  Yeah, I think I do. Let's look at that.
11     (Defendant's Exhibit No. 1 was
12     marked for identification and a
13     copy of the same is attached
14     hereto.)
15  Q.  I've marked as Exhibit 1 a Corrective Action
16  Form dated May 2, 2005.
17     See if you remember seeing that and signing
18  that.
19  A.  Yes, I do.
20  Q.  Okay. And this is what you testified about
21  earlier, when you were suspended along with the
22  sanitation supervisor and the QA supervisor?
23  A.  Right.

## Page 76

1  Q.  So it wasn't just you?
2  A.  Right.
3  Q.  They got all the supervisory people on duty
4  at that time; is that what happened?
5  A.  Yes.
6  Q.  Y'all all got suspended?
7  A.  Yes. But at this time, the QA supervisor --
8  all of us were suspended for three days.
9     And I went to Kathy Gilmore and said, "This
10  can't be correct. I'm suspended for three days.
11  And you've cut my pay based on a five-day work
12  week. But yet you want me to work the next four
13  days this week."
14  Q.  All right. I'm not following that.
15  A.  Okay. They told me my pay is based on 40
16  hours, Kathy Gilmore did.
17  Q.  When did she tell you that?
18  A.  When my check came out, after this
19  suspension.
20  Q.  So you were arguing they suspended you and
21  then sent you a reduced paycheck; and you went to
22  her to complain about that part of it?
23  A.  Yeah. And my boss, Reb. Because they're

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
**Court Reporting * Legal Videography * Trial Services**

| Page 77 | Page 79 |
|---|---|

**Page 77**

1  telling me they base my pay on 40 hours. And they
2  suspend me for three days, so they take three
3  days' pay, 60 percent of my pay out; and then tell
4  me straight out that that's what they're doing,
5  but want me to work the next four days of that
6  week. I said, "This isn't right. How do you
7  expect me to work for two days' pay and work four
8  days?"
9  Q.   So you had a beef with them about how much
10  they were reducing your pay as a result of this
11  suspension?
12  A.   Yes, sir. I told them that I had no problem
13  with working two days that week. But you're
14  telling me to work four, and I'm not getting paid
15  for it.
16  Q.   Were the other people treated the same way,
17  or do you know?
18  A.   The sanitation director was also treated the
19  same way; but the QA was only working five days,
20  so it wasn't no big deal. She got suspended for
21  three days, worked two days, and got two days'
22  pay.
23  Q.   Okay. Who brought -- who counseled you on

**Page 79**

1  A.   That was it.
2  Q.   Okay. Did they mention overtime in any way?
3  A.   Not at that time.
4  Q.   Did they mention any complaints you had made
5  in any way?
6  A.   No.
7  Q.   And they treated, at least, the sanitation
8  supervisor the same as you, correct?
9  A.   Yes.
10  Q.   Who was that person?
11  A.   I don't remember his name.
12  Q.   What about the QA supervisor?
13  A.   Glenda. I don't remember her last name.
14  Her first name is Glenda.
15  Q.   Okay.
16  A.   You've got her name written in one of these
17  reports somewhere.
18  Q.   Okay. In one of these write-up things?
19  A.   (Witness nods head.)
20  Q.   Okay. All right. So I take it then you
21  complained, once you got your check, after this
22  write-up on the lock out and tag out, you
23  complained that they had taken out too much?

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  this? I can't read that writing, that supervisor.
2  Is that Reb?
3  A.   Reb and Kathy were in the office. It must
4  be Reb's signature.
5  Q.   This was on May 2nd when you were in the
6  office with them? It says up there May 2nd;
7  that's what I'm going by.
8  A.   Yes, sir.
9  Q.   Tell me what was said to you.
10  A.   That that's the way it was. I work the
11  hours they tell me, and that was the way it was
12  going to be. If I didn't like it, go find another
13  job.
14  Q.   Well, when did you know -- I mean, when you
15  initially got counseled over the lock out and tag
16  out, you'll weren't discussing your pay at that
17  time, or were you?
18  A.   No.
19  Q.   Okay. What did they tell you on that
20  initial conversation about why you were being
21  written up?
22  A.   For the lock out/tag out procedure.
23  Q.   Anything else?

**Page 80**

1  A.   Yes. I told them it wasn't fair for me to
2  have to work over 40 hours a week if they were
3  going to base my pay on 40.
4  Q.   And who did you take that complaint to?
5  A.   I went to Reb Bludsworth. And I told him, I
6  said, "Look, Reb, I'm sorry, but according to
7  company procedure, if I don't agree with you and I
8  think I'm being mistreated, I need to go to your
9  boss, even though I know that's your hometown
10  buddy."
11  And I went from there straight to Greg
12  Mills' office.
13  Q.   All right. Tell me about that conversation.
14  A.   Greg told me that that's the way things
15  work; that he didn't want to deal with me; that I
16  need to go back and talk to Reb; what happens
17  between him and me is his business.
18  And I informed Greg, I said, "Greg, just to
19  make this official, I want to let you know that
20  I'm leaving your office; I will go back to Reb and
21  tell him what you said, but I'm going to speak to
22  Kathy Gilmore."
23  Q.   What did you tell Greg though specifically?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 81

1  I mean, tell me what the complaint you made to him
2  was.
3  A.  That I was tired.  I worked 80, 90 hours
4  week, and yet my pay is based on 40.  And if you
5  suspend me, you base my pay on 40.  You guaranteed
6  me when I took the job that I would only have to
7  work 40 to 45 hours a week.  And I'm exhausted.
8  Q.  Did you ever, prior to that time, May 2nd,
9  did you ever complain to Greg Mills about how many
10  hours you were working?
11  A.  Yes.
12  Q.  All right.  Tell me about those.
13  A.  He had came by and asked me how things were
14  going, and I told him I was working too many hours
15  for what was promised.
16  Q.  And what did he say to that?
17  A.  Oh, it will get better one day, don't you
18  worry; just stick it on in there; we need you.
19  Q.  All right.  Anything else he said?
20  A.  That was it.
21  Q.  All right.  And back to this May 2nd.  After
22  this May 2nd counseling, he just essentially sent
23  you back to Reb?

Page 82

1  A.  Yes, sir.
2  Q.  Tell me what else he said to you during that
3  meeting that you haven't already told me about.
4  A.  I explained to him that, at least at the
5  sister plant over here in Camilla, if a supervisor
6  had to work that kind of hours, they were given a
7  bonus.
8  Q.  And how did you know that?
9  A.  They sent me to Camilla to school, and the
10  guys told me.
11  Q.  That's when you learned that --
12  A.  Yeah.  That's when I found out the hourly
13  rate at that company was higher than the company I
14  worked at.
15  Q.  So you found that out from that plant, not
16  from the plant here where you worked?
17  A.  Yes.
18  Q.  Was anybody in your plant getting any kind
19  of bonus for working extra? any kind of salaried
20  supervisor, that you know of?
21  A.  The sanitation supervisor would get some
22  days off.
23  Q.  Who was his boss?

Page 83

1  A.  I can't remember his name right now.
2  Q.  Okay.  And do you know of anybody that was a
3  maintenance supervisor --
4      MR. SMITH:  Let me strike that.
5  Q.  Did a maintenance supervisor, in the fresh
6  plant or the processing plant, make the same
7  salary as you did when you were a maintenance
8  supervisor?
9  A.  I don't know exactly, but I was told they
10  were making the same thing.
11  Q.  Do you know if they got any kind of bonuses
12  over there?
13  A.  They didn't get any bonuses at that time
14  either.
15  Q.  So it was the same way as with you?
16  A.  But they weren't working with as many hours
17  as I was having to.
18  Q.  Okay.  And you were in the start-up mode in
19  the plant; is that correct?
20  A.  After eight months, I would figure the
21  start-up mode was over.
22  Q.  Well, you'd been there -- I mean, tell me
23  when you would have figured it was over.  Because,

Page 84

1  I mean, it sounds like you went October to May;
2  that's seven months.  And they wanted you -- are
3  you talking about in May of --
4  A.  The first month I didn't complain because I
5  said, you know, we're trying to build this thing
6  up.
7  Q.  Right.
8  A.  But after that, I felt that I was being done
9  wrong.  That's when I started complaining.
10  Q.  In November or December?
11  A.  Yes.  Because they said, "Oh, it's normal
12  for start-up."  I said, "Man, start-up's been
13  over.  We've got people quitting because of the
14  overtime."
15  Q.  Tell me who quit because of the overtime.
16  A.  Michael Johnson quit because of the
17  overtime.
18  Q.  Was he under you?
19  A.  No.  That was before.
20  Q.  All right.  Who else?
21  A.  I really don't remember all the people that
22  quit.  I couldn't tell you the names right now.
23  Q.  Okay.  I know we're jumping around a little

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 85

1  bit, but that's how it goes sometimes.
2      Back to this May 2nd Corrective Action Form.
3  You went to complain to Reb about how much they
4  took out of your pay?
5  A.  Yes.
6  Q.  And then he sent you over to Greg? Or you
7  went to Greg; he didn't send you?
8  A.  He didn't want me to go to Greg.
9  Q.  You went over to Greg though?
10  A.  But I explained to him -- I didn't want to
11  do nothing behind someone's back. I explained to
12  him what I was going to do.
13  Q.  All right. And then Greg sent you back to
14  Reb.
15  A.  Yes.
16  Q.  And tell me about that conversation.
17  A.  I didn't go directly back to Reb. I told
18  Greg instead of going right back to Reb, which was
19  a dead-end, I was going to make sure it was
20  officially reported to HR.
21  Q.  All right. And so then you go to see Kathy?
22  A.  No. I actually went to see Kathy's boss,
23  who had just hired on, who wouldn't know the

## Page 86

1  political stuff of the plant. And he told me that
2  he felt that I should go talk to Kathy.
3  Q.  Was that Jim Vice?
4  A.  Yes.
5  Q.  Okay. Tell me about the political stuff in
6  the plant. What does that mean?
7  A.  Well, you know, certain people were in like
8  a click, you call it. You know, a buddy-buddy
9  system.
10  Q.  Who would that be?
11  A.  Just certain groups of people. Like Reb and
12  Greg all went to school together, you know.
13  Q.  So they were friends; is that what you're
14  saying?
15  A.  Yeah. What I'm saying is, it was always
16  like that. Certain folks got treated a little
17  different.
18  Q.  Like who?
19  A.  Well, like, Reb, Greg.
20  Q.  Who treated them differently?
21  A.  Reb and Greg treated certain people a little
22  different than others.
23  Q.  Treated certain people under them?

## Page 87

1  A.  Right.
2  Q.  All right. Tell me who those people were.
3  A.  Charlie Smith, Charlie Mobley. Certain
4  people were treated a little different.
5  Q.  And what jobs were those guys in?
6  A.  Charlie Smith was a supervisor; Butch
7  White's boy, they treated him a little different
8  than some. You know what I mean?
9  A.  Uh-huh.
10  A.  He could walk off the job mad and come back,
11  and nothing would be said, you know. Just little
12  things.
13  Q.  Were, I mean, are these people that worked
14  maintenance?
15  A.  Yes.
16  Q.  And who was their direct supervisor?
17  A.  Sometimes it was Billy Kelly; sometimes it
18  was -- they were all basically working with Reb
19  though. Reb or Greg.
20  Q.  Okay. And they were working overtime too?
21  A.  I really don't know what kind of hours for
22  sure they were working.
23  Q.  All right. Let's go back to when you went

## Page 88

1  to see Kathy Gilmore about this. And I take it
2  you went to see her because you thought they had
3  taken too much out of your paycheck for the
4  suspension?
5  A.  It wasn't just that. I thought that I
6  shouldn't have to stay over and work that many
7  hours.
8  Q.  All right. Tell me what she said when you
9  went to see her.
10  A.  She told me Reb was in charge of scheduling,
11  and she would get a meeting with us. Then we had
12  a meeting, and she said, "Well, Reb's in charge of
13  scheduling. If he tells you to work, you've got
14  to be there."
15  Q.  Okay. Anything else?
16  A.  That's all she said.
17  Q.  Who else was at that meeting?
18  A.  Just the three of us.
19  Q.  So she essentially told you, Reb's the boss;
20  if he says you've got to work, you've got to work?
21  I mean, is that kind of how that went?
22  A.  Yes.
23  Q.  What did you do after that, in the way of

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 89

1 complaining?
2 A.   A couple of the other supervisors -- one of
3 them was Terrance Skinner -- said, "Man, you
4 shouldn't have went to Greg; you'll probably be
5 terminated."
6      And I loaded my toolbox up that day in case
7 I was.  Two weeks later, approximately, I was
8 terminated.
9 Q.   Where was Terrance Skinner when he told you
10 that?
11 A.   In the maintenance office.  He told me,
12 that, you know, you don't go over people's head
13 around here without paying for it.  I should have
14 handled it a different way, he said.
15 Q.   So do you think part of the reason you got
16 terminated was because you went over Reb's head?
17 A.   Well, Reb was furious and so was Greg.  How
18 dare I talk about leaving the company and stuff.
19 Because I told them I was burnt out.
20 Q.   So you told them -- I didn't hear you say
21 that earlier.
22      Did you tell them you were going to quit
23 your job?

## Page 90

1 A.   I told them that I couldn't afford to quit
2 my job, but I would start looking elsewhere.
3 Q.   So they knew you were going to be looking
4 for another job then?
5 A.   I told them if I had to keep working that
6 many hours, there was no way I could stay.
7 Q.   Did you ever start looking for another job?
8 A.   I went and put in an application in Dawson,
9 Georgia.  That was right after I got terminated.
10 Excuse me.
11 Q.   Did you look for one before you were
12 terminated?
13 A.   Didn't have time to.  You work that many
14 hours, you're so tired, all you can do is sleep.
15 Q.   But you told them you wanted to go get
16 another job, it sounds like; is that correct?
17 A.   It was basically a threat, hoping to cut
18 back on some of the overtime.
19 Q.   So you threatened to leave your employment
20 with Equity Group?
21 A.   I stated that I didn't want to; that I would
22 like to go back to refrigeration or something;
23 that this just wasn't what I was promised when I

## Page 91

1 took the job.
2 Q.   And then what did they say about going back
3 to refrigeration?
4 A.   They told me once you become a supervisor,
5 it's either you do this job or you're out the
6 gate; there is no going back.
7 Q.   Do you know of any other supervisors that
8 went back to hourly?
9 A.   No, I don't.
10 Q.   Do you understand that to be sort of the
11 policy?
12 A.   I don't know what the policy is.
13 Q.   Or the practice, or whatever you want to
14 call it.
15 A.   I didn't know what kind of policy the
16 company had.  I never got a chance to -- I had
17 planned at the time -- at the time, the CEO was
18 Spence Jernigan.
19      Some people told me I should have talked to
20 him to see what the policy was; go over Kathy's
21 head and go on to the plant manager.  And that was
22 the plan I had that I was going to do, but I never
23 got to talk to him.  I was terminated before I

## Page 92

1 could.
2 Q.   Well, you had between May 2nd and -- what
3 day were you terminated?  May 17th?
4 A.   Uh-huh.
5 Q.   You had 15 days.
6 A.   It's kind of hard, when you're working that
7 many hours, to even stay awake when you go home.
8 And it's hard to come to a man that important to
9 get a time to speak to him.
10 Q.   Okay.  And you feel like that Reb and Greg
11 were mad at you for getting outside of the chain
12 of command, so to speak, on complaining about your
13 overtime?
14      MR. ROBERSON:  Object to the form.
15 A.   Yes.
16 Q.   Okay.  After May 2nd, when you talked to --
17 you had that conversation with Kathy Gilmore and
18 Reb, where Kathy essentially told you that Reb set
19 your hours -- I mean, is that what he -- I don't
20 want to put words in your mouth.
21 A.   Kathy Gilmore explained to me that she had
22 already talked to Reb; Reb was in charge of
23 scheduling, so I have to work the hours he tells

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 93

1   me.
2   Q.   Okay.  What else was said during that
3   conversation?
4   A.   That was it.
5   Q.   And did that occur on May 2nd?
6   A.   No.  I believe it happened a little while
7   after that.  I can't give you the exact date.
8   Q.   I guess it would be when your paycheck came
9   out; is that when it was?
10  A.   Approximately.  I don't remember the exact
11  date.
12  Q.   And you don't remember anything else said in
13  that conversation?
14  A.   No.  It was a very short meeting.
15  Q.   And you've told me everything you told Kathy
16  during that meeting, correct?
17  A.   As far as I can remember.
18  Q.   All right.  And did you have any other
19  complaints that you made to Kathy Gilmore at any
20  time?
21  A.   Not that I can remember.
22  Q.   None before?
23  A.   I don't remember going to Kathy about that,

Page 94

1   no.
2   Q.   And none after that?  I mean, that's the one
3   time you've talked to Kathy and the complaint was,
4   when you were suspended, they cut too much out of
5   your paycheck; is that correct?
6   A.   I went to her that time.  I also went to her
7   when I complained about the overtime.
8   Q.   That's what I'm trying to get to.  When was
9   that?
10  A.   I can't remember the exact dates, but it was
11  more than once.
12  Q.   And you don't know when that occurred?
13  A.   Somewhere during that time frame.  Right
14  after this incident here.
15  Q.   It was after the May 2nd counseling?
16  A.   Yes.
17  Q.   But you don't know when?
18  A.   I couldn't give you the exact date, no, sir.
19  It's hard to remember back three years.
20  Q.   All right.  Did you make any more complaints
21  to Reb or Greg, other than the ones you've told me
22  about?
23  A.   Just to Reb.

Page 95

1   Q.   All right.  When was that?
2   A.   A couple days after this, he left me, told
3   me not to leave the plant until he told me to
4   leave.
5   Q.   Okay.
6   A.   And it was like one o'clock, and I tried to
7   reach Reb, and they told me he wasn't even on the
8   job site.
9        And David Griffin told me, he said, "Look,
10  I'm telling you, you ought to talk to Spence
11  Jernigan.  You're being mistreated."  He said,
12  "They can't fire you.  You ought to just go on
13  home."
14       I said, "Well, I was told to stay here until
15  he got here."  David Griffin said, "They're
16  playing you.  Go on home.  They can't fire you for
17  this."
18  Q.   For what?
19  A.   For leaving.  It's one o'clock in the
20  afternoon; I've been there since ten o'clock at
21  night.
22  Q.   Right.  Was he right about that?
23  A.   I don't know.

Page 96

1   Q.   I mean, did you ever leave early when you
2   felt like you shouldn't have?
3   A.   My schedule was supposed to have been from
4   ten o'clock at night until six in the morning.  If
5   I left at one o'clock the next afternoon, I had
6   already been there almost 16 hours.
7   Q.   Well, nobody would fault you for that, would
8   they?
9   A.   Reb would.  He told me not to leave until he
10  told me I could.
11  Q.   And that was after you had been on a shift?
12  A.   Yes.
13  Q.   And then you stayed extra?
14  A.   Right.
15  Q.   And that's when Terrance Skinner said,
16  "Don't worry; go ahead and leave"?
17  A.   No.  That was David Griffin.
18  Q.   I'm sorry.
19  A.   David Griffin told me I ought to speak to
20  Spence Jernigan.
21  Q.   Okay.  And you never did go to see Spence?
22  A.   I went by his house one time, because he
23  lived right beside me almost.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 97

1  Q.  Tell me what happened.
2  A.  He was busy at the time.  I didn't want to
3  talk to a man with his wife there and interrupt a
4  family deal.
5  Q.  When was that?
6  A.  It was somewhere after the May 2nd issue.
7  Q.  Okay.  Any other complaints about overtime
8  that you made that you haven't told me about?
9  A.  Just that the next morning or the next day I
10  told Reb that was sure convenient for him to leave
11  the job site and go somewhere else, knowing that
12  he wasn't going to be there to tell me to leave; I
13  thought he done me wrong.  He just laughed.
14  Q.  What did he say?
15  A.  He just laughed, and walked on.
16  Q.  Did you complain to anybody about that
17  incident, other than Reb?
18  A.  No, sir.
19  Q.  Okay.  Is that it for complaints about your
20  work hours?  I'm just trying get -- I'm not trying
21  to belabor the point; I'm trying to make sure I've
22  got all the complaints that you made.
23  A.  I had talked with David Griffin about it.

Page 98

1  But he didn't want nobody to know that me and him
2  had talked.
3  Q.  And he was a supervisor?
4  A.  He came in for special projects when they
5  were building the plant and stuff, and I worked a
6  lot with him.
7  Q.  And you talked to Randy Ogletree about it?
8  A.  I talked to Randy and some guys that I
9  fished with and stuff.
10  Q.  Who's Randy Ogletree?
11  A.  He works in the welding shop, or he did at
12  that time.  I think he still has the same
13  position.
14  Q.  Okay.  And then Terrance Skinner?
15  A.  Terrance Skinner was the refrigeration
16  supervisor at that time.
17  Q.  And you complained to him?
18  A.  I had talked with him about it, yes.
19  Q.  What did you tell him?
20  A.  I thought I was being mistreated.  He warned
21  me never to take that position, because I was
22  working under him, hourly.
23  Q.  Okay.  And then Joe McCraney?

Page 99

1  A.  I talked with Joe about it.  Me and Joe
2  talked regular.
3  Q.  Where did Joe work?
4  A.  Joe was the kill plant first shift
5  supervisor.  He'd see me still there on first
6  shift a lot of times and ask me why I was still
7  there.
8  Q.  Okay.  What about James Bragg?
9  A.  James was a first shift supervisor at the
10  cook plant.
11  Q.  Okay.  None of those guys had supervisory
12  authority over you, did they?
13  A.  No.
14  Q.  They were all kind of equal in rank?
15  A.  Yes, sir.  And they were all making the same
16  money I was.
17  Q.  Okay.  Tell me what your job duties were
18  when you were the third shift maintenance
19  supervisor in the cook plant.
20  A.  Just to maintain the equipment, make sure it
21  was ready for start-up.
22  Q.  And you had to oversee employees under you,
23  correct?

Page 100

1  A.  Yes.
2  Q.  Did you direct those employees on what
3  jobs --
4  A.  I trained the employees on how to work on
5  the equipment and what to look for, for
6  troubleshooting.
7  Q.  Would you tell them when to do what job and
8  how to prioritize what projects had to be done?
9  A.  Yes.  I would tell them when we had to work
10  on the equipment and when we didn't work on it and
11  how to upkeep, you know.  There was housekeeping
12  too, you know; you had to keep areas clean.
13  Q.  Was there paperwork they had to fill out?
14  A.  Just whenever we did maintenance.  Once a
15  week when we did our maintenance log sheets, we
16  had to fill out paperwork.
17  Q.  And would you be in charge of making sure
18  they did all that?
19  A.  Yes.
20  Q.  And would you review it?
21  A.  Yes.
22  Q.  Would you give them performance reviews and
23  tell them whether they were doing a good job or a

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1  bad job or where they needed to improve?
2  A.   Yes.
3  Q.   That was part of your job as a supervisor?
4  A.   Yes.
5  Q.   Could you hire those people?  How would that
6  work?  If you needed a person on your crew, would
7  you interview them and hire them?  Tell me about
8  that process.
9  A.   Sometimes I interviewed and hired.  Most of
10 the time somebody else would tell me they'd run
11 across somebody, would I take them.
12 Q.   And it would be your decision whether you
13 could take them?
14 A.   Yes.
15 Q.   And what about termination with people
16 underneath you?
17 A.   I could terminate people under me.
18 Q.   And did you ever do that?
19 A.   Yes.
20 Q.   Tell me who you terminated.
21 A.   I think I only terminated two people.  One
22 was Ken Pelham, and I can't remember the other
23 young man's name.

Page 102

1  Q.   Why did you terminate Ken Pelham?
2  A.   Absentee.
3  Q.   And why did you terminate the other guy?
4  A.   Poor job performance, on three or four
5  different occasions.
6  Q.   And you don't remember his name?
7  A.   I'll be honest with you:  I'm the kind of
8  person, if I don't remember his name, when I walk
9  out of this office, these things will be popping
10 in my head.
11 Q.   I understand that.
12 A.   And I'll probably write them down.
13 Q.   If you remember his name, can you give it to
14 your attorney?
15 A.   Right.  All these questions you ask me, if I
16 can't remember a name, I'm just the kind of
17 person, I'll be riding down the road and these
18 things will be bothering me.
19 Q.   Well, if you think of it while we're here,
20 interrupt and we'll go back to it.
21      But you terminated him for job performance,
22 essentially?
23 A.   Yes.

Page 103

1  Q.   Anybody else?
2  A.   That's all I remember terminating.
3  Q.   And when you were in your hourly job on the
4  refrigeration maintenance crew, you didn't have
5  that authority?
6  A.   Oh, no.  It was a lot simpler.
7  Q.   You weren't the manager, correct?
8  A.   Right.  You just did your job, and that was
9  fine.
10 Q.   Right.  And you didn't have management or
11 supervisory authority over anybody; isn't that
12 true?
13 A.   That's true.
14 Q.   So you clearly had more responsibility when
15 you moved to the supervisory salaried position?
16 A.   Oh, definitely.
17 Q.   Okay.  What was the chain of command there?
18 You just reported direct to Reb, or was there
19 somebody in between?
20 A.   Reported directly to Reb.
21 Q.   And that's because he was in charge of
22 maintenance for the whole complex out there?
23 A.   Yes.

Page 104

1  Q.   Okay.  And how would you -- would you have
2  regular meetings you would have to attend?
3  Supervisor meetings or anything like that?
4  A.   We had a supervisor meeting once a week.
5  But just about every morning, I was to report to
6  Reb before I could leave, or every afternoon,
7  whatever time.
8  Q.   What would be the purpose of that report?
9  A.   Just to see how things were going.
10 Q.   You just had to give him a heads-up on
11 whether things were running right or --
12 A.   If we needed to order anything or whatever.
13 Q.   Okay.  You claim you were asked not to clock
14 in by the management people?
15 A.   Yes.
16 Q.   Who were those people who told you not to
17 clock in?
18 A.   Reb told me that, and David Griffin was
19 standing there.  They were making a joke out of
20 it.  They said, "Blocker, what you trying to do?
21 Clock in to keep up with how many hours you're
22 working?"
23      That was the first couple of weeks.  It was

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 105

1  just a force of habit, after clocking in for five
2  and a half years, to wipe in and swipe the clock.
3  Q.  Well, did the other supervisors clock in?
4  A.  I wouldn't know.  I didn't see anybody.  I
5  only did it a couple of weeks.  It was just a
6  force of habit.
7  Q.  And then you stopped doing it?
8  A.  Yes.  I was told to.  I wasn't doing it
9  trying to record hours, it was just a force of
10  habit.  Every day, as soon as you walk in the
11  door, you're used to swiping the clock.  It's like
12  taking your shoes off at the front door.
13  Q.  I understand.  While you were the third
14  shift maintenance supervisor, did anybody ever
15  complain to HR or to Reb or to anybody about your
16  performance as a supervisor?
17  A.  I don't recall.
18  Q.  You don't know or you don't recall?
19  A.  I remember that Rex told me he went up and
20  talked to Kathy about he thought I was hard on
21  him.
22  Q.  Rex Faircloth?
23  A.  Yes.  Because he wanted to transfer to

Page 106

1  another shift.  But everybody wanted to transfer
2  off third, because it was -- you couldn't sleep.
3  It was hard to adjust your sleeping patterns,
4  going from day shift to night shift.
5  Q.  Were you brought in and counseled about Rex
6  Faircloth's complaints?
7  A.  No, sir.
8  Q.  When was that?
9  A.  I couldn't tell you exact dates.
10  Q.  Was it in May?
11  A.  Way before May.  And, also, I can't remember
12  the young man's name that I terminated -- it'll
13  come to me in a little bit -- but me and Kathy had
14  had a few meetings, because he seemed to want to
15  go up and talk to her regular about every little
16  thing that happened.
17  Q.  So tell me about all that.
18  A.  He complained that -- he complained to
19  everybody.  He just complained all the time.
20  Q.  What were the complaints that related to
21  you, that you're aware of?
22  A.  He thought because him and Reb didn't get
23  along, that Reb was going to have me fire him,

Page 107

1  because he had went over Reb's head to Spence
2  Jernigan.
3      He had went and talked to Spence Jernigan
4  about he didn't think Reb treated people
5  correctly.  Then he went and reported to HR that I
6  was Reb's ax man, and he felt that I just had a
7  list of people given to me that Reb wanted to get
8  rid of.  And he went to Kathy with that situation,
9  Kathy Gilmore.
10  Q.  And did Kathy call you in to talk about
11  that?
12  A.  Yes, she did.
13  Q.  Tell me about that conversation.
14  A.  She asked me why I had written him up and
15  was there a problem.  I said I wrote the man up
16  only for reasons -- it didn't have anything to do
17  with anybody telling me to fire him or anything;
18  it had to do with his job performance, because he
19  wasn't doing the job correctly.  And he had been
20  told how to do the job, and he'd just neglect on
21  purpose.
22  Q.  And you don't remember the guy's name?
23  A.  I don't remember it right now, but I know

Page 108

1  I --
2  Q.  It's the same guy you fired?
3  A.  Yes.
4  Q.  I mean, the one you talked about earlier, it
5  was that same guy, whoever that is?
6  A.  Yes.  He had went to Kathy quite a few times
7  with the story that he had went over Reb's head,
8  to Spence Jernigan, and talked to him; and that he
9  felt that I was going to fire him, no matter what
10  kind of job he did, because Reb had told me to.
11  Q.  And you did ultimately fire him?
12  A.  I fired him for legitimate reasons.
13  Q.  Tell me what those were.
14  A.  He was sent out to do work on an oil tank
15  one time; and instead of pumping the oil out, he
16  just pulled the plug and let hundreds of gallons
17  of oil run all out in the compound.  And all he
18  had to do was go get help or anything.  He just
19  sat there and watched it.
20  Q.  So it was a job performance reason that you
21  fired him?
22  A.  Yes.
23  Q.  And you had the authority to do that?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 109

1  A.  Yes.
2  Q.  And did they ever hire him back or anything;
3  or was his termination, that was it?  I mean, it
4  stuck?
5  A.  Yes.
6  Q.  Okay.  And you've told me about Ken Pelham.
7  And you fired him just on the absentee attendance
8  policy?
9  A.  Yes.
10  Q.  Okay.  Did anybody else on your shift, that
11  was under your supervision, complain to you about
12  how you were managing them or supervising them?
13  A.  A lot of them didn't like the idea that we
14  went by a point system.  If you got four points,
15  you were terminated.
16  Q.  On attendance?
17  A.  Attendance.  And a lot of these guys weren't
18  on time or missed a day or overslept and would be
19  late.  It was tough to keep people there.
20  Q.  Okay.  And who complained about those
21  problems?
22  A.  They just felt it was unfair, as many hours
23  as we were working, that if a man was 15 minutes

## Page 110

1  late, I had to go by the book.
2  Q.  I see.  So they were saying you strictly
3  enforced the attendance policy?
4  A.  Yeah.  I was given an attendance policy.
5  And like Rex said, "Man, I just worked 16 hours,
6  and I'm 15 minutes late."
7  Q.  He'd worked 16 the day before and --
8  A.  The day before.  "And I'm 15 minutes late,
9  and you want to write me up?  Where's the thank
10  you for helping out?"  I said, "Man, I've got a
11  job to do.  If I don't do it, they'll find
12  somebody else."
13  Q.  Do you remember any kind of incident
14  involving a vending machine?
15  A.  Yes.
16  Q.  Tell me about it.
17  A.  An employee named Alan Carpenter stood a
18  machine up that, when we walked in for break, it
19  was laying on the ground.  And he stood it up.  I
20  was there when he stood it up.  He put $5 in it
21  and shook it just a little bit and stood it up
22  against the wall.  I think another employee helped
23  him stand it up, because they were trying to drag

## Page 111

1  it over there.
2      That's the only food you had to eat was in
3  that break room.  Working third shift, you can't
4  order out or anything.  It was twelve o'clock at
5  night before we got a break.
6  Q.  But y'all went in there and the thing was on
7  its side?
8  A.  Somebody had already throwed it on its side.
9  Q.  Do you know who that was?
10  A.  I have no idea.
11  Q.  Would it have been somebody on your crew?
12  A.  I don't think it was anybody on my crew,
13  because they were on the floor with me.
14  Q.  I mean, who has access to it? anybody
15  working?
16  A.  Anybody that walks by.  Sometimes we would
17  have Hispanics from the other plants staying
18  there.
19  Q.  Right.
20  A.  And sometimes we came in and actually found
21  vending machines wide open, which took someone
22  with a key to do it.
23  Q.  Okay.

## Page 112

1  A.  And I'm not mentioning anything that -- this
2  is not fact, but a lot of folks know that Hartz
3  Catering, at that time, was having problems with
4  one of their own children taking money out of
5  their machines.
6  Q.  So you think a Hartz --
7  A.  I don't know that for a fact at all.  But
8  sometimes the young man would come in and unload
9  the change out of the machine, not stock it, and a
10  few times he actually made a mistake and left it
11  unlocked.
12  Q.  Well, back to the issue of the thing being
13  on its side.  Was the machine vandalized?
14  A.  It was on its side, so it had to have been
15  vandalized.
16  Q.  I mean, did it look like they had tried to
17  break into it?
18  A.  It didn't look like anybody had actually
19  opened anything; it was just laying on its side.
20  Q.  All right.  And what did y'all do? picked it
21  up?
22  A.  I didn't pick it up; one of my employees
23  picked it up and put it back in the position it

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 113

1 was originally in; stood it up.
2 Q.   Did anything ever come of that?  Did anybody
3 get in trouble over that?
4 A.   There was an investigation about it.
5 Q.   Who handled that?
6 A.   You mentioned his name.  It was Kathy's boss
7 at the time.
8 Q.   Jim Vice?
9 A.   Right.
10 Q.   All right.  Tell me how that went.
11 A.   They called me up and asked me what I knew
12 about it, along with most of my employees.
13 Q.   And what became of it?
14 A.   We didn't know what happened.  It was
15 dropped.
16 Q.   Did anybody get in trouble over it?
17 A.   No, sir.
18 Q.   When was that?  We know Jim Vice was already
19 there.
20 A.   Probably a couple of weeks before I was
21 terminated.  Two or three weeks, four weeks; I'm
22 not sure exactly.
23 Q.   Okay.  Any other complaints that your

## Page 114

1 personnel had about you, that they made either to
2 you or somebody else, that you're aware of?
3 A.   Ken Pelham had called my house drunk a few
4 times telling me he had to have his job and stuff
5 like this.  I mean, you couldn't hardly even
6 understand what he was saying.  Leave messages on
7 my answering machine.
8 Q.   That was after he was terminated?
9 A.   That's before he was terminated.
10 Q.   Before he had been terminated.
11 A.   I had reported that to Reb Bludsworth.  And
12 he told me that even though a tool person was hard
13 to come by, you just need to cut your losses and
14 get another one.  Terminate him at this time.
15 Q.   A tool person?
16 A.   Yes.
17 Q.   Tell me what that means.
18 A.   He was a tool man.  He stood behind the
19 cage.  If you come up and said, "I need a sledge
20 hammer," he handed you a sledge hammer.  If you
21 needed a gear for a machine, you explained to him
22 what it was, he went and got it, handed it to you;
23 he logged it in the book, so the inventory was

## Page 115

1 kept up.
2 Q.   I see.  So he didn't work on the equipment;
3 he --
4 A.   No.  His job was to stay behind the cage and
5 issue the equipment.
6 Q.   Okay.  Do you ever recall you or anybody
7 else on your crew mistreating him or calling him
8 names or being cruel to him in any way?
9 A.   The only thing that ever happened, which I
10 brought him in the office and talked with him and
11 an employee, an employee named Alan Carpenter
12 would pick at him sometimes, but Ken was picking
13 back.
14      And I told them if this was going to get out
15 of hand, they needed to put a stop to it.  And Ken
16 said, "Oh, we're just playing."  I said, "Well, we
17 ain't got room for horseplay on the floor."  He
18 said, "This is just in the tool room."
19 Q.   All right.  Did it keep going after that?
20 A.   They cut back on it.
21 Q.   But did they still do it?
22 A.   A little bit, yes.  But Ken was picking at
23 the boy just as much as he was picking at Ken.

## Page 116

1 Q.   Who was the other fellow?
2 A.   Alan Carpenter and Josh Bradford.  They were
3 young kids.  Josh was 18 or 19, and Alan was
4 probably just turning 21.
5 Q.   So you agree there was some problems among
6 those employees picking at each other?  Did it go
7 so far as horseplay?
8 A.   I had a meeting with every one of my
9 employees in the office to discuss this.  And Ken
10 said it wasn't no big deal.
11 Q.   And when was that?
12 A.   A few weeks before I was terminated.
13 Q.   All right.  After that meeting, were there
14 additional problems with those employees.
15 A.   Not that I was aware of.
16 Q.   Okay.  Did they complain to you after that
17 meeting?
18 A.   No.  But the same kind of deal they were
19 horseplaying, my own boss, Reb and Greg would come
20 in and pop you in the belly, you know.  It was
21 just something the guys would do.
22 Q.   Did you ever complain about that to anybody?
23 A.   No.  I mean, they didn't hurt you or

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 117

1　anything; it was just trying to see how fast you
2　could be.
3　Q.　Okay. Tell me what led to your -- all the
4　conversations and events that you're aware of,
5　that you know about, that led to your termination.
6　A.　I felt that it was done because I was
7　complaining about the overtime policy.
8　Q.　Okay. That's what you think in your mind,
9　correct?
10　A.　Yes.
11　Q.　And so tell me what evidence that you would
12　have that would prove that.
13　A.　Well, any time you went over Greg or Reb's
14　head, you just about knew you didn't have a job.
15　Any time anyone else did that -- I knew exactly
16　what I was doing.
17　　When I talked to Reb about I didn't think I
18　was being treated right, that him and Greg had
19　made this deal with me of 40 to 45 hours a week, I
20　pretty much knew that when I went to Greg, that my
21　job was over. That there was a 90 percent chance,
22　because of the way that they had -- if they wanted
23　somebody gone, they would tell somebody to let

## Page 118

1　them go. And they'd give a general grievance and
2　let them go.
3　Q.　All right. Give me an example.
4　A.　Example?
5　Q.　A person that they wanted gone.
6　A.　The boy's name that I couldn't remember, I
7　was told that they sure didn't want him hanging
8　around. That's the reason they put him on my
9　shift. And I said, "I will not fire a man for
10　unjustifiable reasons." I said, "If he does
11　something wrong, I will terminate him."
12　Q.　Why didn't they want him around?
13　A.　Because he already went to Spence Jernigan
14　reporting Reb and Greg.
15　Q.　About what?
16　A.　I don't know. That was the only
17　conversation they gave me.
18　Q.　You don't know if it had to do with overtime
19　or not?
20　A.　I don't think it was overtime. This guy was
21　young and used to go and tell everybody anything.
22　Like, he thought this should happen to make things
23　better. But he went about it the wrong way.

## Page 119

1　Q.　Okay. And so he got into some kind of
2　political thing with those guys?
3　A.　Political deal.
4　Q.　Is that what you think?
5　A.　Well, Reb told me he sure didn't want to see
6　him on the floor. I said, "What do you mean?" He
7　said, "You're his supervisor. You need to get him
8　gone."
9　　And I told him, I said, "Look, you've made
10　me the supervisor. If a man does wrong by the
11　company policy, I'll let him go; but not for any
12　other reason."
13　Q.　Okay. Anybody else that sort of went out of
14　the chain of command, and complained to Greg or
15　Reb about something, that got fired?
16　　MR. ROBERSON: Object to the form.
17　That's not out of the chain of command.
18　　MR. SMITH: Well, you're right. That's
19　a good objection.
20　Q.　Anybody that went over your head or over
21　another supervisor's head, up to Reb or Greg, that
22　got fired?
23　A.　I can't remember the man's name, but we had

## Page 120

1　what I thought was a pretty good maintenance man,
2　didn't last but a couple weeks out there. He made
3　the mistake of telling Reb how he thought the
4　concrete ought to be done. Next thing I know,
5　they picked a reason to let him go.
6　Q.　What was the reason they picked?
7　A.　I don't remember exactly. But like he said,
8　he didn't need a job out there if they were going
9　to treat him that way.
10　　But he had a lot of experience in the
11　concrete, and the comment he made was correct.
12　Q.　Well, it had nothing to do with overtime?
13　A.　No.
14　Q.　Anything else you can think of? Any other
15　example?
16　A.　Not right off the top of my head right now.
17　Q.　All right. I think we got started down that
18　road when I asked you what evidence are you aware
19　of that would support your claim that you were
20　fired because you complained about overtime.
21　　Do you know of anything else that would
22　support that?
23　A.　I can't think of anything right now.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 121 | Page 123 |
|---|---|

Page 121

1   Q.   Okay.  Tell me -- ultimately, you got
2   disciplined, or you got brought in, on May 17,
3   2005.  Do you remember that?
4   A.   May 17th, the only thing I was told was I
5   was being suspended upon investigation.
6         (Defendant's Exhibit No. 2 was
7          marked for identification and a
8          copy of the same is attached
9          hereto.)
10  Q.   All right.  Let's look at this May 17th memo
11  to Ron Blocker from Reb Bludsworth.  I've marked
12  it as Exhibit 2.
13       Do you remember seeing that?
14  A.   Yes.
15  Q.   And was there a conversation at which time
16  you signed that memorandum there?
17  A.   Huh?
18  Q.   I mean, you had a conversation with Reb?
19  A.   I had a conversation wanting to know what
20  was going on.  And Kathy said that they weren't at
21  liberty to discuss it; that I was just being
22  suspended upon investigation.  And Reb told me, he
23  said, "Ron, just sign it.  You've worked a lot,

Page 123

1   A.   That was it.  I asked why.  They didn't give
2   me any reason; they wouldn't go into anything.
3   Q.   Well, did you read this?
4   A.   Yes, I did.
5   Q.   All right.  It says, "It has been reported
6   that there has been numerous reports of physical
7   and mental abuse and vandalism in areas that you
8   are managing."  Do you agree with that?
9   A.   Yes.  I agree that some drink machines had
10  been messed with.
11  Q.   All right.  And then it says, "There will be
12  an investigation into these allegations."
13  A.   I thought the investigation on these drink
14  machines had already been done, because we had
15  already had discussions in meetings with HR on
16  that a few weeks earlier.
17  Q.   All right.  Well, I didn't hear all that.  I
18  guess Jim had done an investigation?
19  A.   Right.
20  Q.   That's when you said they couldn't figure
21  out who had done it?
22  A.   I mean, we never knew exactly who did it.
23  I'm not -- I'm not a -- I was a maintenance

Page 122

1   and then complaining about.  Just take your wife
2   on a little vacation.  I'll work things out."
3   Q.   All right.  Let's go back.  In this
4   conversation that occurred, was all this on May
5   17th, the same date you signed it?
6   A.   Yes, sir.
7   Q.   Go back through, if you would for me, how
8   this was brought to your attention and, you know,
9   who was involved in the conversation.  Just
10  everything you can remember about it.
11  A.   We were having a supervisors' meeting on May
12  17th.  And I had asked Reb, I said, "Reb, that's
13  my birthday, and y'all said I would be off for my
14  birthday."  He said, "Just come in for this
15  meeting."  I had called him.  I came in for the
16  meeting.  Folks were awful quiet for some reason.
17       And then I was asked to go to Kathy
18  Gilmore's office.  I get there, and Kathy and Reb
19  are sitting there.  And they put this out and said
20  I was being suspended upon investigation; please
21  sign that; and that they were going to have
22  security escort me off the property.
23  Q.   What else was said?

Page 124

1   supervisor.  I wasn't in charge of the cafeteria.
2   Q.   I understand.  But this says, "There will be
3   an investigation into these allegations."
4   A.   Yes.
5   Q.   Did you ask any questions during this
6   meeting where you signed this?
7   A.   I was told they wasn't going to answer any
8   questions; just sign that, and there would be an
9   investigation.  Reb said, "Just calm down.  Don't
10  say anything."
11  Q.   Why was he needing to tell you to calm down?
12  A.   Because I wanted an answer:  What was going
13  on?  I mean, here it is, I walk in.  And I would
14  like to know why I'm being suspended.
15  Q.   Okay.  What did you ask them specifically,
16  in your own words, the best you can recollect?
17  A.   Why I was being suspended.  What kind of
18  investigation would cause me to lose my income for
19  five days?
20  Q.   Did you raise your voice with them?
21  A.   No, sir.
22  Q.   Did you make any kind of threatening gesture
23  toward them or anything?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

## Page 125

1    A.    No, sir.

2    Q.    Well, why would he need to tell you to calm

3    down?

4    A.    Why?

5    Q.    Uh-huh.

6    A.    Because he knew I wanted to know what was

7    going on.

8    Q.    All right. Tell me what else was said.

9    A.    That was it. I was escorted off the

10    property.

11    Q.    All right. Tell me the next thing that

12    happened.

13    A.    I called Kathy after about five days, and

14    she said, under the State of Alabama law, they

15    didn't have to tell me why I was being terminated;

16    it's just that my services are no longer needed

17    there.

18    Q.    What else did she tell you?

19    A.    That was it. I told her I would like to

20    know why. And she said, "By the State of Alabama,

21    I don't have to answer why you're being

22    terminated."

23    Q.    Well, you knew, from this, that they were

## Page 126

1    investigating you for reports of physical and

2    mental abuse and vandalism, correct?

3    A.    Yes.

4    Q.    Anything else said during that conversation?

5    A.    No, sir. But I did feel if I was terminated

6    and fired, how could I immediately go out and file

7    for unemployment and get it? If I was terminated

8    and they won't tell me why, how can I file for

9    unemployment and get my unemployment?

10    Q.    Okay. Let's go through that. Tell me what

11    you did, after you heard from Ms. Gilmore that you

12    were being terminated?

13          Did you have any more conversations with Reb

14    or anybody?

15    A.    Nobody would return my call.

16    Q.    So you tried to call people?

17    A.    I did try to speak to Reb, but he never

18    called me back.

19    Q.    All right. And then you sought unemployment

20    benefits?

21    A.    Yes.

22    Q.    And you say you got them?

23    A.    Yes.

## Page 127

1    Q.    How long did you get them for?

2    A.    I think I drawed them for the maximum amount

3    of time, I think. Approximately six months.

4    Q.    Did you apply for those here in Eufaula?

5    A.    Yes.

6    Q.    Any other conversations with anybody at

7    Equity Group, since your termination?

8    A.    During the five days I was terminated

9    Charlie -- Charlie Morgan -- Charlie --

10          MR. ROBERSON:  Smith?

11          THE WITNESS:  No, no, no.

12    A.    -- Charlie Mobley called me probably once or

13    twice each one of them days, just asking me how I

14    was doing and what I was doing.

15    Q.    Who is Charlie Mobley?

16    A.    He was basically over the welding and

17    fabrication. He was also one of Reb's real good

18    friends though, from the same hometown.

19    Q.    Was he a friend of yours?

20    A.    I think he was also.

21    Q.    And he just called to see how you were

22    doing?

23    A.    He called and said, "What are you doing?" I

## Page 128

1    said, "I'm down here in Florida, fishing." I

2    said, "Me and my wife, I've worked so many hours

3    all this time, I decided if I'm going to be

4    suspended, why sit at home and worry about it."

5          I loaded up my wife, instead of being

6    stressed out and thinking, What are you going to

7    do? or What's going on? Heck, we went on

8    vacation.

9    Q.    All right. Anything else he said during

10    that time?

11    A.    He just said, "Man, I'm sorry to hear what's

12    going on." He said, "I don't think it's being

13    handled right, but I can't go into details."

14    Q.    What was his job?

15    A.    He was over the welding and fabrication.

16    Q.    You said that; I'm sorry. I didn't mean to

17    make you say it twice.

18          He was a supervisor?

19    A.    He was not a supervisor. He drawed the same

20    hourly salary that I did when I was on hourly at

21    that time.

22    Q.    He was under Reb?

23    A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 129

1  Q.   Did anybody else contact you during that
2  five-day period?
3  A.   Alan Carpenter, Josh Bradford, Rex.  They
4  all called me at home.
5  Q.   What did they say?
6  A.   Couldn't believe I wasn't out there.
7  Q.   Anything in particular they said?
8  A.   Just that there was an investigation going
9  on; that Ken Pelham had made up a bunch of bull.
10  Q.   So were they all being called in for this
11  investigation?
12  A.   I guess.
13  Q.   But they were all still working there?  None
14  of them were suspended?
15  A.   No.
16  Q.   Was anybody else suspended when you were,
17  that you're aware of?
18  A.   No.
19  Q.   So you had the conversation with Ms. Gilmore
20  where she told you you were being terminated, and
21  you said she wouldn't tell you why?
22  A.   Yes.
23  Q.   All right.  What happened after that?

## Page 130

1  A.   After that, I moved on.  Filed my
2  unemployment and looked for other work.
3  Q.   Did you find other work?
4  A.   It was quite a while before I found
5  something else.
6  Q.   How long?
7  A.   On 1/15, I went to work for Heartland
8  Mechanical Contractors.
9  Q.   You may have told me some here.
10  A.   I think you've got it.
11  Q.   Yeah, let me look.  I forgot I had this.
12  May '05, you went to Heartland Mechanical
13  Contractors; is that right?
14  A.   Yes.
15  Q.   And then you were installing freezers in
16  chicken plants?
17  A.   Yes, sir.
18  Q.   14 an hour?
19  A.   Yes, sir.
20  Q.   Why did you leave that job?
21  A.   During the wintertime -- certain times of
22  the year they wouldn't get much work.
23       And when I was working with them, I was also

## Page 131

1  working with Chaney Branch Construction.  I did a
2  little part-time work for them when I wasn't
3  working putting in freezers.
4       And then in March of '06, Chaney Branch
5  offered me a position.  Even though it wasn't much
6  money, it gave me a place to live, paid all my
7  food, right there on Fort Walton Beach where I
8  could go fishing and lay on the beach every
9  afternoon.
10  Q.   Sounds like a fun job.  Okay.  Chaney Branch
11  Construction, that was down at the beach?
12  A.   Yes.  I was building a Cadillac dealership
13  in Fort Walton.
14  Q.   So that's when you say, in your
15  interrogatories --
16       MR. SMITH:  Let's go ahead and mark
17  them.
18       (Defendant's Exhibit No. 3 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22  Q.   Exhibit 3 is your Answers to
23  Interrogatories.

## Page 132

1       Tell me if you've seen that and if that's
2  your signature back here.  Just make sure if
3  you've reviewed those and seen them.
4  A.   I remember this.  I've got a copy.
5  Q.   So you reviewed those answers with your
6  lawyer?
7  A.   Yes, sir.
8  Q.   And then you signed?  That is your
9  signature?
10  A.   Yes, sir.
11  Q.   Interrogatory No. 1 is where we asked you a
12  question about your employment.  And you say.
13  "...putting freezers in chicken plants.  I worked
14  until February 2006."
15       And that's when you said the work slowed
16  down; is that right?
17  A.   Yes.
18  Q.   And then your next job was March 2006, when
19  you went to work for Chaney Branch Construction?
20  A.   Yes.
21  Q.   That says they were located in Clio.  But
22  you were working in --
23  A.   The home office is Clio.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 133

1  Q.   Okay.  But they were doing work down at the
2  beach?
3  A.   Right.  We had quite a bit of hurricane
4  damage back at that time, so it was booming all
5  along the beach.  We stayed down on the beach the
6  whole time.
7  Q.   Okay.  And what was your job there?
8  A.   Iron worker.
9  Q.   And you were getting $8 an hour?
10  A.   Right.  But they paid all your food, your
11  room, took you out to eat, took you fishing.
12  Q.   All right.  Did you have health insurance or
13  anything like that with them?
14  A.   No.
15  Q.   Did you get COBRA health insurance coverage
16  when you left Equity Group?
17  A.   No, sir.
18  Q.   All right.  It says you were at $8 an hour,
19  and you worked there for, looks like, about five
20  or six months?
21  A.   Yes.
22  Q.   Why did you leave?
23  A.   I was offered a job at the Hyundai Polytech

## Page 134

1  plant here in Eufaula as production manager.
2  Q.   And you took that?
3  A.   Yes, sir.
4  Q.   42,000 a year?
5  A.   Yes, sir.
6  Q.   And says you voluntarily resigned after a
7  coworker was injured?
8  A.   Yes.
9  Q.   Who was that?
10  A.   Scott --
11  Q.   Scott Benson?
12  A.   Benson, yeah.
13  Q.   Okay.  Tell me about that situation.  Did
14  you get fired from that?
15  A.   Oh, no; I quit.  They begged me to stay and
16  offered me more money.  I just couldn't work at a
17  job that wasn't caring about their people and
18  didn't treat safety -- they had no safety
19  policies.
20  Q.   Well, what happened to the guy?
21  A.   My boss, Kenny Lee, pushed a button, a wrong
22  button, as a man was standing behind a machine;
23  and it grabbed him in the conveyor and twisted him

## Page 135

1  up.
2  Q.   Are you saying the machine should have been
3  guarded or locked out?  Tell me what the --
4  A.   It should have been guarded; it should have
5  been locked out.
6  Q.   Was the guy working on the machine at the
7  time or something?
8  A.   Yes.
9  Q.   Was he performing maintenance?
10  A.   No.  He was a production worker.
11  Q.   Okay.  And so they actually -- when did they
12  offer you more money?
13  A.   When I told them that I had had enough; that
14  I was going to work my eight hours that day, and I
15  would be done.
16  Q.   And that was a 42,000-a-year job?
17  A.   Yes.
18  Q.   And who did you complain to about that,
19  about the safety?
20  A.   Mr. Lee.
21  Q.   Is he the manager?
22  A.   They're all Lees.  I think that's a real
23  common Korean name.  Just about everybody out

## Page 136

1  there, their last name is Lee.  But Kihyun Lee was
2  the plant manager, and the CEO was Kyungdon Choi.
3  I don't know how to spell that.
4      And I reported to him -- he was the CEO --
5  that I had already talked to Kihyun and I just
6  couldn't work there no more.  I mean, I just
7  couldn't work at a plant like that.
8  Q.   And that's when they offered you more money?
9  A.   Yes.
10  Q.   What did they offer you?
11  A.   They didn't ever give me an exact figure.  I
12  told them money wasn't the principle.
13  Q.   What were you getting?  Were you getting
14  health insurance?
15  A.   I had full health insurance, three weeks off
16  a year, unlimited amount of sick leave.  They
17  didn't set a number of days you could have.
18  Q.   What were your job duties there?
19  A.   Production.
20  Q.   Were you actually producing product yourself
21  or were you overseeing other people?
22  A.   Overseeing other people.
23  Q.   So you didn't actually operate the machinery

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 137

1  yourself?
2  A.  No, sir.
3  Q.  And you left there voluntarily?
4  A.  Yes. I quit.
5  Q.  Okay. And since then, tell me where you've
6  applied. Your Answer says you're applying for
7  work with several companies. Do you see that? It
8  says, "I am presently applying for work with
9  several companies."
10  A.  Okay. Since then, I caught a little bit of
11  part-time work with Garden Gallery, just a little
12  bit. I went to work for Hewitt, on the shutdown
13  at the mill up here, for a couple of weeks.
14  Q.  Is that a contractor up there?
15  A.  Yes.
16  Q.  What were they paying you?
17  A.  $16 an hour.
18  Q.  And were you doing maintenance?
19  A.  No, sir. I was a laborer.
20  Q.  And what were they doing up there?
21  A.  I did everything from fire watch to tear
22  down scaffolds.
23  Q.  How long was that shutdown?

---

Page 138

1  A.  It only lasted me two and a half weeks.
2  Q.  Okay. And did you have any opportunity to
3  work with them somewhere else?
4  A.  No. They told me here recently that
5  something will start back up soon.
6  Q.  Do they go to other paper mills?
7  A.  Not that I know of.
8  Q.  They just work up here at Mead?
9  A.  I don't know all that. I just know that I
10  was at the Mead job.
11  Q.  I'm just trying to figure out what
12  opportunities you would have with that company.
13  Did you have the chance to go to any other
14  job?
15  A.  If I would have paid 300-some-odd dollars to
16  join the union, they thought they could get me
17  back out in the Iron Workers Union.
18  Q.  At Mead?
19  A.  It would be at Mead when they needed iron
20  workers.
21  Q.  Uh-huh.
22  A.  And it would be other jobs.
23  Q.  So you had a chance at a job as an iron

---

Page 139

1  worker?
2  A.  I didn't have the money for the amount they
3  wanted.
4  Q.  So you would have had to pay -- who was
5  that, that made that offer to you?
6  A.  The Iron Workers Union out of Columbus.
7  Q.  I mean, that made the job offer.
8  A.  I mean -- excuse me -- not the Iron Workers
9  Union. No. One of the millwrights. Excuse me.
10  The millwright company, which also worked
11  with Hewitt, one of the head guys, the millwright,
12  had told me that he could get me in the union out
13  there, and they could probably get me pretty much
14  six months' work out of the year, and probably
15  make 40-, or $50,000 a year.
16  Q.  Okay. And you didn't pursue that because --
17  A.  I'm still pursuing it.
18  Q.  Okay.
19  A.  Instead of joining the union, I found that I
20  think I can get other work nonunion, without
21  having to join.
22  Q.  Well, you didn't have to join the union to
23  get a job, do you?

---

Page 140

1  A.  No. But you do have to join the union to
2  get a union job.
3  Q.  You do have to join? That was my question.
4  A.  If you're not in the union -- what it is,
5  it's like this job up there for Hewitt.
6  I was brought in because they could not get
7  enough union people. As soon as they find a union
8  person to come in, I can be automatically let go;
9  because they have to take care of union first.
10  Q.  I see. And what company was that that you
11  were applying?
12  A.  Hewitt.
13  Q.  That was with Hewitt?
14  A.  Yes.
15  Q.  Okay. So as we sit here today, is there a
16  job available for you at Hewitt, if you joined the
17  union?
18  A.  Not with Hewitt. But the union says they
19  could find me some work.
20  Q.  Okay. And you just haven't pursued it?
21  A.  I felt that instead of paying out that kind
22  of money to the union, maybe I should look for
23  nonunion work.

---

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 141

1  Q.  All right.  Tell me about that?
2  A.  I've been to over here in Cuthbert and
3  turned in applications at that -- where all the
4  guts and everything goes from CP.
5  Q.  American Protein?
6  A.  American Protein.  I've been up to the other
7  chicken plant at Phenix City and put in an
8  application.  I've been to Union Springs and
9  Montgomery, both of those chicken plants, and
10  turned in applications.
11  Q.  Have you had any luck from that?
12  A.  I thought I had a job in Montgomery, but it
13  didn't work out.
14  Q.  Tell me about that.
15  A.  The guy told me to come on up there; he'd
16  hire me.  And I went up there last Thursday.  I
17  finished up some little projects I had at home.  I
18  told him I had about a week's worth of little
19  things I needed to do before I went to work with
20  him.  He said, "Fine.  Come on up and I'll put you
21  to work."
22  And I'm waiting for a call back.  He was
23  supposed to have called back Monday, but I haven't

---

Page 142

1  heard from him.  When I leave this meeting, I was
2  going to call him today.
3  Q.  What company is that?
4  A.  Koch Foods.  K-O-C-H.
5  Q.  Okay.  And that's a poultry --
6  A.  Yes.
7  Q.  Who were you dealing with?
8  A.  Philip Mauldin.
9  Q.  Okay.  He used to be down here somewhere?
10  A.  Yes.  He was my origin supervisor at CP,
11  when I first went to the cook plant.
12  Q.  Okay.  And it sounds like you're waiting to
13  hear from him, but you just haven't heard?
14  A.  Right.  I've already went and looked at a
15  trailer park about moving my trailer and
16  everything, relocating up there.
17  Q.  Okay.  Any other job prospects or
18  applications that you've put in?
19  A.  Oh, yeah.  I've put in some at Beaulieu of
20  America.  The unemployment office sent me to an
21  interview out there.
22  Q.  Okay.
23  A.  I just -- I was supposed to go to an

---

Page 143

1  interview next week at the sawmill up here about a
2  maintenance job up there.  The Alabama
3  unemployment place, I did the paperwork this week;
4  and they told me they've sent my application off;
5  I'd go up for an interview sometime next week.
6  Q.  Okay.
7  A.  I've went to Cooper Lighting.  And they told
8  me there will be a position open sometime the end
9  of May in maintenance that I might be interested
10  in.
11  Q.  All right.
12  A.  And I'm just waiting on them to tell me.
13  That position isn't open yet.  I'm not guaranteed
14  the position, it's just that I know some of the
15  workers and all.  And they told me that I would be
16  in -- that was the kind of work I did before, kind
17  of similar, and that I was already skilled at it.
18  Q.  Any other companies you've applied to?
19  A.  I've applied to a lot of different places; I
20  just can't remember all the names right off the
21  top of my head.
22  Q.  All right.  Any more that you can remember?
23  A.  I don't remember the name, but I went to the

---

Page 144

1  new plant in Camilla, Georgia, that's opening up
2  to do -- they're taking corn and making gas.  And
3  I turned in a resumé there.
4  Q.  Okay.  Haven't heard from them?
5  A.  Not yet.
6  Q.  All right.  Any other ones?
7  A.  I've just been on the Internet a lot looking
8  at different jobs.  I couldn't tell you the names
9  of those, but I've put in my resumé on the
10  Internet at quite a few different places.
11  Q.  Okay.  Let me ask you, on your Initial
12  Disclosures -- and I don't know if you've seen
13  these or not.  This is where the parties each
14  disclose to the other one who they think the
15  witnesses could be in the case.
16  A.  Uh-huh.
17  Q.  And there's a couple that I just wanted to
18  ask you about.
19  Who is --
20  MR. SMITH:  I'm going to mark this as
21  Exhibit 4.
22  (Defendant's Exhibit No. 4 was
23  marked for identification and a

---

36 (Pages 141 to 144)

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 145

1        copy of the same is attached
2        hereto.)
3   Q.   Who is Buck Giles?
4   A.   Buck would be the -- he was over the
5   maintenance shop -- I mean, not maintenance. He
6   was over the maintenance of the trucks.
7   Q.   Okay.
8   A.   And I believe he's the one that has the
9   third shift supervisor position at the cook plant
10  now.
11  Q.   He took your place, you think?
12  A.   Oh, yeah.
13  Q.   Okay. Have you talked to him about this
14  case at all?
15  A.   He would come out and drink coffee in the
16  mornings. A lot of mornings he'd be getting there
17  too early, and drop by over there and talk to me
18  about, man, he couldn't believe how many hours
19  they were making me work.
20  Q.   All right. And he was a supervisor in
21  another part?
22  A.   He was not a supervisor. He was basically
23  over the truck shop. I'm not sure if they gave

Page 146

1   him supervisor pay or not; I wouldn't know that.
2   Q.   Over the live haul trucks over there?
3   A.   Right.
4   Q.   And have you talked to him about the case,
5   your claims, at all, since you've left the chicken
6   plant?
7   A.   Not since I left, no.
8   Q.   All right. Did Buck Giles ever tell you why
9   you were terminated from the chicken plant or why
10  you were under investigation at the chicken plant?
11  Any conversations like that with him?
12  A.   I can't remember.
13  Q.   All right. And Joe McCraney, I think you
14  mentioned him earlier.
15  A.   Yes.
16  Q.   Same with Terrance Skinner. What about
17  Michael Johnson? I can't remember that name. Who
18  is he?
19  A.   Michael worked out there also in
20  maintenance, and he also worked with me with
21  Chaney Branch Construction. And he's one of those
22  guys who also quit because he was promised
23  different things and didn't work out.

Page 147

1   Q.   What was he promised?
2   A.   He was promised that if he went to nights
3   and worked a certain amount of hours, he'd get to
4   go home. And they kept making him stay. One day
5   he blowed up and loaded his stuff up and quit.
6   Q.   All right. So he wasn't fired?
7   A.   No, sir.
8   Q.   Where is he now?
9   A.   He now works for a company installing
10  freezers. As a matter of fact, he was just out
11  there recently installing a freezer. And he'll be
12  out there again sometime, I think, this month.
13  Q.   What company is that called?
14  A.   I don't remember the name right now.
15  Q.   All right. How about Will Partin?
16  A.   Will also worked with me at Chaney Branch
17  Construction. He also worked with me at the
18  chicken plant.
19  Q.   What does he know about your claims?
20  A.   He just told me he didn't think nobody set
21  up for me like Reb or Greg. He said I must have
22  been already gone.
23  Q.   Did you ever have any discussions with Will

Page 148

1   about overtime and complaints about overtime?
2   A.   Oh, yeah, we talked about it.
3   Q.   He was a maintenance man out there too?
4   A.   Yes.
5   Q.   But he wasn't under you?
6   A.   No, sir.
7   Q.   Was he a supervisor?
8   A.   No, sir. He was just maintenance.
9   Q.   All right. Tell me about the conversations
10  you would with Will about overtime. Did he ever
11  say he complained about it?
12  A.   No.
13  Q.   And what did you tell -- tell me anything
14  else you can think of that you and he discussed
15  about overtime or about complaining about
16  overtime.
17  A.   Just that it was a raw deal. I agreed upon
18  a certain deal and it sure didn't happen.
19  Q.   This was after you had been made the
20  salaried position?
21  A.   Yes.
22  Q.   Was Will over in the fresh plant, in the
23  first processing plant?

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

| Page 149 | Page 151 |
|---|---|

**Page 149**

1  A.   He was in the first.
2  Q.   Okay.  And we've talked about Ken Pelham.
3  Any conversations with Ken -- and this is to all
4  these guys.  Any conversations with Ken or Will,
5  since you were terminated?
6  A.   Before I was terminated, while I was on
7  suspension, Ken had left a drunken phone call
8  message.  We couldn't understand much of what he
9  was saying.
10  Q.   All right.  So y'all didn't talk; he just
11  left you a message?
12  A.   No.  I wasn't going to answer to somebody
13  like that.  I had caller ID.  And he said, I told
14  you I was going to get you, you blankety-blank.
15       And we couldn't understand exactly what all
16  he was saying.  He rambled on for a good five or
17  ten minutes.
18  Q.   So you're implying there that he -- he said
19  he was going to get you?  I mean, that's what the
20  message said?
21  A.   He was drinking.
22  Q.   Well, what did he mean by that?
23  A.   I have no idea.

**Page 151**

1  A.   Just that he had been in the area.  We'd
2  probably be in the maintenance shop, and Reb would
3  tell me, "Hey, man, you can let your guys go, but
4  I need you to stay until I tell you you can
5  leave."
6  Q.   I see.  So he was one of your hourly people
7  under you?
8  A.   Yes.
9  Q.   What about Darrell McCartha?
10  A.   Darrell was also in maintenance on third
11  shift; and then when he had some personal
12  problems, I helped him transfer to first.
13  Q.   All right.  And Glenda Merritt?
14  A.   Glenda was the QA supervisor for first
15  shift.
16  Q.   What does she know about all this?
17  A.   She would be in there and see me having to
18  stay late all day.  She would be a witness that
19  would state, "Hey, Ron was still here at twelve,
20  one o'clock in the afternoon."
21       MR. ROBERSON:  Is she the lady that got
22  suspended when you got suspended?
23       THE WITNESS:  Yes.

| Page 150 | Page 152 |
|---|---|

**Page 150**

1       MR. ROBERSON:  Can we take about two
2  minutes so I can go to the restroom?
3       MR. SMITH:  Yeah, sure.
4       (A brief recess was taken.)
5  (BY MR. SMITH)
6  Q.   We were talking, before we broke, about some
7  of the people on your initial disclosures.
8       I think you had mentioned Alan Carpenter and
9  you'd mentioned Josh Bradford.  And then Rex
10  Faircloth?
11  A.   He's passed away now.
12  Q.   Oh, he has?  Okay.  What would he have known
13  about it?  I mean, was he just somebody that was
14  on your shift?
15  A.   He was standing there when Reb told me that
16  I would work the hours he gave me; and if I wanted
17  to get some volunteers to stay over, that would be
18  fine.
19  Q.   All right.  Kelvin Heath?  What about him?
20  A.   Kelvin Heath was just another maintenance
21  guy out there with me.
22  Q.   What does he know about your claims against
23  the company and your lawsuit?

**Page 152**

1       MR. ROBERSON:  So that's her last name.
2       MR. SMITH:  Okay.
3  Q.   And then you had mentioned a guy you fired;
4  you couldn't remember his name.  Is there a Jim
5  Allen?
6  A.   There was a Jim Allen, but I never -- he
7  actually quit.
8  Q.   All right.  So that's not the guy, earlier
9  when you were saying you had to fire somebody?
10  A.   No.  I can get his name, but I just can't
11  remember right now.
12  Q.   Okay.  Why did Mr. Allen quit?
13  A.   Mr. Allen?
14  Q.   Jim Allen.
15  A.   He just never showed up hardly.
16  Q.   Was he on your crew?
17  A.   I think James Bragg hired him on first and
18  put him over on my shift.  And he only showed up a
19  few times.  Just quit showing up.
20  Q.   Okay.  Do you remember any incidents where
21  workers on your crew were hitting each other in
22  the midsection with wrenches and tools and stuff?
23  A.   Not with wrenches or tools, no.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 153

1   Q.   What were they hitting with?
2   A.   Alan Carpenter and Josh, they would pop you
3   in the belly or something.  Reb Bludsworth, the
4   maintenance superintendent, did the same thing.
5   Q.   Did y'all ever complain about Reb to
6   anybody?
7   A.   No.
8   Q.   Were you ever aware or did you ever witness
9   or hear about anybody on your crew hitting their
10  coworkers in their genitals?
11  A.   No.
12  Q.   You're not aware of any of that?
13  A.   Not of hitting in the genitals, no.  In the
14  belly.
15  Q.   You're saying in the belly?
16  A.   Here (indicating).
17  Q.   Any time lower than that?  You know how guys
18  do; they'll hit somebody in the --
19  A.   Nobody reported anything like that to me.
20  Q.   Okay.
21  A.   I'm not saying it didn't happen.  I don't
22  know.
23  Q.   You never got a complaint about that?

Page 155

1   necessary.  And the State of Alabama law, she
2   didn't have to tell me why.
3   Q.   But beyond that, you don't know --
4   A.   I did not know anything until I seen the
5   copies of these reports that they mailed to me
6   last Friday.
7        MR. ROBERSON:  I mailed them.
8   A.   I didn't have any idea of these other
9   accusations or anything, until then.
10  Q.   And what do you think about those
11  accusations?
12  A.   I think they're exaggerated.
13  Q.   Since you mentioned them, I'm going to just
14  go ahead and mark them.
15       (Defendant's Exhibit No. 5 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19       MR. SMITH:  I've marked, as Exhibit 5,
20  Bates numbers Equity Group 10 through 14.
21  Q.   Is this what you're talking about?
22  A.   Yes.  I received those last Friday.
23  Q.   Okay.  And we produced those in the lawsuit,

Page 154

1   A.   Nobody ever came to my office and said,
2   "Hey, somebody hit me in the groin," or anything,
3   no.
4   Q.   Yeah, groin.  That's the word I was looking
5   for; I just couldn't think of it.
6        Have you done any kind of analysis or
7   comparison of how much you made when you went on
8   salary versus what you were making when you were
9   on hourly?  Have you figured out the difference?
10  A.   I haven't added it up, but I could.
11  Q.   You just haven't done it yet?
12  A.   I remember putting a pencil to what kind of
13  hours I thought I worked and how much money I
14  would have made if I'd been on -- but I don't have
15  that with me.
16  Q.   And do you remember what it was, what it
17  came to?
18  A.   No, I don't.
19  Q.   Do you know who made the decision to
20  terminate your employment?  Did anybody ever tell
21  you that?
22  A.   No one ever told me.  Just Kathy told me
23  over the phone that my services were no longer

Page 156

1   and your attorney got them and gave them to you.
2        Are you saying today is the first time
3   you've heard of some of this stuff?
4   A.   Last Friday, when I opened up the manila
5   envelope.
6   Q.   All right.  And you say it's exaggerated?
7   A.   I think it is.
8   Q.   I mean, is there some truth to some of it?
9   A.   There was a little horseplay that went on,
10  on the shift, that shouldn't have; but that went
11  on, on all the shifts.
12  Q.   Okay.  Anything else in here in particular,
13  that you're aware of, that you say is either not
14  true or exaggerated?
15  A.   I'd have to read them and go over each
16  piece, I guess.
17  Q.   Well, I hate for you to have to do that.  I
18  mean, you're welcome to.  I don't --
19  A.   The whole Ken Pelham statement is false.
20  Q.   Okay.  You never called him "tool boy"?
21  A.   I may have called him "tool boy."  And I did
22  tell him to go back into the cage.
23       But if your job is to issue out tools in the

39 (Pages 153 to 156)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 157

1  cage, and my boss comes in two mornings in a row
2  and wants to know why this man's over in the
3  smoking area when he should be in the cage, I
4  constantly had to tell him to get back in the
5  cage. That was his job in that cage.
6      If you need to go to the bathroom, you lock
7  that cage and go to the bathroom. But you notify
8  me on the radio before you go, so I can unlock it
9  in case something's needed. Those are the kind of
10  things.
11  Q.   But you agree you used to call him "tool
12  boy"?
13  A.   Yes.
14  Q.   How old is Mr. Pelham?
15      MR. ROBERSON: That's abusive. I'd
16  like for y'all to make that argument in federal
17  court.
18  Q.   All right. What else?
19  A.   That was just the joke he made. He'd call
20  himself the tool boy. "I'm just the tool boy
21  here. Y'all won't let me on the floor."
22  Q.   Did he ever complain to you about being
23  called anything like that?

## Page 158

1  A.   No, sir.
2      MR. ROBERSON: Is he black or white?
3      THE WITNESS: White.
4      MR. SMITH: If he were black, you would
5  agree it would be. I'm sure you've alleged that
6  before, haven't you?
7      MR. ROBERSON: It could be.
8      MR. SMITH: I'm just messing with you.
9      MR. ROBERSON: It could have a
10  derogatory meaning if he were black.
11  Q.   And so this allegation that he saw you
12  trying to get free chips out of the vending
13  machine, what do you say about that?
14  A.   I put my money in and got my chips out.
15  Q.   He's saying he saw you trying to get free
16  chips out of the machine.
17  A.   No, sir.
18  Q.   You're saying that's not true?
19  A.   No, sir. I had told them that if the
20  machine rips you off, in the morning go down and
21  report it to -- I forgot the woman's name -- but
22  you report it to her. And she writes it on a
23  piece of paper and then she gets your money back.

## Page 159

1  It might be a week or two before you get it.
2  Q.   Okay. Did you ever see any of those guys
3  throw bolts over the cage and hit him in the head?
4  A.   That never happened, not to my knowledge. I
5  have seen them take a nut and sling it over,
6  because it would go ding-ding in the corner, away
7  from the man.
8  Q.   What you saw somebody sling a nut into the
9  cage, did you say anything to them about that?
10  A.   I made them go pick it up.
11  Q.   What else did you tell them?
12  A.   Just that they shouldn't be doing that.
13  Q.   Are any of those guys somebody you fired? I
14  guess Ken Pelham was?
15  A.   Ken's the only one on that list there that I
16  actually terminated.
17  Q.   Okay. Did you bring any other documents
18  with you? We've copied -- we'll just mark what
19  we've got that you brought. It looks like a set
20  of --
21      (Defendant's Exhibit No. 6 was
22      marked for identification and a
23      copy of the same is attached

## Page 160

1      hereto.)
2  Q.   Exhibit 6 is a set of copies of the pay
3  stubs that you brought; is that right?
4  A.   Yes, sir.
5  Q.   And then -- oh, there's more to it. Hang
6  on. Let's group all of these together. So
7  Exhibit 6 are your pay stubs.
8      And those look like all CP checks. Do you
9  have any copies of your Equity Group checks?
10  A.   I'll have to dig and find them. They were
11  all the same. After supervision, they were all
12  the same amount; but I'll have to dig back and
13  look for them.
14  Q.   Okay. And I want to divide these other ones
15  into -- you've got some 2004 tax return
16  information.
17      MR. SMITH: Let's mark that as Exhibit
18  No. 7.
19      (Defendant's Exhibit No. 7 was
20      marked for identification and a
21      copy of the same is attached
22      hereto.)
23  Q.   And you file jointly with your wife, Cindy?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

## Page 161

1  A.   Yes.

2  Q.   And this will show your income and wages

3  from CP and/or Equity Group, I guess, correct?

4  A.   Yes.

5  Q.   CP and --

6  A.   And Equity Group.  I worked for both the

7  same year.

8  Q.   Okay.  So that will tell us what your wage

9  was for '04?

10  A.   Yes.

11  Q.   Okay.  And then 2003.  Looks like for 2003

12  we've got a W-2, but I don't see a return.  Did

13  you file a return in '03?

14  A.   I'm sure I did.

15       MR. ROBERSON:  I think I've got it.

16  Well, maybe not.

17       (Defendant's Exhibit No. 8 was

18       marked for identification and a

19       copy of the same is attached

20       hereto.)

21  Q.   Exhibit 8 looks like W-2s for 2003.  And

22  those would be from CP.  And it looks like your

23  wages there, your gross pay was 45,656.  Does that

## Page 162

1  sound right?

2  A.   Yes, sir.

3  Q.   And you were on hourly back then, correct?

4  A.   Uh-huh.

5       (Defendant's Exhibit No. 9 was

6       marked for identification and a

7       copy of the same is attached

8       hereto.)

9  Q.   Okay.  All right.  And then there's a 2005

10  W-2.  And it says they paid you -- let's see.  It

11  says Social Security wages were 19,685.02.  Would

12  that be the gross amount?  That's Exhibit 9.

13  A.   That's only for January, February, March,

14  April.

15  Q.   Right.  January through May?

16  A.   Right.

17  Q.   Okay.

18  A.   Well, that would be half of May.

19  Q.   Okay.  Any other documents that you brought

20  with you today?

21  A.   Not with me today.

22  Q.   Are there any other documents that you have

23  that would support your claims?

## Page 163

1       MR. ROBERSON:  Joel -- and I'll let him

2  answer -- but he's going to provide to Albert his

3  '05, '-6, and '-7 W-2s and tax returns, and I'll

4  provide them to you.

5       He's supposed to go back home and get them

6  today, but he may not be able to accomplish that.

7  But we'll get them to you next week at the latest.

8       MR. SMITH:  Okay, that'll be fine.

9  Q.   Are there any correspondence or documents

10  that you've gotten from Equity Group, where they

11  sent you anything about your job or your

12  termination or anything?

13  A.   No, sir.

14  Q.   You've given everything you have to your

15  lawyers?

16  A.   Yes, sir.

17  Q.   Okay.  And I think -- I mean, basically what

18  we have on the table is what you've got in the way

19  of documents?

20  A.   Yes, sir.

21  Q.   Okay.  And you've told me everything they

22  told you about why you were terminated?

23  A.   Yes.

## Page 164

1  Q.   Are you related to Tom Mann?

2  A.   That was my father-in-law.

3  Q.   What's your wife's name?

4  A.   Cindy.

5  Q.   I know Nelda and I know Sharon.

6  A.   Cindy is the middle child.

7  Q.   Okay.  I just didn't know her.

8       Have you ever filed any other lawsuits?

9  A.   No, sir.

10  Q.   And other than the Mann family, do you have

11  any relatives in Barbour County?

12  A.   No, sir.

13  Q.   Are you aware of any other employees that

14  were salaried, supervisor employees that

15  complained about the amount of overtime they had

16  to work, or extra time over the 40-hour shift?

17  A.   Joe McCraney complained to me.  He told me

18  that he felt the same way, that he got stuck.  He

19  just said I got stuck with a lot worse than he

20  did.

21  Q.   Is he still employed out there, or do you

22  know?

23  A.   I really don't know.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

## Page 165

1  Q.  Okay.  Anybody else that you know of that
2  complained about it?
3  A.  I don't know.
4  Q.  Okay.  I don't have any more questions.
5      MR. ROBERSON:  I've just got about
6  three questions, to try to clear something up.
7  BY MR. ROBERSON:
8  Q.  Ron, on 2004, you've got three W-2s.  One is
9  for CP.  And that's because you worked there and
10  CP sold it to the Equity Group?
11  A.  Right.
12  Q.  And that was for $13,000 that you earned in
13  2004 from CP.
14      Then you have two W-2s from the Equity
15  Group.  Do you see this, for 2004?
16  A.  Uh-huh.
17  Q.  Is that yes?
18  A.  Yes.
19  Q.  One of them is for 8,355.  Do you see that?
20  A.  Yes.
21  Q.  Is that correct?
22  A.  Yes.
23  Q.  Do you know what that's for?

## Page 166

1  A.  I always wondered if they -- I really don't
2  know.
3  Q.  W-2 wages is what it says?
4  A.  I was wondering if one of them was salary
5  and one was -- I'm not sure.
6  Q.  Okay.  Then you have another one for 37,919.
7  Do you see that?
8  A.  Yes, sir.
9  Q.  Is that correct?
10  A.  Yes, sir.
11  Q.  You didn't get promoted to salary until
12  November; so could this $8300 be your salary, what
13  you earned in 2004 for your salary?
14  A.  I really don't know.
15  Q.  That would be -- it sounds like that would
16  be a reasonable amount?
17  A.  I think this is salary and this is hourly.
18  Q.  And then the 37- was what you earned as
19  hourly?
20  A.  Yes, sir.
21  Q.  If you combine all three of these, you made
22  $59,000 in 2004 while working at the chicken
23  plant, correct?

## Page 167

1  A.  Yes, sir.
2  Q.  Your salary though, when you went as a
3  supervisor, was $48,000 annually, correct?
4  A.  Yes.
5  Q.  Now, in 2004, versus 2005, did you actually
6  work longer hours in 2005, before you were fired?
7  A.  Yes, I worked longer hours.
8  Q.  So you actually would have made more than
9  $59,000?
10  A.  Yes.
11  Q.  Okay.  I don't have anything further.
12  BY MR. SMITH:
13  Q.  Have you ever been arrested?
14  A.  I got a DUI 25 years ago.
15  Q.  Do you drink?
16  A.  Sometimes.
17  Q.  What do you drink?
18  A.  Beer.
19  Q.  Have you ever drank before having to go in
20  on a night shift?
21  A.  No, sir.
22  Q.  Never?
23  A.  Never.

## Page 168

1  Q.  Are you sure?
2  A.  Positive.
3  Q.  All right.  Anybody ever complain to you
4  about alcohol on the job, or were you ever
5  counseled about drinking on the job or having been
6  under the influence on the job?
7  A.  Never.
8  Q.  At any job you've ever had?
9  A.  Never.
10  Q.  Okay.  And you're not presently -- and I'm
11  not asking this to embarrass you -- have you ever
12  been in bankruptcy, or are you presently in
13  bankruptcy?
14  A.  No, sir.
15  Q.  You've never filed bankruptcy?
16  A.  No, sir.
17  Q.  Okay.  That's all I have.
18  A.  Okay.
19
20      (The deposition was concluded.)
21
22
23

42 (Pages 165 to 168)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 169

```
 1        C E R T I F I C A T E
 2
 3    STATE OF ALABAMA
 4    BARBOUR COUNTY
 5
 6        I hereby certify that the above and
 7    foregoing deposition was taken down by me in
 8    stenotype and the questions and answers thereto
 9    were transcribed by means of computer-aided
10    transcription, and that the foregoing represents
11    a true and correct transcript of the testimony
12    given by said witness upon said hearing.
13        I further certify that I am neither of
14    counsel, nor kin to the parties to the action,
15    nor am I in anywise interested in the result of
16    said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23    Commission Expires 07/08/2009
```

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

# Condensed Transcript

# Deposition of
# Kathy Gilmore

### taken on
### 5/30/2008

### Ron Blocker
### v.
### Equity Group

## Case No. 2:07cv722MHT - WC



BAKER&BAKER

**Certified Court Reporters,
Certified Legal Video Specialists,
and Trial Presentation Consultants
(334) 262-3332  888-253-3377
www.baker-baker.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


RON BLOCKER,

      Plaintiff,

vs.          CASE NO. 2:07cv722MHT-WC

EQUITY GROUP, EUFAULA DIVISION,

L.L.C.,

      Defendants.



*    *    *    *    *    *    *    *

964eae78-78d6-40f5-9389-b1a367dbf82d

Kathy Gilmore
May 30, 2008

2

1          *       *       *       *       *       *       *

2                        APPEARANCES

3

4     Representing the Plaintiff:

5
            MR. JERRY ROBERSON
6           Attorney at Law
            Roberson & Roberson
7           8 Office Park Circle, Suite 150
            Birmingham, Alabama  35223
8           (205) 981-3906
            jdratty@charter.net
9

10    Representing the Defendants:

11          MR. JOEL P. SMITH, JR.
            Attorney at Law
12          Williams, Potthoff, Williams
                & Smith, L.L.C.
13          125 South Orange Avenue
            Eufaula, Alabama  36072
14          (334) 687-5834

15

16

17

18          *       *       *       *       *       *       *

19

20

21

22

23

24

25

964eae78-78d6-40f5-9389-b1a367dbf82d

Kathy Gilmore
May 30, 2008

3

1
2         STIPULATIONS
3
4        It is hereby stipulated and
5 agreed by and between counsel representing
6 the parties that the deposition of KATHY
7 GILMORE is taken pursuant to the Rules of
8 Civil Procedure, and that said deposition
9 may be taken before Cornelia J. Baker,
10 Certified Court Reporter, as Commissioner,
11 without the formality of a commission; that
12 objections to questions, other than
13 objections as to the form of the questions,
14 need not be made at this time, but may be
15 reserved for a ruling at such time as the
16 deposition may be offered into evidence, or
17 used for any other purpose by either party
18 hereto, provided by the Statute.
19      It is further stipulated and agreed by
20 and between counsel representing the parties
21 in this case, that the filing of the
22 deposition of KATHY GILMORE is hereby
23 waived, and that said deposition may be
24 introduced at the trial of this case or used
25 in any other manner by either party hereto

5

1   *  *  *  *  *  *  *  *
2         I N D E X
3
4 EXAMINATION        PAGE
5 BY MR. ROBERSON:      8
  BY MR. SMITH:        70
6
7 EXHIBIT           PAGE
8 Plaintiff's Exhibit No. 1 .......... 20
9
  Plaintiff's Exhibit No. 2 .......... 23
10
11 Plaintiff's Exhibit No. 3 .......... 24
12
  Plaintiff's Exhibit No. 4 .......... 28
13
14 Plaintiff's Exhibit No. 5 .......... 64
15
  Plaintiff's Exhibit No. 6 .......... 67
16
17
18
19
20
21
22
23
24
25

4

1 provided for by the Statute, regardless of
2 the waiving of the filing of same.
3      It is further stipulated and agreed by
4 and between counsel and the witness that the
5 reading and signing of the deposition by the
6 witness is hereby waived.
7
8   *  *  *  *  *  *  *  *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1         KATHY GILMORE,
2   The Witness, having first been sworn
3 or affirmed to speak the truth, the whole
4   truth, and nothing but the truth,
5       testified as follows:
6     MR. ROBERSON:  The usual
7       stipulations?
8     MR. SMITH:  Yeah.
9     MR. ROBERSON:  Have you got any
10      documents?
11     MR. SMITH:  Yeah.  That's
12      what we've got in response
13      to your notice, is a copy
14      of the Saturday pay policy,
15      which Ms. Gilmore can
16      explain that if need be.
17      And then there's a form
18      that goes with that when
19      that's requested.
20       And this is a
21      document that's arguably
22      responsive to your earlier
23      discovery request.  It was
24      a complaint from a temp
25      employee in December that

Kathy Gilmore
May 30, 2008

7

```
 1    she found.  It's not part
 2    of his personnel file.  I'm
 3    not sure how relevant it
 4    is, but you can look at it
 5    and see anyway.
 6         And then this -- we
 7    think that Buck Giles,
 8    Robert Giles, replaced him
 9    as supervisor.  And this is
10    his personnel file.  It
11    doesn't have his -- what do
12    you call that green sheet?
13  THE WITNESS:  The pay sheet.
14    MR. SMITH:  But that's being
15    faxed.  It wasn't in his
16    personnel.  We've got
17    somebody tracking that down
18    now.  So we'll get that in
19    a minute.
20         And let's see.  As
21    to the rest of them, we
22    produced the -- we don't
23    have any other statements,
24    other than . . .
25    MR. ROBERSON:  What I was
```

8

```
 1    asking you, primarily, was
 2    these guys that -- you
 3    know, that she did that
 4    interview --
 5    MR. SMITH:  Right.
 6    MR. ROBERSON:  -- and it's
 7    typed up.  Are there any
 8    statements?
 9    MR. SMITH:  No, just her -- no,
10    this is all we have.
11    MR. ROBERSON:  Okay.  That's
12    primarily what I was
13    asking.
14         All right.  Let's
15    get started.
16         EXAMINATION
17  BY MR. ROBERSON:
18    Q.  Ms. Gilmore, my name is Jerry
19  Roberson, and I represent Ron Blocker.  Have
20  you ever given a deposition before?
21    A.  Yes, I have.
22    Q.  How many times?
23    A.  Once.
24    Q.  And was it a business matter,
25  or --
```

9

```
 1    A.  Yes, sir.
 2    Q.  Where was the case; where was
 3  it pending?
 4    A.  Here.
 5    Q.  In Barbour County?
 6    A.  In Barbour County.
 7    Q.  And who were you working for at
 8  the time?
 9    A.  Columbus Mills.
10    Q.  Do you remember the lawyer who
11  took your deposition?  I hope it wasn't me.
12    A.  No.  Tommy Gaither was the
13  local counsel.  I don't remember --
14    Q.  He was your lawyer?
15    A.  No.  Our lawyer was --
16    Q.  Oh.  Tommy Gaither was
17  representing the Plaintiff?
18    A.  Yeah -- well, somebody from
19  Birmingham was representing, but Tommy was
20  the local.
21    Q.  Did somebody get caught up in a
22  machine or something?
23    A.  No.  It was a -- he fell and
24  slipped, I think, at Columbus Mills, in the
25  water.
```

10

```
 1    Q.  Okay.  All right.  It was an
 2  injury case?
 3    A.  Right.
 4    Q.  All right.  What's your
 5  residence address, please, ma'am?
 6    A.  308 Gregory Drive.
 7    Q.  Is that here in -- or in
 8  Eufaula?
 9    A.  Yes, sir.
10    Q.  36067?
11    A.  27.
12    Q.  27.  All right.  And are you
13  married?
14    A.  Yes, sir.
15    Q.  What's your husband's name?
16    A.  James Davis.
17    Q.  I feel sorry for you.
18         How long have you been married
19  to James Davis?
20    A.  Almost a year, a year in July.
21    Q.  Okay.  So at the time that
22  Mr. Blocker was fired, you were not married
23  to him?
24    A.  True, yes, sir.
25    Q.  Were you married?
```

Kathy Gilmore
May 30, 2008

11

1    A. Yes, sir.
2    Q. At that time? And that was May
3  of 2005.
4    A. No, I wasn't. Huh-uh, no I
5  wasn't.
6    Q. Have you been married before
7  Mr. Davis?
8    A. Yes.
9    Q. To whom?
10   A. Wayne Gilmore.
11   Q. And is he still living?
12   A. Yes, sir.
13   Q. Where does he live?
14   A. Chewalla Circle, here in
15  Eufaula.
16   Q. What does he do?
17   A. He works at Alabama Power.
18   Q. Okay. What does he do for
19  them?
20   A. He's an engineer.
21   Q. Any other marriages?
22   A. Yes, sir.
23   Q. Who?
24   A. Eric Glover.
25   Q. And does he still live here?

12

1    A. Yes, sir, in Eufaula.
2    Q. Okay. And any other marriages?
3    A. That's it.
4    Q. Okay. Now, how long have you
5  worked for -- I'm going to call where you're
6  working now the chicken plant.
7    A. Okay. Seven years.
8    Q. Seven years?
9    A. Uh-huh (affirmative response).
10   Q. And when you first went to work
11  there, it was CP?
12   A. Yes, sir.
13   Q. And now it's Equity Group?
14   A. Uh-huh (affirmative response).
15   Q. When did you begin working,
16  2001?
17   A. March of 2001, yes, sir.
18   Q. Were you hired in at your
19  present position?
20   A. Yes, sir.
21   Q. And that's HR?
22   A. Uh-huh (affirmative response).
23   Q. Do you have a title?
24   A. Assistant HR Manager.
25   Q. Who's the HR Manager?

13

1    A. Jim Bise.
2    Q. Is he still there?
3    A. Yes, sir.
4    Q. Now, have you had -- what's the
5  extent of your education?
6    A. I graduated, a four-year degree
7  at Troy State.
8    Q. In what?
9    A. Troy -- oh, I'm sorry. Office
10  Management.
11   Q. And when did you receive that
12  degree, what year?
13   A. 1982.
14   Q. And have you worked since that
15  time? Where did you work before the chicken
16  plant?
17   A. Columbus Mills.
18   Q. For how long?
19   A. Five years.
20   Q. And was that in HR also?
21   A. Yes, sir.
22   Q. What was your position?
23   A. HR manager.
24   Q. And so that would be from '96
25  to 2001, approximately?

14

1    A. Yes, sir.
2    Q. Where did you work between '82
3  and '96?
4    A. Alabama Power.
5    Q. In what capacity?
6    A. Different departments. Started
7  out actually in the mailroom, starting out.
8  Moved from the mailroom to the claims
9  department. From there, got promoted to
10  support services, and then substation
11  transmission lines.
12   Q. Okay. Is that the last
13  position you held there, substation --
14   A. Transmission lines, yes, sir.
15   Q. Was that in Eufaula?
16   A. Yes, sir.
17   Q. Why did you leave the power
18  company? I didn't think anybody ever left
19  the power company.
20   A. Actually, Columbus Mills called
21  me. Butch McRae [phonetic] called me and
22  asked me if I'd be interested in coming to
23  talk to him about an HR position. And I did.
24   Q. Well, now, I understand --
25  first of all, were you involved in any way in

Kathy Gilmore
May 30, 2008

15

1  the decision to terminate Ron Blocker?
2       A. Yes, sir.
3       Q. Okay. And what was your role
4  in that decision?
5       A. I made the recommendation.
6       Q. Okay. What position was he
7  terminated from?
8       A. He was a maintenance
9  supervisor.
10      Q. And how long had he been a
11  maintenance supervisor?
12      A. Approximately, six months.
13      Q. Okay. Before he was a
14  supervisor, what did he do?
15      A. He worked in maintenance.
16      Q. Okay. Do you know why he was
17  promoted to supervisor?
18      A. I didn't make that decision.
19      Q. Who did?
20      A. I guess Reb and Greg, Reb
21  Bludsworth and Greg Mills.
22      Q. Well, are you normally involved
23  in promotions?
24      A. The only involvement I have is
25  if someone wants to promote somebody, they

16

1  approach me. And I pull their file and let
2  them take a look at it. But their decision
3  is the final decision.
4       Q. All right. Did they take a
5  look at his file before they promoted him?
6       A. I don't recall.
7       Q. They didn't approach you and
8  ask you to pull it?
9       A. I don't remember.
10      Q. Well, they wouldn't promote
11  somebody without looking at his file, would
12  they?
13          MR. SMITH: Object to the form.
14              You can answer.
15      A. That's usually what they do.
16      Q. Right. If they followed their
17  usual practice, they would have, correct?
18      A. Correct.
19      Q. Now, do you know what kind of
20  person they were looking for to be a
21  maintenance supervisor; did y'all have any
22  discussion about that?
23      A. Not that I recall.
24      Q. Are there things in your file
25  that would make you ineligible to receive a

17

1  promotion to management?
2       A. I would certainly take a look
3  at attendance and suspension issues, maybe.
4  Disciplinary actions.
5       Q. Well, when Equity Group took
6  over the chicken plant, were there some
7  changes made in the practices out there from
8  your standpoint, HR?
9       A. Certainly, uh-huh.
10      Q. What were they?
11      A. I think we changed the
12  attendance policy. There were some policy
13  changes.
14      Q. Okay. What did you change the
15  attendance policy to?
16      A. We had an attendance policy
17  that required four occurrences within a
18  ninety-day period. We changed that to -- we
19  changed that to -- I think it was six within
20  forty-five. So there were some changes made.
21  There were some changes made in, you know,
22  management.
23      Q. You mean, in the personnel
24  staff at the chicken plant; is that what you
25  mean?

18

1       A. Uh-huh (affirmative response).
2       Q. Is that a yes?
3       A. Yes, sir.
4       Q. And what changes were made in
5  the staffing at the chicken plant?
6       A. I know Al Rhodes was
7  replaced -- of some manager -- to Spence
8  Jernigan.
9       Q. What was Mr. Rhodes' position?
10      A. I want to say general manager.
11      Q. Okay. And Spence Jernigan
12  became the general manager?
13      A. Yes, sir.
14      Q. Was Mr. Rhodes let go or just
15  had a change in his role?
16      A. He was let go.
17      Q. Okay. Any other changes that
18  you're aware of?
19      A. We started up the cook plant.
20  Mike Courtner [phonetic] came over from
21  Camilla as manager over there.
22      Q. Mike who?
23      A. Courtner.
24      Q. All right. Anything else?
25      A. That's all I can -- at this

Kathy Gilmore
May 30, 2008

19

1  time.
2      Q.  Make any decisions about
3  overtime; make any new policies about
4  overtime that you're aware of?
5      A.  Not that I'm aware of, except
6  for the Saturday overtime for supervisors
7  that came into effect.
8      Q.  When did that come into effect?
9      A.  According to that paperwork,
10  May of 2005.
11      Q.  Right after Ron Blocker left?
12      A.  Yes, sir.
13      Q.  Well, that's a coincidence,
14  isn't it?
15          MR. SMITH:  Object to the form.
16          Let's look at the date.
17          And object to the
18          predicate, that it was
19          right after he left.
20          Appears to be right before
21          he left.
22          MR. ROBERSON:  That's even
23          better.
24  BY MR. ROBERSON:
25      Q.  I'll show you what I'll mark as

20

1  Exhibit 1 to your deposition and ask you if
2  this is the policy to which you refer?
3          (Whereupon Plaintiff's Exhibit
4          No. 1 was marked for
5          identification and attached
6          hereto.)
7          (Witness reviewed document.)
8      A.  Yes, sir.  That was given to me
9  by Greg Mills.
10      Q.  When was it given to you?
11      A.  I brought it this morning.
12      Q.  But when did he give it to you?
13      A.  This morning.
14      Q.  You hadn't seen it before
15  today?
16      A.  Well, it was a policy.  I
17  didn't have it in my possession.
18      Q.  Well, have you ever seen it
19  before it was given to you this morning?  As
20  the HR Assistant Manager, had you ever seen
21  that policy?
22      A.  Yes, I've seen it.
23      Q.  When did you see it first?
24      A.  It's been a while.
25      Q.  Well, and it's dated --

21

1  effective date of May the 9th, correct, 2005?
2      A.  Correct.
3      Q.  Okay.  And Ron Blocker, I
4  believe, was discharged May the 17th, 2005;
5  is that correct?
6      A.  Yes, sir.
7      Q.  Okay.  So it's your testimony
8  that this policy began one week prior to his
9  discharge?
10      A.  As far as I know.
11      Q.  Well, when they start a new
12  policy, do they put it up on the bulletin
13  board or anything, post it in some fashion?
14      A.  No, not necessarily.
15      Q.  Well, how do the supervisors
16  become aware of the new policy, ma'am?
17      A.  Now, I just started paying my
18  HR manager that Saturday pay about six, seven
19  months ago, so it's -- I don't know when
20  exactly it would have been told to the
21  supervisors.
22      Q.  Well, aren't you the person who
23  is responsible for implementing the new
24  policies?
25          MR. SMITH:  Object to the form.

22

1      Q.  You can answer.
2      A.  Either me or Jim Bice.
3      Q.  So would that be a failure on
4  your part not to comply with the existing pay
5  policy?
6          MR. SMITH:  Object to the form.
7      A.  Me complying?
8      Q.  Yeah.  If your supervisor
9  worked there on Saturdays for two years
10  without getting paid, wouldn't that be your
11  fault?
12          MR. SMITH:  Object to the form.
13      Q.  You can answer.
14      A.  Not necessarily.
15      Q.  Well, whose fault would it be,
16  ma'am?
17      A.  It was just decided to pay him
18  six or seven months ago.  I'm not paid on
19  Saturdays.
20      Q.  Who decided to pay?
21      A.  My boss.
22      Q.  Do you work Saturdays?
23      A.  Yes, sir.
24      Q.  Are you a salaried, exempt
25  employee?

Kathy Gilmore
May 30, 2008

23

1   A. Salaried employee, yes, sir.
2   Q. And let me mark as Exhibit 2
3   this sheet that apparently goes along with
4   this policy. Is that just a sheet that's
5   submitted -- is Exhibit 2 just a sheet that's
6   sent to payroll?
7       (Whereupon Plaintiff's Exhibit
8       No. 2 was marked for
9       identification and attached
10      hereto.)
11      (Witness reviewed document.)
12   A. It is.
13   Q. To reflect that they work, and
14   they're entitled to this additional
15   compensation?
16   A. Saturday pay, yes, sir.
17   Q. Okay. Do you know who made the
18   decision to implement this policy?
19   A. I think the policy actually was
20   done in other Keystone facilities. So Spence
21   Jernigan and Jim Bice would have made the
22   decision to implement the policy.
23   Q. In Eufaula?
24   A. Yes, sir.
25   Q. Okay. And do you know when

24

1   they did that --
2   A. No, I don't.
3   Q. -- when they made that
4   decision?
5   A. I do not know.
6   Q. Do you know why they made that
7   decision?
8   A. I do not.
9   Q. They hadn't ever had any
10  discussions with you about it?
11  A. No, sir.
12  Q. Was it in response to any
13  complaints that were made by the salaried
14  people?
15  A. Not to my knowledge.
16  Q. I see. Well, were there ever
17  any complaints, that you were aware of, by
18  the salaried people about working in excess
19  of eighty hours a week?
20  A. No, sir.
21  Q. Well, while I'm marking, I'll
22  just mark this as Exhibit 3. Tell me what
23  Exhibit 3 is.
24      (Whereupon Plaintiff's Exhibit
25      No. 3 was marked for

25

1       identification and attached
2       hereto.)
3       (Witness reviewed document.)
4   A. This is -- a Staffing Solution
5   employee made a complaint about how Ron was
6   treating him.
7   Q. Who is the employee?
8   A. Rosheed Whigham.
9   Q. Is he probably not from Eufaula
10  originally?
11  A. I'm not sure.
12      MR. SMITH: If he's a Whigham,
13      I'll bet he is. In Barbour
14      County.
15  A. I don't know. I didn't know
16  him.
17  Q. Let's see. Well, did he make
18  this complaint to personnel at Staffing
19  Solutions or did he make this complaint to
20  you?
21  A. At Staffing Solutions. And
22  they faxed it to me.
23  Q. Okay. And did he make this
24  complaint while he was working at Equity
25  Group?

26

1   A. Yes, sir.
2   Q. Okay. It's dated 12/10/04,
3   which is the date it was sent from Christy
4   Lane at Staffing Solutions to Jim Bice,
5   correct?
6   A. Yes, sir.
7   Q. Okay. What action did y'all
8   take in response to this complaint?
9   A. I get these complaints. Most
10  of the time you -- when you have new
11  supervisors, of course, you're going to get
12  complaints about supervisors. When I get a
13  complaint like this, I would sit down with
14  the supervisor and use it basically as a
15  coaching tool to ask questions about what
16  happened and tell him how this is perceived.
17  Q. All right, ma'am. I want to be
18  clear about this. Did you talk to Ron
19  Blocker about this complaint, Mr. Whigham's
20  complaint?
21  A. I can't recall if I did.
22  Q. Was Ron Blocker ever made aware
23  that Mr. Whigham had made a complaint?
24  A. I cannot tell you that
25  100 percent, no, sir.

Kathy Gilmore
May 30, 2008

27

1    Q. Did you obtain any witness
2  statement from anybody listed in this
3  complaint in investigating Mr. Whigham's
4  complaint?
5    A. No, sir.
6    Q. Did you talk to Mr. Whigham?
7    A. I can't recall.
8    Q. Okay. Can you recall anything
9  you did or was done by Equity Group in
10  response to this complaint?
11    A. I can't recall.
12    Q. Okay. Thank you. But now, all
13  of a sudden, in this litigation, the
14  complaint that was not investigated or
15  reacted to in any way has become important?
16    MR. SMITH: Object to the form.
17        That's a total lack of
18        foundation.
19    Q. You can answer.
20    A. I missed the whole question.
21  What was it?
22    Q. Do you think this is somehow
23  important now?
24    A. I just found that.
25    Q. Okay. I'm going to mark this

28

1  as Exhibit 4 to your deposition. Now, can
2  you tell me what Exhibit 4 is?
3    (Whereupon Plaintiff's Exhibit
4      No. 4 was marked for
5      identification and attached
6      hereto.)
7    (Witness reviewed document.)
8    A. These are the notes that I took
9  when I interviewed these employees.
10    Q. I see. Now, who asked you to
11  interview employees?
12    A. I had received a couple of
13  complaints about treatment on the third-shift
14  maintenance, and I decided to do an
15  investigation.
16    Q. Okay. Who did you receive
17  complaints from?
18    A. Ken Pelham.
19    Q. After he was fired, he made a
20  complaint?
21    MR. SMITH: Object to the form.
22    A. I'm not sure whether it was
23  after he was fired or during his employment.
24    Q. When did you begin your
25  investigation?

29

1    A. May 16th.
2    Q. 2005?
3    A. Uh-huh (affirmative response).
4  It's what it says here, yes, sir.
5    Q. Do you know when Mr. Pelham's
6  last day was?
7    A. I don't.
8    Q. You probably could obtain that
9  information, though, couldn't you?
10    A. Yes, sir.
11    Q. So it was your decision to
12  begin an investigation on Ron Blocker,
13  correct?
14    A. Correct.
15    Q. Did you have any discussions
16  with Mr. Bice before you began your
17  investigation?
18    A. Probably.
19    Q. You don't recall any?
20    A. I don't. But I usually do run
21  things by Jim before I do proceed.
22    Q. Okay. Well, in fact, did you
23  get a call from Ken Pelham on May 16th?
24    A. Yes.
25    Q. And is that what prompted you

30

1  to begin your investigation?
2    A. Well, there were several issues
3  that had come up about this. It was also an
4  e-mail circulated to the company from a Jim
5  Allen saying how he had been abused on third
6  shift.
7    Q. Who is Jim Allen?
8    A. He was a former employee.
9    Q. In the maintenance department?
10    A. Yes, sir.
11    Q. And when did he work there?
12    A. I don't recall right now.
13    Q. Was there a maintenance
14  supervisor on the third shift before Ron
15  Blocker?
16    A. I don't remember. I don't
17  recall who it would be.
18    Q. Well, was this a new position
19  that was being created, a maintenance
20  supervisor on the third shift, or did he
21  replace somebody?
22    A. I don't recall.
23    Q. Well, do you think there's
24  anybody out at Equity Group who might recall
25  or if there's some document you might look at

9 (Pages 27 to 30)

964eae78-78d6-40f5-9389-b1a367dbf82d

Kathy Gilmore
May 30, 2008

31

1  to refresh your recollection?
2      A. Reb may know. He's been the
3  maintenance manager for quite a few years.
4      Q. Okay. Well, we'll get to him
5  in just a few minutes.
6          So Jim Allen made a complaint.
7  Was his complaint in writing?
8      A. From an e-mail, yes.
9      Q. Where's the e-mail?
10      A. I don't have it.
11      Q. What was his complaint?
12      A. That he had been abused and
13  mistreated on the third shift, and . . .
14      Q. Did he tell you what form this
15  abuse had taken place in, how he was abused?
16      A. Well, he talked about being
17  struck.
18      Q. Who struck him?
19      A. I don't recall.
20      Q. Anything else?
21      A. No, sir.
22      Q. Jim Allen, Ken Pelham, all
23  former employees. Now, did Jim Allen ever
24  make a complaint while he was working out
25  there?

32

1      A. He did come to see me one time,
2  yes.
3      Q. Okay. When did he come?
4      A. Sometime that 2005.
5      Q. Well, you're an HR person,
6  correct?
7      A. Correct.
8      Q. When somebody comes to see you,
9  it's important, correct; they're coming to
10  HR?
11      A. Yes, sir.
12      Q. You're going to address their
13  needs, right?
14      A. Yes, sir.
15      Q. You're going to make a record
16  of their visit, right?
17      A. Not necessarily.
18      Q. Oh. Well, did you make a
19  record of his visit with you in 2005?
20      A. Not to my knowledge.
21      Q. Okay. How long did he stay in
22  your office?
23      A. I don't recall.
24      Q. What was the nature of his
25  complaint?

33

1      A. He just didn't think he was
2  being treated right on third shift.
3      Q. Okay. Well, how did you
4  address that complaint?
5      A. I would have told Ron Blocker.
6      Q. You would have told him? You
7  would have come to see Ron?
8      A. I would call Ron to come see
9  me.
10      Q. Okay. And did he?
11      A. To my knowledge, yes.
12      Q. You don't recall that
13  conversation, though, correct?
14      A. Correct.
15      Q. There's no writing that
16  reflects a conversation ever took place,
17  correct?
18      A. Correct.
19      Q. There's nothing in his
20  personnel file to indicate that James
21  Allen -- Jim Allen, ever complained and that
22  he was ever counseled about such a complaint,
23  is there?
24      A. No, sir.
25      Q. Okay. Any other complaints,

34

1  ma'am?
2      A. Not to my knowledge.
3      Q. Okay. Now, on May 16th, you
4  began your investigation, and you -- oh, did
5  you have a phone interview with Ken Pelham or
6  did he come down to the plant?
7      A. I remember seeing him, but I
8  don't remember when it was.
9      Q. Well, this indicates that he
10  was fired when he was discussing this with
11  you; do you recall that now?
12      A. No, sir.
13      Q. Have you reviewed this
14  Exhibit 4 before your deposition?
15      A. I did briefly, yes, sir.
16      Q. Ken said that Ron humiliates
17  him by calling him "tool boy." What was Ken
18  Pelham's job?
19      A. He worked in the tool cage.
20      Q. Was he assigned to get tools to
21  the maintenance workers?
22      A. Yes, sir.
23      Q. If they needed supplies, saw
24  blades, things like that, he would check them
25  out to them?

Kathy Gilmore
May 30, 2008

35

1    A.  As far as I know.
2    Q.  He would distribute the tools
3  on the third shift, correct?
4    A.  Yes, sir.
5    Q.  Well, and would it be his
6  responsibility to remain in the tool area,
7  which has wire around it to limit access to
8  the tools, the cage as you described it?
9    A.  Yes, sir, as far as I know.
10    Q.  Would that be his assigned work
11  area?
12    A.  Yes, sir.
13    Q.  And so if Ron told him to get
14  in his cage, he would be exercising his
15  supervisory authority correctly, wouldn't he?
16    A.  Yes.  I do think that's an ugly
17  way to put it.
18    Q.  Well, so Mr. Blocker was
19  insensitive is what you're suggesting?
20    A.  Yes, sir.
21    Q.  Okay.  And what should he have
22  called it, if not a cage?  What should he
23  have said, Get back in the tool area?
24    A.  That would have been
25  appropriate.

36

1    Q.  Okay.  Who is Darrell McCartha?
2    A.  He was a previous employee.
3    Q.  Okay.  Did he transfer from the
4  third shift to the first shift?
5    A.  As I recall, yes, sir.
6    Q.  Is he still with the company?
7    A.  Not to my knowledge.
8    Q.  Was he fired?
9    A.  I don't recall.
10    Q.  Who's Glenda Merritt?
11    A.  She was a QA supervisor.
12    Q.  Did she work on third shift?
13    A.  Actually, she worked on first
14  shift.  She came in early to do like pre-op
15  for machines, to make sure that they were
16  cleaned before the workday began.
17    Q.  Okay.  Is she still employed
18  there?
19    A.  No, sir.
20    Q.  Was she fired?
21    A.  No, sir.
22    Q.  Did she quit?
23    A.  Yes, sir.
24    Q.  When did she quit?
25    A.  It's been a couple of years

37

1  ago.
2    Q.  Did she indicate why she was
3  leaving?
4    A.  No, sir.
5    Q.  Who's James Bragg?
6    A.  He was a maintenance man with
7  us, supervisor.  He was promoted to an IT
8  supervisor.
9    Q.  Is he still with your company?
10    A.  No, sir.
11    Q.  Was he fired or did he quit?
12    A.  Yes.  He was terminated.
13    Q.  Why was he terminated?
14    A.  The last incident was -- we had
15  some issues with him.  He was supposed to go
16  out to California to some IT Keystone
17  convention thing.  He never showed up.  We
18  called over to his house where he lived in
19  Phenix City.  And he was still at home and
20  elected just not to go.  And the folks in
21  California were looking for him, and we were
22  looking for him.  And that was what happened
23  with James Bragg.
24    Q.  The last straw, so to speak?
25    A.  Yes, sir.

38

1    Q.  Okay.  Does Alan Carpenter
2  still work for you?
3    A.  Yes, sir.
4    Q.  What does he do?
5    A.  I think he's still in
6  maintenance.
7    Q.  Still on third shift?
8    A.  I'm not for sure.
9    Q.  What about Josh Bradford?
10    A.  No, sir.  He was let go two
11  weeks ago, approximately.
12    Q.  What for?
13    A.  He had attendance issues.
14    Q.  He didn't come to work?
15    A.  Yes, sir.
16    Q.  Okay.  What was his job before
17  he was let go?
18    A.  He was in maintenance.  And was
19  on third shift.
20    Q.  Who replaced Ron Blocker as
21  maintenance foremen on third shift?
22    A.  To my knowledge, it was Buck
23  Giles.
24    Q.  Is he still there?
25    A.  Yes, sir.

Kathy Gilmore
May 30, 2008

39

1    Q. Is he still third-shift
2 supervisor?
3    A. No, sir. He has moved to
4 second.
5    Q. Who's the third-shift
6 supervisor now?
7    A. James Key.
8    Q. When did he take over? Do you
9 know?
10    A. I don't recall. It's been a
11 while.
12    Q. What about Rex Faircloth, is he
13 still working for you?
14    A. No, sir. He's deceased.
15    Q. Oh, sorry to hear that. Was he
16 working for you at the time of his death?
17    A. Yes, sir.
18    Q. Maintenance, third shift?
19    A. Yes, sir.
20    Q. All right. Now, when you were
21 doing your investigation into Ron Blocker,
22 were you aware that it could lead to his
23 termination?
24    A. If the findings would warrant
25 termination, yes, sir.

40

1    Q. Well, do y'all have forms out
2 there for witnesses to sign statements?
3    A. No, sir.
4    Q. Have you ever had an
5 investigation where you obtained signed
6 statements from witnesses?
7    A. Yes, sir.
8    Q. Under what circumstances do you
9 do that, ma'am?
10    A. Depends on the situation. If
11 something happens in the plant, a lot of the
12 supervisors will take statements and then
13 bring it to me. And I'll complete the
14 investigation.
15    Q. Okay. Well, you didn't obtain
16 any witness statements before Mr. Blocker was
17 discharged, correct?
18    MR. SMITH: Object to the form.
19    A. No.
20    Q. Why not?
21    A. I interviewed everybody
22 personally.
23    Q. Great. Why didn't you obtain a
24 witness statement and get them to sign it and
25 acknowledge that that's what they were

41

1 saying, ma'am?
2    A. I just didn't feel like it was
3 necessary.
4    Q. Why not? Why wouldn't it be
5 necessary?
6    A. That's not the way I chose to
7 interview these people.
8    Q. Well, looking back on it, do
9 you wish you had obtained signed statements?
10    A. Not necessarily.
11    Q. Well, did y'all do some
12 investigation into a vending machine
13 incident? Mr. Bice, did he do an
14 investigation into a vending machine
15 vandalism incident?
16    A. To my recollection, yes, he
17 did.
18    Q. Where's that?
19    A. I don't know. I don't have
20 that.
21    Q. Well, does he? Does Equity
22 Group?
23    A. Not to my knowledge.
24    Q. Well, what investigation did he
25 do, ma'am?

42

1    A. I don't know.
2    Q. Never discussed it with you?
3    A. No, sir.
4    Q. You don't know the outcome of
5 that investigation?
6    A. Not from Jim Bice, no.
7    Q. From any source?
8    A. No, sir.
9    Q. Was anybody disciplined as a
10 result of vandalism to a vending machine?
11    A. Not that I can recall.
12    Q. Was anybody disciplined besides
13 Ron Blocker?
14    MR. SMITH: Object to the form.
15    A. Disciplined when?
16    Q. Well, you recall that Ron
17 Blocker was suspended and then fired,
18 correct?
19    A. Yes, sir.
20    Q. I call that discipline. Was
21 anybody else disciplined besides Ron Blocker
22 as a result of the investigation into the
23 third shift?
24    A. No, sir.
25    Q. Well, you were made aware of

Kathy Gilmore
May 30, 2008

43

1  inappropriate behavior on the part of
2  numerous people under Blocker's supervision,
3  correct?
4      A. Say that again.
5      Q. There were allegations of
6  inappropriate conduct on the part of numerous
7  people, correct?
8      A. Allegations of misconduct
9  from -- I'm sorry. I'm kind of distracted.
10  Say again.
11      Q. You recorded numerous
12  allegations of misconduct involving several
13  people, correct?
14      A. Yes, sir.
15      Q. Was anybody else disciplined
16  other than Ron Blocker?
17      A. Not to my knowledge.
18      Q. Why not?
19      A. Because Ron was the manager
20  over that shift, and he was ultimately
21  responsible for his employees.
22      Q. Well, if you had proof of
23  misconduct, why didn't you take some action,
24  ma'am?
25      A. I did.

44

1      Q. You fired Ron Blocker, but what
2  did you do to his crew?
3      A. They weren't responsible for
4  their -- I mean, he was responsible for the
5  management of that shift. He was held
6  accountable for his employees. And we held
7  him accountable.
8      Q. I see. Ken Pelham named Alan
9  Carpenter, John Bradford, Rex Faircloth, and
10  Kelvin Heath. He said they lock him in his
11  cage. They throw bolts over the cage and hit
12  him in the head. Alan hit him in the head,
13  and it almost knocked him out. He said one
14  time someone threw something and busted his
15  lip. Did you take any action in response to
16  those complaints?
17      A. I did indeed. I went to the
18  management and disciplined them, who were
19  ultimately in charge of that shift. Ron
20  Blocker should have managed his employees on
21  that shift so that would not have happened.
22      Q. Do you know how much money Ron
23  Blocker made in 2004?
24      A. No, sir.
25      Q. He made $60,000; were you aware

45

1  of that?
2      A. No, sir.
3      Q. Is that more than you make?
4      A. Yes, sir.
5      Q. And he took a job as a
6  supervisor where he got paid a salary. Do
7  you know what his salary was as maintenance
8  foreman on the third shift?
9      A. In his deposition, I believe he
10  said 48,000.
11      Q. Do you know why somebody would
12  agree to work a job and take a $12,000 pay
13  cut to be a supervisor; can you think of any
14  reason why they would do that?
15      A. No, sir.
16      Q. That doesn't make sense, does
17  it?
18      MR. SMITH: Object to the form.
19      Q. Ms. Gilmore?
20      A. What was the question? I'm
21  sorry.
22      Q. It doesn't make sense to take a
23  job that pays $12,000 less?
24      MR. SMITH: Are you talking
25          about in theory or are you

46

1          talking about Ron Blocker's
2          actual job?
3      Q. Does it make much sense to take
4  a job that pays $12,000 less?
5      A. People do it for different
6  reasons.
7      Q. Do you have any knowledge into
8  why Ron Blocker took the job?
9      A. No, I don't.
10      Q. Do you know who had
11  conversations with him before he took the
12  job?
13      A. No. Unless it was Reb and
14  Greg.
15      Q. Did you have any conversations
16  with him before he took the job as
17  maintenance supervisor?
18      A. Not to my knowledge.
19      Q. Now, Ron Blocker worked for you
20  before, didn't he, Columbus Mills?
21      A. He was at Columbus Mills, yes.
22      Q. While you were?
23      A. Yes, sir.
24      Q. Did you fire him from there?
25      A. I don't recall what happened,

13  (Pages 43 to 46)

Kathy Gilmore
May 30, 2008

47

1    why he left.
2         Q. They closed that plant, didn't
3    they, Columbus Mills?
4         A. No, sir. It's Beaulieu of
5    America.
6         Q. Oh. Well, they've lost a lot
7    of their supervisors, haven't they?
8         A. I don't know.
9         Q. Why did you leave?
10        A. I just left to go the -- at
11   that time, textiles was kind of soft. The
12   hours were being kind of short at Beaulieu.
13   We weren't running. And I figured everybody
14   had to eat chicken. So I had to eat, so
15   that's why I went somewhere else.
16        Q. Do you consider yourself an HR
17   professional?
18        A. Yes, sir.
19        Q. Are you familiar with the Fair
20   Labor Standards Act, ma'am?
21        A. Yes. I am aware that you pay
22   hours worked and . . .
23        Q. Overtime, pay time-and-a-half
24   for over forty hours, correct; you're aware
25   of that?

48

1         A. For hourly associates and
2    salary not, yes, sir.
3         Q. In fact, you know that it's
4    illegal not to pay overtime, correct?
5         MR. SMITH: Object to the form.
6         A. I don't know all of the
7    legalities of that. I don't.
8         Q. Well, you do know that y'all
9    pay your hourly people time-and-a-half for
10   all time over forty hours worked?
11        A. Yes, sir.
12        Q. You are aware of that. And are
13   you aware that it is illegal not to?
14        A. Yes.
15        Q. Thank you.
16        MR. SMITH: This is still
17             hourly employees; is that
18             your question?
19        MR. ROBERSON: Yes.
20   BY MR. ROBERSON:
21        Q. And it's your testimony that
22   Ron Blocker never had any discussions with
23   you about his pay; is that correct?
24        A. Not that I can recall, no, sir.
25        MR. ROBERSON: All right.

49

1         Let's take a break. And I
2    want to talk to Ron for a
3    minute.
4    (Whereupon a brief recess was
5        taken.)
6    BY MR. ROBERSON:
7         Q. Ms. Gilmore, you were here when
8    Mr. Blocker was deposed, correct?
9         A. Yes, sir.
10        Q. And you heard his testimony,
11   correct?
12        A. Yes, sir.
13        Q. And he indicated that he had
14   some discussions with you about his
15   compensation before you began your
16   investigation; do you recall that?
17        A. He did testify to that, yes.
18        Q. I mean, I'm not asking you to
19   agree with him, I'm just saying you recall
20   that that's what he testified to --
21        A. Yes, he did.
22        Q. -- that he had conversations
23   with you about the overtime issues he had,
24   okay; is that correct?
25        A. Yes, sir. He did testify to

50

1    that.
2         Q. Okay. And your testimony is
3    that you don't recall any meeting with him
4    about that, correct?
5         A. Yes, sir, correct.
6         Q. Okay. His position and your
7    position are different on that issue,
8    correct?
9         A. Yes, sir.
10        Q. Okay. Now, with respect to the
11   decision to promote him to maintenance
12   supervisor, you believe that decision would
13   have been made by Mr. Bludsworth and
14   Mr. Mills?
15        A. Yes, sir.
16        Q. The decision to terminate him,
17   you made a recommendation, correct?
18        A. Yes, sir.
19        Q. Who else was involved in the
20   decision to fire him?
21        A. I would present what I had to
22   my boss, Jim Bice.
23        Q. Okay. Anybody else? Would
24   Mr. Bludsworth and Mr. Mills be consulted?
25        A. We would tell them what we

14  (Pages 47 to 50)

Kathy Gilmore
May 30, 2008

51

1  would recommend and what we were going to do.
2      Q. Okay. I mean, he works for
3  them, right?
4      A. Yes, sir.
5      Q. So I hope they would be
6  consulted and -- well, did they approve of
7  the decision?
8      A. Yes, sir.
9      Q. Okay. Now, do you know how
10  long Mr. Bludsworth's been out there at the
11  chicken plant?
12      A. I do not. He was there before
13  I --
14      Q. When you arrived?
15      A. Right. He was there before I
16  got there.
17      Q. Was he in maintenance?
18      A. Yes, sir. As far as I have
19  known him, he's always been the maintenance
20  manager.
21      Q. And who is his boss? Do you
22  know who he reports to?
23      A. Greg.
24      Q. Okay. And who is Greg's boss?
25  Who does he report to?

52

1      A. The general manager. At this
2  time, it's Tim Eslinger [phonetic].
3      Q. When did he take over?
4      A. He's only been there four or
5  five months, maybe, two or three.
6      Q. What happened to Mr. Jernigan?
7      A. He went to Huntsville. He is
8  the corporate HR manager now in Huntsville.
9      Q. Is it fair to say that you made
10  your recommendation to terminate Mr. Blocker
11  on this Exhibit 4 based on your
12  investigation?
13      A. Yes, sir.
14      Q. Is that the only reason you
15  made that recommendation to terminate him?
16      A. Yes, sir.
17      Q. In other words, it wasn't
18  anything else that we haven't discussed?
19      A. No, sir.
20      Q. Okay. Now, do you agree with
21  me that if Mr. Blocker engaged in the conduct
22  that's recorded here, that he would be guilty
23  of misconduct; do you agree with that?
24      A. Yes, sir.
25      Q. Okay. Do you play any role

53

1  when an employee files for unemployment; that
2  is, do you make any decision about whether to
3  fight it or submit something in opposition to
4  it?
5      A. I do. My general philosophy, I
6  guess, is I have someone that does the hourly
7  employment -- unemployment. The salaried
8  ones are sent to me. I elect to not answer
9  those. I feel that that's kind of a perk as
10  a manager. That's just my philosophy.
11      Q. Have you ever opposed one?
12      A. Not to my knowledge, no, sir.
13      Q. Okay. So Ron Blocker, after he
14  was terminated, did file for unemployment;
15  you've aware of that?
16      A. Yes, sir. I'm assuming he did,
17  yes, sir.
18      Q. Okay. And Equity Group did not
19  oppose his application; are you aware of
20  that?
21      A. Yes, sir.
22      Q. Okay. And you're saying that's
23  done because of your practice, because he was
24  salaried?
25      A. Yes, sir.

54

1      Q. Even though you have what you
2  consider to be proof of misconduct that would
3  require that he not draw his unemployment,
4  correct?
5      A. Right. I did not --
6      Q. You could submit it, but you
7  chose not to?
8      A. Yes, sir.
9      Q. Even though you had that
10  evidence --
11      A. Yes, sir.
12      Q. -- based on your interviews,
13  correct?
14      A. Yes, sir. I made that decision
15  not to. I do it on all salaried.
16      Q. Okay. Now, have you ever seen
17  employees of Equity Group on a social basis?
18      A. Have I? No, sir.
19      Q. Okay. Have you ever seen Reb
20  Bludsworth on a social basis?
21      A. No, sir.
22      Q. Okay. Do you fish?
23      A. I do.
24      Q. Bass tournaments or do you just
25  run the bank or . . .

Kathy Gilmore
May 30, 2008

55

1    A. No. Just tinker.
2    Q. Who do you fish with, not now
3  that you're married, but before you were
4  married?
5    A. Who?
6    Q. Yeah.
7    A. I can't -- I don't know who I'd
8  have -- I don't understand, I guess.
9    Q. Well, do you go fishing by
10  yourself?
11    A. No.
12    Q. Well, who do you fish with?
13    A. Well, James.
14    Q. I know now. But before you
15  married James, who did you fish with?
16    A. I've gone with James before.
17    Q. Okay. Anybody else?
18    A. We had a little tournament
19  amongst the company that Greg and Reb and all
20  of us, Al and them. But we all kind of just
21  had a little tournament and fished.
22    Q. Who won?
23    A. Me. I was actually the only
24  one that caught a fish.
25    Q. Do you know how many employees

56

1  there are at Equity Group, approximately?
2    A. Approximately, 1,600.
3    Q. And Equity Group's right here
4  in Barbour County; their plant's in Barbour
5  County, right?
6    A. Yes, sir. That does include
7  the feed mill and hatchery.
8    Q. And Mr. Blocker was fired on
9  May 17th, correct?
10    A. Correct.
11    Q. And did y'all tell him anything
12  about why he was fired? I'm talking about
13  did you have any discussions with Mr. Blocker
14  about the reason for his termination?
15    A. As far as I can recall, it was
16  misconduct unbecoming of a member of
17  management.
18    Q. Okay. You have never told him
19  he was fired for his complaints of not being
20  paid overtime or being tricked into taking a
21  salaried position, correct?
22    A. No, sir.
23    Q. And it's your position that he
24  should have no reason to believe that,
25  correct?

57

1    MR. SMITH: Object to the form;
2      lack of foundation. And I
3      don't really understand
4      what you're talking about.
5      No reason to believe what?
6    MR. ROBERSON: That he was
7      fired for making complaints
8      that he wasn't receiving
9      overtime.
10  BY MR. ROBERSON:
11    Q. He doesn't have any basis to
12  make that complaint, does he?
13    A. No, huh-uh.
14    Q. Oh, I know -- I think he got
15  the position in November, and he was fired in
16  May, correct? November of '04, he was a
17  salaried person?
18    A. I think that's when he was
19  promoted.
20    Q. Yes. And then he worked until
21  May, which is maybe six or seven months,
22  correct?
23    A. Yes, sir.
24    Q. And during that period of time,
25  is there anybody besides Mr. Pelham and

58

1  Mr. Allen who complained about his
2  supervisory efforts; are you aware of any
3  other complaints?
4    A. None that I can recall right
5  now.
6    Q. Do you know, during that period
7  of time, how many hours a week Ron Blocker
8  was working as a salaried maintenance
9  supervisor?
10    A. No, sir.
11    Q. Do you have any way of
12  determining that?
13    A. I don't, no, sir.
14    Q. Did you ever have any
15  discussions during that period of time with
16  Mr. Bludsworth or Mr. Mills about Ron Blocker
17  working eighty or more hours per week?
18    A. No, sir.
19    Q. Do you take any exception to
20  his claim that he was working eighty or more
21  hours in those weeks; that is, do you have
22  any evidence that would prove he wasn't?
23    A. I don't know how many hours he
24  worked.
25    Q. Okay. When are you normally at

Kathy Gilmore
May 30, 2008

59

1  work?
2       A.  At seven.
3       Q.  Was he normally at work when
4  you were?
5       A.  When Ron would have any issues,
6  he would come see me at seven, when I got
7  there.
8       Q.  Can you recall any issues he
9  came to see you about?
10      A.  Not specifically.  But he has
11 come over to talk about some of his, you
12 know, employee issues.
13      Q.  In fact, Ron fired Ken Pelham,
14 didn't he?
15      A.  I don't recall that.  I don't
16 remember why or recall it.
17      Q.  And, in fact, Ron was requested
18 by his supervisors to fire Ken Pelham, wasn't
19 he?
20      MR. SMITH:  Object to the form.
21      A.  I don't know who would have
22 told Ron to fire him.
23      Q.  Okay.  Now, in a lawsuit like
24 this, if he's successful, on the off chance
25 that he actually wins his case, one of the

60

1  remedies is reinstatement into the position.
2  Is there any reason, that you're aware of,
3  why you couldn't work with Ron Blocker if
4  he's reinstated?
5       A.  If he's -- say that again now.
6       MR. SMITH:  By the Court?
7       MR. ROBERSON:  Yeah.  A federal
8            judge can put him back in
9            his job.
10 BY MR. ROBERSON:
11      Q.  Do you have any reason you want
12 to express why you couldn't work with Ron if
13 he's reinstated?
14      MR. SMITH:  Object to the form.
15           You can answer if
16           you have an answer.
17      A.  If the Court puts him back to
18 work?  I mean, I like Ron as a person.
19      Q.  Always gotten along with him?
20      A.  Yes.
21      Q.  In fact, are y'all hiring
22 people in your maintenance department right
23 now?
24      A.  I don't know how many positions
25 are available in maintenance right now.

61

1       Q.  And Mr. Blocker was discharged
2  for, shall we say, misconduct as concerns his
3  supervision; is that a fair way to put it?
4       A.  Yes, sir.  His managers, yes,
5  sir.
6       Q.  Do you know anything that would
7  disqualify him from holding a nonmanagerial
8  position in your maintenance department?
9       A.  Now, are we back in the
10 Court-ordered type thing?  What are we saying
11 now?
12      Q.  No.  We're not on Court order.
13      A.  So say it again.  I'm sorry.
14      Q.  I'm saying you're hiring
15 people; what's to keep him from putting in an
16 application and being hired just in
17 maintenance?
18      A.  He's welcome to put in an
19 application.
20      Q.  Will he be hired, though?
21      A.  Would have to take a look at
22 his folder, and what's in his file, and that
23 kind of thing.
24      Q.  Well, you know what's in it,
25 because he's worked there before, and you

62

1  know what kind of employee he is, so would he
2  be hired?
3       A.  I would have to take it under
4  advisement from all the other members of
5  management.  But he was a -- the salaried
6  supervisors, I'd call Greg Mills and see if
7  he's, you know, eligible for rehire.  And
8  then he gives me his recommendations.
9       Q.  Who makes the decision about
10 hourly people?
11      A.  Me.
12      Q.  You do.  Then why would you
13 have to consult with anybody?
14      A.  Well, I would just have to take
15 a look at it.
16      Q.  I see.  Well, have you hired
17 people with less qualifications than Ron in
18 your maintenance department?
19      MR. SMITH:  Object to the form.
20      A.  I don't -- I don't know.
21      Q.  You do know.
22      A.  I'm not a maintenance --
23      MR. SMITH:  Object to the form;
24           it's argumentative.
25      A.  I don't know what exactly,

Kathy Gilmore
May 30, 2008

63

1  skills.
2      Q.  Who are the last three people
3  you hired in your maintenance department,
4  ma'am?
5      A.  I don't know.
6      Q.  Who would know?
7      A.  Well, we have an employment
8  center.
9      Q.  Uh-huh (affirmative response).
10     A.  And all the applicants go
11 through the employment center.  They have a
12 staffing report as to how many's needed in
13 each department.
14     Q.  Who's over that?
15     A.  Dante Rodgers [phonetic] is
16 over the employment center.
17     Q.  Okay.  Is he here in Eufaula?
18     A.  Yes, sir.
19     Q.  Better give him a heads-up.
20         All right.  And, ma'am, just
21 like you know that it's illegal not to pay
22 hourly workers time-and-a-half, do you know
23 that it's also illegal to take any action
24 against them because they complain about
25 overtime?

64

1      A.  Yes, I would certainly think
2  so.
3         MR. ROBERSON:  Okay.  Thank
4           you.  Just a second.  We'll
5           go off the Record for just
6           a second.
7         (Whereupon a brief recess was
8           taken.)
9  BY MR. ROBERSON:
10     Q.  Ms. Gilmore, let me show you
11 what I've marked as Exhibit 5.  And this is
12 from Keystone Foods, Equity Group, Eufaula.
13 It's marked Equity Group 15, which I'm
14 assuming is the document that indicates his
15 discharge, Mr. Blocker's discharge?
16         MR. SMITH:  Yeah.
17     Q.  Have you seen that before?
18         (Whereupon Plaintiff's Exhibit
19           No. 5 was marked for
20           identification and attached
21           hereto.)
22         (Witness reviewed document.)
23     A.  Yes, sir.
24     Q.  And what do you call Exhibit 5?
25 How do you refer to it?

65

1      A.  A disciplinary suspension.
2      Q.  Okay.  To Ron Blocker, date,
3  May 17th, regarding conduct unbecoming of
4  management.  All right.  You're being
5  suspended for five days.  It has been
6  reported that there are numerous reports of
7  physical and mental abuse and vandalism in
8  areas that you are managing.  There will be
9  an investigation into these allegations.  And
10 you're supposed to contact Human Resources in
11 a week for the results of this investigation.
12 Now, it's signed by Ron Blocker on 5/17 and
13 by Reb Bludsworth.
14         Is there another document
15 regarding his discharge or is this the only
16 one that you're aware of?
17     A.  When there's a separation
18 notice done, there's a blue sheet attached to
19 that telling the reason.
20     Q.  Okay.  Was there one done for
21 Ron Blocker?
22     A.  Yes.
23         MR. SMITH:  It's produced.  It
24           came with that.
25         MR. ROBERSON:  Okay.

66

1         MR. SMITH:  I think that might
2           have been attached to it,
3           that document right there.
4           But I can't remember for
5           sure.  It was right there
6           with it.
7         MR. ROBERSON:  Okay.
8  BY MR. ROBERSON:
9      Q.  Now, were you there when
10 Mr. Blocker signed this or was this done by
11 Mr. Bludsworth?
12     A.  I don't -- I think I was there.
13     Q.  Was anything, any information,
14 conveyed to Mr. Blocker, other than what is
15 available here in Exhibit 5?  Did y'all tell
16 him what kind of abuse or anything about
17 vandalism, any other information?
18     A.  I can't -- I can't recall what
19 was told to him.
20     Q.  Okay.  Let me show you what
21 I'll mark as Exhibit 6, which is
22 Mr. Blocker's W-2 from 2004.  And he actually
23 got two W-2s from Equity Group in 2004, one
24 for the first ten months when he was hourly,
25 and a second one for the two months that he

Kathy Gilmore
May 30, 2008

67

1  was on salary.  Would that be correct, that
2  would be how y'all would do it?
3        (Whereupon Plaintiff's Exhibit
4        No. 6 was marked for
5        identification and attached
6        hereto.)
7        (Witness reviewed document.)
8     A.  (No immediate response.)
9     Q.  You don't know?
10    A.  I do not know.
11    Q.  Okay.  Actually, I tell you
12  what it is, I misspoke.  Okay.  He got three
13  W-2s in 2004, and a portion of his
14  compensation was the -- did Equity Group
15  acquire CP in 2004?
16    A.  In March.
17    Q.  So he actually had three
18  separate employers, CP until the acquisition;
19  is that correct?
20    A.  That would be correct.
21    Q.  Then he had Equity Group as an
22  hourly employee, and then he had Equity Group
23  as a salaried employee, okay?
24    A.  I guess -- I don't even know
25  why you'd separate it, but -- I don't know

68

1  anything about it.
2     Q.  Well, I don't know either.  So
3  I'm going to show you what I've marked as
4  Exhibit 6, which are three W-2s for Ron
5  Blocker in 2004, okay?
6     A.  Okay.
7     Q.  And would you just indicate the
8  amount of compensation for each one?
9     A.  (No immediate response.)
10    Q.  You want me to do it?
11    A.  Well, $8,355.51.
12    Q.  From who now?
13    A.  Equity Group.
14    Q.  Okay.  That's his salary.
15    A.  Okay.
16    Q.  All right.
17    A.  Then the next one -- I guess
18  they're all the same -- $37,919.36.
19    Q.  All right.  Almost 38,000.  Is
20  that also from Equity Group?
21    A.  Yes, sir.
22    Q.  Okay.  That's his hourly wages?
23    A.  Okay.
24    Q.  All right.  And then 13 --
25    A.  13,180.30.

69

1     Q.  From CP?
2     A.  Uh-huh (affirmative response).
3     Q.  Okay.  So the total of those
4  three figures is what he received in
5  compensation from his employer at the chicken
6  plant during 2004, correct?
7     A.  From what I can see.
8     Q.  Okay.  Now, did anybody, other
9  than Ron Blocker, anybody in his crew or
10  anybody else on the third shift ever
11  complain, make any complaint, that you're
12  aware of, about the number of hours they were
13  working for Equity Group?
14    A.  No, sir.
15    Q.  Not to your knowledge?
16    A.  Not to my knowledge.
17       MR. ROBERSON:  Okay.  Thank
18       you, ma'am.  I don't have
19       any further questions.
20       MR. SMITH:  Let me just ask one
21       follow-up.
22       EXAMINATION
23  BY MR. SMITH:
24    Q.  Earlier, when you were asked
25  about salaried personnel's compensation, in

70

1  addition to their salary, they get other
2  benefits, correct?
3     A.  Correct.
4     Q.  Do you know what those are?
5     A.  Medical, dental.  Short term,
6  long term pension, that kind of thing.
7     Q.  Do they get profit sharing?
8     A.  Yes.
9     Q.  Do they get a bonus?
10    A.  Yes.
11    Q.  Is the bonus part of the profit
12  sharing or is it separate?
13    A.  Separate.  It's all company
14  paid.
15    Q.  Do they get family health
16  insurance?
17    A.  Yes.  Company paid.
18    Q.  The company pays that, too.
19  And hourly employees don't get those
20  benefits?
21    A.  The hourly employee gets the
22  single medical coverage, company paid.
23       MR. SMITH:  Okay.  That's all.
24
25

Kathy Gilmore
May 30, 2008

71

1    (The deposition of KATHY GILMORE
2    concluded at approximately
3    10:32 a.m.)
4    * * * * * * * * * *
5    FURTHER DEPONENT SAITH NOT
6    * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

72

1    * * * * * * * * * *
2    REPORTER'S CERTIFICATE
3    * * * * * * * * * *
4    STATE OF ALABAMA)
5    COUNTY OF MONTGOMERY)
6        I, Cornelia J. Baker, Certified
7    Court Reporter, Certified Shorthand
8    Reporter, and Notary Public in and for the
9    State of Alabama at Large, do hereby certify
10   that on Friday, May 30, 2008, I reported the
11   aforementioned proceedings, and that the
12   pages herein contain a true and accurate
13   transcription of the said proceedings.
14       I further certify that I am
15   neither of kin nor of counsel to the parties
16   to said cause, nor in any manner interested
17   in the results thereof.
18       This the 4th day of June, 2008.
19
20
21
     Cornelia J. Baker, ACCR 290
22   Certified Shorthand Reporter,
     Certified Court Reporter and
23   Notary Public for the
     State of Alabama
24
25   My Commission expires 6/9/08.

**A**

abuse
31:15 65:7
66:16
abused
30:5 31:12,15
access
35:7
accountable
44:6,7
ACCR
72:21
accurate
72:12
acknowledge
40:25
acquire
67:15
acquisition
67:18
Act
47:20
action
26:7 43:23
44:15 63:23
actions
17:4
actual
46:2
addition
70:1
additional
23:14
address
10:5 32:12 33:4
advisement
62:4
affirmative
12:9,14,22 18:1
29:3 63:9
69:2
affirmed
6:3
aforementioned
72:11
ago
21:19 22:18
37:1 38:11
agree
45:12 49:19
52:20,23
agreed
3:5,19 4:3
Al
18:6 55:20

Alabama
1:4 2:7,13
11:17 14:4
72:4,9,23
Alan
38:1 44:8,12
allegations
43:5,8,12 65:9
Allen
30:5,7 31:6,22
31:23 33:21
33:21 58:1
America
47:5
amount
68:8
answer
16:14 22:1,13
27:19 53:8
60:15,16
anybody
14:18 27:2
30:24 42:9,12
42:21 43:15
50:23 55:17
57:25 62:13
69:8,9,10
anyway
7:5
apparently
23:3
APPEARAN...
2:2
Appears
19:20
applicants
63:10
application
53:19 61:16,19
approach
16:1,7
appropriate
35:25
approve
51:6
approximately
13:25 15:12
38:11 56:1,2
71:2
area
35:6,11,23
areas
65:8
arguably
6:21

argumentative
62:24
arrived
51:14
asked
14:22 28:10
69:24
asking
8:1,13 49:18
assigned
34:20 35:10
Assistant
12:24 20:20
associates
48:1
assuming
53:16 64:14
attached
20:5 23:9 25:1
28:5 64:20
65:18 66:2
67:5
attendance
17:3,12,15,16
38:13
Attorney
2:6,11
authority
35:15
available
60:25 66:15
Avenue
2:13
aware
18:18 19:4,5
21:16 24:17
26:22 39:22
42:25 44:25
47:21,24
48:12,13
53:15,19 58:2
60:2 65:16
69:12
a.m
71:3

**B**

back
35:23 41:8 60:8
60:17 61:9
Baker
3:9 72:6,21
bank
54:25
Barbour

9:5,6 25:13
56:4,4
based
52:11 54:12
basically
26:14
basis
54:17,20 57:11
Bass
54:24
Beaulieu
47:4,12
began
21:8 29:16 34:4
36:16 49:15
behavior
43:1
believe
21:4 45:9 50:12
56:24 57:5
benefits
70:2,20
bet
25:13
better
19:23 63:19
Bice
22:2 23:21 26:4
29:16 41:13
42:6 50:22
Birmingham
2:7 9:19
Bise
13:1
blades
34:24
Blocker
1:10 8:19 10:22
15:1 19:11
21:3 26:19,22
29:12 30:15
33:5 35:18
38:20 39:21
40:16 42:13
42:17,21
43:16 44:1,20
44:23 46:8,19
48:22 49:8
52:10,21
53:13 56:8,13
58:7,16 60:3
61:1 65:2,12
65:21 66:10
66:14 68:5
69:9

Blocker's
43:2 46:1 64:15
66:22
Bludsworth
15:21 50:13,24
54:20 58:16
65:13 66:11
Bludsworth's
51:10
blue
65:18
board
21:13
bolts
44:11
bonus
70:9,11
boss
22:21 50:22
51:21,24
boy
34:17
Bradford
38:9 44:9
Bragg
37:5,23
break
49:1
brief
49:4 64:7
briefly
34:15
bring
40:13
brought
20:11
Buck
7:7 38:22
bulletin
21:12
business
8:24
busted
44:14
Butch
14:21

**C**

cage
34:19 35:8,14
35:22 44:11
44:11
California
37:16,21
call

7:12 12:5 29:23
33:8 42:20
62:6 64:24
called
14:20,21 35:22
37:18
calling
34:17
Camilla
18:21
capacity
14:5
Carpenter
38:1 44:9
case
1:14 3:21,24
9:2 10:2
59:25
caught
9:21 55:24
cause
72:16
center
63:8,11,16
certainly
17:2,9 64:1
CERTIFICA...
72:2
Certified
3:10 72:6,7,22
72:22
certify
72:9,14
chance
59:24
change
17:14 18:15
changed
17:11,18,19
changes
17:7,13,20,21
18:4,17
charge
44:19
check
34:24
Chewalla
11:14
chicken
12:6 13:15 17:6
17:24 18:5
47:14 51:11
69:5
chose
41:6 54:7

Kathy Gilmore
May 30, 2008

| | | | | |
|---|---|---|---|---|
| **Christy** | 33:21 58:1 | 16:17,18 21:1,2 | **Darrell** | described |
| 26:3 | **complaint** | 21:5 26:5 | 36:1 | 35:8 |
| **Circle** | 6:24 25:5,18,19 | **date** | **date** | **determining** |
| 2:7 11:14 | 25:24 26:8,13 | 32:7,9 33:13 | 19:16 21:1 26:3 | 58:12 |
| circulated | 26:19,20,23 | 33:14,17,18 | 65:2 | different |
| 30:4 | 27:3,4,10,14 | 35:3 40:17 | dated | 14:6 46:5 50:7 |
| circumstances | 28:20 31:6,7 | 42:18 43:3,7 | 20:25 26:2 | discharge |
| 40:8 | 31:11,24 | 43:13 47:24 | **Davis** | 21:9 64:15,15 |
| **City** | 32:25 33:4,22 | 48:4,23 49:8 | 10:16,19 11:7 | 65:15 |
| 37:19 | 57:12 69:11 | 49:11,24 50:4 | **day** | discharged |
| **Civil** | complaints | 50:5,8,17 54:4 | 29:6 72:18 | 21:4 40:17 61:1 |
| 3:8 | 24:13,17 26:9 | 54:13 56:9,10 | days | disciplinary |
| claim | 26:12 28:13 | 56:21,25 | 65:5 | 17:4 65:1 |
| 58:20 | 28:17 33:25 | 57:16,22 67:1 | death | discipline |
| claims | 44:16 56:19 | 67:19,20 69:6 | 39:16 | 42:20 |
| 14:8 | 57:7 58:3 | 70:2,3 | deceased | disciplined |
| cleaned | complete | correctly | 39:14 | 42:9,12,15,21 |
| 36:16 | 40:13 | 35:15 | **December** | 43:15 44:18 |
| clear | comply | counsel | 6:25 | discovery |
| 26:18 | 22:4 | 3:5,20 4:9 13:1 | decided | 6:23 |
| closed | complying | 72:15 | 22:17,20 28:14 | discussed |
| 47:2 | 22:7 | counseled | decision | 42:2 52:18 |
| coaching | concerns | 33:22 | 15:1,4,18 16:2 | discussing |
| 26:15 | 61:2 | **County** | 16:3 23:18,22 | 34:10 |
| coincidence | concluded | 9:5,6 25:14 | 24:4,7 29:11 | discussion |
| 19:13 | 71:2 | 56:4,5 72:5 | 50:11,12,16 | 16:22 |
| **Columbus** | conduct | couple | 50:20 51:7 | discussions |
| 9:9,24 13:17 | 43:6 52:21 65:3 | 28:12 36:25 | 53:2 54:14 | 24:10 29:15 |
| 14:20 46:20 | consider | course | 62:9 | 48:22 49:14 |
| 46:21 47:3 | 47:16 54:2 | 26:11 | decisions | 56:13 58:15 |
| come | consult | **Court** | 19:2 | disqualify |
| 19:8 30:3 32:1 | 62:13 | 1:2 3:10 60:6 | **Defendants** | 61:7 |
| 32:3 33:7,8 | consulted | 60:17 61:12 | 1:20 2:10 | distracted |
| 34:6 38:14 | 50:24 51:6 | 72:7,22 | degree | 43:9 |
| 59:6,11 | contact | **Courtner** | 13:6,12 | distribute |
| comes | 65:10 | 18:20,23 | dental | 35:2 |
| 32:8 | contain | **Court-ordered** | 70:5 | **DISTRICT** |
| coming | 72:12 | 61:10 | department | 1:2,4 |
| 14:22 32:9 | convention | coverage | 14:9 30:9 60:22 | **DIVISION** |
| commission | 37:17 | 70:22 | 61:8 62:18 | 1:6,16 |
| 3:11 72:25 | conversation | **CP** | 63:3,13 | document |
| **Commissioner** | 33:13,16 | 12:11 67:15,18 | departments | 6:21 20:7 23:11 |
| 3:10 | conversations | 69:1 | 14:6 | 25:3 28:7 |
| company | 46:11,15 49:22 | created | **Depends** | 30:25 64:14 |
| 14:18,19 30:4 | conveyed | 30:19 | 40:10 | 64:22 65:14 |
| 36:6 37:9 | 66:14 | crew | **DEPONENT** | 66:3 67:7 |
| 55:19 70:13 | cook | 44:2 69:9 | 71:5 | documents |
| 70:17,18,22 | 18:19 | cut | deposed | 6:10 |
| compensation | copy | 45:13 | 49:8 | doing |
| 23:15 49:15 | 6:13 | | deposition | 39:21 |
| 67:14 68:8 | **Cornelia** | **D** | 3:6,8,16,22,23 | draw |
| 69:5,25 | 3:9 72:6,21 | | 4:5 8:20 9:11 | 54:3 |
| complain | corporate | **D** | 20:1 28:1 | **Drive** |
| 63:24 69:11 | 52:8 | 5:2 | 34:14 45:9 | 10:6 |
| complained | correct | **Dante** | 71:1 | |
| | | 63:15 | | |

| **E** |
|---|
| **E** |
| 5:2 |
| earlier |
| 6:22 69:24 |
| early |
| 36:14 |
| eat |
| 47:14,14 |
| education |
| 13:5 |
| effect |
| 19:7,8 |
| effective |
| 21:1 |
| efforts |
| 58:2 |
| eighty |
| 24:19 58:17,20 |
| either |
| 3:17,25 22:2 |
| 68:2 |
| elect |
| 53:8 |
| elected |
| 37:20 |
| eligible |
| 62:7 |
| employed |
| 36:17 |
| employee |
| 6:25 22:25 23:1 |
| 25:5,7 30:8 |
| 36:2 53:1 |
| 59:12 62:1 |
| 67:22,23 |
| 70:21 |
| employees |
| 28:9,11 31:23 |
| 43:21 44:6,20 |
| 48:17 54:17 |
| 55:25 70:19 |
| employer |
| 69:5 |
| employers |
| 67:18 |
| employment |
| 28:23 53:7 63:7 |
| 63:11,16 |
| engaged |
| 52:21 |
| engineer |
| 11:20 |
| entitled |
| 23:14 |

Kathy Gilmore
May 30, 2008

**Equity**
1:16 12:13 17:5
25:24 27:9
30:24 41:21
53:18 54:17
56:1,3 64:12
64:13 66:23
67:14,21,22
68:13,20
69:13
**Eric**
11:24
**Eslinger**
52:2
**Eufaula**
1:16 2:13 10:8
11:15 12:1
14:15 23:23
25:9 63:17
64:12
**everybody**
40:21 47:13
**evidence**
3:16 54:10
58:22
**exactly**
21:20 62:25
**EXAMINATI...**
5:4 8:16 69:22
**exception**
58:19
**excess**
24:18
**exempt**
22:24
**exercising**
35:14
**Exhibit**
5:7,8,9,11,12
5:14,15 20:1,3
23:2,5,7 24:22
24:23,24 28:1
28:2,3 34:14
52:11 64:11
64:18,24
66:15,21 67:3
68:4
**existing**
22:4
**expires**
72:25
**explain**
6:16
**express**
60:12

**extent**
13:5
**e-mail**
30:4 31:8,9

——————
**F**
**facilities**
23:20
**fact**
29:22 48:3
59:13,17
60:21
**failure**
22:3
**fair**
47:19 52:9 61:3
**Faircloth**
39:12 44:9
**familiar**
47:19
**family**
70:15
**far**
21:10 35:1,9
51:18 56:15
**fashion**
21:13
**fault**
22:11,15
**faxed**
7:15 25:22
**federal**
60:7
**feed**
56:7
**feel**
10:17 41:2 53:9
**fell**
9:23
**fight**
53:3
**figured**
47:13
**figures**
69:4
**file**
7:2,10 16:1,5
16:11,24
33:20 53:14
61:22
**files**
53:1
**filing**
3:21 4:2
**final**

16:3
**findings**
39:24
**fire**
46:24 50:20
59:18,22
**fired**
10:22 28:19,23
34:10 36:8,20
37:11 42:17
44:1 56:8,12
56:19 57:7,15
59:13
**first**
6:2 12:10 14:25
20:23 36:4,13
66:24
**fish**
54:22 55:2,12
55:15,24
**fished**
55:21
**fishing**
55:9
**five**
13:19 52:5 65:5
**folder**
61:22
**folks**
37:20
**followed**
16:16
**follows**
6:5
**follow-up**
69:21
**Foods**
64:12
**foreman**
45:8
**foremen**
38:21
**form**
3:13 6:17 16:13
19:15 21:25
22:6,12 27:16
28:21 31:14
40:18 42:14
45:18 48:5
57:1 59:20
60:14 62:19
62:23
**formality**
3:11
**former**

30:8 31:23
**forms**
40:1
**forty**
47:24 48:10
**forty-five**
17:20
**found**
7:1 27:24
**foundation**
27:18 57:2
**four**
17:17 52:4
**four-year**
13:6
**Friday**
72:10
**further**
3:19 4:3 69:19
71:5 72:14

——————
**G**
**Gaither**
9:12,16
**general**
18:10,12 52:1
53:5
**getting**
22:10
**Giles**
7:7,8 38:23
**Gilmore**
3:7,22 6:1,15
8:18 11:10
45:19 49:7
64:10 71:1
**give**
20:12 63:19
**given**
8:20 20:8,10,19
**gives**
62:8
**Glenda**
36:10
**Glover**
11:24
**go**
18:14,16 37:15
37:20 38:10
38:17 47:10
55:9 63:10
64:5
**goes**
6:18 23:3
**going**

12:5 26:11
27:25 32:12
32:15 51:1
68:3
**gotten**
60:19
**graduated**
13:6
**Great**
40:23
**green**
7:12
**Greg**
15:20,21 20:9
46:14 51:23
55:19 62:6
**Gregory**
10:6
**Greg's**
51:24
**Group**
1:16 12:13 17:5
25:25 27:9
30:24 41:22
53:18 54:17
56:1 64:12,13
66:23 67:14
67:21,22
68:13,20
69:13
**Group's**
56:3
**guess**
15:20 53:6 55:8
67:24 68:17
**guilty**
52:22
**guys**
8:2

——————
**H**
**happened**
26:16 37:22
44:21 46:25
52:6
**happens**
40:11
**hatchery**
56:7
**head**
44:12,12
**heads-up**
63:19
**health**
70:15

**hear**
39:15
**heard**
49:10
**Heath**
44:10
**held**
14:13 44:5,6
**hereto**
3:18,25 20:6
23:10 25:2
28:6 64:21
67:6
**hired**
12:18 61:16,20
62:2,16 63:3
**hiring**
60:21 61:14
**hit**
44:11,12
**holding**
61:7
**home**
37:19
**hope**
9:11 51:5
**hourly**
48:1,9,17 53:6
62:10 63:22
66:24 67:22
68:22 70:19
70:21
**hours**
24:19 47:12,22
47:24 48:10
58:7,17,21,23
69:12
**house**
37:18
**HR**
12:21,24,25
13:20,23
14:23 17:8
20:20 21:18
32:5,10 47:16
52:8
**huh-uh**
11:4 57:13
**Human**
65:10
**humiliates**
34:16
**Huntsville**
52:7,8
**husband's**

| | | | | | |
|---|---|---|---|---|---|
| 10:15 | investigation | judge | knowledge | living | 62:5 65:4 |
| | 28:15,25 29:12 | 60:8 | 24:15 32:20 | 11:11 | **manager** |
| **I** | 29:17 30:1 | **July** | 33:11 34:2 | **local** | 12:24,25 13:23 |
| **identification** | 34:4 39:21 | 10:20 | 36:7 38:22 | 9:13,20 | 18:7,10,12,21 |
| 20:5 23:9 25:1 | 40:5,14 41:12 | **June** | 41:23 43:17 | **lock** | 20:20 21:18 |
| 28:5 64:20 | 41:14,24 42:5 | 72:18 | 46:7,18 53:12 | 44:10 | 31:3 43:19 |
| 67:5 | 42:22 49:16 | | 69:15,16 | **long** | 51:20 52:1,8 |
| **illegal** | 52:12 65:9,11 | **K** | **known** | 10:18 12:4 | 53:10 |
| 48:4,13 63:21 | **involved** | **KATHY** | 51:19 | 13:18 15:10 | **managers** |
| 63:23 | 14:25 15:22 | 3:6,22 6:1 71:1 | | 32:21 51:10 | 61:4 |
| **immediate** | 50:19 | **keep** | **L** | 70:6 | **managing** |
| 67:8 68:9 | **involvement** | 61:15 | **Labor** | **look** | 65:8 |
| **implement** | 15:24 | **Kelvin** | 47:20 | 7:4 16:2,5 17:2 | **manner** |
| 23:18,22 | **involving** | 44:10 | **lack** | 19:16 30:25 | 3:25 72:16 |
| **implementing** | 43:12 | **Ken** | 27:17 57:2 | 61:21 62:15 | **many's** |
| 21:23 | **issue** | 28:18 29:23 | **Lane** | **looking** | 63:12 |
| **important** | 50:7 | 31:22 34:5,16 | 26:4 | 16:11,20 37:21 | **March** |
| 27:15,23 32:9 | **issues** | 34:17 44:8 | **Large** | 37:22 41:8 | 12:17 67:16 |
| **inappropriate** | 17:3 30:2 37:15 | 59:13,18 | 72:9 | **lost** | **mark** |
| 43:1,6 | 38:13 49:23 | **Key** | **Law** | 47:6 | 19:25 23:2 |
| **incident** | 59:5,8,12 | 39:7 | 2:6,11 | **lot** | 24:22 27:25 |
| 37:14 41:13,15 | | **Keystone** | **lawsuit** | 40:11 47:6 | 66:21 |
| **include** | **J** | 23:20 37:16 | 59:23 | **L.L.C** | **marked** |
| 56:6 | **J** | 64:12 | **lawyer** | 1:18 2:12 | 20:4 23:8 24:25 |
| **indicate** | 3:9 72:6,21 | **kin** | 9:10,14,15 | | 28:4 64:11,13 |
| 33:20 37:2 68:7 | **James** | 72:15 | **lead** | **M** | 64:19 67:4 |
| **indicated** | 10:16,19 33:20 | **kind** | 39:22 | **machine** | 68:3 |
| 49:13 | 37:5,23 39:7 | 16:19 43:9 | **leave** | 9:22 41:12,14 | **marking** |
| **indicates** | 55:13,15,16 | 47:11,12 53:9 | 14:17 47:9 | 42:10 | 24:21 |
| 34:9 64:14 | jdratty@char... | 55:20 61:23 | **leaving** | **machines** | **marriages** |
| **ineligible** | 2:8 | 62:1 66:16 | 37:3 | 36:15 | 11:21 12:2 |
| 16:25 | **Jernigan** | 70:6 | **left** | **mailroom** | **married** |
| **information** | 18:8,11 23:21 | **knocked** | 14:18 19:11,19 | 14:7,8 | 10:13,18,22,25 |
| 29:9 66:13,17 | 52:6 | 44:13 | 19:21 47:1,10 | **maintenance** | 11:6 55:3,4,15 |
| **injury** | **Jerry** | **know** | **legalities** | 15:8,11,15 | **matter** |
| 10:2 | 2:5 8:18 | 8:3 15:16 16:19 | 48:7 | 16:21 28:14 | 8:24 |
| **insensitive** | **Jim** | 17:21 18:6 | **let's** | 30:9,13,19 | **ma'am** |
| 35:19 | 13:1 22:2 23:21 | 21:10,19 | 7:20 8:14 19:16 | 31:3 34:21 | 10:5 21:16 |
| **insurance** | 26:4 29:21 | 23:17,25 24:5 | 25:17 49:1 | 37:6 38:6,18 | 22:16 26:17 |
| 70:16 | 30:4,7 31:6,22 | 24:6 25:15,15 | **limit** | 38:21 39:18 | 34:1 40:9 |
| **interested** | 31:23 33:21 | 29:5 31:2 | 35:7 | 45:7 46:17 | 41:1,25 43:24 |
| 14:22 72:16 | 42:6 50:22 | 35:1,9 39:9 | **lines** | 50:11 51:17 | 47:20 63:4,20 |
| **interview** | **job** | 41:19 42:1,4 | 14:11,14 | 51:19 58:8 | 69:18 |
| 8:4 28:11 34:5 | 34:18 38:16 | 44:22 45:7,11 | **lip** | 60:22,25 61:8 | **McCartha** |
| 41:7 | 45:5,12,23 | 46:10 47:8 | 44:15 | 61:17 62:18 | 36:1 |
| **interviewed** | 46:2,4,8,12,16 | 48:3,6,8 51:9 | **listed** | 62:22 63:3 | **McRae** |
| 28:9 40:21 | 60:9 | 51:22 55:7,14 | 27:2 | **making** | 14:21 |
| **interviews** | **JOEL** | 55:25 57:14 | **litigation** | 57:7 | **mean** |
| 54:12 | 2:11 | 58:6,23 59:12 | 27:13 | **man** | 17:23,25 44:4 |
| **introduced** | **John** | 59:21 60:24 | **little** | 37:6 | 49:18 51:22 |
| 3:24 | 44:9 | 61:6,24 62:1,7 | 55:18,21 | **managed** | 60:18 |
| **investigated** | **Josh** | 62:20,21,25 | **live** | 44:20 | **medical** |
| 27:14 | 38:9 | 63:5,6,21,22 | 11:13,25 | **management** | 70:5,22 |
| **investigating** | **JR** | 67:9,10,24,25 | **lived** | 13:10 17:1,22 | **meeting** |
| 27:3 | 2:11 | 68:2 70:4 | 37:18 | 44:5,18 56:17 | 50:3 |

member
56:16
members
62:4
mental
65:7
Merritt
36:10
MIDDLE
1:4
Mike
18:20,22
mill
56:7
Mills
9:9,24 13:17
14:20 15:21
20:9 46:20,21
47:3 50:14,24
58:16 62:6
minute
7:19 49:3
minutes
31:5
misconduct
43:8,12,23
52:23 54:2
56:16 61:2
missed
27:20
misspoke
67:12
mistreated
31:13
money
44:22
MONTGOM...
72:5
months
15:12 21:19
22:18 52:5
57:21 66:24
66:25
morning
20:11,13,19
moved
14:8 39:3

_____
N
_____
N
5:2
name
8:18 10:15
named
44:8

nature
32:24
necessarily
21:14 22:14
32:17 41:10
necessary
41:3,5
need
3:14 6:16
needed
34:23 63:12
needs
32:13
neither
72:15
never
37:17 42:2
48:22 56:18
new
19:3 21:11,16
21:23 26:10
30:18
ninety-day
17:18
nonmanagerial
61:7
normally
15:22 58:25
59:3
NORTHERN
1:6
Notary
72:8,23
notes
28:8
notice
6:13 65:18
November
57:15,16
number
69:12
numerous
43:2,6,11 65:6

_____
O
_____
object
16:13 19:15,17
21:25 22:6,12
27:16 28:21
40:18 42:14
45:18 48:5
57:1 59:20
60:14 62:19
62:23
objections

3:12,13
obtain
27:1 29:8 40:15
40:23
obtained
40:5 41:9
occurrences
17:17
offered
3:16
office
2:7 13:9 32:22
oh
9:16 13:9 32:18
34:4 39:15
47:6 57:14
okay
8:11 10:1,21
11:18 12:2,4,7
14:12 15:3,6
15:13,16
17:14 18:11
18:17 21:3,7
23:17,25
25:23 26:2,7
27:8,12,25
28:16 29:22
31:4 32:3,21
33:3,10,25
34:3 35:21
36:1,3,17 38:1
38:16 40:15
49:24 50:2,6
50:10,23 51:2
51:9,24 52:20
52:25 53:13
53:18,22
54:16,19,22
55:17 56:18
58:25 59:23
63:17 64:3
65:2,20,25
66:7,20 67:11
67:12,23 68:5
68:6,14,15,22
68:23 69:3,8
69:17 70:23
Once
8:23
ones
53:8
oppose
53:19
opposed
53:11

opposition
53:3
Orange
2:13
order
61:12
originally
25:10
outcome
42:4
overtime
19:3,4,6 47:23
48:4 49:23
56:20 57:9
63:25

_____
P
_____
P
2:11
PAGE
5:4,7
pages
72:12
paid
22:10,18 45:6
56:20 70:14
70:17,22
paperwork
19:9
Park
2:7
part
7:1 22:4 43:1,6
70:11
parties
3:6,20 72:15
party
3:17,25
pay
6:14 7:13 21:18
22:4,17,20
23:16 45:12
47:21,23 48:4
48:9,23 63:21
paying
21:17
payroll
23:6
pays
45:23 46:4
70:18
Pelham
28:18 29:23
31:22 34:5
44:8 57:25
plant

59:13,18
Pelham's
29:5 34:18
pending
9:3
pension
70:6
people
24:14,18 41:7
43:2,7,13 46:5
48:9 60:22
61:15 62:10
62:17 63:2
perceived
26:16
percent
26:25
period
17:18 57:24
58:6,15
perk
53:9
person
16:20 21:22
32:5 57:17
60:18
personally
40:22
personnel
7:2,10,16 17:23
25:18 33:20
personnel's
69:25
Phenix
37:19
philosophy
53:5,10
phone
34:5
phonetic
14:21 18:20
52:2 63:15
physical
65:7
place
31:15 33:16
Plaintiff
1:12 2:4 9:17
Plaintiff's
5:8,9,11,12,14
5:15 20:3
23:7 24:24
28:3 64:18
67:3

12:6 13:16 17:6
17:24 18:5,19
34:6 40:11
47:2 51:11
69:6
plant's
56:4
play
52:25
please
10:5
policies
19:3 21:24
policy
6:14 17:12,12
17:15,16 20:2
20:16,21 21:8
21:12,16 22:5
23:4,18,19,22
portion
67:13
position
12:19 13:22
14:13,23 15:6
18:9 30:18
50:6,7 56:21
56:23 57:15
60:1 61:8
positions
60:24
possession
20:17
post
21:13
Potthoff
2:12
power
11:17 14:4,17
14:19
practice
16:17 53:23
practices
17:7
predicate
19:18
present
12:19 50:21
previous
36:2
pre-op
36:14
primarily
8:1,12
prior
21:8

Kathy Gilmore
May 30, 2008

probably
25:9 29:8,18
Procedure
3:8
proceed
29:21
proceedings
72:11,13
produced
7:22 65:23
professional
47:17
profit
70:7,11
promote
15:25 16:10
50:11
promoted
14:9 15:17 16:5
37:7 57:19
promotion
17:1
promotions
15:23
prompted
29:25
proof
43:22 54:2
prove
58:22
provided
3:18 4:1
Public
72:8,23
pull
16:1,8
purpose
3:17
pursuant
3:7
put
21:12 35:17
60:8 61:3,18
puts
60:17
putting
61:15

_____ Q _____

QA
36:11
qualifications
62:17
question
27:20 45:20

48:18
questions
3:12,13 26:15
69:19
quit
36:22,24 37:11
quite
31:3

_____ R _____

reacted
27:15
reading
4:5
really
57:3
reason
45:14 52:14
56:14,24 57:5
60:2,11 65:19
reasons
46:6
Reb
15:20,20 31:2
46:13 54:19
55:19 65:13
recall
16:6,23 26:21
27:7,8,11
29:19 30:12
30:17,22,24
31:19 32:23
33:12 34:11
36:5,9 39:10
42:11,16
46:25 48:24
49:16,19 50:3
56:15 58:4
59:8,15,16
66:18
receive
13:11 16:25
28:16
received
28:12 69:4
receiving
57:8
recess
49:4 64:7
recollection
31:1 41:16
recommend
51:1
recommendat...
15:5 50:17

52:10,15
recommendat...
62:8
record
32:15,19 64:5
recorded
43:11 52:22
refer
20:2 64:25
reflect
23:13
reflects
33:16
refresh
31:1
regarding
65:3,15
regardless
4:1
rehire
62:7
reinstated
60:4,13
reinstatement
60:1
relevant
7:3
remain
35:6
remedies
60:1
remember
9:10,13 16:9
30:16 34:7,8
59:16 66:4
replace
30:21
replaced
7:8 18:7 38:20
report
51:25 63:12
reported
65:6 72:10
Reporter
3:10 72:7,8,22
72:22
REPORTER'S
72:2
reports
51:22 65:6
represent
8:19
representing
2:4,10 3:5,20
9:17,19

request
6:23
requested
6:19 59:17
require
54:3
required
17:17
reserved
3:15
residence
10:5
Resources
65:10
respect
50:10
response
6:12 12:9,14,22
18:1 24:12
26:8 27:10
29:3 44:15
63:9 67:8
68:9 69:2
responsibility
35:6
responsible
21:23 43:21
44:3,4
responsive
6:22
rest
7:21
result
42:10,22
results
65:11 72:17
reviewed
20:7 23:11 25:3
28:7 34:13
64:22 67:7
Rex
39:12 44:9
Rhodes
18:6,9,14
right
8:5,14 10:1,3,4
10:12 16:4,16
18:24 19:11
19:19,20
26:17 30:12
32:13,16 33:2
39:20 48:25
51:3,15 54:5
56:3,5 58:4
60:22,25

63:20 65:4
66:3,5 68:16
68:19,24
Roberson
2:5,6,6 5:5 6:6
6:9 7:25 8:6
8:11,17,19
19:22,24
48:19,20,25
49:6 57:6,10
60:7,10 64:3,9
65:25 66:7,8
69:17
Robert
7:8
Rodgers
63:15
role
15:3 18:15
52:25
Ron
1:10 8:19 15:1
19:11 21:3
25:5 26:18,22
29:12 30:14
33:5,7,8 34:16
35:13 38:20
39:21 42:13
42:16,21
43:16,19 44:1
44:19,22 46:1
46:8,19 48:22
49:2 53:13
58:7,16 59:5
59:13,17,22
60:3,12,18
62:17 65:2,12
65:21 68:4
69:9
Rosheed
25:8
Rules
3:7
ruling
3:15
run
29:20 54:25
running
47:13

_____ S _____

SAITH
71:5
salaried
22:24 23:1

24:13,18 53:7
53:24 54:15
56:21 57:17
58:8 62:5
67:23 69:25
salary
45:6,7 48:2
67:1 68:14
70:1
Saturday
6:14 19:6 21:18
23:16
Saturdays
22:9,19,22
saw
34:23
saying
30:5 41:1 49:19
53:22 61:10
61:14
says
29:4
second
39:4 64:4,6
66:25
see
7:5,20 20:23
24:16 25:17
28:10 32:1,8
33:7,8 44:8
59:6,9 62:6,16
69:7
seeing
34:7
seen
20:14,18,20,22
54:16,19
64:17
sense
45:16,22 46:3
sent
23:6 26:3 53:8
separate
67:18,25 70:12
70:13
separation
65:17
services
14:10
seven
12:7,8 21:18
22:18 57:21
59:2,6
sharing
70:7,12

Kathy Gilmore
May 30, 2008

| | | | | | |
|---|---|---|---|---|---|
| sheet | 46:23 47:4,18 | sorry | substation | taken | think |
| 7:12,13 23:3,4 | 48:2,11,24 | 10:17 13:9 | 14:10,13 | 3:7,9 31:15 | 7:7 9:24 14:18 |
| 23:5 65:18 | 49:9,12,25 | 39:15 43:9 | successful | 49:5 64:8 | 17:11,19 |
| shift | 50:5,9,15,18 | 45:21 61:13 | 59:24 | talk | 23:19 27:22 |
| 30:6,14,20 | 51:4,8,18 | source | sudden | 14:23 26:18 | 30:23 33:1 |
| 31:13 33:2 | 52:13,16,19 | 42:7 | 27:13 | 27:6 49:2 | 35:16 38:5 |
| 35:3 36:4,4,12 | 52:24 53:12 | South | suggesting | 59:11 | 45:13 57:14 |
| 36:14 38:7,19 | 53:16,17,21 | 2:13 | 35:19 | talked | 57:18 64:1 |
| 38:21 39:18 | 53:25 54:8,11 | speak | Suite | 31:16 | 66:1,12 |
| 42:23 43:20 | 54:14,18,21 | 6:3 37:24 | 2:7 | talking | third |
| 44:5,19,21 | 56:6,22 57:23 | specifically | supervision | 45:24 46:1 | 30:5,14,20 |
| 45:8 69:10 | 58:10,13,18 | 59:10 | 43:2 61:3 | 56:12 57:4 | 31:13 33:2 |
| short | 61:4,5 63:18 | Spence | supervisor | tell | 35:3 36:4,12 |
| 47:12 70:5 | 64:23 68:21 | 18:7,11 23:20 | 7:9 15:9,11,14 | 24:22 26:16,24 | 38:7,19,21 |
| Shorthand | 69:14 | staff | 15:17 16:21 | 28:2 31:14 | 39:18 42:23 |
| 72:7,22 | sit | 17:24 | 22:8 26:14 | 50:25 56:11 | 45:8 69:10 |
| show | 26:13 | staffing | 30:14,20 | 66:15 67:11 | third-shift |
| 19:25 64:10 | situation | 18:5 25:4,18,21 | 36:11 37:7,8 | telling | 28:13 39:1,5 |
| 66:20 68:3 | 40:10 | 26:4 63:12 | 39:2,6 45:6,13 | 65:19 | three |
| showed | six | Standards | 46:17 50:12 | temp | 52:5 63:2 67:12 |
| 37:17 | 15:12 17:19 | 47:20 | 58:9 | 6:24 | 67:17 68:4 |
| sign | 21:18 22:18 | standpoint | supervisors | ten | 69:4 |
| 40:2,24 | 57:21 | 17:8 | 19:6 21:15,21 | 66:24 | threw |
| signed | skills | start | 26:11,12 | term | 44:14 |
| 40:5 41:9 65:12 | 63:1 | 21:11 | 40:12 47:7 | 70:5,6 | throw |
| 66:10 | slipped | started | 59:18 62:6 | terminate | 44:11 |
| signing | 9:24 | 8:15 14:6 18:19 | supervisory | 15:1 50:16 | Tim |
| 4:5 | Smith | 21:17 | 35:15 58:2 | 52:10,15 | 52:2 |
| single | 2:11,12 5:5 6:8 | starting | supplies | terminated | time |
| 70:22 | 6:11 7:14 8:5 | 14:7 | 34:23 | 15:7 37:12,13 | 3:14,15 9:8 |
| sir | 8:9 16:13 | State | support | 53:14 | 10:21 11:2 |
| 9:1 10:9,14,24 | 19:15 21:25 | 13:7 72:4,9,23 | 14:10 | termination | 13:15 19:1 |
| 11:1,12,22 | 22:6,12 25:12 | statement | supposed | 39:23,25 56:14 | 26:10 32:1 |
| 12:1,12,17,20 | 27:16 28:21 | 27:2 40:24 | 37:15 65:10 | testified | 39:16 44:14 |
| 13:3,21 14:1 | 40:18 42:14 | statements | sure | 6:5 49:20 | 47:11 48:10 |
| 14:14,16 15:2 | 45:18,24 48:5 | 7:23 8:8 40:2,6 | 7:3 25:11 28:22 | testify | 52:2 57:24 |
| 18:3,13 19:12 | 48:16 57:1 | 40:12,16 41:9 | 36:15 38:8 | 49:17,25 | 58:7,15 |
| 20:8 21:6 | 59:20 60:6,14 | STATES | 66:5 | testimony | times |
| 22:23 23:1,16 | 62:19,23 | 1:2 | suspended | 21:7 48:21 | 8:22 |
| 23:24 24:11 | 64:16 65:23 | Statute | 42:17 65:5 | 49:10 50:2 | time-and-a-half |
| 24:20 26:1,6 | 66:1 69:20,23 | 3:18 4:1 | suspension | textiles | 47:23 48:9 |
| 26:25 27:5 | 70:23 | stay | 17:3 65:1 | 47:11 | 63:22 |
| 29:4,10 30:10 | social | 32:21 | sworn | Thank | tinker |
| 31:21 32:11 | 54:17,20 | stipulated | 6:2 | 27:12 48:15 | 55:1 |
| 32:14 33:24 | soft | 3:4,19 4:3 | | 64:3 69:17 | title |
| 34:12,15,22 | 47:11 | stipulations | _____ | theory | 12:23 |
| 35:4,9,12,20 | Solution | 3:2 6:7 | **T** | 45:25 | today |
| 36:5,19,21,23 | 25:4 | straw | take | thereof | 20:15 |
| 37:4,10,25 | Solutions | 37:24 | 16:2,4 17:2 | 72:17 | told |
| 38:3,10,15,25 | 25:19,21 26:4 | struck | 26:8 39:8 | thing | 21:20 33:5,6 |
| 39:3,14,17,19 | somebody | 31:17,18 | 40:12 43:23 | 37:17 61:10,23 | 35:13 56:18 |
| 39:25 40:3,7 | 7:17 9:18,21 | submit | 44:15 45:12 | 70:6 | 59:22 66:19 |
| 42:3,8,19,24 | 15:25 16:11 | 53:3 54:6 | 45:22 46:3 | things | Tommy |
| 43:14 44:24 | 30:21 32:8 | submitted | 49:1 52:3 | 16:24 29:21 | 9:12,16,19 |
| 45:2,4,15 | 45:11 | 23:5 | 58:19 61:21 | 34:24 | tool |
| | | | 62:3,14 63:23 | | |

Kathy Gilmore
May 30, 2008

| | | | | | |
|---|---|---|---|---|---|
| 26:15 34:17 | unemployment | welcome | workers | **1** | **28** |
| 34:19 35:6,23 | 53:1,7,14 54:3 | 61:18 | 34:21 63:22 | **1** | 5:12 |
| **tools** | **UNITED** | went | **working** | 5:8 20:1,4 | **290** |
| 34:20 35:2,8 | 1:2 | 12:10 44:17 | 9:7 12:6,15 | **1,600** | 72:21 |
| **total** | **use** | 47:15 52:7 | 24:18 25:24 | 56:2 | |
| 27:17 69:3 | 26:14 | **weren't** | 31:24 39:13 | **10:32** | **3** |
| **tournament** | **usual** | 44:3 47:13 | 39:16 58:8,17 | 71:3 | **3** |
| 55:18,21 | 6:6 16:17 | **we'll** | 58:20 69:13 | **100** | 5:11 24:22,23 |
| **tournaments** | **usually** | 7:18 31:4 64:4 | **works** | 26:25 | 24:25 |
| 54:24 | 16:15 29:20 | **We're** | 11:17 51:2 | **12/10/04** | **30** |
| **tracking** | | 61:12 | **wouldn't** | 26:2 | 72:10 |
| 7:17 | **V** | **we've** | 16:10 22:10 | **125** | **308** |
| **transcription** | **vandalism** | 6:12 7:16 | 35:15 41:4 | 2:13 | 10:6 |
| 72:13 | 41:15 42:10 | **Whigham** | **writing** | **13** | **334** |
| **transfer** | 65:7 66:17 | 25:8,12 26:23 | 31:7 33:15 | 68:24 | 2:14 |
| 36:3 | **vending** | 27:6 | **W-2** | **13,180.30** | **35223** |
| **transmission** | 41:12,14 42:10 | **Whigham's** | 66:22 | 68:25 | 2:7 |
| 14:11,14 | **visit** | 26:19 27:3 | **W-2s** | **15** | **36067** |
| **treated** | 32:16,19 | **Williams** | 66:23 67:13 | 64:13 | 10:10 |
| 33:2 | **vs** | 2:12,12 | 68:4 | **150** | **36072** |
| **treating** | 1:14 | **wins** | | 2:7 | 2:13 |
| 25:6 | | 59:25 | **X** | **16th** | **38,000** |
| **treatment** | **W** | **wire** | **X** | 29:1,23 34:3 | 68:19 |
| 28:13 | **wages** | 35:7 | 5:2 | **17th** | |
| **trial** | 68:22 | **wish** | | 21:4 56:9 65:3 | **4** |
| 3:24 | **waived** | 41:9 | **Y** | **1982** | **4** |
| **tricked** | 3:23 4:6 | **witness** | **Yeah** | 13:13 | 5:12 28:1,2,4 |
| 56:20 | **waiving** | 4:4,6 6:2 7:13 | 6:8,11 9:18 | | 34:14 52:11 |
| **Troy** | 4:2 | 20:7 23:11 | 22:8 55:6 | **2** | **4th** |
| 13:7,9 | **want** | 25:3 27:1 | 60:7 64:16 | **2** | 72:18 |
| **true** | 18:10 26:17 | 28:7 40:16,24 | **year** | 5:9 23:2,5,8 | **48,000** |
| 10:24 72:12 | 49:2 60:11 | 64:22 67:7 | 10:20,20 13:12 | **2:07cv722M...** | 45:10 |
| **truth** | 68:10 | **witnesses** | **years** | 1:14 | |
| 6:3,4,4 | **wants** | 40:2,6 | 12:7,8 13:19 | **20** | **5** |
| **two** | 15:25 | **won** | 22:9 31:3 | 5:8 | **5** |
| 22:9 38:10 52:5 | **warrant** | 55:22 | 36:25 | **2001** | 5:14 64:11,19 |
| 66:23,25 | 39:24 | **words** | **y'all** | 12:16,17 13:25 | 64:24 66:15 |
| **type** | **wasn't** | 52:17 | 16:21 26:7 40:1 | **2004** | **5/17** |
| 61:10 | 7:15 9:11 11:4 | **work** | 41:11 48:8 | 44:23 66:22,23 | 65:12 |
| **typed** | 11:5 52:17 | 12:10 13:15 | 56:11 60:21 | 67:13,15 68:5 | |
| 8:7 | 57:8 58:22 | 14:2 22:22 | 66:15 67:2 | 69:6 | **6** |
| | 59:18 | 23:13 30:11 | | **2005** | **6** |
| **U** | **water** | 35:10 36:12 | **$** | 11:3 19:10 21:1 | 5:15 66:21 67:4 |
| **ugly** | 9:25 | 38:2,14 45:12 | **$12,000** | 21:4 29:2 | 68:4 |
| 35:16 | **way** | 59:1,3 60:3,12 | 45:12,23 46:4 | 32:4,19 | **6/9/08** |
| **uh-huh** | 14:25 27:15 | 60:18 | **$37,919.36** | **2008** | 72:25 |
| 12:9,14,22 17:9 | 35:17 41:6 | **workday** | 68:18 | 72:10,18 | **64** |
| 18:1 29:3 | 58:11 61:3 | 36:16 | **$60,000** | **205** | 5:14 |
| 63:9 69:2 | **Wayne** | **worked** | 44:25 | 2:8 | **67** |
| **ultimately** | 11:10 | 12:5 13:14 | **$8,355.51** | **23** | 5:15 |
| 43:20 44:19 | **week** | 15:15 22:9 | 68:11 | 5:9 | **687-5834** |
| **unbecoming** | 21:8 24:19 58:7 | 34:19 36:13 | | **24** | 2:14 |
| 56:16 65:3 | 58:17 65:11 | 46:19 47:22 | **0** | 5:11 | |
| **understand** | **weeks** | 48:10 57:20 | **04** | **27** | **7** |
| 14:24 55:8 57:3 | 38:11 58:21 | 58:24 61:25 | 57:16 | 10:11,12 | **70** |

Kathy Gilmore
May 30, 2008

5:5

**8**

**8**
2:7 5:5
**82**
14:2

**9**

**9th**
21:1
**96**
13:24 14:3
**981-3906**
2:8

# Condensed Transcript

# Deposition of
# James Gregory Mills

### taken on
### 5/30/2008

### Ron Blocker
### v.
### Equity Group

### Case No. 2:07cv722MHT - WC



**BAKER & BAKER**

**Certified Court Reporters,
Certified Legal Video Specialists,
and Trial Presentation Consultants
(334) 262-3332  888-253-3377
www.baker-baker.com**

James Gregory Mills
May 30, 2008

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


RON BLOCKER,

     Plaintiff,

vs.          CASE NO. 2:07cv722MHT-WC

EQUITY GROUP, EUFAULA DIVISION,

L.L.C.,

     Defendants.


     *    *    *    *    *    *    *    *


     The deposition of JAMES GREGORY MILLS

was taken before Cornelia J. Baker,

Certified Court Reporter, ACCR 290, as

Commissioner, on Friday, May 30, 2008,

commencing at approximately 12:21 p.m., in

the law offices of Williams, Potthoff,

Williams & Smith, L.L.C., 125 South Orange

Avenue, Eufaula, Alabama, pursuant to the

stipulations set forth herein.

James Gregory Mills
May 30, 2008

2

1          *      *      *      *      *      *      *

2                    APPEARANCES

3

4      Representing the Plaintiff:

5

6              MR. JERRY ROBERSON
               Attorney at Law
               Roberson & Roberson
7              8 Office Park Circle, Suite 150
               Birmingham, Alabama  35223
8              (205) 981-3906
               jdratty@charter.net
9

10     Representing the Defendants:

11             MR. JOEL P. SMITH, JR.
               Attorney at Law
12             Williams, Potthoff, Williams
                   & Smith, L.L.C.
13             125 South Orange Avenue
               Eufaula, Alabama  36072
14             (334) 687-5834

15

16

17

18          *      *      *      *      *      *      *

19

20

21

22

23

24

25

a4432b2e-870b-445c-a152-10eb473026e1

3

STIPULATIONS

It is hereby stipulated and
agreed by and between counsel representing
the parties that the deposition of JAMES
GREGORY MILLS is taken pursuant to the Rules
of Civil Procedure, and that said deposition
may be taken before Cornelia J. Baker,
Certified Court Reporter, as Commissioner,
without the formality of a commission; that
objections to questions, other than
objections as to the form of the questions,
need not be made at this time, but may be
reserved for a ruling at such time as the
deposition may be offered into evidence, or
used for any other purpose by either party
hereto, provided by the Statute.
It is further stipulated and agreed by
and between counsel representing the parties
in this case, that the filing of the
deposition of JAMES GREGORY MILLS is hereby
waived, and that said deposition may be
introduced at the trial of this case or used
in any other manner by either party hereto

4

provided for by the Statute, regardless of
the waiving of the filing of same.
It is further stipulated and agreed by
and between counsel and the witness that the
reading and signing of the deposition by the
witness is hereby waived.

* * * * * * * *

5

JAMES GREGORY MILLS,
The Witness, having first been sworn
or affirmed to speak the truth,
the whole truth, and nothing but the truth,
testified as follows:
(Whereupon all parties agreed to
usual stipulations.)
EXAMINATION
BY MR. ROBERSON:
Q. Would you state your full name,
please, sir?
A. James Gregory Mills.
Q. Have you ever been deposed
before?
A. Yes.
Q. How many times?
A. Twice.
Q. Cases involving the chicken
plant?
A. Yes, sir.
Q. What was the nature of the
cases? And don't tell me about the odor
case.
A. Doning and doffing.
Q. I'm sorry?

6

A. Doning and doffing.
MR. SMITH: FLSA, doning and
doffing, you know, the
smocks and all that stuff.
MR. ROBERSON: Oh, the clothes,
okay.
BY MR. ROBERSON:
Q. Okay. A Fair Labor Standards
case?
A. And an accident happened. I
was with another company, Wayne Farms.
Q. Okay. How did y'all come out
in the doning and doffing case?
A. Good. We won the case.
Q. Okay. Who represented the
Plaintiff? Do you remember?
A. I don't remember.
Q. Mr. Mills, I represent Ron
Blocker. Do you know Ron?
A. Yes.
Q. And he was in maintenance,
worked out there for a number of years, and
in November of '04, he was promoted to a
maintenance supervisor position; were you
aware of that?

James Gregory Mills
May 30, 2008

7

1    A. Yes.
2    Q. Did you promote him?
3    A. No.
4    Q. Who did?
5    A. Reb.
6    Q. Okay. Did you consult with Reb
7  before he was promoted?
8    A. Yes.
9    Q. You were aware of it, right?
10   A. Yes.
11   Q. Did you voice any objection?
12   A. No.
13   Q. Okay. Why not?
14   A. I felt like Ron would do a good
15  job.
16   Q. Okay. Before he became a
17  supervisor, had you had anybody complain
18  about Ron as an employee, hourly employee?
19   A. Not that I remember, no.
20   Q. And then he had worked for --
21  when did you come to work at -- it's NCP?
22   A. 1999.
23   Q. Okay. And Al Rhodes came first
24  as general manager?
25   A. Yes.

8

1    Q. And he recruited you from Wayne
2  Farms?
3    A. Yes.
4    Q. Was he a general manager at
5  Wayne Farms?
6    A. Yes.
7    Q. And you recruited Reb?
8    A. Yes.
9    Q. So when did Al get here?
10   A. It was in 1999. I don't know
11  what month, so . . .
12   Q. All right. And then shortly
13  after, you followed, and then shortly after,
14  Reb followed?
15   A. Yes.
16   Q. What position did you take here
17  at CP?
18   A. Maintenance manager.
19   Q. What's your position now?
20   A. Operations manager.
21   Q. When did you receive that
22  promotion, approximately?
23   A. '04. Latter part of '04, I
24  believe.
25   Q. So after Equity Group took

9

1  over?
2    A. Yes.
3    Q. Did you implement any changes
4  when you took over as maintenance manager?
5      MR. SMITH: Maintenance or
6        operations?
7      MR. ROBERSON: I'm sorry. Let
8        me rephrase it. That was a
9        poor question.
10  BY MR. ROBERSON:
11   Q. You took over as operations
12  manager in '04?
13   A. Yes.
14   Q. With the new company, Equity
15  Group, correct?
16   A. Yes.
17   Q. Did you promote Reb to
18  maintenance manager?
19   A. Yes.
20   Q. Okay.
21   Q. Let's back up.
22   Q. All right.
23   A. I was maintenance manager. And
24  then in about eight months after I was
25  employed with CP, I was promoted to plant

10

1  manager.
2    Q. Okay. So you went from plant
3  manager to operations manager?
4    A. With Equity Group.
5    Q. Okay. So you had actually
6  promoted Reb before you became operations
7  manager; is that correct?
8    A. Yes, 2000.
9    Q. Okay. Now, with CP, did Ron
10  Blocker work as a supervisor in the cook
11  plant, cook house?
12   A. Yes.
13   Q. On the third shift?
14   A. Yes.
15   Q. But he was still an hourly
16  worker at that time, correct?
17   A. If he was an hourly worker, he
18  was not a supervisor.
19   Q. Okay. You don't have lead
20  people that are supervisors, but hourly?
21   A. No. Supervisors are
22  supervisors, salary.
23   Q. Okay. Can you be in charge of
24  a shift and be hourly?
25   A. You can be a lead person, but

James Gregory Mills
May 30, 2008

11

1  you're not authorized to do any time sheets,
2  pay deductions, disciplinary action.
3      Q.  Okay.  So can you be in charge
4  of a shift and be a lead person?
5      A.  Partially.
6      Q.  Okay.  And you still have to
7  report to a supervisor, who was on a salary,
8  who has to take any disciplinary action or
9  whatever?
10      A.  Correct.
11      Q.  Okay.  Any reason in November
12  of '04 why Ron Blocker couldn't have led the
13  third shift as a lead person and be an hourly
14  employee?
15      A.  Because we want salary
16  employees managing hourly people.
17      Q.  I understand that's what you
18  want, but is there any reason why he couldn't
19  do that as an hourly?
20      A.  Yes.  Because disciplinary
21  action on that shift couldn't be done without
22  a salaried person there.
23      Q.  Okay.  Well, you had some
24  salaried persons besides him on the third
25  shift, didn't you?

12

1      A.  Not in maintenance.
2      Q.  Okay.  Were you made aware of a
3  no overtime policy that was going to begin
4  with the Equity Group?
5      A.  No.
6      Q.  Did you ever have any
7  discussions with Ron Blocker or Reb
8  Bludsworth about a no overtime policy?
9      A.  No.
10      Q.  Did you ever tell Ron Blocker
11  that they were going to have a no overtime
12  policy and, as a supervisor, he would not
13  have to work more than forty-five hours a
14  week?
15      A.  No.
16      Q.  So if he alleges that in his
17  Complaint, he's mistaken; is that correct?
18      A.  Yes.
19      Q.  Okay.  Do you remember what
20  Mr. Blocker's salary was?
21      A.  No.
22      Q.  If I told you $48,000 a year,
23  would you have any reason to dispute that?
24      A.  No.  That's --
25      Q.  That sounds about right?

13

1      A.  That's in the range.
2      Q.  Okay.  Do you know what
3  Mr. Blocker made as an hourly employee in
4  2004?
5      A.  No.
6      Q.  Did you know he made $60,000 --
7      A.  No.
8      Q.  -- as an hourly employee?
9      A.  No.
10      Q.  Did you know in the seven
11  months that he worked as an hourly employee
12  for the Equity Group, from March of '04 until
13  he was promoted in November, that he made
14  $40,000 in seven months as an hourly
15  employee?
16      A.  No.
17      Q.  Do you know why someone would
18  take a job, same shift, that paid $40,000 in
19  seven months, and take a position that was
20  salaried at 48, that would pay $48,000 for
21  twelve months?  Do you have any explanation
22  as to why someone would do that?
23      A.  No.
24      Q.  That doesn't make sense to me;
25  does it to you?

14

1      A.  No.
2      Q.  Okay.  Now, Ron claims that
3  before Ms. Gilmore made a recommendation to
4  fire Ron based on her investigation -- are
5  you aware of that?
6      A.  Yes.
7      Q.  In May of 2005 --
8      A.  I'm aware of it, yes.
9      Q.  -- did you make any
10  investigation?
11      A.  No.
12      Q.  Did you talk to anybody --
13      A.  No.
14      Q.  -- other than Kathy and Reb?
15      A.  No.
16      Q.  Have you ever seen any signed
17  statements from any witness?
18      A.  Just when I read his
19  deposition.
20      Q.  Okay.  Other than -- you read
21  his deposition, but have you ever seen a
22  statement from anybody else that was on his
23  crew or worked with him?
24      A.  No.
25      Q.  Okay.  And you made your

James Gregory Mills
May 30, 2008

**15**

1  decision or approved the decision to fire Ron
2  Blocker based on Kathy's recommendation and
3  the report that she generated?
4       A. I didn't make that decision.
5       Q. You didn't? Well, did you
6  approve it?
7       A. No.
8       Q. Okay.
9       A. HR makes that decision.
10      Q. Okay. Did they consult you?
11      A. I was aware of it.
12      Q. Okay. Did you voice any
13  objection to their decision?
14      A. No.
15      Q. It was okay with you, is what
16  you're saying? You were the operations
17  manager; it was okay with you?
18      A. Yes.
19      Q. Okay. Now, before Kathy began
20  her investigation, do you recall meeting with
21  Mr. Blocker where he made a complaint to you
22  about the number of hours he was being
23  required to work as a supervisor?
24      A. I don't recall that.
25      Q. Do you recall him telling you

**16**

1  that he had previously met with Reb
2  Bludsworth about that same issue?
3       A. I don't remember that. But
4  it's been four years ago. I don't remember
5  that.
6       Q. Do you recall him leaving your
7  office and going to see Jim Bice about the
8  same issue?
9       A. No, I don't remember that.
10      Q. And do you recall Jim Bice
11  sending him to Kathy Gilmore --
12      A. I don't recall.
13      Q. -- who again he consulted about
14  that issue; you don't recall any of that?
15      A. No.
16      Q. Okay. And then shortly after
17  that conversation, this investigation began
18  where he was suspended, and then a week
19  later, discharged, correct?
20      A. (No immediate response.)
21      Q. May 17th, he was suspended;
22  you agree with that, don't you?
23      A. Based on what I read in his
24  deposition, I agree with it.
25      Q. Okay. Well, we've got a

**17**

1  document around here somewhere.
2       Were you involved in this
3  transaction?
4       A. No.
5       Q. Okay. Do you see that
6  document's May 17th, and he's suspended for
7  conduct unbecoming management?
8       A. Yes.
9       Q. Okay. And that squares with
10  your recollection, correct? You remember he
11  got suspended, and then, ultimately, was
12  discharged a week later?
13      A. Yes.
14      Q. Okay. Now, you know that
15  Keystone has an employee handbook, correct?
16      A. Yes.
17      Q. And I've marked as Exhibit 7 to
18  Reb's deposition a copy of that handbook. Is
19  that a Keystone handbook, sir?
20      A. Yes.
21      Q. Okay. And it, on page 16 of
22  this handbook -- do you know what retaliation
23  is?
24      A. Yes.
25      Q. What is it?

**18**

1       A. When you go against somebody
2  for -- getting back at them, I guess, is what
3  you'd say.
4       Q. Well, you understand that the
5  employees have certain rights granted them by
6  federal statutes, federal laws, correct?
7       A. Yes.
8       Q. One of them is you can't
9  discriminate based on race or age; do you
10  agree with that?
11      A. Yes.
12      Q. And you have to pay overtime
13  for more than forty hours worked in a week;
14  do you agree with that? This is a federal
15  statute.
16      MR. SMITH: Object to the form.
17      A. If they're hourly, yes.
18      Q. If they're an hourly employee,
19  okay.
20      And nonretaliation means if
21  somebody complains about what they consider
22  to be a violation of those laws, they make a
23  good faith complaint, the employer, Equity
24  Group, can't take any adverse action against
25  them because of their complaint; you

James Gregory Mills
May 30, 2008

19

1  understand that, right?
2      A.  Yes.
3      Q.  In other words, if he complains
4  about his hours, you can't punish him for
5  complaining about that?
6      A.  Correct.
7      Q.  Okay.  You understood that --
8      A.  Yes.
9      Q.  -- back in 2005, right?
10      A.  Yes.
11      Q.  And, in fact, your policy says
12  Equity Group, Eufaula, encourages its
13  employees to voice concerns about suspected
14  problems or suspected violations of company
15  policy; you agree with that statement, don't
16  you?
17      A.  Yes.
18      Q.  If somebody has some concerns,
19  you want them to come to you and make you
20  aware of them, correct?
21      A.  Yes.
22      Q.  Okay.  Now, has anybody that
23  was an employee at the Equity Group ever come
24  to you with any concerns that they were
25  having to work too many hours?

20

1      A.  Yes.  I've heard that.
2      Q.  Who has come to you?
3      A.  I don't recall, but I've heard,
4  you know . . .
5      Q.  What did you do about it?  What
6  action did you take?
7      A.  Well, recently we've had to
8  run, due to customer expectations and
9  requirements, six and seven days a week.  And
10  we've explained to them that our requirements
11  are from our customers, that we had to do
12  that.  And it was for a short time.
13      Q.  All right.  I'm going to show
14  you what I marked as Exhibit 1 to
15  Ms. Gilmore's deposition, which is a Saturday
16  pay policy.
17      A.  Yes.
18      Q.  Are you familiar with that?
19      A.  Yes, I am.
20      Q.  And Ron was suspended on
21  May 17th, fired May 24th.  This document
22  states it's effective May 9th, 2005?
23      A.  Yes.
24      Q.  Is it your testimony under oath
25  that on May 9th, 2005, y'all were paying

21

1  supervisors $115 if they worked on a
2  Saturday?
3      A.  It's according to what they
4  worked for.
5      Q.  The ones listed on that pay
6  policy?
7      A.  If it's due to economic status,
8  we pay them.  If we run, produce product for
9  our customer, we pay them.  If it's because
10  the job didn't get done in five day, no, we
11  do not pay them.
12      Q.  Who decides?
13      A.  It's based on whether we're
14  required to run due to -- our customer
15  decides that.
16      Q.  But who decides whether they
17  get paid or not; who makes that decision?
18      A.  I do.  Supervisors do.
19      Q.  Before May 9th, 2005, had you
20  ever paid a supervisor for working on a
21  Saturday?
22      A.  No.  This came into effect when
23  Keystone bought the plant, shortly
24  thereafter.
25      Q.  Oh, it came into effect then?

22

1      A.  Shortly thereafter it was
2  purchased.  In April, I believe, is when they
3  purchased the plant.
4      Q.  Actually, they purchased it in
5  March of 2004; are you aware of that?
6      A.  Yeah.  But this come into --
7      Q.  Why did this policy come into
8  effect a year later -- or fourteen months
9  later?
10      A.  I can't answer that.
11      Q.  Well, can you tell me the name
12  of any supervisor that you paid for Saturday
13  work that was a salaried supervisor before
14  May of 2005?  Can you name one?
15      A.  No.
16      Q.  Well, there were occasions when
17  y'all ran -- worked on Saturday during that
18  period of time, weren't there?
19      A.  Occasions.
20      Q.  Caused by your customers'
21  requirements, correct?
22      A.  Yes.  If we ran, it was because
23  of customers.
24      Q.  Okay.  Well, so you're saying
25  this was a Keystone policy, correct?

James Gregory Mills
May 30, 2008

23

1     A. Yes.
2     Q. But it wasn't implemented at
3  your plant in March of '05, was it?
4     A. No.
5     Q. March of --
6     A. May of '05.
7     Q. March of '04?
8     A. No.
9     Q. Do you know why that was?
10     A. No.
11     Q. Should it have been?
12     A. That was a corporate decision.
13     Q. Okay. Well, in fact, after
14  Mr. Blocker was fired, after he contends he
15  made complaints about the number of hours he
16  was working, they began paying supervisors
17  who worked on Saturday, correct?
18     A. Effective May the 9th.
19     Q. Yeah, okay. Who would I see
20  that would have records about when
21  supervisors were paid on Saturday? Who would
22  I talk to out there at the Equity Group?
23     A. Robin Jones keeps a record of
24  all of the Saturday and Sunday pay.
25     Q. Is that a male or a female?

24

1     A. Female.
2     Q. And what's her position?
3     A. She's the assistant to the
4  general manager.
5     Q. Okay. Now, I know you worked
6  with Reb when y'all were both at Wayne Farms?
7     A. Yes.
8     Q. When were you there, what
9  years?
10     A. 1978 to 1999.
11     Q. You were there, what,
12  twenty-one years?
13     A. Yes.
14     Q. How long was he there? Do you
15  know?
16     A. I don't recall.
17     Q. He wasn't there the whole time
18  you were there, was he?
19     A. No. I don't -- no, I don't
20  think so.
21     Q. Where are you from originally?
22     A. Elba, Alabama.
23     Q. Okay. Well, let me just ask
24  you this way: How long have you been knowing
25  Reb?

25

1     A. Thirty-five years, roughly.
2     Q. And would it be fair to say
3  that y'all are friends, and you see each
4  other socially sometimes?
5     A. Occasionally.
6     Q. Do you fish?
7     A. Yes.
8     Q. Does he fish?
9     A. Occasionally, yes.
10     Q. Do y'all fish together
11  sometimes?
12     A. Sometimes.
13     Q. Okay. Do you hunt?
14     A. Yes.
15     Q. Does he hunt?
16     A. Yes.
17     Q. Do y'all hunt together
18  sometimes?
19     A. Haven't in about four years.
20     Q. Okay. Y'all have been hunting
21  together, though?
22     A. Yeah.
23     Q. I don't know what other hobbies
24  you might have. Do you have any other
25  hobbies?

26

1     A. No.
2     Q. Okay. You got children?
3     A. Yes.
4     Q. How old are they?
5     A. Twenty-six and twenty-five.
6     Q. You're not spending any time at
7  the ball fields, are you?
8     A. Not yet.
9     Q. Okay. One of the remedies that
10  Mr. Blocker -- if he's successful in his
11  claim in his lawsuit, one of the remedies
12  that's available to him -- actually, is
13  presumed to be entitled to -- is
14  reinstatement. If he wins his lawsuit, the
15  Judge can reinstate him. They have that
16  discretion. So I normally ask: Is there any
17  reason, that you know of, why Mr. Blocker --
18  that wouldn't be a good idea, why he
19  shouldn't be allowed to go back to work at
20  the Equity Group; do you know of any reason?
21     A. I would like to look at Ron's
22  file and see what's in his file, because I'm
23  not familiar with his file. But when Ron was
24  there, to the best of my knowledge, he was a
25  good worker. But I would review his file,

James Gregory Mills
May 30, 2008

27

1    along with HR and supervisors that he worked
2    for, and we would make a group decision.
3        Q.  And certainly, at least in the
4    period of time that he worked there, not as a
5    supervisor, but just as an hourly employee,
6    you're not aware of anything today that would
7    disqualify him from working there as an
8    hourly worker; is that a fair statement?
9        A.  I don't recall.  But like I
10   said, I would have to just look at his file,
11   because I'm not that familiar with Ron's
12   file.
13       Q.  And did you always get along
14   with Ron?
15       A.  Yes.
16       Q.  I mean, he always conducted
17   himself appropriately around you?
18       A.  Yes, to me, he did.
19       Q.  And to your knowledge, is he a
20   competent maintenance man; that is, does he
21   know what to do and how to do it?
22       A.  He did.
23           MR. ROBERSON:  Okay.  All
24           right.  Man, that's record
25           time.

28

1        (The deposition of JAMES GREGORY
2        MILLS concluded at
3        approximately 12:42 p.m.)
4
5    * * * * * * * * * *
6    FURTHER DEPONENT SAITH NOT
7    * * * * * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

29

1    * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3    * * * * * * * * * *
4    STATE OF ALABAMA)
5    COUNTY OF MONTGOMERY)
6        I, Cornelia J. Baker, Certified
7    Court Reporter, Certified Shorthand
8    Reporter, and Notary Public in and for the
9    State of Alabama at Large, do hereby certify
10   that on Friday, May 30, 2008, I reported the
11   aforementioned proceedings, and that the
12   pages herein contain a true and accurate
13   transcription of the said proceedings.
14       I further certify that I am
15   neither of kin nor of counsel to the parties
16   to said cause, nor in any manner interested
17   in the results thereof.
18       This the 2nd day of June, 2008.
19
20
21
         Cornelia J. Baker, ACCR 290
22       Certified Shorthand Reporter,
         Certified Court Reporter and
23       Notary Public for the
         State of Alabama
24
25       My Commission expires 6/9/08.

**A**

accident
6:10
ACCR
1:16 29:21
accurate
29:12
action
11:2,8,21 18:24
20:6
adverse
18:24
affirmed
5:3
aforementioned
29:11
age
18:9
ago
16:4
agree
16:22,24 18:10
18:14 19:15
agreed
3:5,19 4:3 5:6
Al
7:23 8:9
Alabama
1:2,21 2:7,13
24:22 29:4,9
29:23
alleges
12:16
allowed
26:19
answer
22:10
anybody
7:17 14:12,22
19:22
APPEARAN...
2:2
appropriately
27:17
approve
15:6
approved
15:1
approximately
1:18 8:22 28:3
April
22:2
assistant
24:3
Attorney

2:6,11
authorized
11:1
available
26:12
Avenue
1:21 2:13
aware
6:25 7:9 12:2
14:5,8 15:11
19:20 22:5
27:6

**B**

back
9:21 18:2 19:9
26:19
Baker
1:15 3:9 29:6
29:21
ball
26:7
based
14:4 15:2 16:23
18:9 21:13
began
15:19 16:17
23:16
believe
8:24 22:2
best
26:24
Bice
16:7,10
Birmingham
2:7
Blocker
1:5 6:19 10:10
11:12 12:7,10
13:3 15:2,21
23:14 26:10
26:17
Blocker's
12:20
Bludsworth
12:8 16:2
bought
21:23

**C**

case
1:7 3:21,24
5:23 6:9,13,14
cases
5:18,22

cause
29:16
Caused
22:20
certain
18:5
certainly
27:3
CERTIFICA...
29:2
Certified
1:16 3:10 29:6
29:7,22,22
certify
29:9,14
changes
9:3
charge
10:23 11:3
chicken
5:18
children
26:2
Circle
2:7
Civil
3:8
claim
26:11
claims
14:2
clothes
6:5
come
6:12 7:21 19:19
19:23 20:2
22:6,7
commencing
1:18
commission
3:11 29:25
Commissioner
1:17 3:10
company
6:11 9:14 19:14
competent
27:20
complain
7:17
complaining
19:5
complains
18:21 19:3
complaint
12:17 15:21

18:23,25
complaints
23:15
concerns
19:13,18,24
concluded
28:2
conduct
17:7
conducted
27:16
consider
18:21
consult
7:6 15:10
consulted
16:13
contain
29:12
contends
23:14
conversation
16:17
cook
10:10,11
copy
17:18
Cornelia
1:15 3:9 29:6
29:21
corporate
23:12
correct
9:15 10:7,16
11:10 12:17
16:19 17:10
17:15 18:6
19:6,20 22:21
22:25 23:17
counsel
3:5,20 4:4
29:15
COUNTY
29:5
Court
1:1,16 3:10
29:7,22
CP
8:17 9:25 10:9
crew
14:23
customer
20:8 21:9,14
customers
20:11 22:20,23

**D**

day
21:10 29:18
days
20:9
decides
21:12,15,16
decision
15:1,1,4,9,13
21:17 23:12
27:2
deductions
11:2
Defendants
1:10 2:10
DEPONENT
28:6
deposed
5:13
deposition
1:14 3:6,8,16
3:22,23 4:5
14:19,21
16:24 17:18
20:15 28:1
discharged
16:19 17:12
disciplinary
11:2,8,20
discretion
26:16
discriminate
18:9
discussions
12:7
dispute
12:23
disqualify
27:7
DISTRICT
1:1,2
DIVISION
1:3,8
document
17:1 20:21
document's
17:6
doffing
5:24 6:1,3,13
doning
5:24 6:1,2,13
due
20:8 21:7,14

**E**

economic
21:7
effect
21:22,25 22:8
effective
20:22 23:18
eight
9:24
either
3:17,25
Elba
24:22
employed
9:25
employee
7:18,18 11:14
13:3,8,11,15
17:15 18:18
19:23 27:5
employees
11:16 18:5
19:13
employer
18:23
encourages
19:12
entitled
26:13
Equity
1:8 8:25 9:14
10:4 12:4
13:12 18:23
19:12,23
23:22 26:20
Eufaula
1:8,21 2:13
19:12
evidence
3:16
EXAMINATI...
5:8
Exhibit
17:17 20:14
expectations
20:8
expires
29:25
explained
20:10
explanation
13:21

**F**

fact
19:11 23:13

fair
6:8 25:2 27:8
faith
18:23
familiar
20:18 26:23
27:11
Farms
6:11 8:2,5 24:6
federal
18:6,6,14
felt
7:14
female
23:25 24:1
fields
26:7
file
26:22,22,23,25
27:10,12
filing
3:21 4:2
fire
14:4 15:1
fired
20:21 23:14
first
5:2 7:23
fish
25:6,8,10
five
21:10
FLSA
6:2
followed
8:13,14
follows
5:5
form
3:13 18:16
formality
3:11
forth
1:22
forty
18:13
forty-five
12:13
four
16:4 25:19
fourteen
22:8
Friday
1:17 29:10
friends

25:3
full
5:10
further
3:19 4:3 28:6
29:14

_____ G _____

general
7:24 8:4 24:4
generated
15:3
getting
18:2
Gilmore
14:3 16:11
Gilmore's
20:15
go
18:1 26:19
going
12:3,11 16:7
20:13
good
6:14 7:14 18:23
26:18,25
granted
18:5
Gregory
1:14 3:7,22 5:1
5:12 28:1
group
1:8 8:25 9:15
10:4 12:4
13:12 18:24
19:12,23
23:22 26:20
27:2
guess
18:2

_____ H _____

handbook
17:15,18,19,22
happened
6:10
heard
20:1,3
hereto
3:18,25
hobbies
25:23,25
hourly
7:18 10:15,17
10:20,24

11:13,16,19
13:3,8,11,14
18:17,18 27:5
27:8
hours
12:13 15:22
18:13 19:4,25
23:15
house
10:11
HR
15:9 27:1
hunt
25:13,15,17
hunting
25:20

_____ I _____

idea
26:18
immediate
16:20
implement
9:3
implemented
23:2
interested
29:16
introduced
3:24
investigation
14:4,10 15:20
16:17
involved
17:2
involving
5:18
issue
16:2,8,14

_____ J _____

J
1:15 3:9 29:6
29:21
James
1:14 3:6,22 5:1
5:12 28:1
jdratty@char...
2:8
JERRY
2:5
Jim
16:7,10
job
7:15 13:18

21:10
JOEL
2:11
Jones
23:23
JR
2:11
Judge
26:15
June
29:18

_____ K _____

Kathy
14:14 15:19
16:11
Kathy's
15:2
keeps
23:23
Keystone
17:15,19 21:23
22:25
kin
29:15
know
6:3,19 8:10
13:2,6,10,17
17:14,22 20:4
23:9 24:5,15
25:23 26:17
26:20 27:21
knowing
24:24
knowledge
26:24 27:19

_____ L _____

Labor
6:8
Large
29:9
law
1:19 2:6,11
laws
18:6,22
lawsuit
26:11,14
lead
10:19,25 11:4
11:13
leaving
16:6
led
11:12

Let's
9:21
listed
21:5
long
24:14,24
look
26:21 27:10
L.L.C
1:9,20 2:12

_____ M _____

maintenance
6:21,24 8:18
9:4,5,18,23
12:1 27:20
male
23:25
man
27:20,24
management
17:7
manager
7:24 8:4,18,20
9:4,12,18,23
10:1,3,3,7
15:17 24:4
managing
11:16
manner
3:25 29:16
March
13:12 22:5 23:3
23:5,7
marked
17:17 20:14
mean
27:16
means
18:20
meeting
15:20
met
16:1
MIDDLE
1:2
Mills
1:14 3:7,22 5:1
5:12 6:18
28:2
mistaken
12:17
MONTGOM...
29:5
month

8:11
months
9:24 13:11,14
13:19,21 22:8

_____ N _____

name
5:10 22:11,14
nature
5:21
NCP
7:21
need
3:14
neither
29:15
new
9:14
nonretaliation
18:20
normally
26:16
NORTHERN
1:3
Notary
29:8,23
November
6:23 11:11
13:13
number
6:22 15:22
23:15

_____ O _____

oath
20:24
Object
18:16
objection
7:11 15:13
objections
3:12,13
Occasionally
25:5,9
occasions
22:16,19
odor
5:22
offered
3:16
office
2:7 16:7
offices
1:19
Oh

| | | | | | |
|---|---|---|---|---|---|
| 6:5 21:25 | 18:12 20:16 | 3:18 4:1 | 23:20 | 2:5,6,6 5:9 6:5 | 11:1 |
| **okay** | 21:5,8,9,11 | **Public** | **recruited** | 6:7 9:7,10 | **shift** |
| 6:6,8,12,15 7:6 | 23:24 | 29:8,23 | 8:1,7 | 27:23 | 10:13,24 11:4 |
| 7:13,16,23 | **paying** | **punish** | **regardless** | **Robin** | 11:13,21,25 |
| 9:20 10:2,5,9 | 20:25 23:16 | 19:4 | 4:1 | 23:23 | 13:18 |
| 10:19,23 11:3 | **people** | **purchased** | **reinstate** | **Ron** | **short** |
| 11:6,11,23 | 10:20 11:16 | 22:2,3,4 | 26:15 | 1:5 6:18,19 | 20:12 |
| 12:2,19 13:2 | **period** | **purpose** | **reinstatement** | 7:14,18 10:9 | **Shorthand** |
| 14:2,20,25 | 22:18 27:4 | 3:17 | 26:14 | 11:12 12:7,10 | 29:7,22 |
| 15:8,10,12,15 | **person** | **pursuant** | **remedies** | 14:2,4 15:1 | **shortly** |
| 15:17,19 | 10:25 11:4,13 | 1:21 3:7 | 26:9,11 | 20:20 26:23 | 8:12,13 16:16 |
| 16:16,25 17:5 | 11:22 | **p.m** | **remember** | 27:14 | 21:23 22:1 |
| 17:9,14,21 | **persons** | 1:18 28:3 | 6:16,17 7:19 | **Ron's** | **show** |
| 18:19 19:7,22 | 11:24 | | 12:19 16:3,4,9 | 26:21 27:11 | 20:13 |
| 22:24 23:13 | **Plaintiff** | **Q** | 17:10 | **roughly** | **signed** |
| 23:19 24:5,23 | 1:6 2:4 6:16 | **question** | **rephrase** | 25:1 | 14:16 |
| 25:13,20 26:2 | **plant** | 9:9 | 9:8 | **Rules** | **signing** |
| 26:9 27:23 | 5:19 9:25 10:2 | **questions** | **report** | 3:7 | 4:5 |
| **old** | 10:11 21:23 | 3:12,13 | 11:7 15:3 | **ruling** | **sir** |
| 26:4 | 22:3 23:3 | | **reported** | 3:15 | 5:11,20 17:19 |
| **ones** | **please** | **R** | 29:10 | **run** | **six** |
| 21:5 | 5:11 | **race** | **Reporter** | 20:8 21:8,14 | 20:9 |
| **operations** | **policy** | 18:9 | 1:16 3:10 29:7 | | **Smith** |
| 8:20 9:6,11 | 12:3,8,12 19:11 | **ran** | 29:8,22,22 | **S** | 1:20 2:11,12 |
| 10:3,6 15:16 | 19:15 20:16 | 22:17,22 | **REPORTER'S** | **SAITH** | 6:2 9:5 18:16 |
| **Orange** | 21:6 22:7,25 | **range** | 29:2 | 28:6 | **smocks** |
| 1:20 2:13 | **poor** | 13:1 | **represent** | **salaried** | 6:4 |
| **originally** | 9:9 | **read** | 6:18 | 11:22,24 13:20 | **socially** |
| 24:21 | **position** | 14:18,20 16:23 | **represented** | 22:13 | 25:4 |
| **overtime** | 6:24 8:16,19 | **reading** | 6:15 | **salary** | **somebody** |
| 12:3,8,11 18:12 | 13:19 24:2 | 4:5 | **representing** | 10:22 11:7,15 | 18:1,21 19:18 |
| | **Potthoff** | **reason** | 2:4,10 3:5,20 | 12:20 | **sorry** |
| **P** | 1:19 2:12 | 11:11,18 12:23 | **required** | **Saturday** | 5:25 9:7 |
| **P** | **presumed** | 26:17,20 | 15:23 21:14 | 20:15 21:2,21 | **sounds** |
| 2:11 | 26:13 | **Reb** | **requirements** | 22:12,17 | 12:25 |
| **page** | **previously** | 7:5,6 8:7,14 | 20:9,10 22:21 | 23:17,21,24 | **South** |
| 17:21 | 16:1 | 9:17 10:6 | **reserved** | **saying** | 1:20 2:13 |
| **pages** | **problems** | 12:7 14:14 | 3:15 | 15:16 22:24 | **speak** |
| 29:12 | 19:14 | 16:1 24:6,25 | **response** | **says** | 5:3 |
| **paid** | **Procedure** | **Reb's** | 16:20 | 19:11 | **spending** |
| 13:18 21:17,20 | 3:8 | 17:18 | **results** | **see** | 26:6 |
| 22:12 23:21 | **proceedings** | **recall** | 29:17 | 16:7 17:5 23:19 | **squares** |
| **Park** | 29:11,13 | 15:20,24,25 | **retaliation** | 25:3 26:22 | 17:9 |
| 2:7 | **produce** | 16:6,10,12,14 | 17:22 | **seen** | **Standards** |
| **part** | 21:8 | 20:3 24:16 | **review** | 14:16,21 | 6:8 |
| 8:23 | **product** | 27:9 | 26:25 | **sending** | **state** |
| **Partially** | 21:8 | **receive** | **Rhodes** | 16:11 | 5:10 29:4,9,23 |
| 11:5 | **promote** | 8:21 | 7:23 | **sense** | **statement** |
| **parties** | 7:2 9:17 | **recollection** | **right** | 13:24 | 14:22 19:15 |
| 3:6,20 5:6 | **promoted** | 17:10 | 7:9 8:12 9:22 | **set** | 27:8 |
| 29:15 | 6:23 7:7 9:25 | **recommendat...** | 12:25 19:1,9 | 1:22 | **statements** |
| **party** | 10:6 13:13 | 14:3 15:2 | 20:13 27:24 | **seven** | 14:17 |
| 3:17,25 | **promotion** | **record** | **rights** | 13:10,14,19 | **states** |
| **pay** | 8:22 | 23:23 27:24 | 18:5 | 20:9 | 1:1 20:22 |
| 11:2 13:20 | **provided** | **records** | **Roberson** | **sheets** | **status** |

| | | | | |
|---|---|---|---|---|
| 21:7 | think | violations | 10:16,17 26:25 | 20:21 |
| **statute** | 24:20 | 19:14 | 27:8 | **1978** |
| 3:18 4:1 18:15 | **third** | **voice** | **working** | 24:10 |
| **statutes** | 10:13 11:13,24 | 7:11 15:12 | 21:20 23:16 | **1999** |
| 18:6 | **Thirty-five** | 19:13 | 27:7 | 7:22 8:10 24:10 |
| **stipulated** | 25:1 | **vs** | **wouldn't** | |
| 3:4,19 4:3 | **time** | 1:7 | 26:18 | **2** |
| **stipulations** | 3:14,15 10:16 | | | **2nd** |
| 1:22 3:2 5:7 | 11:1 20:12 | **W** | **Y** | 29:18 |
| **stuff** | 22:18 24:17 | **waived** | **Yeah** | **2:07cv722M...** |
| 6:4 | 26:6 27:4,25 | 3:23 4:6 | 22:6 23:19 | 1:7 |
| **successful** | **times** | **waiving** | 25:22 | **2000** |
| 26:10 | 5:16 | 4:2 | **year** | 10:8 |
| **Suite** | **today** | **want** | 12:22 22:8 | **2004** |
| 2:7 | 27:6 | 11:15,18 19:19 | **years** | 13:4 22:5 |
| **Sunday** | **told** | **wasn't** | 6:22 16:4 24:9 | **2005** |
| 23:24 | 12:22 | 23:2 24:17 | 24:12 25:1,19 | 14:7 19:9 20:22 |
| **supervisor** | **transaction** | **way** | **y'all** | 20:25 21:19 |
| 6:24 7:17 10:10 | 17:3 | 24:24 | 6:12 20:25 | 22:14 |
| 10:18 11:7 | **transcription** | **Wayne** | 22:17 24:6 | **2008** |
| 12:12 15:23 | 29:13 | 6:11 8:1,5 24:6 | 25:3,10,17,20 | 1:17 29:10,18 |
| 21:20 22:12 | **trial** | **week** | | **205** |
| 22:13 27:5 | 3:24 | 12:14 16:18 | **$** | 2:8 |
| **supervisors** | **true** | 17:12 18:13 | **$115** | **24th** |
| 10:20,21,22 | 29:12 | 20:9 | 21:1 | 20:21 |
| 21:1,18 23:16 | **truth** | **went** | **$40,000** | **290** |
| 23:21 27:1 | 5:3,4,4 | 10:2 | 13:14,18 | 1:16 29:21 |
| **suspected** | **twelve** | **weren't** | **$48,000** | |
| 19:13,14 | 13:21 | 22:18 | 12:22 13:20 | **3** |
| **suspended** | **twenty-five** | **we're** | **$60,000** | **30** |
| 16:18,21 17:6 | 26:5 | 21:13 | 13:6 | 1:17 29:10 |
| 17:11 20:20 | **twenty-one** | **we've** | | **334** |
| **sworn** | 24:12 | 16:25 20:7,10 | **0** | 2:14 |
| 5:2 | **Twenty-six** | **Williams** | **04** | **35223** |
| | 26:5 | 1:19,20 2:12,12 | 6:23 8:23,23 | 2:7 |
| **T** | **Twice** | **wins** | 9:12 11:12 | **36072** |
| **take** | 5:17 | 26:14 | 13:12 23:7 | 2:13 |
| 8:16 11:8 13:18 | | **witness** | **05** | |
| 13:19 18:24 | **U** | 4:4,6 5:2 14:17 | 23:3,6 | **4** |
| 20:6 | **ultimately** | **won** | | **48** |
| **taken** | 17:11 | 6:14 | **1** | 13:20 |
| 1:15 3:7,9 | **unbecoming** | **words** | **1** | |
| **talk** | 17:7 | 19:3 | 20:14 | **6** |
| 14:12 23:22 | **understand** | **work** | **12:21** | **6/9/08** |
| **tell** | 11:17 18:4 19:1 | 7:21 10:10 | 1:18 | 29:25 |
| 5:22 12:10 | **understood** | 12:13 15:23 | **12:42** | **687-5834** |
| 22:11 | 19:7 | 19:25 22:13 | 28:3 | 2:14 |
| **telling** | **UNITED** | 26:19 | **125** | |
| 15:25 | 1:1 | **worked** | 1:20 2:13 | **7** |
| **testified** | **usual** | 6:22 7:20 13:11 | **150** | **7** |
| 5:5 | 5:7 | 14:23 18:13 | 2:7 | 17:17 |
| **testimony** | | 21:1,4 22:17 | **16** | |
| 20:24 | **V** | 23:17 24:5 | 17:21 | **8** |
| **thereof** | **violation** | 27:1,4 | **17th** | **8** |
| 29:17 | 18:22 | **worker** | 16:21 17:6 | 2:7 |

| | |
|---|---|
| | **9** |
| | **9th** |
| | 20:22,25 21:19 |
| | 23:18 |
| | **981-3906** |
| | 2:8 |

# Condensed Transcript

# Deposition of
# Reb Bludsworth

### taken on
### 5/30/2008

### Ron Blocker
### v.
### Equity Group

### Case No. 2:07cv722MHT - WC



BAKER&BAKER

**Certified Court Reporters,
Certified Legal Video Specialists,
and Trial Presentation Consultants
(334) 262-3332  888-253-3377
www.baker-baker.com**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


RON BLOCKER,

     Plaintiff,

vs.            CASE NO. 2:07cv722MHT-WC

EQUITY GROUP, EUFAULA DIVISION,

L.L.C.,

     Defendants.


    *    *    *    *    *    *    *    *


    The deposition of REB BLUDSWORTH was

taken before Cornelia J. Baker, Certified

Court Reporter, ACCR 290, as Commissioner,

on Friday, May 30, 2008, commencing at

approximately 11:01 a.m., in the law offices

of Williams, Potthoff, Williams & Smith,

L.L.C., 125 South Orange Avenue, Eufaula,

Alabama, pursuant to the stipulations set

forth herein.

2

1    *    *    *    *    *    *    *

2                    APPEARANCES

3

4    Representing the Plaintiff:

5

6              MR. JERRY ROBERSON
               Attorney at Law
               Roberson & Roberson
7              8 Office Park Circle, Suite 150
               Birmingham, Alabama   35223
8              (205) 981-3906
               jdratty@charter.net

9

10   Representing the Defendants:

11             MR. JOEL P. SMITH, JR.
               Attorney at Law
12             Williams, Potthoff, Williams
                   & Smith, L.L.C.
13             125 South Orange Avenue
               Eufaula, Alabama   36072
14             (334) 687-5834

15

16

17   Also Present:

18             MS. KATHY GILMORE

19

20

21

22

23

24

25

Reb Bludsworth
May 30, 2008

3

```
1     * * * * * * * *
2            STIPULATIONS
3
4        It is hereby stipulated and
5  agreed by and between counsel representing
6  the parties that the deposition of REB
7  BLUDSWORTH is taken pursuant to the Rules of
8  Civil Procedure, and that said deposition
9  may be taken before Cornelia J. Baker,
10  Certified Court Reporter, as Commissioner,
11  without the formality of a commission; that
12  objections to questions, other than
13  objections as to the form of the questions,
14  need not be made at this time, but may be
15  reserved for a ruling at such time as the
16  deposition may be offered into evidence, or
17  used for any other purpose by either party
18  hereto, provided by the Statute.
19        It is further stipulated and agreed by
20  and between counsel representing the parties
21  in this case, that the filing of the
22  deposition of REB BLUDSWORTH is hereby
23  waived, and that said deposition may be
24  introduced at the trial of this case or used
25  in any other manner by either party hereto
```

5

```
1     * * * * * * * *
2             I N D E X
3
4   EXAMINATION                    PAGE
5   BY MR. ROBERSON:                  6
6
7   EXHIBIT                        PAGE
8   Plaintiff's Exhibit No. 7 .......... 62
         Keystone Foods Employee Handbook
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1  provided for by the Statute, regardless of
2  the waiving of the filing of same.
3        It is further stipulated and agreed by
4  and between counsel and the witness that the
5  reading and signing of the deposition by the
6  witness is hereby waived.
7
8     * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

```
1              REB BLUDSWORTH,
2       The Witness, having first been sworn
3           or affirmed to speak the truth,
4    the whole truth, and nothing but the truth,
5             testified as follows:
6          (Whereupon all parties agreed to
7             usual stipulations.)
8              EXAMINATION
9  BY MR. ROBERSON:
10       Q.  Mr. Bludsworth, my name is
11  Jerry Roberson, and I represent Ron Blocker
12  in this case.  Have you ever given a
13  deposition before?
14       A.  Yes, I have.
15       Q.  How many times?
16       A.  Once.
17       Q.  Was that in the case involving
18  the chicken plant?
19       A.  CP, when it was . . .
20       Q.  Do you remember what that case
21  was about?
22       A.  It was an odor case.
23       Q.  Well, I can assure you that
24  chicken has an odor, doesn't it?
25       A.  Yes, sir.
```

3 (Pages 3 to 6)

Reb Bludsworth
May 30, 2008

7

```
 1        Q.  Did you assure them that
 2  chicken has an odor?
 3        A.  Yes, sir.
 4        Q.  Okay.  Do you know what
 5  happened to that case, how it was disposed
 6  of?
 7        A.  No, sir, I don't.
 8        Q.  Do you remember who took your
 9  deposition, what lawyer?  We don't normally
10  make very much of an impression.
11        MR. SMITH:  I was there.  I
12            don't remember who did it.
13        A.  I don't remember.
14        Q.  Okay.  What's your residence
15  address, sir?
16        A.  Cheenahatchee Drive in Eufaula.
17        Q.  And what is your age?
18        A.  Forty-seven.
19        Q.  Forty-seven?
20        A.  Forty-seven.
21        Q.  I'm two years older than you.
22            What's the extent of your
23  education?
24        A.  GED.
25        Q.  Where did you grow up,
```

8

```
 1  Mr. Bludsworth?
 2        A.  California, Alabama, Wyoming.
 3        Q.  Well traveled?
 4        A.  Somewhat, yes.
 5        Q.  How long have you been working
 6  at the chicken plant?
 7        A.  This particular facility, nine
 8  years.
 9        Q.  So you worked at it when it was
10  CP?
11        A.  Yes, sir.
12        Q.  Is that who owned it when you
13  went to work there?
14        A.  Yes, sir.
15        Q.  And then you stayed when it was
16  acquired by Equity Group?
17        A.  Yes, sir.
18        Q.  When you began your employment
19  nine years ago, would that be around 1999 or
20  '98?
21        A.  I believe it was '99, yes, sir.
22        Q.  When you began your employment,
23  in what capacity were you first hired?
24        A.  Maintenance supervisor.
25        Q.  Now, where had you worked
```

9

```
 1  before that, sir.
 2        A.  With Wayne Farms.
 3        Q.  Is that a chicken plant?
 4        A.  Yes, sir.
 5        Q.  Okay.  And where were they
 6  located?
 7        A.  In Jack, Alabama.
 8        Q.  Jack?
 9        A.  Yes, sir.
10        Q.  I'm not familiar.  Where is
11  that located?
12        A.  Outside of Enterprise.
13        Q.  During what period of time did
14  you work for Wayne Farms?
15        A.  Eleven years.
16        Q.  So from '88 to '99,
17  approximately?
18        A.  Yes, sir.
19        Q.  And in what capacity did you
20  work for Wayne Farms; what was your job
21  there?
22        A.  When I left, I was maintenance
23  manager.
24        Q.  What did you begin as?
25        A.  Maintenance technician.
```

10

```
 1        Q.  When you worked for Wayne Farms
 2  as maintenance manager, who did you report
 3  to?
 4        A.  Greg Mills.
 5        Q.  Same guy you're reporting to
 6  now?
 7        A.  Yes, sir.
 8        Q.  Okay.  So he worked at Wayne
 9  Farms also?
10        A.  Yes, sir.
11        Q.  Did y'all leave together?
12        A.  No, sir.  He left before I did.
13        Q.  Okay.  When did he leave Wayne
14  Farms?  Do you know, approximately?
15        A.  About two weeks before I did.
16        Q.  Oh, okay.  Why did you leave?
17        A.  The gentleman that came to
18  Equity -- or to CP as the new general
19  manager, he had been the general manager with
20  Wayne.
21        Q.  Okay.  So he recruited you?
22        A.  Yes, sir.
23        Q.  And he recruited Greg?
24        A.  Yes, sir.
25        Q.  Who was that?
```

Reb Bludsworth
May 30, 2008

11

1       A. Al Rhodes.
2       Q. And I understand Mr. Rhodes was
3   replaced at some point as the general
4   manager?
5       A. Yes, sir.
6       Q. By Mr. Jernigan?
7       A. Spence Jernigan, yes, sir.
8       Q. Okay. But Al Rhodes recruited
9   you when he became general manager here?
10      A. Yes, sir.
11      Q. Okay. Now, do you know what
12  Mr. Rhodes is doing now?
13      A. He's working part-time for a
14  chemical company in Columbus.
15      Q. Do you know the name of it?
16      A. Chem Station.
17      Q. Is that K-I-M or C-H-E-M?
18      A. C-H-E-M, uh-huh.
19      Q. Do you know what he does there?
20      A. He's a salesman.
21      Q. How old, approximately, is
22  Mr. Rhodes?
23          MR. ROBERSON: No help from the
24              studio audience now.
25      A. Probably seventy.

12

1       Q. So he should be working
2   part-time, is what you're saying?
3       A. Yes.
4       Q. Now, when you came to work here
5   in Eufaula at CP originally --
6       A. Uh-huh (affirmative response).
7       Q. -- were they running three
8   shifts?
9       A. Yes, sir.
10      Q. Who was the third-shift
11  supervisor when you came? Do you recall?
12      A. No.
13      Q. I'm talking about the position
14  of maintenance foreman; did y'all have a
15  maintenance foreman on the third shift?
16      A. I'm sure they did. That was
17  the cook facility.
18      Q. Okay. Here's what I'm trying
19  to get to: Mr. Blocker was fired from a
20  third-shift maintenance supervisor position;
21  do you agree with that?
22      A. Uh-huh (affirmative response).
23      Q. You have to answer yes or no.
24      A. Yes, sir. I'm sorry.
25      Q. That's all right. I'll try to

13

1   remind you, but today you've got to make a
2   record, so you can't nod your head and you
3   can't say uh-huh.
4       A. Won't be a problem.
5       Q. Okay. That's one of those
6   rules, deposition rules.
7       A. Yes, sir. I understand.
8       Q. So I'm interested in other
9   people who have held that position of a
10  third-shift maintenance supervisor, okay,
11  other than Ron Blocker?
12      A. At the cook plant?
13      Q. Is that the position he was
14  working?
15      A. Yes, sir.
16      Q. Okay. Was there a third-shift
17  maintenance supervisor at the cook plant
18  before Mr. Blocker?
19      A. When I went there?
20      Q. Yeah. Y'all weren't operating
21  the cook plant, were you?
22      A. Yes.
23      Q. Okay.
24      A. Yes. But I do not remember who
25  was looking after third shift at that time,

14

1   because I wasn't really affiliated with the
2   cook plant in the beginning.
3       Q. Okay. Well, Mr. Blocker was
4   promoted to maintenance foreman in November
5   of 2004; do you agree with that?
6       A. To what position?
7       Q. Maintenance supervisor or a
8   salaried position?
9       A. A salaried position?
10      Q. Yeah.
11      A. That sounds right.
12      Q. Okay. He worked from
13  November 1st, 2004, until he was fired on
14  May 17th, 2005, as a salaried supervisor in
15  the maintenance department?
16      A. Yes, sir. That sounds correct.
17      Q. On the third shift?
18      A. Yes, sir.
19      Q. I'm asking you, since you work
20  in the maintenance department, who held that
21  position that he held before him? Do you
22  know?
23      A. I honestly cannot remember who
24  that was.
25      Q. Was there somebody in that

Reb Bludsworth
May 30, 2008

15

1  position?
2      A.  I do not remember.  I don't
3  believe there was a salaried person in that
4  position.
5      Q.  Well, was there somebody in
6  that position maybe on hourly?
7      A.  Could have been, but I don't
8  remember who it would have been.
9      Q.  Well, who replaced Ron Blocker?
10     A.  Robert Giles.
11     Q.  Is that Buck Giles?
12     A.  Yes, sir.
13     Q.  All right.  Is he still the
14 maintenance supervisor?
15     A.  Yes, sir.
16     Q.  On the third shift?
17     A.  No, sir.  He's on second shift.
18     Q.  All right.  Who's the
19 third-shift supervisor?
20     A.  James Key.
21     Q.  And when did that change take
22 place, approximately?
23     A.  Maybe a year ago.  I can't
24 remember the exact date.
25     Q.  All right.  That's fine.  Has

16

1  there been any other supervisor on the third
2  shift since Mr. Blocker other than Mr. Giles
3  and Mr. Key?
4      A.  Charlie Mobley [phonetic]
5  filled in on that shift, I believe, for a
6  little while.
7      Q.  Now, is Mr. Giles, was he a
8  salaried supervisor when he worked the third
9  shift?
10     A.  Yes, sir.
11     Q.  Mr. Key a salaried supervisor?
12     A.  Yes, sir.
13     Q.  And when Mr. Mobley filled in,
14 was he salaried or was he still hourly?
15     A.  He was salaried.
16     Q.  Okay.  Now, when Ron Blocker --
17 first of all, who made the decision to
18 promote Ron Blocker to this salaried
19 position?
20     A.  I would think it would have
21 been Greg and myself.
22     Q.  Okay.  Why did you select Ron
23 Blocker?
24     A.  He was the best candidate for
25 the job.

17

1      Q.  What made him the best
2  candidate?
3      A.  He had been filling in or
4  acting in that capacity as an hourly
5  employee.
6      Q.  Do you know who he filled in
7  for as the supervisor?
8      A.  I don't remember.  There
9  wasn't -- I don't think there was a salaried
10 supervisor in that slot prior to making Ron
11 salaried in that position.
12     Q.  Okay.  When Ron took over the
13 position, had y'all recently restarted the
14 cook plant; that is, was this a startup?
15     A.  Yes, sir, it was a startup.  I
16 believe that is correct.
17     Q.  And do you know how long y'all
18 hadn't been operating the cook plant?
19     A.  No.  I can't remember that
20 right off.
21     Q.  For those of us who aren't in
22 the chicken business, what is the cook plant?
23 Tell me what they do.
24     A.  That's where they take the raw
25 product, bread it, batter it, par fry it,

18

1  freeze it, and bag it.
2      Q.  So you're actually preparing
3  the chicken; from just being raw meat, you're
4  actually cooking it and preparing it,
5  correct?
6      A.  Yes, sir.
7      Q.  Okay.  And you have some
8  assembly lines, for lack of a better term,
9  that the chicken proceeds down; is that the
10 way it works?
11     A.  Yes, sir.
12     Q.  Okay.  And the maintenance
13 supervisor on the third shift, what would be
14 his responsibility with respect to that cook
15 plant?
16     A.  To finish up production for the
17 second shift and to ensure that everything
18 was ready to run and start it up on the day
19 shift.
20     Q.  Okay.  That's what I want to
21 get to.  You have two shifts that actually
22 cook the chicken, correct?
23     A.  Yes, sir.
24     Q.  And then the third shift does
25 the maintenance to prepare for the next day

6  (Pages 15 to 18)

Reb Bludsworth
May 30, 2008

19

1  of cooking; is that a fair statement?
2      A. Yes, sir.
3      Q. Okay. And so give me some
4  examples of what they would do in terms of
5  maintenance work on the third shift.
6      A. They would tear down the FORMAX
7  machines, disassemble those.
8      Q. I'm sorry, the what kind of
9  machines?
10     A. FORMAX.
11     Q. What does that do?
12     A. It's a forming machine.
13     Q. Okay.
14     A. Take those apart, dismantle
15  those for cleaning. Pipes, pumps. There's
16  just a number of things they take apart and
17  get ready to clean. Repair any damaged belts
18  or anything. Sanitation and damages.
19     Q. When you're cooking chicken, is
20  it important that the work area be cleaned?
21  Sanitation is important, correct?
22     A. Sanitation is important, yes.
23     Q. Okay. Would that be part of
24  what they would do or see that it was done,
25  the maintenance crew?

20

1      A. I don't understand.
2      Q. Well, did they have some
3  responsibility for keeping the work area
4  clean and sanitized, or you've got another
5  crew that does that?
6      A. Another crew does that.
7      Q. Who does that?
8      A. Sanitation.
9      Q. Oh, okay. And do they have a
10 supervisor that also works on the third
11 shift?
12     A. Yes.
13     Q. Do you recall who that was from
14 November of '04 to May of '05?
15     A. That would have been Fred
16 Thomas.
17     Q. So would he have also worked in
18 the same plant or general area as
19 Mr. Blocker?
20     A. Fred worked both plants.
21     Q. Is he still with you?
22     A. Yes.
23     Q. Well, is it important that
24 maintenance and sanitation coordinate their
25 work?

21

1      A. Yes.
2      Q. I mean, you can't clean while
3  he's doing maintenance work, correct?
4      A. Correct.
5      Q. So they have to work together?
6      A. That is correct.
7      Q. Did you ever receive any
8  complaints while Ron was the supervisor out
9  there from Fred Thomas about Ron Blocker?
10     A. I don't recall any.
11     Q. Okay. Other than sanitation,
12 were there other people that worked -- you
13 don't have crews cooking chicken on the third
14 shift, correct?
15     A. That's correct.
16     Q. Other than sanitation and
17 maintenance, do you have anybody else that's
18 out there in the facility?
19     A. Shipping and QA.
20     Q. Okay. Q and A is Quality and
21 Assurance?
22     A. Quality Assurance, yes.
23     Q. Okay. And do they make a daily
24 inspection of the machines in the process?
25     A. Yes.

22

1      Q. They test for bacteria and
2  things like that?
3      A. Yes.
4      Q. Okay. So they, too, have to
5  coordinate their work with maintenance,
6  correct?
7      A. Yes.
8      Q. And who was over QA; is that
9  Ms. Merritt, Glenda Merritt [phonetic]?
10     A. She was QA supervisor, yes.
11     Q. Okay. You're the
12 maintenance -- what did you say your position
13 was?
14     A. I didn't.
15     Q. Okay.
16     A. Complex Maintenance Manager.
17     Q. Okay. And I assume that you
18 have an open-door policy; that is, if anybody
19 that's under your supervision has a problem,
20 they can come to you, correct?
21     A. Yes, sir.
22     Q. Are you over QA?
23     A. No, sir.
24     Q. Who is?
25     A. The QA -- Complex QA Manager.

7  (Pages 19 to 22)

Reb Bludsworth
May 30, 2008

23

1  Q. Okay.
2  A. Which is Butch White.
3  Q. Was he there in 2004, 2005?
4  A. Yes.
5  Q. Did he ever come to you with
6  any concern about Ron Blocker?
7  A. Not that I recall.
8  Q. Did Glenda Merritt ever come to
9  you with any concern about Ron Blocker?
10  A. Not that I recall.
11  Q. Did anybody ever come to you --
12  before Ms. Gilmore came in May, did anybody
13  ever come to you with some concern about Ron
14  Blocker?
15  A. I can't recall.
16  Q. Okay. What period of time does
17  the third shift report to work?
18  A. If I'm correct, they come in
19  around 9, 9:30.
20  Q. And when do they work until?
21  A. Until they get through.
22  Q. Okay. Do they have a schedule?
23  A. No, sir.
24  Q. Okay. So when you say "until
25  they get through," can you give me some

24

1  range? I don't know when they would normally
2  get through, so . . .
3  A. It depends on what's going on
4  at the time.
5  Q. Okay. Well, can you give me
6  some range? What's the earliest they could
7  get off?
8  A. Usually, eight, eight-and-
9  a-half hours.
10  Q. And what's the latest they
11  could stay?
12  A. It depends on the nature of the
13  problem.
14  Q. Now, do you recall when Ron
15  Blocker went to work in your maintenance
16  department, what year?
17  A. No, I don't.
18  Q. He was there a number of years
19  before he got promoted to supervisor; would
20  you agree with that?
21  A. Yes, sir. He was there a
22  while.
23  Q. Did you have any complaints
24  about his work performance during that period
25  of time?

25

1  A. No, sir.
2  Q. Okay. And then a decision was
3  made to offer him this position as a
4  maintenance supervisor. Did you have any
5  discussions with him about the job before he
6  took it?
7  A. I'm sure I did.
8  Q. Now, when did Equity Group
9  acquire the facility?
10  A. Approximately, March.
11  Q. 2004?
12  A. Yes, sir.
13  Q. Okay. So Equity Group took
14  over. And before they took over, was CP
15  operating the cook plant?
16  A. No, sir.
17  Q. Okay. So that was a change
18  that they made, Equity Group started the cook
19  plant back, correct?
20  A. That is correct.
21  Q. All right. Now, Mr. Blocker
22  claims that he was told by you and by Greg
23  Mills that Equity Group was not going to
24  allow overtime to be worked; that is, they
25  were implementing a no overtime policy. Do

26

1  you recall any conversation you had with him
2  like that?
3  A. No, sir.
4  Q. So he just made that up?
5  A. I don't know about that.
6  Q. Okay. Well, you never were
7  made aware from any source about a no
8  overtime policy at the Equity Group?
9  A. No, sir.
10  Q. Were you under any pressure to
11  eliminate or reduce overtime?
12  A. No, sir.
13  Q. Okay. Now, do you know what
14  shift Ron was working before he took the --
15  was he working the third shift before he took
16  the supervisor position?
17  A. I can't remember that.
18  Q. Well, can you remember anything
19  you told Ron about the supervisor's job, why
20  he should take it?
21  A. Well, I'm sure we discussed
22  benefits.
23  Q. Okay. What would be better
24  about being the supervisor?
25  A. Equity paid for insurance.

Reb Bludsworth
May 30, 2008

27

1    Q.  For your family?
2    A.  Yes, sir.
3    Q.  Anything else?
4    A.  You have a disability, long
5  term and short term.
6    Q.  That's available only to
7  management or can hourly people actually get
8  disability insurance from Equity Group?
9    A.  I'm not sure on that.
10    Q.  Anything else?
11    A.  I can't remember.
12    Q.  In fact, it's a group policy,
13  isn't it, disability?
14    A.  I'm not sure.
15    Q.  So Equity Group, if you're in
16  management, pays for your disability
17  insurance, but it's available to be purchased
18  by hourly workers, correct?  They'd have to
19  pay for it themselves, but . . .
20    A.  I don't know.
21    Q.  Okay.  Do you know any reason
22  why they wouldn't be offering it, an
23  insurance company?
24    A.  I don't know.
25    Q.  What about this profit sharing;

28

1  did they have profit sharing for management?
2    A.  Yes.  They have a bonus
3  program.
4    Q.  Okay.  What do you have to do
5  to get a bonus?
6    A.  You have to meet the criteria
7  for -- usually, for areas in your department.
8    Q.  All right.  You've been working
9  there since '99?
10    A.  Yes, sir.
11    Q.  Have you gotten bonuses?
12    A.  Yes, sir.
13    Q.  Is it based on production or
14  based on how much the plant produces, sales
15  or anything like that?
16    A.  It can be online time,
17  downtime.
18    Q.  Oh, okay.  For maintenance?
19    A.  Yes.
20    Q.  So if you reduce or keep your
21  downtime to certain percentages, you get a
22  bonus?
23    A.  Yes, sir.
24    Q.  Okay.  Depends on your
25  particular area?

29

1    A.  That is correct.
2    Q.  If you're in sales, it might be
3  production, but if you're in maintenance, it
4  might be downtime?
5    A.  Yes, sir.
6    Q.  Okay.  And you've gotten
7  bonuses?
8    A.  Yes, sir.
9    Q.  Okay.  Anything else, any other
10  benefits to being in management that you're
11  aware of?
12    A.  I'm sure there are.
13    Q.  Okay.  But as a manager, you
14  get paid a salary, correct?
15    A.  Yes, sir.
16    Q.  You don't get overtime?
17    A.  No, sir.
18    Q.  So did you discuss that at all
19  with Ron Blocker before he took the job as a
20  salaried employee?
21    A.  When we talked salary, I'm
22  sure.
23    Q.  Did you tell him how many hours
24  he would be expected to work each week?
25    A.  No, sir.

30

1    Q.  Would you know?
2    A.  Would I know --
3    Q.  How many hours he'd be expected
4  to work as a third-shift supervisor?
5    A.  No.
6    Q.  So would it be fair to say that
7  if you told him how many hours he'd be
8  working, you'd be telling him something you
9  couldn't possibly know; would that be fair?
10    A.  Yes.
11    Q.  And that in certain
12  circumstances -- well, from November of '04
13  to May of '05, did y'all have a second-shift
14  supervisor that quit or got fired or
15  something -- or was off work?
16    A.  I don't remember.
17       MR. ROBERSON:  The first shift,
18          what was his name?
19    MR. SMITH:  James Brag.
20    MR. ROBERSON:  Hurt his leg or
21          something?
22       MR. SMITH:  Yeah, he was out.
23  BY MR. ROBERSON:
24    Q.  Do you remember when James Brag
25  was out for a period of time, first-shift

9  (Pages 27 to 30)

65574c28-fd0e-4514-9176-891472a8f0d2

31

1  supervisor?
2      A. I don't remember.
3      Q. Well, was James Brag a
4  first-shift supervisor for a period of time?
5      A. He was a plant superintendent.
6      Q. Well, if Mr. Blocker claims
7  that he worked eighty hours or more during
8  the period of time from November of '04 to
9  May of '05, do you dispute that?
10      A. I wouldn't know how many hours
11  he worked.
12      Q. So is that a no, you don't
13  dispute it?
14      A. I wouldn't have any way of
15  knowing.
16      Q. Okay. Well, you worked there,
17  didn't you?
18      A. Yes.
19      Q. What time do you come to work?
20      A. I don't have a set time.
21      Q. Well, what time do you normally
22  arrive at work?
23      A. It varies. It depends on what
24  I've got to do that day.
25      Q. Well, were there occasions when

32

1  you saw Mr. Blocker there during that period
2  of time while you were at work?
3      A. I'm sure I saw him a lot of
4  mornings.
5      Q. Did you see him a lot of
6  afternoons after lunchtime?
7      A. It's possible.
8      Q. Did he ever work sixteen or
9  more hours in a day?
10      A. He could have.
11      Q. Did the third-shift maintenance
12  supervisor work on Saturdays?
13      A. I believe they did some, yes, I
14  do.
15      Q. Did you? Did you work on
16  Saturdays?
17      A. Yes, sir.
18      Q. Your line employees, do they
19  work on Saturdays?
20      A. Yes, sir.
21      Q. Okay. The hourly people get
22  paid overtime?
23      A. Hourly maintenance. You're
24  talking about hourly maintenance?
25      Q. I'm actually talking about the

33

1  crews and the maintenance, yeah. Do they
2  cook chicken on Saturday?
3      A. Sometimes, yes.
4      Q. Depending on your orders and --
5      A. That is correct.
6      Q. Okay. If they work on
7  Saturday, your hourly people, they get paid
8  overtime, correct?
9      A. Yes.
10      Q. Now, Ms. Gilmore had shown me a
11  document which we marked as Exhibit 1 to her
12  deposition, Saturday Pay Policy, and it says
13  the effective date is May 9th, 2005; are you
14  familiar with that document?
15      A. Yes, sir.
16      Q. Now, who implemented that
17  policy at the Eufaula location?
18      A. I don't know.
19      Q. Did you have anything to do
20  with it?
21      A. Did I? No, sir.
22      Q. Okay. To your knowledge, did
23  Greg Mills?
24      A. Not to my knowledge.
25      Q. Okay. You don't know who

34

1  implemented the policy?
2      A. No, sir.
3      Q. How were you made aware of it?
4      A. In a staff meeting.
5      Q. When?
6      A. Oh, I don't recall that, when.
7      Q. Do you know who was present?
8      A. No, I don't.
9      Q. How often do y'all have them?
10      A. Have . . .
11      Q. Staff meetings.
12      A. Every week.
13      Q. So it could have been any week;
14  you don't recall what day?
15      A. No, I don't recall.
16      Q. Well, this document says it's
17  effective date is May 9th, 2005. Do you see
18  that?
19      A. Yes, sir.
20      Q. Do you recall this staff
21  meeting to have occurred around that time?
22      A. I don't recall when it was.
23      Q. Did you know Ron Blocker was
24  fired on May 17th? Did you know that?
25      A. I don't recall when.

Reb Bludsworth
May 30, 2008

35

1    Q.  Okay.  Did you have any role in
2  his firing?
3    A.  No, sir.
4    Q.  Did Kathy Gilmore come to you
5  with her recommendation?
6    A.  Yes, sir.
7    Q.  Did you approve of it?
8    A.  Yes, sir.
9    Q.  Okay.  And are y'all paying
10  supervisors who work Saturdays $115; are
11  y'all paying them now?
12    A.  Maintenance supervisors?
13    Q.  Yes.
14    A.  For working Saturdays?
15    Q.  Yes, sir.
16    A.  No, sir.
17    Q.  This says that's your policy,
18  the maintenance supervisor --
19    A.  Maintenance supervisor is
20  seventh day, not sixth day.
21    Q.  Saturday Pay Policy, Exhibit 1,
22  Affected personnel from this policy are
23  listed below:  Maintenance supervisor.  It
24  doesn't say anything about seventh day.  Do
25  you see that?

37

1    A.  No.  I don't recall that
2  either.
3    Q.  But you know Equity Group would
4  have records like that, wouldn't they?
5    A.  Yes, sir.
6    Q.  Who would I ask to get those?
7    A.  Kathy, I'm sure.
8    Q.  I see.  She'd have access to
9  that information, shouldn't she?
10    A.  Yes.
11    Q.  Who's over your payroll
12  department?
13    A.  I'm not sure who would handle
14  the salary payroll.
15    Q.  Well, somebody has to, don't
16  they?
17    A.  Yes, sir.
18    Q.  Would Jim Bice know that?
19    MR. SMITH:  Know who to ask or
20      who he paid what?
21    A.  Yeah.
22    Q.  Have you ever --
23    MR. SMITH:  What were you
24      answering yes to?
25    THE WITNESS:  I just told him

36

1    A.  Yes, sir.
2    Q.  Y'all don't pay your
3  maintenance supervisors $115 to work
4  Saturdays?
5    A.  If they work seven days, yes,
6  sir.
7    Q.  Well, if they work on Saturday,
8  do they get extra pay?
9    A.  Yes, sir.
10    Q.  $115?
11    A.  I don't have any idea what it
12  is.
13    Q.  All right.  What if they work
14  Sunday, do they get extra pay?
15    A.  If it -- maintenance gets paid
16  for the seventh day.
17    Q.  Well, can you name one person
18  that was in maintenance as a supervisor that
19  was paid for a Saturday before Ron Blocker
20  was fired?
21    A.  Oh, I don't recall.  I don't
22  recall that.
23    Q.  Do you know when the first time
24  was that you paid a maintenance supervisor
25  for working on a Saturday?

38

1    Jim knew.
2    MR. SMITH:  That he would know
3      who to ask?
4    THE WITNESS:  Yeah.
5    MR. SMITH:  Okay.
6    Q.  Have you ever been paid for
7  working on a Saturday?
8    A.  No, sir.
9    Q.  You never have signed this
10  sheet or --
11    A.  No, sir.
12    Q.  Okay.  Do you know that
13  supervisors have been paid for working on
14  Saturday?  Do you know personally?
15    A.  I have not seen their checks,
16  no.
17    Q.  Has anybody ever told you they
18  were paid --
19    A.  No, sir.
20    Q.  -- or didn't get paid?
21    A.  No, sir.
22    Q.  All right.  Now, there's been
23  some allegations that Mr. Blocker engaged in
24  inappropriate conduct on his third shift.
25  Did you ever make any investigation into any

Reb Bludsworth
May 30, 2008

39

1  of those allegations?
2       A.  No, sir.
3       Q.  Did you talk to anybody on the
4  third shift?
5       A.  No, sir.
6       Q.  Do you have any personal
7  knowledge of any inappropriate conduct by
8  Mr. Blocker?
9       A.  Personal, no, sir.
10      Q.  That you saw, you observed him
11 do something that you felt was improper?
12      A.  No, sir.
13      Q.  Have you ever had any
14 discussion with him about any inappropriate
15 conduct?
16      A.  Not that I recall.
17      Q.  You've got a personal vehicle?
18      A.  Yes, sir.
19      Q.  What do you drive?
20      A.  A 1996 model GMC pickup.
21      Q.  Is that what you drove in 2004
22 and 2005, same truck?
23      A.  No, sir.
24      Q.  What were you driving back
25 then, if you recall?

40

1       A.  My personal vehicle then was a
2  1996 F-150.
3       Q.  Did Ron Blocker ever work on
4  your truck?
5       A.  Not that I recall.
6       Q.  Any maintenance employees ever
7  work on your truck?
8       A.  Not that I recall.
9       Q.  Did you ever ask Ron Blocker to
10 do anything that was illegal?
11      A.  No, sir.
12      Q.  Against the law?
13      A.  No, sir.
14      Q.  Tell me how they -- do they use
15 water to clean their machinery there at the
16 chicken plant?
17      A.  Yes, sir.
18      Q.  And where does that water go?
19 Does it go through some kind of filtration
20 system?
21      A.  Goes through the wastewater
22 system, the . . .
23      Q.  Y'all have got some ponds built
24 that this water goes through to kind of get
25 cleaned up?

41

1       A.  Yes.  We have constructed
2  wetlands.
3       Q.  I'm sorry?  Constructed
4  wetlands?
5       A.  Yes, sir.
6       Q.  And are there some plants in
7  there?
8       A.  Yes, sir.
9       Q.  What are they called?
10      A.  We have cattails.
11      Q.  Okay.  Anything else?
12      A.  We have giant reeds.
13      Q.  Okay.  Anything else?
14      A.  And we have -- we have another
15 plant.  I can't recall the name of it.
16      Q.  High lines or something like
17 that?
18      A.  Hyacinths.
19      Q.  Hyacinths?
20      A.  We have had Hyacinths in there,
21 yes.
22      Q.  Okay.  And are there some
23 limitations about those plants, where they
24 can be located?
25      A.  Not that I'm aware of.

42

1       Q.  Did Mr. Blocker bring some of
2  those plants into your facility?
3       A.  Yeah.  We put some in the ponds
4  at one time.
5       Q.  Where did they come from?
6       A.  They were harvested out of a
7  pond in Montgomery.
8       Q.  Do you have to have a permit or
9  something in order to transport those plants?
10      A.  Not that I'm aware of.
11      Q.  Have you looked into that?
12      A.  No, sir.
13      Q.  Well, under who's instruction
14 were those plants transported?
15      A.  The environmental manager.
16      Q.  Who's that?
17      A.  He was Ron Blocker -- Ron
18 Howell.
19      Q.  Is he still with y'all?
20      A.  No, sir.
21      Q.  Where is he?
22      A.  I don't know.  I haven't seen
23 him in a long time.
24      Q.  Why isn't he with y'all; did he
25 quit or was he fired?

Reb Bludsworth
May 30, 2008

43

1      A. He was fired.
2      Q. Okay. Do y'all have some scrap
3  metal out there?
4      A. Yes, sir.
5      Q. What do y'all do with it?
6      A. We have a guy that picks it up.
7      Q. Who's that?
8      A. A gentleman by the name of --
9  Cole Surplus is who's getting it now.
10      Q. Cole Surplus is the name of his
11  business?
12      A. Yes, sir, uh-huh.
13      Q. Okay. Well, in 2004, 2005, who
14  was it?
15      A. Oh, I don't remember whether it
16  was him or who. I don't know.
17      Q. And do y'all get receipts for
18  that? When he picks up, do y'all get
19  receipts?
20      A. They send a check to the plant,
21  yes, sir.
22      Q. Do y'all use motors out there?
23      A. Use motors?
24      Q. Uh-huh (affirmative response),
25  in the chicken business?

44

1      A. Yes.
2      Q. Have you ever purchased any
3  motors?
4      A. Have I ever purchased any?
5      Q. Yes.
6      A. Yes, sir.
7      Q. Who's your vendor for motors?
8      A. We have multiple vendors.
9      Q. Give me their names, any of
10  them.
11      A. Grainger, Higgins.
12      Q. Do y'all get rebuilt motors?
13      A. Yes, sir.
14      Q. Who do you get those from?
15      A. We have a gentleman in
16  Enterprise that used to rebuild them. His
17  name is Frank Brown.
18      Q. Now, do you recall Mr. Blocker
19  coming to your office -- before this alleged
20  investigation and before his suspension, do
21  you recall him coming to your office to
22  complain about the hours he was working?
23      A. I don't recall.
24      Q. And do you recall that after he
25  visited with you, he went to see Greg Mills

45

1  about the same thing?
2      A. I don't recall that. I don't.
3      Q. Did you have any conversation
4  with Greg Mills about it?
5      A. Not that I recall, no.
6      Q. And after he went to see you
7  and Greg Mills, he went to see Kathy Gilmore;
8  do you recall that?
9      A. No, sir. I don't recall that.
10      Q. And after he went to see all
11  three of those people complaining about his
12  hours, then we had this investigation by
13  Ms. Gilmore, occasioned by a call she got
14  from Kenneth Pelham?
15      A. Yes, sir.
16      Q. Do you recall that?
17      A. I recall Kenneth Pelham, yes,
18  sir.
19      Q. Now, do you recall when Kenneth
20  Pelham worked there?
21      A. Yes, sir.
22      Q. Did he ever complain to you
23  during the time that he worked there about
24  Ron Blocker?
25      A. I don't recall if he did.

46

1      Q. Do you ever recall having a
2  conversation with Mr. Blocker about Kenneth
3  Pelham before he was fired?
4      A. I don't recall that. I don't.
5      Q. Do you recall instructing
6  Mr. Blocker to fire Kenneth Pelham?
7      A. I don't recall that.
8      Q. I know there's 1,600 employees,
9  and I know it's hard to keep up with all of
10  them --
11      A. Yes, sir.
12      Q. -- but would it be unusual for
13  a foreman to come in and talk to you about
14  somebody before they were fired; would that
15  be just kind of -- that wouldn't be unusual
16  for them to come in and talk about an
17  employee they were considering firing, would
18  it?
19      A. A supervisor?
20      Q. Yeah.
21      A. That could happen, yes, sir.
22      Q. Okay. That has happened from
23  time to time?
24      A. Yes, sir.
25      Q. Okay. But you just don't

Reb Bludsworth
May 30, 2008

47

1  recall if Mr. Blocker had any discussions
2  with you about that?
3        A.  No, sir, I don't.
4        Q.  All right.  Now, do you
5  remember what Mr. Blocker was making; that
6  is, what his salary was as a supervisor?
7        A.  It would have been $48,000 a
8  year.
9        Q.  Okay.  I'm going to show you
10  what I've marked as Exhibit 6.  These are
11  three W-2s for Ron Blocker.  And the reason
12  he got three W-2s is because he worked part
13  of that year for CP.  Then they were acquired
14  by the Equity Group, and then he worked
15  hourly for the Equity Group until November.
16  And then he worked in the salaried position
17  from November 1st to the end of the year,
18  okay?
19        A.  Okay.
20        Q.  That's why he's got three W-2s.
21  Look at those.
22        (Witness reviewed documents.)
23        Q.  Now, do you see where he
24  made -- and I can't recall the first one --
25  yeah, the first one is $8,355; is that

48

1  correct?  Do you see that figure up in the
2  right-hand corner?
3        A.  $8,355.51, wages, tips and
4  other comp.
5        Q.  All right.  Now, at $48,000 a
6  year, that would be about $4,000 a month,
7  wouldn't it?
8        A.  Oh, I don't know.  I'd have to
9  take your word on that.
10        Q.  Okay.
11        MR. SMITH:  He ain't the
12              accountant.
13        Q.  Twelve times four is
14  forty-eight.  So there's twelve months in the
15  year; do you agree with me about that?
16        A.  Yes, sir.  There's twelve
17  months in a year.
18        Q.  Okay.  And if you make $4,000 a
19  month, that would be $48,000, okay?
20        A.  Okay.
21        Q.  So if he worked two months --
22  the $8,000 would reflect the period of time
23  that he was a supervisor; do you agree with
24  that, think that's right?
25        A.  That could be right, yes, sir.

49

1        Q.  Okay.  Then the second W-2,
2  gross pay is $40,000 from the Equity Group.
3  Do you see that in the middle of the page?
4        (Witness reviewed document.)
5        MR. SMITH:  Talking about this
6              37,919?
7        MR. ROBERSON:  No.
8        MR. SMITH:  Same spot as last
9              time.  That's what he was
10              reading off of last time,
11              there in the middle.
12        MR. ROBERSON:  Oh, okay.
13        MR. SMITH:  You may want to go
14              back and do that.
15  BY MR. ROBERSON:
16        Q.  Gross pay, it's got up here at
17  the top, 40,004.
18        A.  Okay.
19        Q.  Do you see that?
20        A.  Yes, sir.
21        Q.  Okay.  And that would reflect
22  the period of time from the time Equity Group
23  took over until he was made supervisor in
24  November, okay.  Now, when did Equity Group
25  take over?  Do you remember what month that

50

1  was?
2        A.  I believe it was March.
3        Q.  Okay.  Then we've got the third
4  one, which is from CP.  And that figure is
5  13,800-and-something.  Do you see that?
6        A.  Yes, sir.
7        Q.  Okay.  So in seven months --
8  that is, we take two months as a salaried
9  employee, and we take three months as when
10  they were CP, and so he had seven months as
11  an hourly employee for Equity Group in 2004,
12  correct?
13        A.  (No immediate response.)
14        Q.  From March to November, seven
15  months, correct?  He made $40,000 working as
16  hourly in seven months.  That's almost --
17  that's $75,000 a year, right?
18        A.  I can't run those numbers in my
19  head quick enough.
20        Q.  All right.  Well, if you worked
21  so many hours that you made $40,000 in seven
22  months, why would you take a job as a
23  salaried supervisor making $48,000 in a whole
24  year?  Can you explain that to me?
25        MR. SMITH:  Object to the form.

Reb Bludsworth
May 30, 2008

51

1          You can answer if you . . .
2          Q. So you could get disability
3  insurance?
4          A. Different people have different
5  reasons.
6          Q. Well, you had to have discussed
7  it with Ron Blocker; what were his reasons
8  for taking the job?
9          MR. SMITH: Object to the form.
10         Q. You can answer.
11         A. I don't know what his reason
12  was.
13         Q. All right. He just wanted to
14  make less money?
15         MR. SMITH: Object to the form.
16         A. I don't know.
17         Q. Well, I'm going to show you
18  what's been marked as Exhibit 5. Did you sit
19  down with Ron Blocker on the 17th of May and
20  tell him he was suspended?
21         (Witness reviewed document.)
22         A. I was present when Kathy told
23  him he was suspended.
24         Q. Okay. Did you get him to sign
25  that document, and you signed it?

52

1          A. Yes, sir.
2          Q. Do you recall anything else you
3  told him that's not contained in that
4  document -- or that Kathy told him?
5          A. I don't quite understand the
6  question.
7          Q. Well, sir, I'll try to rephrase
8  it.
9          A. Okay.
10         Q. This document says, You're
11  being suspended for conduct unbecoming a
12  member of management, okay?
13         A. Okay.
14         Q. It's been reported that he has
15  engaged in physical and mental abuse. Did
16  you tell him or did Kathy tell him what those
17  allegations were, who was making them, what
18  they were saying?
19         A. I did not tell him.
20         Q. Did you hear Kathy tell him?
21         A. I don't remember that.
22         Q. Okay. And vandalism, did you
23  tell him anything about what allegation of
24  vandalism had been made?
25         A. I did not.

53

1          Q. Did Kathy?
2          A. I don't recall that.
3          Q. Okay. So other than what's on
4  this page, did you communicate anything to
5  Ron about why he was being suspended?
6          A. No, sir.
7          Q. Okay. And you didn't hear
8  Kathy explain any of this to Ron about why he
9  was being suspended other than what's on this
10  paper?
11         A. She could have, but I don't
12  remember.
13         Q. Okay. And he was instructed to
14  call the office in a week to find out what
15  the results of their investigation were,
16  right, according to this?
17         A. No. I would say -- well,
18  that's what's on there, yes.
19         Q. Yeah, okay. After that day,
20  May 17th, when he was suspended, did you
21  ever talk to Ron again?
22         A. I saw Ron again, yes.
23         Q. Okay. When was that?
24         A. Two or three months later.
25         Q. Okay. But a week later, you

54

1  didn't talk to him?
2          A. No.
3          Q. Okay. You didn't tell him he
4  was fired?
5          A. No, sir.
6          Q. And you didn't have any contact
7  with him until you saw him two or three
8  months later?
9          A. I didn't have any contact with
10  him then.
11         Q. Okay. Well, when you saw Ron
12  two or three months later, where was that?
13         A. He was inside the property
14  line, backed up there at the well house,
15  going into the well.
16         Q. Going into the well?
17         A. Uh-huh (affirmative response).
18         Q. Okay. What was he doing?
19         A. Oh, I don't know.
20         Q. Okay.
21         A. I guess he was waiting on
22  somebody.
23         Q. Okay. You're not suggesting he
24  was doing something he shouldn't have been?
25         A. No, sir. No, sir. No, sir.

Reb Bludsworth
May 30, 2008

55

1    Q. Well, I just --
2    A. No, sir.
3    Q. I don't get to talk to you
4  except with Mr. Smith --
5    A. Right.
6    Q. -- so I just want to make sure
7  that we're on the same page.
8    A. Yes, sir.
9        MR. SMITH: You haven't heard
10        about that part of the case
11        yet?
12        MR. ROBERSON: No, I haven't.
13        I haven't.
14  BY MR. ROBERSON:
15    Q. And Mr. Blocker hasn't
16  threatened you or done anything inappropriate
17  to you?
18    A. Me?
19    Q. Yeah.
20    A. No, sir.
21    Q. Okay. And he conducted himself
22  appropriately even when he was fired; do you
23  agree with that? In other words, he didn't
24  say he was going to blow up Equity Group or
25  come back there with a machine gun or

56

1  something?
2    A. I don't know about when he was
3  fired.
4    Q. Okay. Well, you're right. But
5  when he was suspended, he didn't --
6    A. I didn't suspend him.
7    Q. -- act inappropriately to you
8  in your presence?
9    A. He was getting a little antsy
10  and . . .
11    Q. Upset?
12    A. Yes, sir.
13    Q. But he didn't start cussing
14  you --
15    A. No, sir.
16    Q. -- or threatening you --
17    A. No, sir.
18    Q. -- or telling you what he was
19  going to do?
20    A. No, sir.
21    Q. Okay. Nobody likes being
22  suspended or fired; do you agree with that?
23    A. I would agree with that.
24    Q. Other than that time you saw
25  Mr. Blocker apparently on the property for

57

1  some reason -- I don't know, he may have been
2  getting his tools or something -- is there
3  any other time that you've seen him or . . .
4    A. I saw him at Wal-Mart.
5    Q. You just bumped into him out in
6  the --
7    A. Yes, sir.
8    Q. Okay. All right. He hasn't
9  called your home and done anything or --
10    A. No, sir, not that I'm aware of.
11    Q. -- threatened your kids or run
12  over your dog or anything?
13    A. No, sir.
14    Q. All right. Do you agree with
15  me that the allegations made in -- did you
16  look at her interview with these people, this
17  document, Exhibit 4?
18    A. I could have seen it before. I
19  don't remember.
20    Q. Okay. Well, other than the
21  complaints about Ron Blocker as a manager, do
22  you know anything that would disqualify him
23  from working as an hourly worker at Equity
24  Group?
25    A. Not that I would know of.

58

1    Q. I mean, best I can tell, he was
2  a pretty good hand, wasn't he, I mean, in
3  maintenance?
4    A. He was a good maintenance man.
5    Q. Okay. And he's got some
6  skills, some ability in that area. And I
7  assume y'all are hiring in that area?
8    A. Yes, sir.
9    Q. So do you know any reason he
10  can't go back to work there?
11    A. That would have to go through
12  probably Huntsville, because he was a
13  salaried employee before.
14    Q. Okay. Now, since this lawsuit,
15  have you talked to anybody or done any
16  investigation into the allegations the people
17  made against Ron Blocker?
18    A. No, sir.
19    Q. I mean, Alan Carpenter still
20  works there; have you talked to him about it?
21    A. No, sir.
22    Q. Talked to anybody?
23    A. No, sir.
24    Q. In fact, Alan quit working at
25  Equity Group for a period of time after Ron

Reb Bludsworth
May 30, 2008

59

1  was fired, didn't he?
2      A. Yes, he did.
3      Q. And he came back to work some
4  time later?
5      A. Yes, he did.
6      Q. But everybody else that was in
7  Ron's crew -- in fact, Mr. Bradford just got
8  fired, right, about two weeks ago?
9      A. Yes, sir. The point system got
10  him.
11      Q. Yeah. The guy y'all called
12  "Pork Chop" --
13      A. Yes, sir.
14      Q. -- he was in maintenance?
15      A. Yes, sir.
16      Q. Was he still on the third
17  shift?
18      A. Yes, sir.
19      Q. All right. So with the
20  exception of Mr. Carpenter, everybody that
21  was on his crew no longer works there, do
22  they?
23      A. I don't recall.
24      Q. You may not know -- I tell you
25  what, let me do this: Mr. McCartha, does he

60

1  still work there?
2      A. No, sir.
3      Q. Glenda Merritt doesn't work
4  there. She wasn't in his crew. She was the
5  supervisor. But she doesn't work there now?
6      A. No, she does not.
7      Q. Josh Bradford, he doesn't work
8  there?
9      A. No.
10      Q. And Rex Faircloth is deceased,
11  correct?
12      A. Yes, sir.
13      Q. Okay. How much are they making
14  out there in maintenance now with top hands
15  by the hour?
16      A. Top pays 17-something, I
17  believe.
18      Q. That's a pretty good job, isn't
19  it?
20      A. Yes, sir.
21      Q. I mean, there are not a lot of
22  places in Eufaula or around Eufaula that you
23  can make $17 an hour.
24      A. No, sir.
25      Q. You agree with that, don't you?

61

1      A. Yes, sir.
2      Q. If you work on the third shift,
3  though, are you just going to -- by the very
4  nature of it, are you going to work a lot of
5  hours?
6      A. That's most any shift.
7      Q. Really?
8      A. Yes, sir.
9      Q. Why do they work so many hours?
10  Do you know?
11      A. It's just part of being in
12  maintenance.
13      Q. Okay. And are there
14  maintenance crews on the first and second
15  shifts?
16      A. Yes, sir.
17      Q. But they do different types of
18  maintenance --
19      A. Yes, sir.
20      Q. -- while the plant's in
21  operation?
22      A. Yes, sir.
23      MR. ROBERSON: Okay. Let's
24      take a break. I'm about
25      through.

62

1      (Whereupon a brief recess was
2      taken.)
3  BY MR. ROBERSON:
4      Q. I'm going to show you what I've
5  marked as Exhibit 7, which is an employee
6  handbook from Keystone Foods.
7      (Whereupon Plaintiff's Exhibit
8      No. 7 was marked for
9      identification and attached
10      hereto.)
11      (Witness reviewed document.)
12      A. Yes, sir.
13      Q. Are you familiar with that? I
14  mean, have y'all got a handbook?
15      A. Yes, sir, we have handbooks.
16      Q. Okay. As the maintenance
17  foreman, do you sometimes have to enforce
18  those rules, work rules?
19      A. Yes, sir.
20      Q. Okay. Keystone has an overtime
21  policy, correct?
22      A. Yes, sir.
23      Q. On page 25. And it indicates
24  what they'll do about overtime on page 25 of
25  their policy, correct?

Reb Bludsworth
May 30, 2008

63

1              (Witness reviewed document.)
2          A.  Yes, sir.  This is the hourly
3   handbook.
4          Q.  Okay.  Well, Ron Blocker worked
5   for CP before he worked for Equity Group,
6   correct?
7          A.  Yes, sir.
8          Q.  And he worked for CP while they
9   operated the cook house, correct?
10         A.  Yes, sir.
11         Q.  In fact, he was the supervisor
12  over the cook house on the third shift for
13  CP, wasn't he?
14         A.  He was an hourly employee.
15         Q.  Exactly.  That's exactly my
16  point.  He worked as the supervisor as an
17  hourly employee for CP, correct?
18         A.  Wouldn't have been classed as a
19  supervisor.
20         Q.  Okay.  Well, who was the
21  supervisor?
22         A.  Would have been Phillip Malden
23  [phonetic].
24         Q.  What was his job position?
25         A.  He was the supervisor at that

64

1   plant.
2          Q.  At the whole plant --
3          A.  Yes, sir.
4          Q.  -- or over the cook house?
5          A.  Over the maintenance.
6          Q.  Okay.  Well, what was Ron
7   Blocker, then, just an hourly employee?
8          A.  Yes, sir.
9          Q.  Where is Mr. Malden; does he
10  still work for y'all?
11         A.  No, sir.
12         Q.  Where is he?
13         A.  He's with Cook Foods.
14         Q.  Was he fired?
15         A.  Yes, sir.
16         Q.  Well, was there any reason in
17  November of 2004 that Ron Blocker couldn't
18  have been paid by the hour and work as the
19  supervisor or be in charge of the crew on the
20  third shift?
21         MR. SMITH:  Object to the form.
22         Q.  You can answer.
23         A.  Equity wanted all supervision
24  to be salary; that is, they have no hourly
25  supervisors.  And to make me -- to make my

65

1   department more in line with the other
2   facilities, that was the reason we put
3   salaried personnel on the shifts.
4          Q.  Well, where did you get that
5   directive from?
6          A.  That would have come from
7   Spence Jernigan.
8          Q.  So he had to become salaried if
9   he wanted to be in charge of the shift?
10         A.  To be a salaried supervisor,
11  you have to be salary, yes, sir.
12         Q.  Well, can you be a supervisor
13  and not be on a salary?
14         A.  No, sir.
15         Q.  Okay.  Do y'all have leadmen?
16         A.  Yes, sir.
17         Q.  How much more do they make?
18         A.  There's not a different class
19  in maintenance for a lead.
20         Q.  All right.  So you can't have a
21  leadman in charge of the shift?
22         A.  Yes, sir.
23         Q.  You do, in fact, don't you?
24         A.  From time to time, yes, sir.
25         Q.  Any reason Ron Blocker couldn't

66

1   work as a leadman in charge of the third
2   shift?
3          A.  No, sir.
4          Q.  All right.  Do you recall any
5   conversation where Mr. Blocker, the same day
6   that he accepted the position, tried to back
7   out of it?
8          A.  No, sir.  I don't recall that.
9          MR. ROBERSON:  Okay.  Thank
10         you, sir.  Mr. Bludsworth,
11         we thank you.
12         MR. SMITH:  I don't have any
13         questions.
14         (The deposition of REB
15         BLUDSWORTH concluded at
16         approximately 12:11 p.m.)
17
18  * * * * * * * * * *
19         FURTHER DEPONENT SAITH NOT
20  * * * * * * * * * * *
21
22
23
24
25

67

```
 1        * * * * * * * * * *
 2            REPORTER'S CERTIFICATE
 3        * * * * * * * * * *
 4    STATE OF ALABAMA)
 5    COUNTY OF MONTGOMERY)
 6            I, Cornelia J. Baker, Certified
 7    Court Reporter, Certified Shorthand
 8    Reporter, and Notary Public in and for the
 9    State of Alabama at Large, do hereby certify
10    that on Friday, May 30, 2008, I reported the
11    aforementioned proceedings, and that the
12    pages herein contain a true and accurate
13    transcription of the said proceedings.
14            I further certify that I am
15    neither of kin nor of counsel to the parties
16    to said cause, nor in any manner interested
17    in the results thereof.
18            This the 4th day of June, 2008.
19
20
21
            Cornelia J. Baker, ACCR 290
22          Certified Shorthand Reporter,
            Certified Court Reporter and
23          Notary Public for the
            State of Alabama
24
25          My Commission expires 6/9/08.
```

65574c28-fd0e-4514-9176-891472a8f0d2

| A | | | | | |
|---|---|---|---|---|---|
| **ability** | 67:23 | 6:23 7:1 | **Bice** | 17:22 43:11,25 | 19:19 21:13 |
| 58:6 | **Alan** | **attached** | 37:18 | **Butch** | 33:2 40:16 |
| **abuse** | 58:19,24 | 62:9 | **Birmingham** | 23:2 | 43:25 |
| 52:15 | **allegation** | **Attorney** | 2:7 | | **Chop** |
| **accepted** | 52:23 | 2:6,11 | **Blocker** | **C** | 59:12 |
| 66:6 | **allegations** | **audience** | 1:5 6:11 12:19 | **California** | **Circle** |
| **access** | 38:23 39:1 | 11:24 | 13:11,18 14:3 | 8:2 | 2:7 |
| 37:8 | 52:17 57:15 | **available** | 15:9 16:2,16 | **call** | **circumstances** |
| **accountant** | 58:16 | 27:6,17 | 16:18,23 | 45:13 53:14 | 30:12 |
| 48:12 | **alleged** | **Avenue** | 20:19 21:9 | **called** | **Civil** |
| **ACCR** | 44:19 | 1:20 2:13 | 23:6,9,14 | 41:9 57:9 59:11 | 3:8 |
| 1:16 67:21 | **allow** | **aware** | 24:15 25:21 | **candidate** | **claims** |
| **accurate** | 25:24 | 26:7 29:11 34:3 | 29:19 31:6 | 16:24 17:2 | 25:22 31:6 |
| 67:12 | **answer** | 41:25 42:10 | 32:1 34:23 | **capacity** | **class** |
| **acquire** | 12:23 51:1,10 | 57:10 | 36:19 38:23 | 8:23 9:19 17:4 | 65:18 |
| 25:9 | 64:22 | **a-half** | 39:8 40:3,9 | **Carpenter** | **classed** |
| **acquired** | **answering** | 24:9 | 42:1,17 44:18 | 58:19 59:20 | 63:18 |
| 8:16 47:13 | 37:24 | **a.m** | 45:24 46:2,6 | **case** | **clean** |
| **act** | **antsy** | 1:18 | 47:1,5,11 51:7 | 1:7 3:21,24 | 19:17 20:4 21:2 |
| 56:7 | 56:9 | | 51:19 55:15 | 6:12,17,20,22 | 40:15 |
| **acting** | **anybody** | **B** | 56:25 57:21 | 7:5 55:10 | **cleaned** |
| 17:4 | 21:17 22:18 | **back** | 58:17 63:4 | **cattails** | 19:20 40:25 |
| **address** | 23:11,12 | 25:19 39:24 | 64:7,17 65:25 | 41:10 | **cleaning** |
| 7:15 | 38:17 39:3 | 49:14 55:25 | 66:5 | **cause** | 19:15 |
| **affiliated** | 58:15,22 | 58:10 59:3 | **blow** | 67:16 | **Cole** |
| 14:1 | **apart** | 66:6 | 55:24 | **certain** | 43:9,10 |
| **affirmative** | 19:14,16 | **backed** | **Bludsworth** | 28:21 30:11 | **Columbus** |
| 12:6,22 43:24 | **apparently** | 54:14 | 1:14 3:7,22 6:1 | **CERTIFICA...** | 11:14 |
| 54:17 | 56:25 | **bacteria** | 6:10 8:1 | 67:2 | **come** |
| **affirmed** | **APPEARAN...** | 22:1 | 66:10,15 | **Certified** | 22:20 23:5,8,11 |
| 6:3 | 2:2 | **bag** | **bonus** | 1:15 3:10 67:6 | 23:13,18 |
| **aforementioned** | **appropriately** | 18:1 | 28:2,5,22 | 67:7,22,22 | 31:19 35:4 |
| 67:11 | 55:22 | **Baker** | **bonuses** | **certify** | 42:5 46:13,16 |
| **afternoons** | **approve** | 1:15 3:9 67:6 | 28:11 29:7 | 67:9,14 | 55:25 65:6 |
| 32:6 | 35:7 | 67:21 | **Bradford** | **change** | **coming** |
| **age** | **approximately** | **based** | 59:7 60:7 | 15:21 25:17 | 44:19,21 |
| 7:17 | 1:18 9:17 10:14 | 28:13,14 | **Brag** | **charge** | **commencing** |
| **ago** | 11:21 15:22 | **batter** | 30:19,24 31:3 | 64:19 65:9,21 | 1:17 |
| 8:19 15:23 59:8 | 25:10 66:16 | 17:25 | **bread** | 66:1 | **commission** |
| **agree** | **area** | **began** | 17:25 | **Charlie** | 3:11 67:25 |
| 12:21 14:5 | 19:20 20:3,18 | 8:18,22 | **break** | 16:4 | **Commissioner** |
| 24:20 48:15 | 28:25 58:6,7 | **beginning** | 61:24 | **check** | 1:16 3:10 |
| 48:23 55:23 | **areas** | 14:2 | **brief** | 43:20 | **communicate** |
| 56:22,23 | 28:7 | **believe** | 62:1 | **checks** | 53:4 |
| 57:14 60:25 | **arrive** | 8:21 15:3 16:5 | **bring** | 38:15 | **comp** |
| **agreed** | 31:22 | 17:16 32:13 | 42:1 | **Cheenahatchee** | 48:4 |
| 3:5,19 4:3 6:6 | **asking** | 50:2 60:17 | **Brown** | 7:16 | **company** |
| **ain't** | 14:19 | **belts** | 44:17 | **Chem** | 11:14 27:23 |
| 48:11 | **assembly** | 19:17 | **Buck** | 11:16 | **complain** |
| **Al** | 18:8 | **benefits** | 15:11 | **chemical** | 44:22 45:22 |
| 11:1,8 | **assume** | 26:22 29:10 | **built** | 11:14 | **complaining** |
| **Alabama** | 22:17 58:7 | **best** | 40:23 | **chicken** | 45:11 |
| 1:2,21 2:7,13 | **Assurance** | 16:24 17:1 58:1 | **bumped** | 6:18,24 7:2 8:6 | **complaints** |
| 8:2 9:7 67:4,9 | 21:21,22 | **better** | 57:5 | 9:3 17:22 | 21:8 24:23 |
| | **assure** | 18:8 26:23 | **business** | 18:3,9,22 | 57:21 |

Complex
22:16,25
concern
23:6,9,13
concluded
66:15
conduct
38:24 39:7,15
52:11
conducted
55:21
considering
46:17
constructed
41:1,3
contact
54:6,9
contain
67:12
contained
52:3
conversation
26:1 45:3 46:2
66:5
cook
12:17 13:12,17
13:21 14:2
17:14,18,22
18:14,22
25:15,18 33:2
63:9,12 64:4
64:13
cooking
18:4 19:1,19
21:13
coordinate
20:24 22:5
Cornelia
1:15 3:9 67:6
67:21
corner
48:2
correct
14:16 17:16
18:5,22 19:21
21:3,4,6,14,15
22:6,20 23:18
25:19,20
27:18 29:1,14
33:5,8 48:1
50:12,15
60:11 62:21
62:25 63:6,9
63:17
counsel

3:5,20 4:4
67:15
COUNTY
67:5
Court
1:1,16 3:10
67:7,22
CP
6:19 8:10 10:18
12:5 25:14
47:13 50:4,10
63:5,8,13,17
crew
19:25 20:5,6
59:7,21 60:4
64:19
crews
21:13 33:1
61:14
criteria
28:6
cussing
56:13
C-H-E-M
11:17,18

**D**
D
5:2
daily
21:23
damaged
19:17
damages
19:18
date
15:24 33:13
34:17
day
18:18,25 31:24
32:9 34:14
35:20,20,24
36:16 53:19
66:5 67:18
days
36:5
deceased
60:10
decision
16:17 25:2
**Defendants**
1:10 2:10
department
14:15,20 24:16
28:7 37:12

65:1
**Depending**
33:4
depends
24:3,12 28:24
31:23
**DEPONENT**
66:19
deposition
1:14 3:6,8,16
3:22,23 4:5
6:13 7:9 13:6
33:12 66:14
different
51:4,4 61:17
65:18
directive
65:5
disability
27:4,8,13,16
51:2
disassemble
19:7
discuss
29:18
discussed
26:21 51:6
discussion
39:14
discussions
25:5 47:1
dismantle
19:14
disposed
7:5
dispute
31:9,13
disqualify
57:22
**DISTRICT**
1:1,2
**DIVISION**
1:3,8
document
33:11,14 34:16
49:4 51:21,25
52:4,10 57:17
62:11 63:1
documents
47:22
dog
57:12
doing
11:12 21:3
54:18,24

downtime
28:17,21 29:4
drive
7:16 39:19
driving
39:24
drove
39:21

**E**
E
5:2
earliest
24:6
education
7:23
effective
33:13 34:17
eight
24:8
eighty
31:7
eight-and
24:8
either
3:17,25 37:2
Eleven
9:15
eliminate
26:11
employee
5:8 17:5 29:20
46:17 50:9,11
58:13 62:5
63:14,17 64:7
employees
32:18 40:6 46:8
employment
8:18,22
enforce
62:17
engaged
38:23 52:15
ensure
18:17
Enterprise
9:12 44:16
environmental
42:15
Equity
1:8 8:16 10:18
25:8,13,18,23
26:8,25 27:8
27:15 37:3
47:14,15 49:2

49:22,24
50:11 55:24
57:23 58:25
63:5 64:23
Eufaula
1:8,20 2:13
7:16 12:5
33:17 60:22
60:22
everybody
59:6,20
evidence
3:16
exact
15:24
exactly
63:15,15
**EXAMINATI...**
5:4 6:18
examples
19:4
exception
59:20
Exhibit
5:7,8 33:11
35:21 47:10
51:18 57:17
62:5,7
expected
29:24 30:3
expires
67:25
explain
50:24 53:8
extent
7:22
extra
36:8,14

**F**
facilities
65:2
facility
8:7 12:17 21:18
25:9 42:2
fact
27:12 58:24
59:7 63:11
65:23
fair
19:1 30:6,9
Faircloth
60:10
familiar
9:10 33:14

62:13
family
27:1
Farms
9:2,14,20 10:1
10:9,14
felt
39:11
figure
48:1 50:4
filing
3:21 4:2
filled
16:5,13 17:6
filling
17:3
filtration
40:19
find
53:14
fine
15:25
finish
18:16
fire
46:6
fired
12:19 14:13
30:14 34:24
36:20 42:25
43:1 46:3,14
54:4 55:22
56:3,22 59:1,8
64:14
firing
35:2 46:17
first
6:2 8:23 16:17
30:17 36:23
47:24,25
61:14
first-shift
30:25 31:4
follows
6:5
Foods
5:8 62:6 64:13
foreman
12:14,15 14:4
46:13 62:17
form
3:13 50:25 51:9
51:15 64:21
formality
3:11

**FORMAX**
19:6,10
**forming**
19:12
**forth**
1:22
**forty-eight**
48:14
**Forty-seven**
7:18,19,20
**four**
48:13
**Frank**
44:17
**Fred**
20:15,20 21:9
**freeze**
18:1
**Friday**
1:17 67:10
**fry**
17:25
**further**
3:19 4:3 66:19
67:14
**F-150**
40:2

___ **G** ___

**GED**
7:24
**general**
10:18,19 11:3,9
20:18
**gentleman**
10:17 43:8
44:15
**getting**
43:9 56:9 57:2
**giant**
41:12
**Giles**
15:10,11 16:2,7
**Gilmore**
2:18 23:12
33:10 35:4
45:7,13
**give**
19:3 23:25 24:5
44:9
**given**
6:12
**Glenda**
22:9 23:8 60:3
**GMC**

39:20
**go**
40:18,19 49:13
58:10,11
**goes**
40:21,24
**going**
24:3 25:23 47:9
51:17 54:15
54:16 55:24
56:19 61:3,4
62:4
**good**
58:2,4 60:18
**gotten**
28:11 29:6
**Grainger**
44:11
**Greg**
10:4,23 16:21
25:22 33:23
44:25 45:4,7
**gross**
49:2,16
**group**
1:8 8:16 25:8
25:13,18,23
26:8 27:8,12
27:15 37:3
47:14,15 49:2
49:22,24
50:11 55:24
57:24 58:25
63:5
**grow**
7:25
**guess**
54:21
**gun**
55:25
**guy**
10:5 43:6 59:11

___ **H** ___

**hand**
58:2
**handbook**
5:8 62:6,14
63:3
**handbooks**
62:15
**handle**
37:13
**hands**
60:14

**happen**
46:21
**happened**
7:5 46:22
**hard**
46:9
**harvested**
42:6
**head**
13:2 50:19
**hear**
52:20 53:7
**heard**
55:9
**held**
13:9 14:20,21
**help**
11:23
**hereto**
3:18,25 62:10
**Higgins**
44:11
**High**
41:16
**hired**
8:23
**hiring**
58:7
**home**
57:9
**honestly**
14:23
**hour**
60:15,23 64:18
**hourly**
15:6 16:14 17:4
27:7,18 32:21
32:23,24 33:7
47:15 50:11
50:16 57:23
63:2,14,17
64:7,24
**hours**
24:9 29:23 30:3
30:7 31:7,10
32:9 44:22
45:12 50:21
61:5,9
**house**
54:14 63:9,12
64:4
**Howell**
42:18
**Huntsville**
58:12

**Hurt**
30:20
**Hyacinths**
41:18,19,20

___ **I** ___

**idea**
36:11
**identification**
62:9
**illegal**
40:10
**immediate**
50:13
**implemented**
33:16 34:1
**implementing**
25:25
**important**
19:20,21,22
20:23
**impression**
7:10
**improper**
39:11
**inappropriate**
38:24 39:7,14
55:16
**inappropriately**
56:7
**indicates**
62:23
**information**
37:9
**inside**
54:13
**inspection**
21:24
**instructed**
53:13
**instructing**
46:5
**instruction**
42:13
**insurance**
26:25 27:8,17
27:23 51:3
**interested**
13:8 67:16
**interview**
57:16
**introduced**
3:24
**investigation**
38:25 44:20

45:12 53:15
58:16
**involving**
6:17

___ **J** ___

**J**
1:15 3:9 67:6
67:21
**Jack**
9:7,8
**James**
15:20 30:19,24
31:3
**jdratty@char...**
2:8
**Jernigan**
11:6,7 65:7
**Jerry**
2:5 6:11
**Jim**
37:18 38:1
**job**
9:20 16:25 25:5
26:19 29:19
50:22 51:8
60:18 63:24
**JOEL**
2:11
**Josh**
60:7
**JR**
2:11
**June**
67:18   .

___ **K** ___

**Kathy**
2:18 35:4 37:7
45:7 51:22
52:4,16,20
53:1,8
**keep**
28:20 46:9
**keeping**
20:3
**Kenneth**
45:14,17,19
46:2,6
**Key**
15:20 16:3,11
**Keystone**
5:8 62:6,20
**kids**
57:11

**kin**
67:15
**kind**
19:8 40:19,24
46:15
**knew**
38:1
**know**
7:4 10:14 11:11
11:15,19
14:22 17:6,17
24:1 26:5,13
27:20,21,24
30:1,2,9 31:10
33:18,25 34:7
34:23,24
36:23 37:3,18
37:19 38:2,12
38:14 42:22
43:16 46:8,9
48:8 51:11,16
54:19,22 56:2
57:1,22,25
58:9 59:24
61:10
**knowing**
31:15
**knowledge**
33:22,24 39:7
**K-I-M**
11:17

___ **L** ___

**lack**
18:8
**Large**
67:9
**latest**
24:10
**law**
1:18 2:6,11
40:12
**lawsuit**
58:14
**lawyer**
7:9
**lead**
65:19
**leadman**
65:21 66:1
**leadmen**
65:15
**leave**
10:11,13,16
**left**

9:22 10:12
**leg**
30:20
**Let's**
61:23
**likes**
56:21
**limitations**
41:23
**line**
32:18 54:14
65:1
**lines**
18:8 41:16
**listed**
35:23
**little**
16:6 56:9
**located**
9:6,11 41:24
**location**
33:17
**long**
8:5 17:17 27:4
42:23
**longer**
59:21
**look**
47:21 57:16
**looked**
42:11
**looking**
13:25
**lot**
32:3,5 60:21
61:4
**lunchtime**
32:6
**L.L.C**
1:9,20 2:12

**M**
**machine**
19:12 55:25
**machinery**
40:15
**machines**
19:7,9 21:24
**maintenance**
8:24 9:22,25
10:2 12:14,15
12:20 13:10
13:17 14:4,7
14:15,20
15:14 18:12

18:25 19:5,25
20:24 21:3,17
22:5,12,16
24:15 25:4
28:18 29:3
32:11,23,24
33:1 35:12,18
35:19,23 36:3
36:15,18,24
40:6 58:3,4
59:14 60:14
61:12,14,18
62:16 64:5
65:19
**making**
17:10 47:5
50:23 52:17
60:13
**Malden**
63:22 64:9
**man**
58:4
**management**
27:7,16 28:1
29:10 52:12
**manager**
9:23 10:2,19,19
11:4,9 22:16
22:25 29:13
42:15 57:21
**manner**
3:25 67:16
**March**
25:10 50:2,14
**marked**
33:11 47:10
51:18 62:5,8
**McCartha**
59:25
**mean**
21:2 58:1,2,19
60:21 62:14
**meat**
18:3
**meet**
28:6
**meeting**
34:4,21
**meetings**
34:11
**member**
52:12
**mental**
52:15
**Merritt**

22:9,9 23:8
60:3
**metal**
43:3
**middle**
1:2 49:3,11
**Mills**
10:4 25:23
33:23 44:25
45:4,7
**Mobley**
16:4,13
**model**
39:20
**money**
51:14
**Montgomery**
42:7 67:5
**month**
48:6,19 49:25
**months**
48:14,17,21
50:7,8,9,10,15
50:16,22
53:24 54:8,12
**mornings**
32:4
**motors**
43:22,23 44:3,7
44:12
**multiple**
44:8

**N**
**N**
5:2
**name**
6:10 11:15
30:18 36:17
41:15 43:8,10
44:17
**names**
44:9
**nature**
24:12 61:4
**need**
3:14
**neither**
67:15
**never**
26:6 38:9
**new**
10:18
**nine**
8:7,19

**nod**
13:2
**normally**
7:9 24:1 31:21
**NORTHERN**
1:3
**Notary**
67:8,23
**November**
14:4,13 20:14
30:12 31:8
47:15,17
49:24 50:14
64:17
**number**
19:16 24:18
**numbers**
50:18

**O**
**Object**
50:25 51:9,15
64:21
**objections**
3:12,13
**observed**
39:10
**occasioned**
45:13
**occasions**
31:25
**occurred**
34:21
**odor**
6:22,24 7:2
**offer**
25:3
**offered**
3:16
**offering**
27:22
**office**
2:7 44:19,21
53:14
**offices**
1:18
**Oh**
10:16 20:9
28:18 34:6
36:21 43:15
48:8 49:12
54:19
**okay**
7:4,14 9:5 10:8
10:13,16,21

11:8,11 12:18
13:5,10,16,23
14:3,12 16:16
16:22 17:12
18:7,12,20
19:3,13,23
20:9 21:11,20
21:23 22:4,11
22:15,17 23:1
23:16,22,24
24:5 25:2,13
25:17 26:6,13
26:23 27:21
28:4,18,24
29:6,9,13
31:16 32:21
33:6,22,25
35:1,9 38:5,12
41:11,13,22
43:2,13 46:22
46:25 47:9,18
47:19 48:10
48:18,19,20
49:1,12,18,21
49:24 50:3,7
51:24 52:9,12
52:13,22 53:3
53:7,13,19,23
53:25 54:3,11
54:18,20,23
55:21 56:4,21
57:8,20 58:5
58:14 60:13
61:13,23
62:16,20 63:4
63:20 64:6
65:15 66:9
**old**
11:21
**older**
7:21
**Once**
6:16
**online**
28:16
**open-door**
22:18
**operated**
63:9
**operating**
13:20 17:18
25:15
**operation**
61:21
**Orange**

1:20 2:13
**order**
42:9
**orders**
33:4
**originally**
12:5
**Outside**
9:12
**overtime**
25:24,25 26:8
26:11 29:16
32:22 33:8
62:20,24
**owned**
8:12

**P**
**P**
2:11
**page**
5:4,7 49:3 53:4
55:7 62:23,24
**pages**
67:12
**paid**
26:25 29:14
32:22 33:7
36:15,19,24
37:20 38:6,13
38:18,20
64:18
**paper**
53:10
**par**
17:25
**Park**
2:7
**part**
19:23 47:12
55:10 61:11
**particular**
8:7 28:25
**parties**
3:6,20 6:6
67:15
**party**
3:17,25
**part-time**
11:13 12:2
**pay**
27:19 33:12
35:21 36:2,8
36:14 49:2,16
**paying**

35:9,11
**payroll**
37:11,14
**pays**
27:16 60:16
**Pelham**
45:14,17,20
46:3,6
**people**
13:9 21:12 27:7
32:31 33:7
45:11 51:4
57:16 58:16
**percentages**
28:21
**performance**
24:24
**period**
9:13 23:16
24:24 30:25
31:4,8 32:1
48:22 49:22
58:25
**permit**
42:8
**person**
15:3 36:17
**personal**
39:6,9,17 40:1
**personally**
38:14
**personnel**
35:22 65:3
**Phillip**
63:22
**phonetic**
16:4 22:9 63:23
**physical**
52:15
**picks**
43:6,18
**pickup**
39:20
**Pipes**
19:15
**place**
15:22
**places**
60:22
**Plaintiff**
1:6 2:4
**Plaintiff's**
5:8 62:7
**plant**
6:18 8:6 9:3

13:12,17,21
14:2 17:14,18
17:22 18:15
20:18 25:15
25:19 28:14
31:5 40:16
41:15 43:20
64:1,2
**plants**
20:20 41:6,23
42:2,9,14
**plant's**
61:20
**point**
11:3 59:9 63:16
**policy**
22:18 25:25
26:8 27:12
33:12,17 34:1
35:17,21,22
62:21,25
**pond**
42:7
**ponds**
40:23 42:3
**Pork**
59:12
**position**
12:13,20 13:9
13:13 14:6,8,9
14:21 15:1,4,6
16:19 17:11
17:13 22:12
25:3 26:16
47:16 63:24
66:6
**possible**
32:7
**possibly**
30:9
**Potthoff**
1:19 2:12
**prepare**
18:25
**preparing**
18:2,4
**presence**
56:8
**present**
2:17 34:7 51:22
**pressure**
26:10
**pretty**
58:2 60:18
**prior**

17:10
**probably**
11:25 58:12
**problem**
13:4 22:19
24:13
**Procedure**
3:8
proceedings
67:11,13
**proceeds**
18:9
**process**
21:24
**produces**
28:14
**product**
17:25
**production**
18:16 28:13
29:3
**profit**
27:25 28:1
**program**
28:3
**promote**
16:18
**promoted**
14:4 24:19
**property**
54:13 56:25
**provided**
3:18 4:1
**Public**
67:8,23
**pumps**
19:15
**purchased**
27:17 44:2,4
**purpose**
3:17
**pursuant**
1:21 3:7
**put**
42:3 65:2
**p.m**
66:16

_____
**Q**

**QA**
21:19 22:8,10
22:22,25,25
**Quality**
21:20,22
**question**

52:6
**questions**
3:12,13 66:13
**quick**
50:19
**quit**
30:14 42:25
58:24
**quite**
52:5

_____
**R**

**range**
24:1,6
**raw**
17:24 18:3
**reading**
4:5 49:10
**ready**
18:18 19:17
**really**
14:1 61:7
**reason**
27:21 47:11
51:11 57:1
58:9 64:16
65:2,25
**reasons**
51:5,7
**REB**
1:14 3:6,22 6:1
66:14
**rebuild**
44:16
**rebuilt**
44:12
**recall**
12:11 20:13
21:10 23:7,10
23:15 24:14
26:1 34:6,14
34:15,20,22
34:25 36:21
36:22 37:1
39:16,25 40:5
40:8 41:15
44:18,21,23
44:24 45:2,5,8
45:9,16,17,19
45:25 46:1,4,5
46:7 47:1,24
52:2 53:2
59:23 66:4,8
**receipts**
43:17,19

**receive**
21:7
**recess**
62:1
**recommendat...**
35:5
**record**
13:2
**records**
37:4
**recruited**
10:21,23 11:8
**reduce**
26:11 28:20
**reeds**
41:12
**reflect**
48:22 49:21
**regardless**
4:1
**remember**
6:20 7:8,12,13
13:24 14:23
15:2,8,24 17:8
17:19 26:17
26:18 27:11
30:16,24 31:2
43:15 47:5
49:25 52:21
52:12 57:19
**remind**
13:1
**Repair**
19:17
**rephrase**
52:7
**replaced**
11:3 15:9
**report**
10:2 23:17
**reported**
52:14 67:10
**Reporter**
1:16 3:10 67:7
67:8,22,22
**REPORTER'S**
67:2
**reporting**
10:5
**represent**
6:11
**representing**
2:4,10 3:5,20
**reserved**
3:15

**residence**
7:14
**respect**
18:14
**response**
12:6,22 43:24
50:13 54:17
**responsibility**
18:14 20:3
**restarted**
17:13
**results**
53:15 67:17
**reviewed**
47:22 49:4
51:21 62:11
63:1
**Rex**
60:10
**Rhodes**
11:1,2,8,12,22
**right**
12:25 14:11
15:13,18,25
17:20 25:21
28:8 36:13
38:22 47:4
48:5,24,25
50:17,20
51:13 53:16
55:5 56:4
57:8,14 59:8
59:19 65:20
66:4
**right-hand**
48:2
**Roberson**
2:5,6,6 5:5 6:9
6:11 11:23
30:17,20,23
49:7,12,15
55:12,14
61:23 62:3
66:9
**Robert**
15:10
**role**
35:1
**Ron**
1:5 6:11 13:11
15:9 16:16,18
16:22 17:10
17:12 21:8,9
23:6,9,13
24:14 26:14

| | | | | | |
|---|---|---|---|---|---|
| 26:19 29:19 | 53:22 54:7,11 | 59:17 61:2,6 | 46:11,21,24 | **Spence** | 36:18,24 |
| 34:23 36:19 | 56:24 57:4 | 63:12 64:20 | 47:3 48:16,25 | 11:7 65:7 | 46:19 47:6 |
| 40:3,9 42:17 | **saying** | 65:9,21 66:2 | 49:20 50:6 | **spot** | 48:23 49:23 |
| 42:17 45:24 | 12:2 52:18 | **shifts** | 52:1,7 53:6 | 49:8 | 50:23 60:5 |
| 47:11 51:7,19 | **says** | 12:8 18:21 | 54:5,25,25,25 | **staff** | 63:11,16,19 |
| 53:5,8,21,22 | 33:12 34:16 | 61:15 65:3 | 55:2,8,20 | 34:4,11,20 | 63:21,25 |
| 54:11 57:21 | 35:17 52:10 | **Shipping** | 56:12,15,17 | **start** | 64:19 65:10 |
| 58:17,25 63:4 | **schedule** | 21:19 | 56:20 57:7,10 | 18:18 56:13 | 65:12 |
| 64:6,17 65:25 | 23:22 | **short** | 57:13 58:8,18 | **started** | **supervisors** |
| **Ron's** | **scrap** | 27:5 | 58:21,23 59:9 | 25:18 | 35:10,12 36:3 |
| 59:7 | 43:2 | **Shorthand** | 59:13,15,18 | **startup** | 38:13 64:25 |
| **rules** | **second** | 67:7,22 | 60:2,12,20,24 | 17:14,15 | **supervisor's** |
| 3:7 13:6,6 | 15:17 18:17 | **show** | 61:1,8,16,19 | **State** | 26:19 |
| 62:18,18 | 49:1 61:14 | 47:9 51:17 62:4 | 61:22 62:12 | 67:4,9,23 | **sure** |
| **ruling** | **second-shift** | **shown** | 62:15,19,22 | **statement** | 12:16 25:7 |
| 3:15 | 30:13 | 33:10 | 63:2,7,10 64:3 | 19:1 | 26:21 27:9,14 |
| **run** | **see** | **sign** | 64:8,11,15 | **STATES** | 29:12,22 32:3 |
| 18:18 50:18 | 19:24 32:5 | 51:24 | 65:11,14,16 | 1:1 | 37:7,13 55:6 |
| 57:11 | 34:17 35:25 | **signed** | 65:22,24 66:3 | **Station** | **Surplus** |
| **running** | 37:8 44:25 | 38:9 51:25 | 66:8,10 | 11:16 | 43:9,10 |
| 12:7 | 45:6,7,10 | **signing** | **sit** | **Statute** | **suspend** |
| | 47:23 48:1 | 4:5 | 51:18 | 3:18 4:1 | 56:6 |
| _____ | 49:3,19 50:5 | **sir** | **sixteen** | **stay** | **suspended** |
| **S** | **seen** | 6:25 7:3,7,15 | 32:8 | 24:11 | 51:20,23 52:11 |
| **SAITH** | 38:15 42:22 | 8:11,14,17,21 | **sixth** | **stayed** | 53:5,9,20 56:5 |
| 66:19 | 57:3,18 | 9:1,4,9,18 | 35:20 | 8:15 | 56:22 |
| **salaried** | **select** | 10:7,10,12,22 | **skills** | **stipulated** | **suspension** |
| 14:8,9,14 15:3 | 16:22 | 10:24 11:5,7 | 58:6 | 3:4,19 4:3 | 44:20 |
| 16:8,11,14,15 | **send** | 11:10 12:9,24 | **slot** | **stipulations** | **sworn** |
| 16:18 17:9,11 | 43:20 | 13:7,15 14:16 | 17:10 | 1:21 3:2 6:7 | 6:2 |
| 29:20 47:16 | **set** | 14:18 15:12 | **Smith** | **studio** | **system** |
| 50:8,23 58:13 | 1:21 31:20 | 15:15,17 | 1:19 2:1,11,12 | 11:24 | 40:20,22 59:9 |
| 65:3,8,10 | **seven** | 16:10,12 | 7:11 30:19,22 | **suggesting** | |
| **salary** | 36:5 50:7,10,14 | 17:15 18:6,11 | 37:19,23 38:2 | 54:23 | _____ |
| 29:14,21 37:14 | 50:16,21 | 18:23 19:2 | 38:5 48:11 | **Suite** | **T** |
| 47:6 64:24 | **seventh** | 22:21,23 | 49:5,8,13 | 2:7 | **take** |
| 65:11,13 | 35:20,24 36:16 | 23:23 24:21 | 50:25 51:9,15 | **Sunday** | 15:21 17:24 |
| **sales** | **seventy** | 25:1,12,16 | 55:4,9 64:21 | 36:14 | 19:14,16 |
| 28:14 29:2 | 11:25 | 26:3,9,12 27:2 | 66:12 | **superintendent** | 26:20 48:9 |
| **salesman** | **sharing** | 28:10,12,23 | **somebody** | 31:5 | 49:25 50:8,9 |
| 11:20 | 27:25 28:1 | 29:5,8,15,17 | 14:25 15:5 | **supervision** | 50:22 61:24 |
| **sanitation** | **sheet** | 29:25 32:17 | 37:15 46:14 | 22:19 64:23 | **taken** |
| 19:18,21,22 | 38:10 | 32:20 33:15 | 54:22 | **supervisor** | 1:15 3:7,9 62:2 |
| 20:8,24 21:11 | **She'd** | 33:21 34:2,19 | **Somewhat** | 8:24 12:11,20 | **talk** |
| 21:16 | 37:8 | 35:3,6,8,15,16 | 8:4 | 13:10,17 14:7 | 39:3 46:13,16 |
| **sanitized** | **shift** | 36:1,6,9 37:5 | **sorry** | 14:14 15:14 | 53:21 54:1 |
| 20:4 | 12:15 13:25 | 37:17 38:8,11 | 12:24 19:8 41:3 | 15:19 16:1,8 | 55:3 |
| **Saturday** | 14:17 15:16 | 38:19,21 39:2 | **sounds** | 16:11 17:7,10 | **talked** |
| 33:2,7,12 35:21 | 15:17 16:2,5,9 | 39:5,9,12,18 | 14:11,16 | 18:13 20:10 | 29:21 58:15,20 |
| 36:7,19,25 | 18:13,17,19 | 39:23 40:11 | **source** | 21:8 22:10 | 58:22 |
| 38:7,14 | 18:24 19:5 | 40:13,17 41:5 | 26:7 | 24:19 25:4 | **talking** |
| **Saturdays** | 20:11 21:14 | 41:8 42:12,20 | **South** | 26:16,24 30:4 | 12:13 32:24,25 |
| 32:12,16,19 | 23:17 26:14 | 43:4,12,21 | 1:20 2:13 | 30:14 31:1,4 | 49:5 |
| 35:10,14 36:4 | 26:15 30:17 | 44:6,13 45:9 | **speak** | 32:12 35:18 | **tear** |
| **saw** | 38:24 39:4 | 45:15,18,21 | 6:3 | 35:19,23 | 19:6 |
| 32:1,3 39:10 | | | | | **technician** |

Reb Bludsworth
May 30, 2008

| | | | | | |
|---|---|---|---|---|---|
| 9:25 | 54:7,12 | 7:21 10:15 | **Wal-Mart** | 22:5 23:17,20 | 30:22 33:1 |
| **tell** | **time** | 18:21 48:21 | 57:4 | 24:15,24 | 37:21 38:4 |
| 17:23 29:23 | 3:14,15 9:13 | 50:8 53:24 | **want** | 29:24 30:4,15 | 42:3 46:20 |
| 40:14 51:20 | 13:25 23:16 | 54:7,12 59:8 | 18:20 49:13 | 31:19,22 32:2 | 47:25 53:19 |
| 52:16,16,19 | 24:4,25 28:16 | **types** | 55:6 | 32:8,12,15,19 | 55:19 59:11 |
| 52:20,23 54:3 | 30:25 31:4,8 | 61:17 | **wanted** | 33:6 35:10 | **year** |
| 58:1 59:24 | 31:19,20,21 | | 51:13 64:23 | 36:3,5,7,13 | 15:23 24:16 |
| **telling** | 32:2 34:21 | ____ U ____ | 65:9 | 40:3,7 58:10 | 47:8,13,17 |
| 30:8 56:18 | 36:23 42:4,23 | **uh-huh** | **wasn't** | 60:1,3,5 | 48:6,15,17 |
| **term** | 45:23 46:23 | 11:18 12:6,22 | 14:1 17:9 58:2 | 60:7 61:2,4,9 | 50:17,24 |
| 18:8 27:5,5 | 46:23 48:22 | 13:3 43:12,24 | 60:4 63:13 | 62:18 64:10 | **years** |
| **terms** | 49:9,10,22,22 | 54:17 | **wastewater** | 64:18 66:1 | 7:21 8:8,19 |
| 19:4 | 56:24 57:3 | **unbecoming** | 40:21 | **worked** | 9:15 24:18 |
| **test** | 58:25 59:4 | 52:11 | **water** | 8:9,25 10:1,8 | **y'all** |
| 22:1 | 65:24,24 | **understand** | 40:15,18,24 | 14:12 16:8 | 10:11 12:14 |
| **testified** | **times** | 11:2 13:7 20:1 | **way** | 20:17,20 | 13:20 17:13 |
| 6:5 | 6:15 48:13 | 52:5 | 18:10 31:14 | 21:12 25:24 | 17:17 30:13 |
| **thank** | **tips** | **UNITED** | **Wayne** | 31:7,11,16 | 34:9 35:9,11 |
| 66:9,11 | 48:3 | 1:1 | 9:2,14,20 10:1 | 45:20,23 | 36:2 40:23 |
| **thereof** | **today** | **unusual** | 10:8,13,20 | 47:12,14,16 | 42:19,24 43:2 |
| 67:17 | 13:1 | 46:12,15 | **week** | 48:21 50:20 | 43:5,17,18,22 |
| **They'd** | **told** | **Upset** | 29:24 34:12,13 | 63:4,5,8,16 | 44:12 58:7 |
| 27:18 | 25:22 26:19 | 56:11 | 53:14,25 | **worker** | 59:11 62:14 |
| **thing** | 30:7 37:25 | **use** | **weeks** | 57:23 | 64:10 65:15 |
| 45:1 | 38:17 51:22 | 40:14 43:22,23 | 10:15 59:8 | **workers** | |
| **things** | 52:3,4 | **usual** | **went** | 27:18 | ____ $ ____ |
| 19:16 22:2 | **tools** | 6:7 | 8:13 13:19 | **working** | **$115** |
| **think** | 57:2 | **usually** | 24:15 44:25 | 8:5 11:13 12:1 | 35:10 36:3,10 |
| 16:20 17:9 | **top** | 24:8 28:7 | 45:6,7,10 | 13:14 26:14 | **$17** |
| 48:24 | 49:17 60:14,16 | | **weren't** | 26:15 28:8 | 60:23 |
| **third** | **transcription** | ____ V ____ | 13:20 | 30:8 35:14 | **$4,000** |
| 12:15 13:25 | 67:13 | **vandalism** | **wetlands** | 36:25 38:7,13 | 48:6,18 |
| 14:17 15:16 | **transport** | 52:22,24 | 41:2,4 | 44:22 50:15 | **$40,000** |
| 16:1,8 18:13 | 42:9 | **varies** | **we're** | 57:23 58:24 | 49:2 50:15,21 |
| 18:24 19:5 | **transported** | 31:23 | 55:7 | **works** | **$48,000** |
| 20:10 21:13 | 42:14 | **vehicle** | **we've** | 18:10 20:10 | 47:7 48:5,19 |
| 23:17 26:15 | **traveled** | 39:17 40:1 | 50:3 | 58:20 59:21 | 50:23 |
| 38:24 39:4 | 8:3 | **vendor** | **White** | **wouldn't** | **$75,000** |
| 50:3 59:16 | **trial** | 44:7 | 23:2 | 27:22 31:10,14 | 50:17 |
| 61:2 63:12 | 3:24 | **vendors** | **Williams** | 37:4 46:15 | **$8,000** |
| 64:20 66:1 | **tried** | 44:8 | 1:19,19 2:12,12 | 48:7 63:18 | 48:22 |
| **third-shift** | 66:6 | **visited** | **witness** | **Wyoming** | **$8,355** |
| 12:10,20 13:10 | **truck** | 44:25 | 4:4,6 6:2 37:25 | 8:2 | 47:25 |
| 13:16 15:19 | 39:22 40:4,7 | **vs** | 38:4 47:22 | **W-2** | **$8,355.51** |
| 30:4 32:11 | **true** | 1:7 | 49:4 51:21 | 49:1 | 48:3 |
| **Thomas** | 67:12 | | 62:11 63:1 | **W-2s** | |
| 20:16 21:9 | **truth** | ____ W ____ | **word** | 47:11,12,20 | ____ 0 ____ |
| **threatened** | 6:3,4,4 | **wages** | 48:9 | | **04** |
| 55:16 57:11 | **try** | 48:3 | **words** | ____ X ____ | 20:14 30:12 |
| **threatening** | 12:25 52:7 | **waiting** | 55:23 | **X** | 31:8 |
| 56:16 | **trying** | 54:21 | **work** | 5:2 | **05** |
| **three** | 12:18 | **waived** | 8:13 9:14,20 | | 20:14 30:13 |
| 12:7 45:11 | **twelve** | 3:23 4:6 | 12:4 14:19 | ____ Y ____ | 31:9 |
| 47:11,12,20 | 48:13,14,16 | **waiving** | 19:5,20 20:3 | **yeah** | |
| 50:9 53:24 | **two** | 4:2 | 20:25 21:3,5 | 13:20 14:10 | ____ 1 ____ |

Reb Bludsworth
May 30, 2008

**1**
33:11 35:21
**1st**
14:13 47:17
**1,600**
46:8
**11:01**
1:18
**12:11**
66:16
**125**
1:20 2:13
**13,800-and-so...**
50:5
**150**
2:7
**17th**
14:14 34:24
  51:19 53:20
**17-something**
60:16
**1996**
39:20 40:2
**1999**
8:19

— **2** —
**2:07cv722M...**
1:7
**2004**
14:5,13 23:3
  25:11 39:21
  43:13 50:11
  64:17
**2005**
14:14 23:3
  33:13 34:17
  39:22 43:13
**2008**
1:17 67:10,18
**205**
2:8
**25**
62:23,24
**290**
1:16 67:21

— **3** —
**30**
1:17 67:10
**334**
2:14
**35223**
2:7
**36072**

2:13
**37,919**
49:6

— **4** —
**4**
57:17
**4th**
67:18
**40,004**
49:17

— **5** —
**5**
51:18

— **6** —
**6**
5:5 47:10
**6/9/08**
67:25
**62**
5:8
**687-5834**
2:14

— **7** —
**7**
5:8 62:5,8

— **8** —
**8**
2:7
**88**
9:16

— **9** —
**9**
23:19
**9th**
33:13 34:17
**9:30**
23:19
**98**
8:20
**981-3906**
2:8
**99**
8:21 9:16 28:9

# CORRECTIVE ACTION FORM

DATE 5-2-05

Ron F. Blocker          Maint.                    Supervisor
EMPLOYEE NAME          DEPARTMENT                 JOB TITLE

**REASON FOR INTERVIEW:**        ☐ Job Performance

☒ Other

Lock out and tag out Violation

EMPLOYEE STATEMENT _____

_____

_____

_____                Ron F. Block
                                                EMPLOYEE SIGNATURE

**INTERVIEWER STATEMENT AND ACTION TAKEN**

Employee is suspended for three days
for failing to follow lock out and tag out
Violation. If this occurs again, further
disciplinary action will be taken including
and up to termination.

_____

_____                5/2/05
SUPERVISOR SIGNATURE                PERSONNEL MANAGER SIGNATURE

☐ Verbal Warning          ☒ Written Warning          ☐ 1 Day Suspension
☐ 3 Day Suspension        ☐ Termination              ☐ Counseling
          BLUE: PERSONNEL    WHITE: SUPERVISOR    CANARY: EMPLOYEE

Liberty Group
28

Saturday Pay Policy
Equity Group Eufaula

**Scope:** This policy applies to all Salaried exempt employees

**Purpose:** To establish the guidelines by which Equity Group Eufaula will determine compensation for Saturday production work when it is to further the company's economic status within the current marketplace.

**Effective Date:** May 9th, 2005

**POLICY:**

I General Guidelines –
- The affected personnel from this policy are listed below:
  - Live Haul Supervisor
  - Further Processing
  - Fresh Processing Supervisor, Superintendent, and Shift Manager
  - QA Supervisor and Haccp Coordinator
  - Maintenance Supervisor
  - Sanitation Supervisor

- If required, under special circumstances, an HR Shift Manager and/or an Accounting Manager may be required also

- The amount to be paid will be $ 115.00 per Saturday

- If the employee does not work his weekly schedule, there will be no Saturday pay.

II Definition
- Saturday pay qualification is determined by the company's desire to enhance its economic status within the current marketplace and not because of poor performance, weather, mechanical issues, etc.

**Equity Group – Al. Division**
**Eufaula, Al.**
**Managers \ Supervisors 6th and 7th Day Approval**

Pay Period (Week
Ending): _____

Submitted By: _____          Date: _____

Dept. Manager
Signature: _____          Date: _____

Plant Manager
Signature: _____          Date: _____

| Employee # | Employee Name | 6th Day - Date | 7th Day - Date | No. Days |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Remarks: _____
_____
_____

On Monday, May 16, 2005, Kenneth Pelham called and said that he needed to tell me what was happening on 3rd shift in maintenance. He said that he was hired as the 3rd shift tool man and that he had "a lot of problems". He said that he got fired and "took a lot of abuse, mentally and physically". He started telling me about how the boys hit him in his back and on his head. I made an appointment with him for the following day Tuesday, May 17, 2005, at 9:00 a.m.


INTERVIEW WITH KEN PELHAM

Ken said that had been working almost 90 days and he got fired because he missed days because of his attendance. Ken said it was because of his blood pressure dealing with the situation at work. He said that there were a lot of things going on that shift. He said that the guys that work on that shift are young and they have hit him on the back three times in his kidneys. He said that it hurts so bad sometimes that he has trouble moving. He said that they hit people in the head with tools when they have their hard hats on. He named Alan Carpenter, John Bradford, Rex Faircloth and Kelvin Heath. He said that they lock him up in the cage. They throw bolts over into the cage and hit in the head. Alan hit him with a box in the head and it almost knocked him out. He said that someone threw something one time and busted his lip.

Ken said that Ron humiliates him by calling in "tool boy" and tells him to "go get in your cage". He says stuff like this in front of people and it is embarrassing. He says that Ron intimidates people. He saw one of the guys hit Jim Allen in the head with the wrench and he went down on the ground. He mentioned Darrell McCartha and Glenda Merritt knowing this activity is going on. He says that Ron sleeps in his office. He has also seen Rex Faircloth asleep.

In regards to the money machine being vandalized, he said that all of them (the maintenance folks) were on break and he saw Alan Carpenter put $5.00 in the machine. When the machine did not give him change back, Alan shook the machine and slammed it up against the wall. He said that Ron and the whole maintenance crew was in the break room when this happened. He has seen Ron try to get free chips out of the vending machine. When the sign went up offering $500.00 for information to who did the damage, Ken jokingly stated that he could use $500.00. Ron told him that "$500.00 would probably benefit your family but it won't you". Ken is a little scared of Ron because he knows what he is "capable of".

Ken said that Alan Carpenter was the one who terminated him. He said that he kept trying to call Ron to find out about his being out and Alan got and the phone and told him he didn't work here anymore. He said that he was on medication for his blood pressure but since all this stuff was going on 3rd shift; his blood pressure has been extremely high.

He said that when he came to the Company he had planned on making this place his "retirement place" but he says he cannot work under the conditions that are on that 3rd shift maintenance.

INTERVIEW WITH DARRELL MCCARTHA

Darrell is now on 1st shift maintenance because of personal problems but he also said that because the 3rd shift maintenance was so bad he would've quit if he had to stay on that shift.

He said that it is a "big game" on that shift. There is a lot of playing. He says that everyone hits everyone on the hard hats with their tools. He says that when he first came to Ron's shift he thought the world of Ron. Now, however, he says that he had no respect for him at all. Darrell says that Ron will "stab you in the back" if you don't watch yourself. Darrell also said that he doesn't believe half of what Ron says. He has seen Ron asleep in his office. He has never seen Alan asleep.

Darrell has watched all the guys pick on Ken Pelham. He says that Ken used to ride to work with him and there were days that he had marks on him from things striking him while he worked in the cage. Ken got hit in the back a couple of times one night and he could tell that Ken was having trouble getting out of the vehicle. Darrell has heard Ron make comments belittling Ken in front of the guys. He tells him to "get back in your cage" and calls him the "tool boy". He said that the behavior with Ken got "out of hand."

Darrell says that he saw the guys hit Jim Allen on the head a couple of times— one with a wrench and another time with another hard hat. He said that Jim Allen quit because of his treatment. He says that Alan Carpenter does it and he has seen Rex Faircloth also hit people on the head. Darrell says that Ron doesn't control his guys and just "lets go on what lets go on".

Darrell said that a week ago when the man got burned, Ron was very upset that he got suspended. He questioned Darrell about why he didn't get suspended. In a group of people, he would make snide comments about "some people got special treatment" because of the incident.

Darrell said that he never saw Alan tear the machine down, but he did hear the guys tells Ron that "you got it" when Ron was shaking the machine to get out some chips. He says that he has seen Ron shake the machines and make the statement that he could "tear the machines apart." He said that when the sign was put up about the reward about the vending machine it was a big joke with all the guys. He said that Ken was playing around and told them that he could sure use $500.00. Ron made that "well the $500.00 won't do you any good but it would your family".

Ron had a couple of meetings with the guys and told them that if they felt that the horseplay was "too much" then he will stop it! Darrell also stated that Ron reeked of alcohol sometimes.

INTERVIEW WITH GLENDA MERRITT

Glenda has observed Ron asleep as his desk. She states that one morning she had to call him three times before he woke up. She says that there is a lot of horse playing on that shift. She has seen the guys pulling on and aggravating each other. She says that she has seen them duck tape Clay Corbin's tools together and she watch them punch holes in his drink cans so that when he drank it would go all over him.

Glenda says that they all walk around and hit each other in the hard hats with their wrenches. Ron humiliates his employees by talking down to them in a demeaning manner in front of others. He has an "arrogant attitude" towards everyone. Just a couple of weeks ago, Darrell McCartha wanted to transfer to another department and she had an opening in QA. Ron wasn't there so she went to Reb to ask him if it was O.K. Reb told her that it was O.K. She said that when Ron came back to work, he was not happy at all about Darrell wanting to transfer. She said that he would make snide, degrading comments to her in front of people.

She says that Ron feels like he should not have been suspended because of the safety violation a few weeks ago. She says he fusses about it and she tells him that she was suspended too and that they should have been suspended!

Glenda says that she has seen Rex sleeping—he sleeps all the time. Glenda says that Ron is aware that Rex sleeps. She believes that Clay quit because of Ron. Glenda says that Clay was a very good worker and he had just taken all he could. She says that he was real rough with Ken Pelham. Ron would tell him to "stay in his cage" and would call him "tool boy". Glenda says that he is very intimidating to people.

INTERVIEW WITH JAMES BRAGG

The biggest problem with Ron that James has is that when James comes in to work, they are late starting up because none of the equipment is ready to start up. He doesn't understand what they do at night so that when the plant is ready to start up, they aren't ready. When James leaves every evening, the Maintenance office is cleaned up with no chairs. When he gets in the office every morning, there are cigarettes and cigarette butts all over the floor and all the chairs are moved back into the office.

James feels that Rex is the most mistreated by Ron because Ron is always complaining about him. He has heard Ron threaten to fire Rex. He has also heard that Rex has taken pictures of Ron asleep on his digital camera. He has seen all of Ron's guys hitting on the hard hats with tools. He has also witnessed the guys hitting others in the groin with their hard hats. He has had to warn Josh Bradford and Alan Carpenter about not playing on his shift. He has told them that "we don't play like ya'll do". He said that when he told them this they kind of hung their heads and told him O.K. James has also seen Alan and Josh slap people on the back. James did see the guys hit Ken Pelham on the head with their wrenches.

When Jim Allen was here, he has seen Ron's guys pick on him. James said that Jim was actually scared to talk to anyone about the situation. Ken Pelham did call James the other day crying talking to him about how the guys are punching and beating on him. He has heard Ron make racial comments. James said that Marcus Young, a black male, worked here awhile back. James said Marcus was a sharp individual that presents himself to be very professional. Marcus was put on Ron's shift and quit work after being employed about three week. He called James and told him that he could not work with Ron because he was a racist and he didn't feel that he could work for him.

James has heard Ron constantly humiliate and intimidate his people. He says that Ron "doesn't have a clue as to how to talk to people".

## INTERVIEW WITH ALAN CARPENTER

Alan says that everyone on that 3rd shift maintenance does play around. He says that they do hit each other on the hard hats with wrenches. Alan says that he did hit Ken Pelham on the back but he did "tap" him on the butt a few times. He says that they have locked people in the cage, but it was "just a joke". He says that they have tossed a few small nuts and bolts into the cage but to his knowledge has never hit anyone. Alan said that everyone on that shift, including Ken, played around.

Alan did say that he has seen Ron "dozing" in his office. He has also witnessed Rex being asleep.

About the vandalism of the change machine, Alan says that he did not tear up the machine. He says that when he went into the break room the machine was already on the floor and him and Josh Bradford picked it up. He said that it was beat up but he heard change in it so he got $5.00 worth of change out of the machine—he said that it still worked.

## INTERVIEW WITH JOSH BRADFORD (a.k.a. Pork chop)

About the vandalism:  Josh said that they walked into the break room and that the machine was on the floor and he helped Alan set it up. He said that he didn't see anyone put any money to get change into it. He said that it was so beat up that he didn't understand why anyone would want to try to get change out of it. He didn't see Alan try to get any money out of the machine because "he went to the bathroom" right after they set the machine back up.

Josh has never witnessed anyone sleeping. He says that 3rd shift is "rough" because nobody there to supervise. All of them do "tap" each other on the hard hats. He says that only times that they meet in the offices was when they had safety meetings.

Josh said that he knew that Ron had been suspended because it was his understanding that Ron had called Alan at home and told him

INTERVIEW WITH REX FAIRCLOTH

Rex admitted that he did sleep during the shift. He also stated that he has witnessed Ron asleep. He said that they "pick" on each other at night to make the night go quicker. He said that they do hit each other on their hard hats but not hard. He said that they really don't have any supervision because they all know what they need to do. He says that Ron doesn't intimidate him but he is a "pretty big fellow".

Rex said that he didn't see anyone tear up the machine in the break room. He said that he was the last one to leave the Shop when they were going to break so he was lagging behind the others. All he saw was Alan and Josh setting up the machine.

*Kathy Gilmore*

*5-24-2005*



Equity Group Eufaula Div.  •  57 Melvin Clark Road
Eufaula, AL 36027  •  (334) 687-7790  •  Fax (334) 687-7779

To:    Ron Blocker                          Date:  May 17, 2005

Re:    Conduct Unbecoming              From:  Reb Bludsworth
       Of Management


You are being suspended for five (5) days for conduct unbecoming of a member of management of this company.  It has been reported that there has been numerous reports of physical and mental abuse and vandalism in areas that you are managing. There will be an investigation into these allegations.

Your are to contact Human Resources on Tuesday, May 24, 2005, for the results of this investigation.


_____          5-17-05
Ron Blocker                               _____
                                          Date

_____
Reb Bludsworth

# 2004 W-2 and EARNINGS SUMMARY

**ADP**

| | |
|---|---|
| Wages, tips, other comp. **8335.98** | 2 Federal income tax withheld **918.99** |
| 3 Social security wages **8355.51** | 4 Social security tax withheld **518.04** |
| 5 Medicare wages and tips **8335.51** | 6 Medicare tax withheld **121.15** |
| a Control Number **001184** 15/B&F Dept. **72A** Corp. **A** | Employer use only **12** |
| b Employer's name, address, and ZIP code | |

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

Batch #00584

| | |
|---|---|
| b Employer's FED ID number **05-0596460** | d Employee's SSA number |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C **19.53** |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| | |
|---|---|
| 15 State Employer's state ID no. **AL 421008** | 16 State wages, tips, etc. **8355.51** |
| 17 State income tax **296.46** | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

Safe, accurate, FASTI Use — **e-file** — Visit the IRS Web Site at www.irs.gov.

## W-2 Wage and Tax Statement 2004
Copy C for employee's records    OMB No. 1545-0008

© 2004 AUTOMATIC DATA PROCESSING, INC.

---

**This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.**

**1. The following information reflects your final 2004 pay stub plus any adjustments submitted by your employer.**

| | | | | | |
|---|---|---|---|---|---|
| Gross Pay | 8335.98 | Social Security Tax Withheld Box 4 of W-2 | 518.04 | AL State Income Tax Box 17 of W-2 | 296.46 |
| | | | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 918.99 | Medicare Tax Withheld Box 6 of W-2 | 121.15 | | |

**2. Your Gross Pay Was Adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AL State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 8,335.98 | 8,335.98 | 8,335.98 | 8,335.98 |
| Plus GTL (C-Box 12) | 19.53 | 19.53 | 19.53 | 19.53 |
| Reported W-2 Wages | 8,355.51 | 8,355.51 | 8,355.51 | 8,355.51 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile Information, ____ ____ your payroll dept.

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

Social Security Number:
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 0
STATE: $30 Yearly Exemption

· · · · · · Fold and Detach Here · · · · · ·

---

| | |
|---|---|
| 1 Wages, tips, other comp. **8355.51** | 2 Federal income tax withheld **918.99** |
| 3 Social security wages **8355.51** | 4 Social security tax withheld **518.04** |
| 5 Medicare wages and tips **8355.51** | 6 Medicare tax withheld **121.15** |
| a Control Number **001184** 15/B&F Dept. **72A** Corp. **A** | Employer use only **12** |

b Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

| | |
|---|---|
| b Employer's FED ID number **05-0596460** | d Employee's SSA number |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a C **19.53** |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| | |
|---|---|
| 15 State Employer's state ID no. **AL 421008** | 16 State wages, tips, etc. **8355.51** |
| 17 State income tax **296.46** | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

### W-2 Wage and Tax Statement 2004
Federal Filing Copy    OMB No. 1545-0008

---

| | |
|---|---|
| 1 Wages, tips, other comp. **8355.51** | 2 Federal income tax withheld **918.99** |
| 3 Social security wages **8355.51** | 4 Social security tax withheld **518.04** |
| 5 Medicare wages and tips **8355.51** | 6 Medicare tax withheld **121.15** |
| a Control Number **001184** 15/B&F Dept. **72A** Corp. **A** | Employer use only **12** |

b Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

| | |
|---|---|
| b Employer's FED ID number **05-0596460** | d Employee's SSA number |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a C **19.53** |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| | |
|---|---|
| 15 State Employer's state ID no. **AL 421008** | 16 State wages, tips, etc. **8355.51** |
| 17 State income tax **296.46** | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

### W-2 Wage and Tax Statement 2004
AL State Reference Copy    OMB No. 1545-0008

---

| | |
|---|---|
| 1 Wages, tips, other comp. **8355.51** | 2 Federal income tax withheld **918.99** |
| 3 Social security wages **8355.51** | 4 Social security tax withheld **518.04** |
| 5 Medicare wages and tips **8355.51** | 6 Medicare tax withheld **121.15** |
| a Control Number **001184** 15/B&F Dept. **72A** Corp. **A** | Employer use only **12** |

b Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

| | |
|---|---|
| b Employer's FED ID number **05-0596460** | d Employee's SSA number |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a C **19.53** |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| | |
|---|---|
| 15 State Employer's state ID no. **AL 421008** | 16 State wages, tips, etc. **8355.51** |
| 17 State income tax **296.46** | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

### W-2 Wage and Tax Statement 2004
AL State Filing Copy    OMB No. 1545-0008

# 2004 W-2 and EARNINGS SUMMARY

ADP

| 1 Wages, tips, other comp. 13180.30 | 2 Federal income tax withheld 1653.40 |
|---|---|
| 3 Social security wages 13180.30 | 4 Social security tax withheld 817.18 |
| 5 Medicare wages and tips 13180.30 | 6 Medicare tax withheld 191.11 |

| a Control Number 0025\_\_ 15/VCJ | Dept. 62A | Corp. A | Employer use only 80 |
|---|---|---|---|

c Employer's name, address and ZIP code

CHAROEN POKPHAND USA INC
4356 DONCASTER DR
ELLICOT CITY MD 21043

Batch #00709

| b Employer's FED ID number 72-1347128 | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State Employer's state ID no. AL   338724 | 16 State wages, tips, etc. 13180.30 |
|---|---|
| 17 State income tax 477.10 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

Safe, accurate, FAST! Use — IRS e-file — Visit the IRS Web Site at www.irs.gov.

**W-2** Wage and Tax Statement **2004**
Employee Reference Copy
Copy Employee's records.      OMB No. 1545-0008

---

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2004 pay stub plus any adjustments submitted by your employer.

| Gross Pay | 13803.94 | Social Security Tax Withheld Box 4 of W-2 | 817.18 | AL State Income Tax Box 17 of W-2 | 477.10 |
|---|---|---|---|---|---|
| | | | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 1653.40 | Medicare Tax Withheld Box 6 of W-2 | 191.11 | | |

2. Your Gross Pay Was Adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AL State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 13,803.94 | 13,803.94 | 13,803.94 | 13,803.94 |
| Less Other Cafe 125 | 623.64 | 623.64 | 623.64 | 623.64 |
| Reported W-2 Wages | 13,180.30 | 13,180.30 | 13,180.30 | 13,180.30 |

3. Employee W-4 Profile. To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

Social Security Number
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 0
STATE: $30 Yearly Exemption

© 2004 AUTOMATIC DATA PROCESSING, INC.

- - - Fold and Detach Here - - -

---

| 1 Wages, tips, other comp. 13180.30 | 2 Federal income tax withheld 1653.40 |
|---|---|
| 3 Social security wages 13180.30 | 4 Social security tax withheld 817.18 |
| 5 Medicare wages and tips 13180.30 | 6 Medicare tax withheld 191.11 |

| a Control Number 002559 15/VCJ | Dept. 62A | Corp. A | Employer use only 80 |
|---|---|---|---|

c Employer's name, address, and ZIP code

CHAROEN POKPHAND USA INC
4356 DONCASTER DR
ELLICOT CITY MD 21043

| b Employer's FED ID number 72-1347128 | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State Employer's state ID no. AL   338724 | 16 State wages, tips, etc. 13180.30 |
|---|---|
| 17 State income tax 477.10 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
Federal Filing Copy
OMB No. 1545-0008

---

| 1 Wages, tips, other comp. 13180.30 | 2 Federal income tax withheld 1653.40 |
|---|---|
| 3 Social security wages 13180.30 | 4 Social security tax withheld 817.18 |
| 5 Medicare wages and tips 13180.30 | 6 Medicare tax withheld 191.11 |

| a Control Number 002559 15/VCJ | Dept. 62A | Corp. A | Employer use only 80 |
|---|---|---|---|

c Employer's name, address, and ZIP code

CHAROEN POKPHAND USA INC
4356 DONCASTER DR
ELLICOT CITY MD 21043

| b Employer's FED ID number 72-1347128 | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State Employer's state ID no. AL   338724 | 16 State wages, tips, etc. 13180.30 |
|---|---|
| 17 State income tax 477.10 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
AL State Reference Copy
OMB No. 1545-0008

---

| 1 Wages, tips, other comp. 13180.30 | 2 Federal income tax withheld 1653.40 |
|---|---|
| 3 Social security wages 13180.30 | 4 Social security tax withheld 817.18 |
| 5 Medicare wages and tips 13180.30 | 6 Medicare tax withheld 191.11 |

| a Control Number 002559 15/VCJ | Dept. 62A | Corp. A | Employer use only 80 |
|---|---|---|---|

c Employer's name, address, and ZIP code

CHAROEN POKPHAND USA INC
4356 DONCASTER DR
ELLICOT CITY MD 21043

| b Employer's FED ID number 72-1347128 | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State Employer's state ID no. AL   338724 | 16 State wages, tips, etc. 13180.30 |
|---|---|
| 17 State income tax 477.10 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
AL State Filing Copy
OMB No. 1545-0008

# 2004 W-2 and EARNINGS SUMMARY

**ADP**

| | |
|---|---|
| 1 Wages, tips, other comp. 37919.36 | 2 Federal income tax withheld 4711.86 |
| 3 Social security wages 37919.36 | 4 Social security tax withheld 2351.00 |
| 5 Medicare wages and tips 37919.36 | 6 Medicare tax withheld 549.83 |
| a Control Number 002559 15/B&E | Dept. 72A | Corp. T | Employer use only 139 |

**Employer's name, address, and ZIP code**

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

Batch #00416

b Employer's FED ID number 05-0596460
d Employee's SSA number

7 Social security tips
8 Allocated tips

9 Advance EIC payment
10 Dependent care benefits

11 Nonqualified plans
12a See instructions for box 12

14 Other
12b
12c
12d
13 Stat emp. Ret. plan 3rd party sick pay

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 421008 | 37919.36 |
| 17 State income tax 1376.78 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

Safe, accurate, FASTI Use **irs e-file** Visit the IRS Web Site at www.irs.gov.

**W-2** Wage and Tax Statement **2004**
Employee Reference Copy
Corp. Employee's records.
OMB No. 1545-0008

## Earnings Summary

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2004 pay stub plus any adjustments submitted by your employer.**

| | | | | | |
|---|---|---|---|---|---|
| Gross Pay | 40004.51 | Social Security Tax Withheld Box 4 of W-2 | 2351.00 | AL. State Income Tax Box 17 of W-2 | 1376.78 |
| | | | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 4711.86 | Medicare Tax Withheld Box 6 of W-2 | 549.83 | | |

**2. Your Gross Pay Was Adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AL. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 40,004.51 | 40,004.51 | 40,004.51 | 40,004.51 |
| Less Other Cafe 125 | 2,085.15 | 2,085.15 | 2,085.15 | 2,085.15 |
| Reported W-2 Wages | 37,919.36 | 37,919.36 | 37,919.36 | 37,919.36 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

Social Security Number:
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 0
STATE: $30 Yearly Exemption

© 2004 AUTOMATIC DATA PROCESSING, INC.

— Fold and Detach Here —

| 1 Wages, tips, other comp. 37919.36 | 2 Federal income tax withheld 4711.86 |
|---|---|
| 3 Social security wages 37919.36 | 4 Social security tax withheld 2351.00 |
| 5 Medicare wages and tips 37919.36 | 6 Medicare tax withheld 549.83 |
| a Control Number 002559 15/B&E | Dept. 72A | Corp. T | Employer use only 139 |

Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

b Employer's FED ID number 05-0596460
d Employee's SSA number

7 Social security tips
8 Allocated tips

9 Advance EIC payment
10 Dependent care benefits

11 Nonqualified plans
12a See instructions for box 12

14 Other
12b
12c
12d
13 Stat emp. Ret. plan 3rd party sick pay

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 421008 | 37919.36 |
| 17 State income tax 1376.78 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
Federal Filing Copy
Copy B to be filed with employee's Federal Income Tax Return.
OMB No. 1545-0008

| 1 Wages, tips, other comp. 37919.36 | 2 Federal income tax withheld 4711.86 |
|---|---|
| 3 Social security wages 37919.36 | 4 Social security tax withheld 2351.00 |
| 5 Medicare wages and tips 37919.36 | 6 Medicare tax withheld 549.83 |
| a Control Number 002559 15/B&E | Dept. 72A | Corp. T | Employer use only 139 |

Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

b Employer's FED ID number 05-0596460
d Employee's SSA number

7 Social security tips
8 Allocated tips

9 Advance EIC payment
10 Dependent care benefits

11 Nonqualified plans
12a

14 Other
12b
12c
12d
13 Stat emp. Ret. plan 3rd party sick pay

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 421008 | 37919.36 |
| 17 State income tax 1376.78 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
AL. State Reference Copy
Copy 2 to be filed with employee's State Income Tax Return.
OMB No. 1545-0008

| 1 Wages, tips, other comp. 37919.36 | 2 Federal income tax withheld 4711.86 |
|---|---|
| 3 Social security wages 37919.36 | 4 Social security tax withheld 2351.00 |
| 5 Medicare wages and tips 37919.36 | 6 Medicare tax withheld 549.83 |
| a Control Number 002559 15/B&E | Dept. 72A | Corp. T | Employer use only 139 |

Employer's name, address, and ZIP code

EQUITY GROUP EUFAULA
DIVISION LLC
57 MELVIN CLARK RD
BAKERHILL AL 36027

b Employer's FED ID number 05-0596460
d Employee's SSA number

7 Social security tips
8 Allocated tips

9 Advance EIC payment
10 Dependent care benefits

11 Nonqualified plans
12a

14 Other
12b
12c
12d
13 Stat emp. Ret. plan 3rd party sick pay

e/f Employee's name, address and ZIP code

RON F. BLOCKER
43 ROCKY MT. CHURCH
ROAD
EUFAULA, AL 36027

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AL | 421008 | 37919.36 |
| 17 State income tax 1376.78 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

**W-2** Wage and Tax Statement **2004**
AL. State Filing Copy
Copy 2 to be filed with employee's State Income Tax Return.
OMB No. 1545-0008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **RON BLOCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | **Case No.: 2:07cv722MHT-WC** |
| | ) | |
| **EQUITY GROUP EUFAULA** | ) | |
| **DIVISION, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF RON BLOCKER

**Comes Now** Ron Blocker and under penalty of perjury alleges as follows:

My name is Ron Blocker. I am the Plaintiff in the above styled lawsuit. I worked at the chicken plant in Eufaula, Alabama operated by CP from approximately 1999 until its sale in 2004. I continued to work there after the sale when it was acquired by Equity Group. All my supervisors, Kathy Gilmore, Reb Bludsworth and Greg Mills all worked for both CP and Equity Group. These were the people who were involved in the decision to terminate me after I had made complaints regarding their tricking me into taking a salaried supervisor's job by telling me that overtime was being cut out by Equity Group. I do not presently ever being made aware of any complaint by James Allen while I was a supervisor prior to my discharge.

I have read the above statement and I declare that it is true and correct under penalty of perjury.

*Ron F. Blocker*

Ron Blocker